UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

JOE W. PEEPLES, III,

                                        Plaintiff,

                                                                3:19-cv-00868
v.                                                              (TJM/TWD)


FBI AGENT CHRIS FIORITO, et al.,

                                        Defendants.
_____

APPEARANCES:                                    OF COUNSEL:

JOE W. PEEPLES, III
  *Plaintiff, pro se*
40425-048
USP POLLOCK
U.S. PENITENTIARY
Inmate Mail/Parcels
P.O. BOX 2099
POLLOCK, LA 71467

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

**ORDER AND REPORT-RECOMMENDATION**

        The Clerk has sent to the Court an amended complaint submitted by *pro se* Plaintiff Joe

W. Peeples, III ("Plaintiff" or "Peeples") asserting claims under 42 U.S.C. § 1983 arising out of

his January 5, 2017, arrest, and subsequent detainment, prosecution, and conviction.  (Dkt. No.

9.[1])  Plaintiff, who is now a federal prison inmate, has not paid the filing fee and seeks leave to

_____

        [1]  Plaintiff filed his original complaint on or about July 18, 2019.  (Dkt. No. 1.)  On July
22, 2019, the Court administratively closed this action due to Plaintiff's failure to comply with
the filing fee requirement.  (Dkt. No. 4.)  On March 13, 2020, Plaintiff filed an amended
complaint.  (Dkt. No. 9.)  On April 9, 2020, Plaintiff provided a complete application to proceed
*in forma paupers* ("IFP Application") and this action was restored to the Court's active docket.
(Dkt. Nos. 10, 12.)

proceed *in forma pauperis*.  (Dkt. No. 10.)  Named as Defendants are FBI Agent Chris Fiorito, FBI Agent John Bokal, Binghamton Sheriff, Binghamton PD Lock-up, and U.S. Dept. of Justice ("DOJ").[2]

## I.      IFP APPLICATION

A court may grant *in forma pauperis* status if a party "is unable to pay" the standard fee for commencing an action.  28 U.S.C. § 1915(a)(1).  As noted, Plaintiff has submitted a completed and signed IFP Application, which demonstrates economic need.  (Dkt. No. 10.) Plaintiff has also filed the inmate authorization form required in this District.  (Dkt. No. 11.) Accordingly, Plaintiff's IFP Application is granted.[3]

## II.     SUFFICIENCY OF THE AMENDED COMPLAINT

### A.      Standard of Review

Having found that Plaintiff meets the financial criteria for commencing this action *in forma pauperis*, and because Plaintiff seeks relief from an officer or employee of a governmental entity, the Court must consider the sufficiency of the allegations set forth in the amended complaint in light of 28 U.S.C. § 1915(e) and 28 U.S.C. § 1915A.

---

[2]  The DOJ was not listed as a Defendant in the caption of the original complaint.  (Dkt. No. 1.)  The Clerk is directed to amend the caption to add the U.S. Dept. of Justice as a Defendant.

[3]  Section 1915 permits "an indigent litigant to commence an action in a federal court without prepayment of the filing fee that would ordinarily be charged."  *Cash v. Bernstein*, No. 09-CV-1922, 2010 WL 5185047, at *1 (S.D.N.Y. Oct. 26, 2010).  "Although an indigent, incarcerated individual need not prepay the filing fee at the time of filing, he must subsequently pay the fee, to the extent he is able to do so, through periodic withdrawals from his inmate accounts."  *Id.* (citing 28 U.S.C. § 1915(b) and *Harris v. City of New York*, 607 F.3d 18, 21 (2d Cir. 2010)).  Plaintiff should also note that although his IFP Application has been granted, he will still be required to pay fees that he may incur in this action, including copying and/or witness fees.

Section 1915(e) of Title 28 United States Code directs that when a plaintiff seeks to proceed *in forma pauperis*, "the court shall dismiss the case at any time if the court determines that . . . the action . . . (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B).[4]  Thus, even if a plaintiff meets the financial criteria to commence an action *in forma pauperis*, it is the court's responsibility to determine whether the plaintiff may properly maintain the complaint that he filed in this District before the court may permit the plaintiff to proceed with this action in forma pauperis.  *See id*.

Similarly, under Section 1915A, a court must review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint . . . is frivolous, malicious, or fails to state a claim upon which relief may be granted; or . . . seeks monetary relief from a defendant who is immune from such relief."  28 U.S.C. § 1915A; *see also Carr v. Dvorin*, 171 F.3d 115, 116 (2d Cir. 1999) (per curiam) (Section 1915A applies to all actions brought by prisoners against government officials even when plaintiff paid the filing fee); *Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007) (stating that both Sections 1915 and 1915A are available to evaluate prisoner *pro se* complaints).

Additionally, when reviewing a complaint, the Court may also look to the Federal Rules of Civil Procedure.  Rule 8 of the Federal Rules of Civil Procedure provides that a pleading which sets forth a claim for relief shall contain, *inter alia*, "a short and plain statement of the

---

[4]  To determine whether an action is frivolous, a court must look to see whether the complaint "lacks an arguable basis either in law or in fact."  *Neitzke v. Williams*, 490 U.S. 319, 325 (1989).

claim showing that the pleader is entitled to relief.  *See* Fed. R. Civ. P. 8(a)(2).  The purpose of Rule 8 "is to give fair notice of the claim being asserted so as to permit the adverse party the opportunity to file a responsive answer, prepare an adequate defense and determine whether the doctrine of res judicata is applicable."  *Hudson v. Artuz*, No. 95 Civ. 4768, 1998 WL 832708, at *1 (S.D.N.Y. Nov. 30, 1998) (quoting *Powell v. Marine Midland Bank*, No. 95-CV-0063 (TJM), 162 F.R.D. 15, 16 (N.D.N.Y. June 23, 1995) (other citations omitted)).

A court should not dismiss a complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  While the court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Id*. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id*. (citing *Twombly*, 550 U.S. at 555).  Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Id*.  Thus, a pleading that contains only allegations which "are so vague as to fail to give the defendants adequate notice of the claims against them" is subject to dismissal.  *Sheehy v. Brown*, 335 F. App'x 102, 104 (2d Cir. 2009).

Where a plaintiff proceeds *pro se*, the pleadings must be read liberally and construed to raise the strongest arguments they suggest.  *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008) (citation omitted).  A *pro se* complaint should not be dismissed "without giving leave to amend at least once when a liberal reading of the complaint gives any indication

that a valid claim might be stated." *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 795 (2d Cir. 1999) (citation and quotation marks omitted). An opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).

### B.    Summary of the Amended Complaint

The following facts are set forth as alleged by Plaintiff in the amended complaint, which also references two federal actions, Case 6:17-cr-06032, captioned *United States v. Joseph W. Peeples, III*, filed in the Western District of New York ("W.D.N.Y.") and Case 3:17-mc-00026, captioned *Joseph W. Peeples v. United States*, filed in the Northern District of New York ("N.D.N.Y."). (*See generally* Dkt. No. 9.[5])

On January 5, 2017, Plaintiff was "free in travel" in Binghamton, located in the N.D.N.Y. when FBI Agent John Bokal "made an independent decision to force himself beyond the locked doors of The Grand Royale Hotel located at 79 Collier St. and detain [Plaintiff] without any attempts at summons, writ, or warrant under Federal Law F.R.C.P Rule 5(1)(A)." *Id*. at 1-2.[6] Plaintiff claims Bokal "willfully and intentionally did circumvent all applicable federal law regarding his unsupportable seizure of [Plaintiff's] body against his will" and violated his "civil rights under 'Miranda.'" *Id*. at 2.

Thereafter, Bokal "hands [Plaintiff's] body to jailers at the Binghamton PD Lock-up; where [he] was booked, photographed, finger printed, stripped totally nude and required to

---

[5] The Court notes the allegations in Plaintiff's amended complaint are substantially similar to those in his original complaint. (Dkt. Nos. 1, 9.)

[6] Page references to documents identified by docket number refer to the numbers assigned by the CM/ECF docketing system maintained by the Clerk's Office. Excerpts from the record are reproduced exactly as they appear in the original and errors in spelling, punctuation, and grammar have not been corrected.

expose his anus and cough out loud 2x, and placed in a cell-block with other inmates." *Id*. at 2-3. The next morning, FBI Agent Chris Fiorito, "walked into Binghamton PD and kidnapped [Plaintiff's] body against [his] will without any legal writ, warrant, summons, or indictment." *Id*. at 3. Plaintiff was transferred approximately 200 miles to the W.D.N.Y. in violation of the "law" and his "civil rights" and "[e]specially after totally booking [Plaintiff] and stripping him but naked and peering in his anus." *Id*. at 3-4.

Plaintiff claims "Binghamton PD Jail is 100% liable for several plain violations of [his] civil rights." *Id*. at 4. "However, they would not have been so if there was proper lawful receiving and discharging papers." *Id*. "By law agents can't travel with detainees without any paper-work." *Id*.[7]

Thereafter and pursuant to the Freedom of Information Act, Plaintiff requested his "booking and release papers" from Binghamton PD Lock up, but there was "no answer" because the "W.D.N.Y. U.S. Atty. who is also liable in this criminal cover up says on record under oath there is no paperwork." *Id*. at 5. Plaintiff asserts "no one arrested in America should/can't by law be arraigned without a legally sworn signed affidavit warrant on file or indictment!" *Id*. at 7.

Plaintiff claims he was "robbed" of his "due process preliminary hearing in [the] District of arrest to have an impartial mind determine probable cause for arrest." *Id*. at 9. "Upon kidnapping and arrival back in W.D.N.Y. for arrignment in court open for business said member of court illegally allowed [Plaintiff] to be arraigned without any live/real signature on any document referring to entire criminal complaint/warrant and a blank jurat on affidavit by

---

[7] Plaintiff contends it is "criminal" to "hand over a prisoner without anything because the clerk of the jail had to docket and log something!" (Dkt. No. 9 at 4.) He notes "someone was charged for Mr. Peeples stay and meal and phone calls! What if Mr. Peeples and those agents would have died in a roll over crash? What proof of Mr. Peeples identity would have been in that car?" *Id*.

complaining agent." *Id*.  Therefore, "by undisputed fact [Plaintiff] was arraigned without a signed criminal complaint or warrant (filed by clerk on record 1-6-17) or indictment." *Id*. at 10. Plaintiff was "brought 200 miles in violation of every law and given a verbal sentence to jail without no check and balance by signature of magistrate empowered to administer oath." *Id*. "To be certain [Plaintiff] ha[s] without doubt according to law been deprived of [his] constitutional right to 'due process' after warrantless indictmentless arrest." *Id*.  He also was "forced to trial." *Id*. at 9.

Plaintiff has "suffered different pains, punishment, and loss of property, life, liberty, and freedom intentionally because color of [his] skin." *Id*.  According to Plaintiff, his constitutional rights have been violated under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments, and "others." *Id*. at 5.  Plaintiff claims he was "kidnapped, sexually asulted, held, and handed over without due process." *Id*.  Plaintiff seeks monetary damages and requests "this case be returned to the U.S. Attorney for review for several criminal charges related to the cover-up of the usurpation of this citizen." *Id*.  He also requests that the Attorney General be notified of the foregoing for "referral of criminal charges or an investigation." *Id*. at 6.

For a complete statement of Plaintiff's claims and the facts he relies on which he relies in support of those claims, reference is made to the amended complaint.  (Dkt. No. 9.)

C.    **Nature of Action**

Plaintiff brings this action pursuant to 42 U.S.C. § 1983, which establishes a cause of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws of the United States." *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 508 (1990). "Section 1983 itself creates no substantive rights, [but] . . . only a procedure for redress for the

deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) (citation omitted).

A plaintiff cannot hold a defendant liable under Section 1983 unless he or she can establish that the defendant acted under color of state law. *See* 42 U.S.C. § 1983; *see also Rounseville v. Zahl*, 13 F.3d 625, 628 (2d Cir. 1994) (noting state action requirement under Section 1983). In order to recover damages in a civil rights action, plaintiff must allege a defendant's direct or personal involvement in the alleged constitutional deprivations. *Farrell v. Burke*, 449 F.3d 470, 474 (2d Cir. 2006); *see also Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) ("It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'") (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)). Thus, "a Section 1983 plaintiff must 'allege a tangible connection between the acts of the defendant and the injuries suffered." *Austin v. Pappas*, No. 04-CV-7263, 2008 WL 857528, at *2 (S.D.N.Y. Mar. 31, 2008) (quoting *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986)).

If the defendant is a supervisory official, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of respondeat superior) is insufficient to show his or her personal involvement in that unlawful conduct. *Polk Cty. v. Dodson*, 454 U.S. 312, 325 (1981); *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003); *Wright*, 21 F.3d at 501; *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985). In other words, supervisory officials may not be held liable merely because they held a position of authority. *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996). Rather, supervisory officials may be considered "personally involved" if they (1) directly participated in the violation; (2) failed to remedy that violation after learning of it through a report or appeal; (3) created, or allowed to

continue, a policy or custom under which the violation occurred; (4) had been grossly negligent in managing subordinates who caused the violation; or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).

Similarly, a "municipality cannot be held liable solely on a theory of respondeat superior." *Anderson v. Cty. of Nassau*, 297 F. Supp. 2d 540, 546 (E.D.N.Y. 2004). In order to sustain a claim for relief under Section 1983 against a municipal defendant, a plaintiff must show the existence of an officially adopted policy or custom that caused injury and a direct causal connection between that policy or custom and the deprivation of a constitutional right. *Bd. of County Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 403 (1997) (citing *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658 (1978)); *see also Vippolis v. Vill. of Haverstraw*, 768 F.2d 40, 44 (2d Cir. 1985) ("The plaintiff must first prove the existence of a municipal policy or custom in order to show that the municipality took some action that caused his injuries beyond merely employing the misbehaving officer.")

Additionally, in light of Plaintiff's status as a *pro se* litigant, the Court also considers whether the amended complaint states claims cognizable under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).[8] *See Morales v. City of New York*, 752 F.3d 234, 237 (2d Cir. 2014) (holding that district court properly construed § 1983 claims brought against federal employee as arising under *Bivens*); *see also Feldman v. Lyons*, 852 F. Supp. 2d 274, 278 (N.D.N.Y. 2012); *McQueen v. United States*, No. 9:19-CV-0998 (TJM/CFH), 2019 WL 4221545, at *3 (N.D.N.Y. Sept. 5, 2019). "*Bivens* actions, although not precisely

---

[8] In *Bivens*, the Supreme Court "recognized for the first time an implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights." *Correctional Services Corp. v. Malesko*, 534 U.S. 61, 66 (2001).

parallel to actions pursuant to 42 U.S.C. § 1983 against state actors, are the analog to such

actions; and the constitutional standard of review is the same for either type of action."

*McQueen*, 2019 WL 4221545, at *3 (citing *Tavarez v. Reno*, 54 F.3d 109, 110 (2d Cir. 1995)

(per curiam)).  Thus, federal courts have "typically incorporated § 1983 law into *Bivens* actions."

*Tavarez*, 54 F.3d at 110.

### D.     Analysis

As set forth above, Plaintiff alleges violations of his constitutional rights under the

Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments when, *inter alia*, he was seized,

searched, detained, held, handed over, and kidnaped without due process, indicted, and forced to

trial.  Plaintiff also claims he was denied equal protection of the laws and Defendants engaged in

"criminal conspiracy."

#### 1.     Claims against DOJ

It is unclear from the amended complaint what, if any, claims are alleged against the

DOJ.  Plaintiff lists the DOJ as a Defendant in the caption of the amended complaint, yet makes

no factual allegations against this Defendant in the body of the amended complaint.

While a plaintiff may bring a *Bivens* action against a federal agent who engages in

unconstitutional conduct under color of his authority, a lawsuit cannot be maintained against the

agency for which the official works, such as the DOJ, which generally enjoys sovereign

immunity from suit.  *See Bivens*, 403 U.S. at 410.  Since the United States is entitled to sovereign

immunity, and has not expressly waived that immunity, Plaintiff cannot maintain his claim for a

violation of his constitutional rights against the DOJ.  *See id.*; see also *Corr. Servs. Corp. v.

Malesko*, 534 U.S. 61, 72 (2001) (holding that plaintiff could not bring a *Bivens* claim against the

United States or the employing federal agency, the BOP); *see also Philippeaux v. United States*,

10

No. 19-CV-3221, 2019 WL 2082549, at *3 (S.D.N.Y. May 13, 2019) ("A *Bivens* action must be brought against an individual for the individual's own acts and may not be brought against federal agencies." (internal citations omitted)).

Therefore, the Court recommends that the amended complaint be dismissed in its entirety with prejudice as against the DOJ pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b).

### 2.     Claims against Binghamton PD Lock-up

Plaintiff names the Binghamton PD Lock-up as a Defendant.  However, "[a] police department cannot sue or be sued because it does not exist separate and apart from the municipality and does not have its own legal identity."  *Baker v. Willett*, 42 F. Supp. 2d 192, 198 (N.D.N.Y. 1999) (dismissing claims against county sheriff's department) (citations omitted); *accord Jackson v. Cty. of Nassau*, No. 07-CV-245, 2010 WL 335581, at *5 (E.D.N.Y. Jan. 22, 2010) ("Under New York law, departments which are merely administrative arms of a municipality do not have a legal identity separate and apart from the municipality and cannot sue or be sued."); *see also La Grande v. Town of Bethlehem Police Dep't*, No. 1:08-CV-0738 (LEK/DRH), 2009 WL 2868231, at *2 (N.D.N.Y. Sept. 1, 2009) ("Since the Bethlehem Police Department cannot be sued pursuant to 42 U.S.C. § 1983, [the plaintiff's] [c]omplaint is dismissed as against the Town of Bethlehem Police Department."); *Jenkins v. Liadka*, No. 5:10-CV-1223 (GTS/DEP), 2012 WL 4052286, at *5 (N.D.N.Y. Sept. 13, 2012) ("Because the Syracuse Police Department is merely an administrative arm of the City of Syracuse, it is not a proper defendant.").  Because the Binghamton Police Department is an administrative arm of the City of Binghamton, it lacks the capacity to be sued.

Therefore, the Court recommends that the amended complaint be dismissed in its entirety with prejudice as against the Binghamton PD Lock-up pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b).

However, in deference to Plaintiff's *pro se* status, the Court recommends that Plaintiff be provided with an opportunity to amend his complaint to clarify claims, if any, he intended to allege against the City of Binghamton, the real party in interest pursuant to the standard for establishing municipality liability laid out in *Monell*, *supra*.

### 3.    Claims against Binghamton Sheriff

Plaintiff names the Binghamton Sheriff as a Defendant in the caption of the amended complaint.  However, there is no such person.  Moreover, the amended complaint is void of any reference to this individual.  In the absence of factual allegations sufficient to plausibly suggest this Defendant was personally involved in conduct that violated Plaintiff's constitutional rights, the amended complaint fails to state a cognizable claim against the Binghamton Sheriff and, therefore, is subject to dismissal.  *See Cipriani v. Buffardi*, No. 06-CV-0889 (GTS/DRH), 2007 WL 607341, *1 (N.D.N.Y. Feb. 20, 2007) ("[d]ismissal is appropriate where a defendant is listed in the caption, but the body of the complaint fails to indicate what the defendant did to the plaintiff") (citation omitted).

Therefore, the Court recommends that the amended complaint be dismissed in its entirety with prejudice as against the Binghamton Sheriff pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b).

However, in deference to Plaintiff's *pro se* status, the Court recommends that Plaintiff be provided with an opportunity to amend his complaint to clarify claims, if any, he intended to

allege against the City of Binghamton Chief of Police, whom the Court assumes is the real party in interest pursuant to the standard for establishing supervisory liability laid out in *Colon*, *supra*.

### 4.    Claims pursuant to 18 U.S.C. § 242

Plaintiff purports to assert claims pursuant to 18 U.S.C. § 242.  (Dkt. No. 9 at 1.)  Section 242, however, is part of the United States criminal code and there is no private right of action under this section.  *See Storm-Eggink v. Gottfried*, 409 F. App'x 426, 427 (2d Cir. 2011) ("[T]here is no private right of action under [18 U.S.C.] § 242[.]"); *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 511 (2d Cir. 1994) (affirming dismissal of plaintiff's claim under 18 U.S.C. § 242 because this "criminal statute[s] . . . do[es] not provide private causes of action").

Therefore, the Court recommends dismissal of Plaintiff's claims under 18 U.S.C. § 242 with prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b).

### 5.    Claims related to Visual Body Cavity Search

Plaintiff alleges that on January 5, 2017, after being booked and photographed at the Binghamton PD Lock-up, he was "stripped totally nude and required to expose his anus and cough out loud 2x, and placed in a cell-block with other inmates" in violation of his constitutional rights.  (Dkt. No. 9 at 2-3.)

The Fourth Amendment "protects individual privacy against certain kinds of governmental intrusion," *Katz v. United States*, 389 U.S. 347, 350 (1967), and its protections extend to prisoners and pretrial detainees, *see Bell v. Wolfish*, 441 U.S. 520, 545, 559 (1979). The Supreme Court has recognized that "correctional officials must be permitted to devise reasonable search policies to detect and deter the possession of contraband in their facilities." *Florence v. Bd. of Chosen Freeholders of Cty. of Burlington*, 566 U.S. 318, 328 (2012).  In

*Florence*, the Supreme Court held that a county jail did not violate prisoners' rights when it permitted visual inspection body cavity searches, without reasonable suspicion, prior to the prisoners' introduction to a general population unit.  *Id*. at 339; *see also Covino v. Patrissi*, 967 F.2d 73, 79 (2d Cir. 1992) (Although "inmates do possess a limited right to bodily privacy, some aspects of that right must yield to searches for contraband, even random visual body-cavity searches, so that prison administrators may maintain security and discipline in their institutions.").  Here, as in *Florence*, Plaintiff's allegations of an unlawful search relate specifically to a "visual body cavity search" conducted upon his admission to the Binghamton City Jail.

To be sure, "[a] strip search that involves a stranger peering without consent at a naked individual, and in particular at the most private portions of that person's body, is a serious invasion of privacy."  *Harris*, 818 F.3d at 58 (quoting *Florence*, 566 U.S. at 344-45 (Breyer, J., dissenting)).  But a constitutional violation requires more—for example, "that the search was excessive, was needlessly prolonged[,] . . . was otherwise meant to intimidate, harass or punish him," *see Perez v. Ponte*, 236 F. Supp. 3d 590, 624 (E.D.N.Y. 2017), *report and recommendation adopted by* 2017 WL 1050109 (E.D.N.Y. Mar. 15, 2017), or was "conducted in the presence of unnecessary spectators," *see Harris*, 818 F.3d at 62.

As pleaded, Plaintiff's allegations do not amount to a constitutional violation "because *Florence* permits corrections officers to strip search detainees without particularized suspicion . . . and recognizes that strip searches are specifically 'designed to uncover contraband that can go undetected by a patdown, metal detector, and other less invasive searches.'"  *Chaney v. City of Albany*, No. 6:16-CV-1185 (NAM/TWD), 2019 WL 3857995, at *7 (N.D.N.Y. Aug. 16, 2019) (quoting *Thompson v. City of New York*, No. 16-CV-824, 2017 WL 1929552, at *2 (S.D.N.Y.

May 9, 2017)).  That includes searches involving visual inspection of body cavities prior to being placed in a cell-block with other inmates at the Binghamton Jail.  *Id*.  Moreover, Plaintiff's allegations do not suggest that the search "did not serve a legitimate penological purpose" or that it was "instead designed to intimidate, harass, or embarrass" him.  Nor has Plaintiff alleged the personal involvement of any properly named Defendant.

Therefore, the Court recommends dismissing Plaintiff's Fourth Amendment claims related to the visual body cavity strip search without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b), but with leave to amend.

### 6.      Eighth Amendment Claims

The amended complaint references the Eighth Amendment.  (Dkt. No. 9 at 5.)  However, the Eighth Amendment's Cruel and Unusual Punishment clause does not apply here because Plaintiff's claims do not arise out of his incarceration.  The Cruel and Unusual Punishment Clause only protects individuals who are incarcerated after being convicted of a crime.

Therefore, the Court recommends that insofar as Plaintiff's amended complaint purports to assert Eighth Amendment claims, such claims be dismissed with prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b).

### 7.      Claims barred by *Heck v. Humphrey*

As set forth above, Plaintiff alleges violations of his constitutional rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments when, *inter alia*, he was seized, held, and "handed over" without due process, transported from the N.D.N.Y. to the W.D.N.Y., indicted, and forced to trial.  (Dkt. No. 9 at 5.)  Plaintiff also claims Defendants conspired to "cover up" such wrongdoings and he was denied equal protection of the law.  *Id*. at 10.  However, a civil

lawsuit may not be used to collaterally attack a criminal conviction. *Heck v. Humphrey*, 512

U.S. 477 (1994). In *Heck*, the Supreme Court held that

> in order to recover damages for allegedly unconstitutional
> conviction or imprisonment, or for other harm caused by actions
> whose unlawfulness would render a conviction or sentence invalid,
> a [Section] 1983 plaintiff must prove that the conviction or
> sentence has been reversed on direct appeal, expunged by
> executive order, declared invalid by a state tribunal authorized to
> make such a determination, or called into question by a federal
> court's issuance of a writ of habeas corpus.

*Id*. at 486-87 (internal footnote omitted). Although *Heck* involved a Section 1983 claim, the

Second Circuit has held that the rationale of *Heck* applies equally to *Bivens* actions such as

Plaintiff's claim. *See Tavarez v. Reno*, 54 F.3d at 110; *see also Maietta v. Artuz*, 84 F.3d 100,

103 n.1 (2d Cir. 1996).

Broadly stated, *Heck* precludes a prisoner from using Section 1983 and/or *Bivens* as a

vehicle to obtain damages where success on the particular constitutional claims alleged would

necessarily require the plaintiff to prove the unlawfulness of his conviction or confinement.

*Poventud v. City of N.Y.*, 750 F.3d 121, 130 (2d Cir. 2014) (en banc ). Thus, under *Heck* and its

progeny, a Section 1983 and/or *Bivens* action "is barred (absent prior invalidation) no matter the

relief sought (damages or equitable relief) . . . *if* success in that action would necessarily

demonstrate the invalidity of confinement or its duration." *Wilkinson v. Dotson*, 544 U.S. 74,

81-82 (2005) (emphasis in original).

The Court takes judicial notice that on January 6, 2017, the United States of America

filed a criminal complaint alleging Peeples robbed a bank on January 5, 2017, in Rochester, New

York, located in the W.D.N.Y. *See* W.D.N.Y. Case 6:17-cr-06032, Dkt. No. 1. On March 30,

2018, following a jury trial before the Hon. Frank P. Geraci, Jr., Chief United States District

Judge, Peeples was convicted of bank robbery, entering a bank with the intent to commit larceny,

and bank larceny.  *Id.*, Dkt. No. 88.  On July 27, 2018, the District Court sentenced Peeples to

240 months' imprisonment on Count 1 (bank robbery) and Count 2 (entering a bank with intent

to commit larceny), to run concurrently with 120 months' imprisonment on Count 3 (bank

larceny), to be followed by 3 years of supervised release.  *Id.*, Dkt. No. 106.  On appeal to the

Second Circuit, Plaintiff's conviction was affirmed.  *See United States v. Peeples*, -- F.3d ----,

No. 18-2309-cr, 2020 WL 3406445, at *12 (2d Cir. June 22, 2020).

Generally, on his counseled appeal to the Second Circuit, Peeples argued his judgment of

conviction should be vacated for two principal reasons.  *See id.* at *1.  First, he argued the

District Court erred in declining to dismiss the criminal charges against him because: (1) he was

transferred outside of the district of arrest (N.D.N.Y.) to the district where the crime took place

(W.D.N.Y.) without first appearing before a magistrate judge, assertedly in violation of Rule

5(c)(2) of the Federal Rules of Criminal Procedure, and (2) the W.D.N.Y. magistrate judge failed

to sign the jurat on the last page of the affidavit in alleged violation of Rule 3 of the Federal

Rules of Criminal Procedure even though the magistrate judge signed the face of the complaint.

*Id.*  Second, he aruged the District Court erred in admitting: (1) the bank employees' testimony

identifying Peeples for the first time at trial in alleged violation of his due process rights, and (2)

physical evidence seized from the Binghamton hotel room in alleged violation of his right to be

free from unreasonable searches and seizures.  *Id.* at *2.[9]

---

[9] The Court also takes judicial notice of Case 3:17-mc-00026, captioned *Joseph W. Peebles v. United States*, referenced in the amended complaint and which is a matter of public record, which was filed by Peeples in this District pursuant to Rule 41(g) of the Federal Rules of Criminal Procedure seeking the return of property seized, including over $51,000 in currency and coins, at a hotel in Binghamton pursuant to a search warrant issued in this District on January 6, 2017, where Peeples had checked-in on January 5th.  *See* N.D.N.Y. Case 3:17-mc-00026, Dkt. No. 4 (citing N.D.N.Y. Case 3:17-mj-10, Dkt. No. 1).  After the search was completed, agents transported and secured the seized evidence at the offices of the FBI in Rochester, in the W.D.N.Y., where the prosecution of Peeples had been initiated.  *Id.*  By Report-

As noted, the Second Circuit affirmed Peeples' conviction and concluded, *inter alia*, that: (1) the appropriate remedy for a violation of Rule 5(c)(2) of the Federal Rules of Criminal Procedure is not dismissal of an indictment but suppression of any post-arrest evidence illegally obtained as a result of the violation of the rule's requirement; (2) Peeples failed to show that his transfer to the W.D.N.Y. for an initial appearance in violation of Rule 5(c)(2) caused him any prejudice;[10] (3) the District Court did not err in denying Peeples' motion to dismiss the criminal complaint because, even though the magistrate judge failed to sign the jurat on the last page of the affidavit in support of the criminal complaint, the magistrate judge signed the jurat on the complaint itself, to which the affidavit was attached and the magistrate judge's signature in the complaint attested to the fact that the complainant's assertions were sworn before the magistrate judge and signed in his presence, thereby complying with the requirement of Rule 3 of the Federal Rules of Criminal Procedure; (4) Peeples failed to present evidence showing that the in-court identification by the Chase Bank employees was irreparably tainted by suggestibility in violation of his due process

---

Recommendation and Order dated November 3, 2017, United States Magistrate Judge Andrew T. Baxter recommended that Peeples' motion for the return of property seized pursuant to the search warrant be denied. *Id*., Dkt. No. 4. By Decision and Order entered November 28, 2017, Senior United States District Judge Thomas J. McAvoy accepted and adopted the recommendation of Magistrate Judge Baxter. *Id*., Dkt. No. 11. Accordingly, Peeples' motion for return of property seized pursuant to a search warrant was denied and judgment was entered in favor of United States of America. *Id*., Dkt. Nos. 11, 12.

[10] Specifically, the Second Circuit held: (a) With respect to the trial proceedings, because the Government did not rely on Peeples' post-arrest statements in its case before the jury, there was no evidence that could have been excluded and thus the motion to dismiss the criminal charges was correctly denied; and (b) with respect to the affidavit in support of the application for the search warrant and the affidavit in support of the criminal complaint, Peeples failed to demonstrate that the circumstances presented warranted the exclusion of the post-arrest statements. And, in any event, even if they were to excise those statements from the affidavits, the District Court correctly denied the motion to dismiss because the search warrant and the criminal complaint remained valid in light of the ample untainted evidence in the affidavits supporting the magistrate judge's probable cause findings. *United States v. Peeples*, 2020 WL 3406445, at *20.

rights;[11] and (5) Peeples failed to support his speculative belief that there was a warrantless entry and exploratory search of the Grande Royal Hotel Room 310 prior to the execution of the search warrant and thus the District Court did not err in admitting the physical evidence seized from the hotel room pursuant to the search warrant. *United States v. Peeples*, 2020 WL 3406445, at *20.

Here, Plaintiff's claims regarding his arrest, indictment, criminal charges, prosecution, trial, and ultimate conviction, including vague allegation of conspiracy and denial of equal protection of the laws, represent challenges that fall squarely within the ambit of *Heck*. Indeed, Plaintiff presents many of the same issues he argued on appeal to the Second Circuit challenging his conviction as violations of his constitutional rights in the case at bar. Because Plaintiff's success on his remaining claims in this case would necessarily call into question the validity of his conviction, such claims are not cognizable under *Heck*. *See, e.g.*, *Feldman v. Lyons*, 852 F. Supp. 2d 274, 279 (N.D.N.Y. 2012) (holding the plaintiff's conviction precludes his claims for false arrest, false imprisonment, and malicious prosecution); *Barnes v. City of New York*, No. 13-CV-7283 (GBD) (JLC), 2015 WL 4076007, at *16 (S.D.N.Y. July 2, 2015) ("Where the plaintiff's underlying conviction has not been so invalidated, courts routinely dismiss Section 1983 claims for, *inter alia*, malicious prosecution, conspiracy and deprivation of the right to a fair trial pursuant to *Heck*"); *Micolo v. F.B.I. Special Agents #1-3*, No. 17-CV-5938, 2018 WL 1730351, at *3 (E.D.N.Y. Apr. 9, 2018) ("Because [the plaintiff's] success on his *Bivens* claims in this case would necessarily invalidate the conviction, which is not alleged to have been reversed or vacated, such claims are not cognizable under *Heck*.").

---

[11] The Second Circuit also noted it need not conclude that the District Court erred in admitting the identification testimony while denying Peeples' request for a special in-court identification procedure because any such error would have been harmless beyond a reasonable doubt and thus would not warrant a vacatur of Peeples' conviction. *United States v. Peeples*, 2020 WL 3406445, at *20.

Therefore, the Court recommends dismissing Plaintiff's remaining claims as barred by *Heck* without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b).

## III.   STATUS LETTERS

Upon review of the docket, the Court notes Plaintiff filed letters regarding the status of this action.  (Dkt. Nos. 13, 14.)  To the extent Plaintiff raises new issues and/or complaints about his conditions of confinement at USP Pollock, located in the Western District of Louisiana, he should file grievances at the facility level, and these new issues and/or complaints are not part of the present action.

## IV.   CONCLUSION

For the foregoing reasons, the Court recommends dismissal of the amended complaint (Dkt. No. 9) in its entirety pursuant to 28 U.S.C. § 1915(e) and 28 U.S.C. § 1915A.

**WHEREFORE**, it is hereby

**ORDERED** that Plaintiff's IFP Application (Dkt. No. 10) is **GRANTED**; and it is further

**RECOMMENDED** that the Clerk be directed to provide the Superintendent of the facility that Plaintiff has designated as his current location with a copy of Plaintiff's inmate authorization form (Dkt. No. 11), and notify that official that Plaintiff has filed this action and is required to pay to the Northern District of New York the entire statutory filing fee of $350 in installments, over time, pursuant to 28 U.S.C. § 1915; and it is further

**ORDERED** that the Clerk is directed to amend the caption to add the U.S. Dept. of Justice as a Defendant; and it is further

**RECOMMENDED** that the amended complaint be **DISMISSED IN ITS ENTIRETY WITH PREJUDICE** as against Defendants U.S. Dept. of Justice, Binghamton PD Lock-up, and Binghamton Sheriff pursuant to 28 U.S.C. § 1915(e) and 28 U.S.C. § 1915A;

**RECOMMENDED** that any claims in which Plaintiff seeks the criminal prosecution of Defendants or others pursuant to 18 U.S.C. § 242 be **DISMISSED WITH PREJUDICE** pursuant to 28 U.S.C. § 1915(e) and 28 U.S.C. § 1915A; and it is further

**RECOMMENDED** that any Eighth Amendment claims be **DISMISSED WITH PREJUDICE**, pursuant to 28 U.S.C. § 1915(e) and 28 U.S.C. § 1915A; and it is further

**RECOMMEDED** that any Fourth Amendment claims related to the visual body cavity strip search be **DISMISSED WITHOUT PREJUDICE** pursuant to 28 U.S.C. § 1915(e) and 28 U.S.C. § 1915A, **BUT WITH LEAVE TO AMEND**; and it is further

**RECOMMENDED** that any remaining claims be dismissed in its **ENTIRETY WITHOUT PREJUDICE** as barred by *Heck v. Humphrey*, 512 U.S. 477 (1994); and it is further

**ORDERED** that the Clerk serve a copy of this Order and Report-Recommendation on Plaintiff, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[12]  Such objections shall be filed with the Clerk of the

---

[12]  If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

Court.  **<u>FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL</u>**

**<u>PRECLUDE APPELLATE REVIEW</u>**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing

*Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1)

(Supp. 2015); Fed. R. Civ. P. 72, 6(a).


Dated: July 20, 2020
       Syracuse, New York

                                       Therèse Wiley Dancks
                                       United States Magistrate Judge

1998 WL 832708
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Theodore HUDSON, Plaintiff,

v.

Christopher ARTUZ, Warden Philip
Coombe, Commissioner Sergeant
Ambrosino Doctor Manion Defendants.

No. 95 CIV. 4768(JSR).
|
Nov. 30, 1998.

**Attorneys and Law Firms**

Mr. Theodore Hudson, Great Meadow Correctional Facility,
Comstock.

Alfred A. Delicata, Esq., Assistant Attorney General, New
York.

MEMORANDUM AND ORDER

BUCHWALD, Magistrate J.

**\*1** Plaintiff Theodore Hudson filed this *pro se* action
pursuant to 42 U.S.C. § 1983 on April 26, 1995. Plaintiff's
complaint alleges defendants violated his constitutional rights
while he was an inmate at Green Haven Correctional
Facility. [1] Plaintiff's complaint was dismissed *sua sponte* by
Judge Thomas P. Griesa on June 26, 1995 pursuant to 28
U.S.C. § 1915(d). On September 26, 1995, the Second Circuit
Court of Appeals vacated the judgment and remanded the case
to the district court for further proceedings.

[1]     Plaintiff is presently incarcerated at Sullivan
        Correctional Facility.

The case was reassigned to Judge Barbara S. Jones on
January 31, 1996. Defendants moved to dismiss the complaint
pursuant to Fed.R.Civ.P. 12(c) on November 25, 1996.
Thereafter, the case was reassigned to Judge Jed S. Rakoff
on February 26, 1997. On February 26, 1998, Judge Rakoff
granted defendants' motion to dismiss, but vacated the
judgment on April 10, 1998 in response to plaintiff's motion
for reconsideration in which plaintiff claimed that he never
received defendants' motion to dismiss.

By Judge Rakoff's Order dated April 14, 1998, this case was
referred to me for general pretrial purposes and for a Report
and Recommendation on any dispositive motion. Presently
pending is defendants' renewed motion to dismiss. Plaintiff
filed a reply on July 6, 1998. For the reasons discussed
below, plaintiff's complaint is dismissed without prejudice,
and plaintiff is granted leave to replead within thirty (30) days
of the date of the entry of this order.

FACTS

Plaintiff alleges that he was assaulted by four inmates in the
Green Haven Correctional Facility mess hall on March 14,
1995. (Complaint at 4.) He alleges that he was struck with
a pipe and a fork while in the "pop room" between 6:00
p.m. and 6:30 p.m. (Complaint at 4–5.) Plaintiff contends
that the attack left him with 11 stitches in his head, chronic
headaches, nightmares, and pain in his arm, shoulder, and
back. (*Id.*) Plaintiff also states that Sergeant Ambrosino
"failed to secure [the] area and separate" him from his
attackers. (Reply at 5.) Plaintiff's claim against Warden Artuz
is that he "fail [sic] to qualify as warden." (Complaint at
4.) Plaintiff names Commissioner Coombes as a defendant,
alleging Coombes "fail [sic] to appoint a qualified warden
over security." (Amended Complaint at 5.) Plaintiff further
alleges that Dr. Manion refused to give him pain medication.
(Complaint at 5.) Plaintiff seeks to "prevent violent crimes"
and demands $6,000,000 in damages. (Amended Complaint
at 5.)

Defendants moved to dismiss the complaint, arguing that: (1)
the Eleventh Amendment bars suit against state defendants
for money damages; (2) the plaintiff's allegations fail to state
a claim for a constitutional violation; (3) the defendants are
qualifiedly immune from damages; and (4) plaintiff must
exhaust his administrative remedies before bringing this suit.

DISCUSSION

I find that plaintiff's complaint runs afoul of Rules 8 and
10 of the Federal Rules of Civil Procedure and dismiss the
complaint without prejudice and with leave to amend. Federal
Rule 8 requires that a complaint contain "a short and plain
statement of the claim showing that the pleader is entitled to
relief." Fed.R.Civ.P. 8(a)(2). The purpose of this Rule "is to
give fair notice of the claim being asserted so as to permit the

adverse party the opportunity to file a responsive answer [and] prepare an adequate defense." *Powell v. Marine Midland Bank,* 162 F.R.D. 15, 16 (N.D.N.Y.1995) (quoting *Brown v. Califano,* 75 F.R.D. 497, 498 (D.D.C.1977)); *see Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir.1988) (stating that the "principal function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial").

**\*2** Rule 10 of the Federal Rules of Civil Procedure requires, *inter alia,* that the allegations in a plaintiff's complaint be made in numbered paragraphs, each of which should recite, as far as practicable, only a single set of circumstances. *Moore's Federal Practice,* Vol. 2A, ¶ 10.03 (1996). Rule 10 also requires that each claim upon which plaintiff seeks relief be founded upon a separate transaction or occurrence. *Id.*[2] The purpose of Rule 10 is to "provide an easy mode of identification for referring to a particular paragraph in a prior pleading." *Sandler v. Capanna,* 92 Civ. 4838, 1992 WL 392597, \*3 (E.D.Pa. Dec.17, 1992) (citing 5 C. Wright & A. Miller, *Federal Practice and Procedure,* § 1323 at 735 (1990)).

[2]   Rule 10 states:

(b) Paragraphs; Separate Statements. All averments of claim or defense shall be made in numbered paragraphs, the contents of each of which shall be limited as far as practicable to a statement of a single set of circumstances; and a paragraph may be referred to by number in all succeeding pleadings. Each claim founded upon a separate transaction or occurrence and each defense other than denials shall be stated in a separate count or defense whenever a separation facilitates the clear presentation of the matters set forth.

A complaint that fails to comply with these pleading rules "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of" a plaintiff's claims. *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996). It may therefore be dismissed by the court. *Id.; see also Salahuddin v. Cuomo,* 861 F.2d at 42 ("When a complaint does not comply with the requirement that it be short and plain, the court has the power to, on its own initiative, ... dismiss the complaint"). Dismissal, however, is "usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible

that its true substance, if any, is well disguised." *Id.* In those cases in which the court dismisses a *pro se* complaint for failure to comply with Rule 8, it should give the plaintiff leave to amend when the complaint states a claim that is on its face nonfrivolous. *Simmons v. Abruzzo,* 49 F.3d 83, 87 (2d Cir.1995).

In determining whether a nonfrivolous claim is stated, the complaint's allegations are taken as true, and the "complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v.. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The complaint of a *pro se* litigant is to be liberally construed in his favor when determining whether he has stated a meritorious claim. *See Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972). Even if it is difficult to determine the actual substance of the plaintiff's complaint, outright dismissal without leave to amend the complaint is generally disfavored as an abuse of discretion. *See Salahuddin,* 861 F.2d at 42–42; *see also Doe v. City of New York,* No. 97 Civ. 420, 1997 WL 124214, at \*2 (E.D.N.Y. Mar.12, 1997).

Here, plaintiff's *pro se* complaint fails to satisfy the requirements of Federal Rules 8 and 10. The complaint is often illegible and largely incomprehensible, scattering what appear to be allegations specific to plaintiff within a forest of headnotes copied from prior opinions. Defendants have answered with a boilerplate brief, which is perhaps all a defendant can do when faced with such a complaint. The Court is left with an insurmountable burden in attempting to make a reasoned ruling on such muddled pleadings.

**\*3** Although plaintiff's complaint is substantially incomprehensible, it appears to plead at least some claims that cannot be termed frivolous on their face. For example, plaintiff clearly alleges that inmates assaulted him and that Dr. Manion refused to provide him medical attention. He also appears to assert that Sergeant Ambrosino failed to protect him from the attack or take steps to prevent future attacks. (Plaintiff's Reply at 5). It is well established that an inmate's constitutional rights are violated when prison officials act with deliberate indifference to his safety or with intent to cause him harm. *Hendricks v. Coughlin,* 942 F.2d 109 (2d Cir.1991). It is similarly well established that an inmate's constitutional rights are violated when a prison doctor denies his request for medical care with deliberate indifference to the inmate's serious medical needs. *Estelle v. Gamble,* 429

U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Hathaway v. Coughlin,* 37 F.3d 63 (2d Cir.1994), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). Although plaintiff provides few facts to support his allegations, I disagree with defendants' assertion that outright dismissal is appropriate because it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Defendant's Memorandum at 5 (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

Because plaintiff's complaint does not comply with Rules 8 and 10, it is hereby dismissed without prejudice, and plaintiff is granted leave to replead within thirty (30) days of the date of the entry of this Order. In drafting his second amended complaint, plaintiff is directed to number each paragraph and order the paragraphs chronologically, so that each incident in which he alleges a constitutional violation is described in the order that it occurred. Plaintiff is also directed to specifically describe the actions of each defendant that caused plaintiff

harm, and to do so in separate paragraphs for each defendant. Plaintiff's complaint shall contain the facts specific to the incidents plaintiff alleges occurred, and not any facts relating to any case that has been decided previously by a court of law. Plaintiff's complaint shall also contain a clear statement of the relief he seeks in addition to monetary damages.

CONCLUSION

For the reasons set forth above, plaintiff's complaint is dismissed without prejudice, and plaintiff is granted leave to replead within thirty (30) days of the date of the entry of this Order.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 1998 WL 832708

---

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

 © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 857528
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Richard AUSTIN, Plaintiff,
v.
Brian PAPPAS, John Does, Yonkers
Police Commissioner Charles C. Coles,
Westchester County, Defendants.

No. 04-CV-7263 (KMK)(LMS).
|
March 31, 2008.

**Attorneys and Law Firms**

Mr. Richard Austin, Stormville, NY, pro se.

Rory Carleton McCormick, Esq., Corporation Counsel, City of Yonkers, Yonkers, NY, for Defendants.

*ORDER ADOPTING REPORT & RECOMMENDATION*

KENNETH M. KARAS, District Judge.

**\*1** Richard Austin ("Plaintiff") filed this suit pursuant to 42 U.S .C. § 1983 ("Section 1983") against Yonkers Police Officer Brian Pappas ("Defendant Pappas"), several John Doe Yonkers Police Officers ("John Doe Defendants"), former Yonkers Police Commissioner Charles C. Cola ("Defendant Cola") (whose name is misspelled in Plaintiff's Complaint as Charles C. Coles), and Westchester County (collectively, "Defendants"), alleging violations of Plaintiff's civil rights under the First, Fourth, Fifth, Eighth, and Fourteenth Amendments of the United States Constitution, along with various supplemental state law claims.[1] (Compl.¶¶ 17, 19.) Plaintiff alleged that these violations occurred when Defendants failed to protect Plaintiff from Franklyn Kelley, a private individual who physically attacked Plaintiff during the course of Plaintiff's May 16, 2003 arrest. (*Id.* ¶ 10.) Plaintiff alleged that Defendant Pappas and the John Doe Defendants handcuffed him and pinned him to the ground while Franklyn Kelley repeatedly kicked and punched Plaintiff in the face. (*Id.* ("The officers did nothing to protect the plaintiff from this vicious assault, even though plaintiff was helpless and in their custody [.]").) Defendants moved for summary judgment, and this Motion was referred by Judge McMahon to Chief Magistrate Judge Lisa M. Smith for review pursuant to 28 U.S.C. § 636(b)(1). On August 2, 2007, Magistrate Judge Smith issued a thorough Report and Recommendation ("R & R"), concluding that this Court should grant Defendants' Motion for Summary Judgment on the ground that Plaintiff has failed to demonstrate that there exists a genuine issue of material fact as to whether his constitutional rights were violated. Plaintiff was advised of his right to file objections to the R & R, but he did not do so.

[1]      On August 8, 2005, Plaintiff's claim against Westchester County was dismissed by the Honorable Gerald E. Lynch, to whom this case was initially assigned. On February 28, 2006, the case was transferred to White Plains and reassigned to Judge Colleen McMahon. The case was reassigned to the undersigned on August 6, 2007.

A district court reviewing a report and recommendation " 'may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.' " *Donahue v. Global Home Loans & Fin., Inc.,* No. 05-CV-8362, 2007 WL 831816, at \*1 (S.D.N.Y. Mar. 15, 2007) (quoting 28 U.S.C. § 636(b)(1)(C)). Under 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, parties may submit objections to a magistrate judge's report and recommendation. The objections must be "specific" and "written," and must be made "within 10 days after being served with a copy of the recommended disposition." Fed.R.Civ.P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1).

Where a party does not submit an objection, " 'a district court need only satisfy itself that there is no clear error on the face of the record.' " *Donahue,* 2007 WL 831816, at \*1 (quoting *Nelson v. Smith,* 618 F.Supp. 1186, 1189 (S.D.N.Y.1985)). In addition, a party's failure to object waives that party's right to challenge the report and recommendation on appeal. *See Fed. Deposit Ins. Corp. v. Hillcrest Assocs.,* 66 F.3d 566, 569 (2d Cir.1995) ("Our rule is that 'failure to object timely to a magistrate's report operates as a waiver of any further judicial review of the magistrate's decision.' " (quoting *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989))).

**\*2** Here, Plaintiff has not filed objections to the R & R. Accordingly, the Court has reviewed the R & R for clear error only. In so doing, the Court adopts the conclusion reached in the R & R that Defendants' Motion for Summary Judgment should be granted, but the Court does so in part on different grounds than those relied on in the R & R.

First, the Court agrees with Magistrate Judge Smith that Defendants' noncompliance with Local Civil Rule 56.2 should be overlooked because any prejudice resulting from noncompliance was cured by the following: (i) Magistrate Judge Smith advised Plaintiff of the nature of summary judgment during a March 23, 2007 conference; and (ii) Magistrate Judge Smith annexed a Rule 56.2 notice to the R & R, a document to which Plaintiff was free to file objections. *See Narumanchi v. Foster,* No. 02-CV-6553, 2006 WL 2844184, at *2 (E.D.N.Y. Sept. 29, 2006) (refusing to deny defendant's motion for summary judgment based on failure of defendant to comply with Local Civil Rule 56.2 because "[a]ny prejudice to *pro se* plaintiffs [was] cured" by court's actions).

As expressed in the R & R, though Plaintiff did not file any opposition to Defendants' Motion for Summary Judgment, Defendants were still required to meet their burden of demonstrating to the Court that "no material issue of fact remains for trial." *See Amaker v. Foley,* 274 F.3d 677, 681 (2d Cir.2001). The Court finds no clear error in Magistrate Judge Smith's determination that Defendants satisfied this burden.

With respect to Defendants Pappas and Cola, the Court finds that Plaintiff has failed to offer any evidence demonstrating that they were personally involved in the alleged violation of Plaintiff's constitutional rights. The " 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Back v. Hastings on Hudson Union Free Sch. Dist.,* 365 F.3d 107, 122 (2d Cir.2004) (quoting *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977)). For purposes of Section 1983 liability, personal involvement can be established by evidence that:

> '(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference ...

by failing to act on information indicating that unconstitutional acts were occurring.'

*Id.* at 127 (quoting *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)); *accord Hayut v. State Univ. of N.Y.,* 352 F.3d 733, 753 (2d Cir.2003); *Schiller v. City of New York,* No. 04-CV-7922, 2008 WL 200021, at *4 (S.D.N.Y. Jan. 23, 2008); *Fair v. Weiburg,* No. 02-CV-9218, 2006 WL 2801999, at *4 (S.D.N.Y. Sept. 28, 2006). Further, a Section 1983 plaintiff must "allege a tangible connection between the acts of the defendant and the injuries suffered." *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986); *see also Fair,* 2006 WL 2801999, at *4 (citing *Bass* ).

**\*3** In support of their Motion for Summary Judgment, Defendants submitted evidence that Defendant Pappas did not directly participate in the arrest of Plaintiff, but he instead arrested Plaintiff's accomplice. For example, on April 8, 2004, at a hearing before the Honorable Richard A. Molea of the Westchester County Court, Defendant Pappas testified that he remained with Plaintiff's accomplice while other officers arrested Plaintiff. (Defs.' Affirmation in Supp., Ex. J, 50-51.) Further, in response to interrogatories served on him by Plaintiff, Defendant Pappas stated that he "did not observe what transpired during the course of plaintiff's arrest." (*Id.,* Ex. L.) Finally, Defendants offer a police report indicating that "Pappas was detaining [Plaintiff's accomplice] in the garage area, as additional units arrived and placed [Plaintiff] into custody." (*Id.,* Ex. C.)

Plaintiff has failed to offer any evidence refuting Defendant Pappas' version of events. In other words, Plaintiff has offered no evidence demonstrating that Defendant Pappas was actually one of the officers who arrested him and allegedly pinned him to the ground while Kelley assaulted him. In fact, during his deposition testimony, Plaintiff admitted that he was not sure whether Defendant Pappas was one of the police officers who arrested him, and that the reason Defendant Pappas was named as a defendant in the present suit was because Plaintiff had seen his name on Plaintiff's felony complaint. (*Id.,* Ex. G, 32-35.) As such, the unrefuted evidence before the Court demonstrates that Defendant Pappas was not one of the officers directly involved in Plaintiff's arrest. Plaintiff therefore has failed to satisfy a prerequisite to liability under Section 1983-namely that Defendant Pappas had personal involvement in the alleged violation of Plaintiff's constitutional rights.

*See Back,* 365 F.3d at 122. Thus, Plaintiff's claim against Defendant Pappas must be dismissed.

Plaintiff alleged that Defendant Cola, Yonkers Police Commissioner at the time of Plaintiff's 2003 arrest, violated Plaintiff's constitutional rights by "authoriz[ing], tolerat[ing], as institutionalized practices, and ratif[ying] the misconduct [of Defendant Pappas and John Doe Defendants]." (Compl.¶ 14.) More specifically, Plaintiff charges Defendant Cola with failure to properly: (1) discipline subordinate officers; (2) take adequate precautions in hiring subordinate officers; (3) report criminal acts by police personnel to the Westchester County District Attorney; and (4) establish a system for dealing with complaints about police misconduct. (*Id.*) Plaintiff does not assert that Defendant Cola directly participated in the violation of his constitutional rights; instead, Plaintiff urges the Court to find Defendant Cola liable under Section 1983 based on his role as supervisor of Defendant Pappas and the John Doe Defendants.

"It is well settled, however, that the doctrine of respondeat superior standing alone does not suffice to impose liability for damages under section 1983 on a defendant acting in a supervisory capacity." *See Hayut,* 352 F.3d at 753 (citing *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 691 (1978)). Instead, it is necessary to establish a supervisory official's personal involvement in the alleged constitutional violation. *See id.; Fair,* 2006 WL 2801999, at *4.

 **\*4** Plaintiff has failed to provide the Court with any evidence from which a reasonable jury could conclude that Defendant Cola was personally involved in the alleged violation of Plaintiff's constitutional rights. Plaintiff has offered no evidence demonstrating that Defendant Cola was aware of and failed to remedy constitutional violations by subordinate officers, or that he acted in a grossly negligent or deliberately indifferent manner in supervising or training subordinate officers. There is also no evidence in the record to support a theory that Defendant Cola created a policy or custom that fostered and led to the alleged violation of Plaintiff's rights. *See Hayut,* 352 F.3d at 754 (finding as fatal to plaintiff's Section 1983 claim the fact that there existed "no evidence that, after becoming aware of the alleged harassment, any of the [supervisory officials] failed to respond or remedy the situation, that any of these [supervisory officials] created or allowed a policy to continue under which alleged harassment could occur, or that they were grossly negligent in monitoring [the alleged harasser's] conduct"); *Harris v. City of New York,* No. 01-CV-6927, 2003 WL

554745, at *6 (S.D.N.Y. Feb. 26, 2003) ("[P]laintiff has put forth no evidence pointing to defendant ['s] personal involvement in plaintiff's alleged deprivation of rights .... Plaintiff's conclusory allegations regarding defendant['s] alleged supervisory role, without more, cannot withstand summary judgment."). Further, nothing in the record, even drawing all inferences in Plaintiff's favor, suggests any tangible connection between Defendant Cola's training or supervision of subordinate officers and the alleged violation of Plaintiff's rights. In fact, the record contains no evidence with regard to Defendant Cola whatsoever. Without such evidence, no reasonable jury could conclude that Defendant Cola had personal involvement in the alleged violation of Plaintiff's constitutional rights, which means that Plaintiff has failed to satisfy a prerequisite to Section 1983 liability, and therefore that Defendant Cola is entitled to summary judgment in his favor. *See Davis v. Kelly,* 160 F.3d 917, 921 (2d Cir.1998) ("After an opportunity for discovery, undisputed allegations that [a] supervisor lacked personal involvement will ultimately suffice to dismiss that official from the case.").

In sum, the Court finds that Plaintiff has failed to establish the personal involvement of Defendants Pappas and Cola in the alleged violation of his rights. For reasons set forth more fully in the R & R, the Court also dismisses the Complaint as to the John Doe Defendants because Plaintiff's time limit to amend the Complaint in order to substitute in named defendants has lapsed. Therefore, the Court finds it unnecessary to reach the question of whether Plaintiff has adequately established an underlying violation of his constitutional rights. Finally, having determined that no cognizable federal claims exist, the Court will follow Magistrate Judge Smith's recommendation in declining to exercise jurisdiction over the state law claims.

 **\*5** Accordingly, it is hereby:

ORDERED that the Report and Recommendation dated August 2, 2007, is ADOPTED on the grounds set forth in this Order; and it is further

ORDERED that Defendants' Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56 is GRANTED.

The Clerk of Court is respectfully directed to enter judgment in favor of Defendants, to terminate Defendant's Motion (Dkt. No. 28), and to close this case.

SO ORDERED.

Austin v. Pappas, Not Reported in F.Supp.2d (2008)
Case 3:19-cv-00868-TJM-TWD   Document 16   Filed 07/20/20   Page 29 of 130
2008 WL 857528

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 857528

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 4221545
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Terrell MCQUEEN, Plaintiff,

v.

UNITED STATES of America, Defendant.

9:19-CV-0998 (TJM/CFH)
|
Signed 09/05/2019

**Attorneys and Law Firms**

TERRELL MCQUEEN, Plaintiff, Pro se, 65130-050, Hazelton FCI, P.O. Box 5000, Bruceton Mills, WV 26525.

**DECISION AND ORDER**

THOMAS J. MCAVOY, Senior United States District Judge

## I. INTRODUCTION

*1 The Clerk has sent to the Court a pro se Complaint filed by plaintiff Terrell McQueen ("Plaintiff"), who is presently incarcerated at the Federal Correctional Institution in Bruceton Mills, West Virginia. Dkt. No. 1 ("Compl."). This action was originally filed by Plaintiff in the United States District Court for the Northern District of West Virginia, and was transferred to this District by Order of Northern District Judge Frederick P. Stamp, Jr. Dkt. No. 24. Plaintiff paid the full filing fee of $400.00 and states that he filed this action pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346. *See generally*, Compl.

## II. SUFFICIENCY OF THE COMPLAINT

### A. Standard of Review

Under 28 U.S.C. § 1915A, a court must review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted; or ... seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b); *see also Carr v. Dvorin*, 171 F.3d 115, 116 (2d Cir. 1999) (per curiam) (Section 1915A applies to all actions

brought by prisoners against government officials even when plaintiff paid the filing fee).

When reviewing a complaint, the court may also look to the Federal Rules of Civil Procedure. Rule 8 of the Federal Rules of Civil Procedure provides that a pleading that sets forth a claim for relief shall contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The purpose of Rule 8 "is to give fair notice of the claim being asserted so as to permit the adverse party the opportunity to file a responsive answer, prepare an adequate defense and determine whether the doctrine of res judicata is applicable." *Hudson v. Artuz*, No. 95 CIV. 4768, 1998 WL 832708, at *1 (S.D.N.Y. Nov. 30, 1998) (quoting *Brown v. Califano*, 75 F.R.D. 497, 498 (D.D.C. 1977)).

A court should not dismiss a complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although the Court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show[n]'-'that the pleader is entitled to relief.' " *Iqbal*, 556 U.S. at 679 (quoting Fed. Rule Civ. Proc. 8(a)(2)). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678.

*2 While pro se parties are held to less stringent pleading standards, the Second Circuit has held that "district courts may dismiss a frivolous complaint sua sponte even when the plaintiff has paid the required filing fee." *See Fitzgerald v. First E. Seventh St. Tenants Corp.*, 221 F.3d 362, 363 (2d Cir. 2000). Indeed, "district courts are especially likely to be exposed to frivolous actions and thus, have [a] need for inherent authority to dismiss such actions quickly in order to preserve scarce judicial resources." *Id.* at 364. A cause of action is properly deemed frivolous "where it lacks an arguable basis either in law or in fact." *Neitzke v. Williams*, 490 U.S. 319, 325 (1989).

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

## B. Summary of the Complaint [1]

[1] The Complaint includes exhibits. *See* Dkt. No. 1-1. To the extent that the exhibits are relevant to the incidents described in the Complaint, the Court will consider the Complaint as well as any documents attached as exhibits. *See Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir. 1991) (the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference).

The incidents that form the foundation for the Complaint occurred while Plaintiff was confined at the Federal Correctional Institution at Ray Brook, New York. *See generally,* Compl. The following facts are set forth as alleged by Plaintiff in his Complaint.

Plaintiff alleges that while he was incarcerated at Ray Brook, he received medical treatment from various providers including an Adult Nurse Practitioner ("ANP"), K. Sorrell ("Sorrell")[2]. Dkt. No. 1-1 at 1-8. In November 2016, Sorrell prescribed medication to treat lesions on Plaintiff's scalp, forehead, lip, chin, and neck. *Id.* at 2. Sorrell had not previously prescribed the medication, Sulfamethoxazole/Trimeth DS, and did not mention the potentially dangerous side effects. *Id.* In July 2017, Sorrell prescribed the medication, for a second time to treat lesions, and failed to explain the side effects, including vision problems. *Id.* at 4.

[2] Sorrell is not named as a defendant in the caption of the Complaint or otherwise identified as a party in the pleading.

On November 28, 2017, Plaintiff was examined by Sorrell after he fell and hit his head on the floor while playing basketball. Dkt. No. 1-1 at 4. Two days later, Plaintiff's vision was blurred and impaired. *Id.* On December 12, 2017, Sorrell examined Plaintiff for complaints related to decreased vision. *Id.* Sorrell explained that Plaintiff needed emergency care for his eye, but that the proper care could not be found near Ray Brook. *Id.* Sorrell told Plaintiff that, "in order to save money for Ray Brook, Plaintiff was going to be reassigned to a CARE 2." Dkt. No. 1-1 at 4. Plaintiff claims that Sorrell did not attempt to locate the proper care near Ray Brook. *Id.*

In January 2018, Plaintiff arrived at Hazelton Correctional Institution. Dkt. No. 1-1 at 5. In February 2018, Plaintiff was diagnosed with a retinal tear with detachment and underwent surgery. *Id.* at 5-6.

On May 1, 2018, Plaintiff filed a personal injury/property tort claim with the "Mid-Atlantic Regional Office." Dkt. No. 1-1 at 7. The claim was received on May 10, 2018 and assigned a claim number. *Id.* Plaintiff received a response on November 17, 2018. *Id.* On March 19, 2019, Plaintiff filed the within action. Compl. at 10.

Plaintiff claims that his injuries are a result of negligence and "deliberate indifference" on the part of Sorrell, an "agent" of the United States of America, acting in her capacity as an ANP for the Federal Bureau of Prisons. Compl. at 7; Dkt. No. 1-1 at 1, 6. Construing the Complaint liberally, the negligence claim will be considered filed under the FTCA and Plaintiff's claim alleging deliberate indifference will be treated as one brought under *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics,* 403 U.S. 388, 397 (1971).

## III. ANALYSIS

### A. FTCA

**\*3** The FTCA constitutes a waiver of the Government's sovereign immunity from suit for claims of property damage or personal injury caused by the "negligent or wrongful act or omission" of its employees "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the laws of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). The statute of limitations for actions brought pursuant to the FTCA is set forth in 28 U.S.C. § 2401(b), which provides that:

> A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues or unless action is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented.

28 U.S.C. § 2401(b). The only proper defendant to an action under the FTCA is the United States. *See Watts v.*

*U.S. Federal Bureau of Prisons*, No. 9:07-CV-773, Report-Recommendation, 2009 WL 81285, at *4 & n. 1 (N.D.N.Y. Sep. 30, 2008) (Peebles, M.J.) (citing cases), *adopted*, 2009 WL 81285, at *1 (N.D.N.Y. Jan. 9, 2009) (Hurd, J.). Tort claims, such as claims of medical malpractice, are actionable under the FTCA. *United States v. Kubrick*, 444 U.S. 111 (1979).

It is clear that "[u]nder the FTCA, before a claimant can file suit, he or she must first present the claim to the appropriate federal agency ... within two years of the date the claim accrued." *Phillips v. Generations Family Health Ctr.*, 723 F.3d 144, 147 (2d Cir. 2013) (citing 28 U.S.C. § 2675(a)). "The claimant can only initiate his or her lawsuit once the claim has been denied by the agency (or if the agency has failed to make a decision within six months after the claim was filed)." *Id.* (citing 28 U.S.C. § 2675(a)). In other words, the FTCA requires a plaintiff to exhaust all administrative remedies before filing suit in federal court. *Celestine v. Mount Vernon Health Ctr.*, 403 F.3d 76, 82 (2d Cir. 2005).

Here, Plaintiff claims that he filed a claim with the appropriate agency, in a timely manner, before initiating the within action. Dkt. No. 1-1 at 6-7. Mindful of the Second Circuit's direction that a pro se plaintiff's pleadings must be liberally construed, *see e.g. Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008), the Court finds that Plaintiff's FTCA claim survives sua sponte review and requires a response.

### B. *Bivens*

In light of Plaintiff's status as a pro se litigant, the Court has also considered whether the Complaint states claims cognizable under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). [3]

[3]    In the Complaint, Plaintiff claims that Sorrell's statement about money and budget, "constitutes negligence and deliberate indifference[.]" Dkt. No. 1-1 at 6.

*Bivens* actions, although not precisely parallel to actions pursuant to 42 U.S.C. § 1983 against state actors, are the analog to such actions; and the constitutional standard of review is the same for either type of action. *Tavarez v. Reno*, 54 F.3d 109, 110 (2d Cir. 1995) (per curiam). Thus, federal courts have "typically incorporated § 1983 law into *Bivens* actions." *Tavarez*, 54 F.3d at 110.

A court presented with a claim styled as a *Bivens* claim must first determine whether it "meaningful[ly] differ[s]" from the three *Bivens* claims the Supreme Court previously recognized, which include (1) a Fourth Amendment "claim against FBI agents for handcuffing a man in his own home without a warrant", (2) a Fifth Amendment "claim against a Congressman for firing his female secretary", and (3) an Eighth Amendment "claim against a prison official for failure to treat an inmate's asthma." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1860 (citations omitted). "If the case is different in a meaningful way from previous *Bivens* cases decided by [the Supreme] Court, then the context is new." *Id.* Once it is established that a case presents a new *Bivens* context, "a special factors analysis" is required before it may proceed. *Id.* "The 'inquiry must concentrate on whether the [j]udiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action.' " *Abdoulaye v. Cimaglia*, No. 15-CV-4921, 2018 WL 1890488, at *6 (S.D.N.Y. Mar. 30, 2018) (citing *Ziglar*, 137 S.Ct. at 1857-58).

**\*4** Here, Plaintiff claims that Sorrell was "deliberately indifferent" to his medical needs in violation of the Eighth Amendment. This claim does not present a "new" *Bivens* context. *See Carlson v. Green*, 446 U.S. 14, 18-19 (1980) (holding that the Eighth Amendment Cruel and Unusual Punishments Clause gave federal prisoner's estate a damages remedy for failure to provide adequate medical treatment).

While a plaintiff may bring a *Bivens* action against a federal agent who engages in unconstitutional conduct under color of his authority, suit cannot be maintained against the agency for which the official works, which generally enjoys sovereign immunity from suit. Since the United States is entitled to sovereign immunity, and has not expressly waived that immunity, Plaintiff may not maintain his claim for a violation of his constitutional rights against the United States. *See Bivens*, 403 U.S. at 410; *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 72 (2001) (holding that plaintiff could not bring a *Bivens* claim against the United States or the employing federal agency, the BOP).

Accordingly, the Court finds that Plaintiff's claim against the United States is not cognizable in a *Bivens* action. [4]

[4]    Rule 10(a) of the Federal Rules of Civil Procedure provides that, "the title of the complaint must name all the parties." A party not named in the caption of the complaint is not a party to the action. *Abbas*

*v. U.S.*, No. 10-CV-0141, 2014 WL 3858398, at *2 (W.D.N.Y. Aug. 1, 2014) (holding that the failure to name a party in the caption makes it "infeasible for the Court to determine which of the individual officers mentioned in the body of the complaint should be deemed to be defendants to which claims). "If [ ] people are not [ ] named in the caption of the [ ] complaint, they will not be defendants in the case." *See Whitley v. Krinser*, No. 06-CV-0575, 2007 WL 2375814, at *1 (W.D.N.Y. Aug. 15, 2007).

Here, Plaintiff refers to Sorrell but does not name her in the caption or designated her as a party to the action. The Court will not construe the Complaint to assert any cause of action against any individual not named in the caption or identified as a defendant.

### C. Service of Process

In this case, Plaintiff paid the entire filing fee for this action. As a result, Plaintiff is responsible for serving the summons and Complaint on Defendant. Rule 4 of the Federal Rules of Civil Procedure provides that "[a]t the plaintiff's request, the court may order that service be made by a United States marshal or deputy marshal or by a person specially appointed by the court." Fed. R. Civ. P. 4(c)(3). In order to advance the disposition of this action, and in light of the fact that Plaintiff is proceeding pro se, to effectuate service by the United States Marshal, Plaintiff must (1) pay the service fee due to the U.S. Marshal in full in advance; [5] and (2) provide all necessary papers for service, including a completed U.S. Marshals Form and summons form (both of which may be obtained from the Office of the Clerk of the Court) for the defendant, and a copy of the complaint for the defendant. Plaintiff is directed to send the service documents and payment of the service fee to the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261-7367, to be forwarded by the Clerk to the U.S. Marshal.

[5]    Payment of the service fee must be made by money order or certified check payable to "U.S. Marshal." For service by mail, the fee is $8.00 per summons and complaint. The cost of service by mail on the Defendant is $8.00. Plaintiff is advised that if initial service is unsuccessful, he will be required to pay the U.S. Marshal any additional fees, also in

advance, for subsequent service attempts according to the fee schedule set by the U.S. Marshal.

### VI. CONCLUSION
**\*5  WHEREFORE**, it is hereby

**ORDERED** that plaintiff's FTCA claim survives sua sponte review and require a response; and it is further

**ORDERED** that plaintiff's *Bivens* claim is **DISMISSED without prejudice** for failure to state a claim pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1)1; and it is further

**ORDERED** that Plaintiff is afforded an opportunity to request an order of this Court directing service by the U.S. Marshal and provide payment of the service fee to the U.S. Marshal in full by money order or certified check; and it is further

**ORDERED** that upon Plaintiff's request for assistance with service of process, the Clerk shall return the file to the Court for further review; and it is further

**ORDERED** that if Plaintiff does not request for assistance with service of process **within twenty (20) days** of the filing date of this Decision and Order, the Clerk shall issue a summons and forward it to Plaintiff, who shall be responsible for effecting service of process on Defendant. Upon issuance of the summons, the Clerk shall send a copy of the summons and Complaint to the United States Attorney for the Northern District of New York ("U.S. Attorney's Office"), and the Attorney General of the United States in Washington, D.C., together with a copy of this Decision and Order; and it is further

**ORDERED** that Defendant or counsel, file a response to the Complaint as provided for in the Federal Rules of Civil Procedure; and it is further

**ORDERED**, that all pleadings, motions and other documents relating to this action must bear the case number assigned to this action and be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261-7367. **Any paper sent by a party to the Court or the Clerk must be accompanied by a certificate showing that a true and correct copy of same was served on all opposing parties or their counsel. Any document received**

2019 WL 4221545

by the Clerk or the Court which does not include a proper certificate of service will be stricken from the docket. Plaintiff must comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions. **Plaintiff is also required to promptly notify the Clerk's Office and all parties or their counsel, in writing, of any change in his address; their failure to do so will result in the dismissal of his action**; and it is further

**ORDERED** that the Clerk of the Court shall serve a copy of this Decision and Order on Plaintiff in accordance with the Local Rules.

**All Citations**

Slip Copy, 2019 WL 4221545

---

**End of Document**                           © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 2082549
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Philander PHILIPPEAUX, Plaintiff,

v.

UNITED STATES of America, et al., Defendants.

19-CV-3221 (CM)

|

Signed 05/13/2019

**Attorneys and Law Firms**

Philander Philippeaux, Coleman, FL, pro se.

ORDER OF DISMISSAL

COLLEEN McMAHON, Chief United States District Judge

**\*1** Plaintiff, appearing *pro se,* brings this action challenging grand jury testimony that resulted in a criminal indictment in the matter of *United States v. Philippeaux,* No. 13-CR-0277-2 (RWS) (S.D.N.Y. Feb. 2, 2016). Plaintiff paid the filing fee to initiate this action. The Court dismisses the complaint, with 30 days' leave to replead his conspiracy claims.

**STANDARD OF REVIEW**

The Court has the authority to dismiss a complaint, even when the plaintiff has paid the filing fee, if it determines that the action is frivolous, *Fitzgerald v. First E. Seventh Tenants Corp.,* 221 F.3d 362, 363-64 (2d Cir. 2000) (per curiam) (citing *Pillay v. INS,* 45 F.3d 14, 16-17 (2d Cir. 1995) (*per curiam*) (holding that Court of Appeals has inherent authority to dismiss frivolous appeal)), or that the Court lacks subject matter jurisdiction, *Ruhrgas AG v. Marathon Oil Co.,* 526 U.S. 574, 583 (1999). A claim is "frivolous when either: (1) the factual contentions are clearly baseless, such as when allegations are the product of delusion or fantasy; or (2) the claim is based on an indisputably meritless legal theory." *Livingston v. Adirondack Beverage Co.,* 141 F.3d 434, 437 (2d Cir. 1998) (internal quotation marks and citation omitted). The Court is obliged, however, to construe *pro se* pleadings liberally, *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir. 2009), and interpret them to raise the "strongest [claims] that they *suggest,*" *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471,

474-75 (2d Cir. 2006) (internal quotation marks and citations omitted) (emphasis in original).

**BACKGROUND**

Plaintiff brings this action under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2671-80, alleging that Defendants committed "tortious acts" and violated the Eighth Amendment's Cruel and Unusual Punishment Clause. This alleged conduct took place during Plaintiff's now closed criminal proceeding. *See Philippeaux,* No. 13-CR-0277-2 (RWS). He names as defendants the United States of America; United States Attorney's Office (USAO) for the Southern District of New York; and the United States Drug Enforcement Administration (DEA).

The following facts are taken from the complaint: Defendants used "fraud to mislead the Grand Jury in order to indict the Petitioner, to cause intentional infliction of emotional distress," as well as other harms. (Compl. at 5.) The USAO and the DEA presented misleading evidence to a grand jury and conspired "to use a fraudulent, non-existent phone number [omitted], fake phone records and calls[ ] [t]o give testimonial evidence to the Grand Jury to mislead the Grand Jury into indicting the Petitioner of a crime he did not commit." (*Id.* at 6.)

Plaintiff also claims that individuals employed by Defendants conspired for the purpose of violating his rights, in violation of *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388 (1971). [1]

[1]     Plaintiff also refers to 42 U.S.C. § 1983, but that statute concerns the conduct of state actors, not federal actors. *Id.*

**\*2** Plaintiff seeks money damages.

On June 27, 2018, Plaintiff filed a motion under 28 U.S.C. § 2255, *Philippeaux v. United States,* No. 18-CV-5974 (RA) (SN), challenging his judgment of conviction entered in *Philippeaux,* No. 13-CR-0277-2 (RWS). He asserts that his lawyers provided ineffective assistance of counsel, claiming that they failed to challenge the Court's jurisdiction to impose a sentence and to argue that a "fraud" had been "practiced upon" the Court.

On March 11, 2019, Plaintiff filed a complaint against his former criminal defense lawyers, claiming that they committed legal malpractice when representing him in the 13-CR-0277 criminal proceeding. *See Philippeaux v. Entin*, No. 19-CV-2205 (RA). Although he asserts claims of legal malpractice, he essentially raises the same claims that he raises in the § 2255 motion.

### DISCUSSION

#### A. FTCA claims

The FTCA provides for a waiver of sovereign immunity for injuries arising from the tortious conduct of federal officers or agents acting within the scope of their office or employment. 28 U.S.C. § 1346(b)(1).

Before bringing a claim in a federal district court under the FTCA, a claimant must first exhaust his administrative remedies by filing a claim for monetary damages with the appropriate federal government entity and must receive a final written determination. *See* 28 U.S.C. § 2675(a). Such an administrative claim must be in writing, specify the amount of damages sought, and be filed within two years of the claim's accrual. 28 U.S.C. §§ 2401(b), 2675(a); *A.Q.C. ex rel. Castillo v. United States*, 715 F. Supp. 2d 452, 457 (2d Cir. 2010) (citing *Millares Guiraldes de Tineo v. United States*, 137 F.3d 715, 720 (2d Cir. 1998)).

A claimant may thereafter challenge the agency's final denial in a federal district court by filing an action within six months of the date of the mailing of the notice of final denial by the agency. *See* § 2401(b). If no written final determination is made by the appropriate federal entity within six months of the date of the claimant's filing of the administrative claim, the claimant may then bring a FTCA action in a federal district court. *See* § 2675(a). "[T]he FTCA's time bars are nonjurisdictional and subject to equitable tolling." *United States v. Kwai Fun Wong,* 135 S. Ct. 1625, 1638 (Apr. 22, 2015).

Plaintiff's FTCA claims are therefore dismissed without prejudice for failure to exhaust his administrative remedies. [2]

[2]  To the extent Plaintiff seeks damages for conduct by federal prosecutors, "the FTCA does not authorize suits for intentional torts based upon the

actions of Government prosecutors." *Bernard v. United States*, 25 F.3d 98, 104 (2d Cir. 1994).

#### B. *Bivens* claims

To state a claim for relief under *Bivens*, a plaintiff must allege facts that plausibly show that: (1) the challenged action was attributable to an officer acting under color of federal law, and (2) such conduct deprived him of a right, privilege, or immunity secured by the Constitution. *See Thomas v. Ashcroft*, 470 F.3d 491, 496 (2d Cir. 2006) (citing *Bivens*, 403 U.S. at 389). *See Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009) ("[*Bivens*] is the federal analog to suits brought against state officials under [§ 1983]."); *Morales v. City of New York*, 752 F.3d 234, 237 (2d Cir. 2014) (holding that district court properly construed § 1983 claims brought against federal employee as arising under Bivens).

**\*3**  A *Bivens* action may be brought against an individual for the individual's own acts, *see Ziglar v. Abbasi*, 137 S. Ct. 1843, 1860 (2017), and may not be brought against federal agencies, *see Correctional Services Corp. v. Malesko*, 534 U.S. 61, 68 (2001).

#### 1. DEA agents may not be sued under the doctrine of witness immunity for their grand jury testimony

The Court construes Plaintiff's complaint as asserting claims against individual DEA agents because federal agencies may not be sued under *Bivens*. *See Ziglar*, 137 S. Ct. at 1860 (2017). But Plaintiff's claims against DEA agents for their alleged false testimony before a grand jury must be dismissed because those agents are immune from suit. Grand jury and trial court witnesses, including law enforcement officers, are absolutely immune from liability for damages for their testimony, even if their testimony was false. *Rehberg v. Paulk*, 566 U.S. 356, 366-69 (2012); *Briscoe v. LaHue*, 460 U.S. 325 (1983); *Coggins v. Buonora*, 776 F.3d 108, 113-14 (2d Cir. 2015); *San Filippo v. U.S. Trust Co. of N.Y., Inc.*, 737 F.2d 246, 254 (2d Cir. 1984).

#### 2. Government attorneys may not be sued under the doctrine of prosecutorial immunity for their conduct during the grand jury proceeding

The Court also construes the complaint as asserting claims against individual prosecutors with the USAO. But these claims must be dismissed because federal prosecutors are absolutely immune.

Prosecutors are immune from civil suits for damages for acts committed within the scope of their official duties where the challenged activities are not investigative in nature but, rather, are "intimately associated with the judicial phase of the criminal process." *Simon v. City of New York*, 727 F.3d 167, 171 (2d Cir. 2013) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976)); *see also Buckley v. Fitzsimmons*, 509 U.S. 259 (1993) (holding that absolute immunity is analyzed under "functional approach" that "looks to the nature of the function performed, not the identity of the actor who performed it"). In addition, prosecutors are absolutely immune from suit for acts that may be administrative obligations but are "directly connected with the conduct of a trial." *Van de Kamp v. Goldstein*, 555 U.S. 335, 344 (2009). "Absolute immunity ... is also extended to officials of government agencies 'performing certain functions analogous to those of a prosecutor....' " *DiBlasio v. Novello*, 344 F.3d 292, 296-97 (2d Cir. 2003) (citation omitted).

Here, Plaintiff's claims against USAO federal prosecutors are based on actions within the scope of their official duties and associated with the judicial phase of the criminal process. Therefore, these claims are dismissed based on absolute immunity. Because these claims are well "within the distinguishable heartland of immune prosecutorial conduct," the Court also dismisses these claims as frivolous. *Flagler v. Trainor*, 663 F.3d 543, 551 (2d Cir. 2011); *Collazo v. Pagano*, 656 F. 3d 131, 134 (2d Cir. 2011) (holding that claim against prosecutor is frivolous if it arises from conduct that is "intimately associated with the judicial phase of the criminal process").

### 3. Plaintiff's Eighth Amendment claim is dismissed because the Eight Amendment does not apply to this case

**\*4**  Although a plaintiff may bring a *Bivens* action under the Eighth Amendment, *Carlson v. Green*, 446 U.S. 14, 18 (1980), the Eighth Amendment's Cruel and Unusual Punishment Clause does not apply here because Plaintiff's claims do not arise out of his incarceration. The Cruel and Unusual Punishment Clause only protects individuals who are incarcerated after being convicted of a crime. *Ingraham v. Wright*, 430 U.S. 651, 671, 97 S. Ct. 1401, 1412, 51 L.Ed. 2d 711 (1977). The Court therefore dismisses Plaintiff's Eighth Amendment claim for failure to state a claim.

### C. The Court construes Plaintiff's conspiracy claim as arising under 42 U.S.C. § 1985(3) and dismisses it

Section 1985 prohibits conspiracies to deprive "any person or class of person of the equal protection of the laws, or of equal privileges and immunities under the laws." 42 U.S.C. § 1985(3). To state a claim under § 1985, a plaintiff must allege facts showing: (1) a conspiracy (2) for the purpose of depriving him of the equal protection of the laws, or the equal privileges or immunities under the laws; (3) an overt act in furtherance of the conspiracy; and (4) an injury to his person or property, or a deprivation of his right or privilege as a citizen of the United States. *Thomas v. Roach*, 165 F.3d 137, 146 (2d Cir. 1999). "[T]he conspiracy must also be motivated by 'some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action.' " *Id.* (quoting *Mian v. Donaldson, Lufkin & Jenrette Securities Corp.*, 7 F.3d 1085, 1088 (2d Cir. 1993) (per curiam)).

Plaintiff fails to state a claim under § 1985 because he does not identify any right violated by Defendants. Rather, he claims that the two entities charged with investigating and prosecuting individuals suspected of committing crimes – the DEA and the USAO – conspired to ensure that he would be indicted. This allegation essentially challenges the proceedings leading up to his indictment. But Plaintiff's claim, that Defendants testified falsely before a grand jury and presented false evidence, does not state a violation of any right. Put simply, Plaintiff's assertion that false evidence and false testimony presented at the grand jury amounted to a conspiracy to indict him does not state a claim that Defendants conspired to violate any right of Plaintiff's.

Plaintiff ultimately seeks to challenge his conviction. His pending § 2255 motion is the appropriate vehicle to do so. The Court therefore dismisses Plaintiff's § 1985 claim for failure to state a claim.

### D. The Court grants Plaintiff leave to replead his claim that DEA agents conspired against him

The Supreme Court has recognized *Bivens* claims in three contexts: (1) unreasonable search and seizure under the Fourth Amendment, *Bivens*, 403 U.S. 388 (1971), (2) employment discrimination under the Fifth Amendment, *Davis v. Passman*, 442 U.S. 228 (1979), and (3) inadequate medical treatment of an inmate under the Eighth Amendment, *Carlson*, 446 U.S. at 18 (1980). *See Ziglar*, 137 S. Ct. at 1854-55. Otherwise, the Supreme Court "has made clear that expanding the *Bivens* remedy is ... a 'disfavored' judicial activity." *Id.* at 1857.

Conclusory and vague allegations of conspiracy are insufficient to state a claim under *Bivens. See Arar v. Ashcroft*, 585 F.3d 559, 569 (2d Cir. 2009) ("[A] plaintiff in a *Bivens* action is required to allege facts indicating that the defendants were personally involved in the claimed constitutional violation"); *see also Sommer v. Dixon*, 709 F.2d 173, 175 (2d Cir. 1983) ("A complaint containing only conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss.").

 **\*5** As an initial matter, post-*Ziglar*, the Court is inclined to dismiss Plaintiff's *Bivens* conspiracy claim against the DEA agents for any conduct in which they are not immune under the doctrine of witness immunity. But, whether Plaintiff may bring a *Bivens* conspiracy claim against the DEA agents for conduct outside of the grand jury proceeding has not been decided by the Supreme Court. [3] Although Plaintiff's claim is conclusory and vague, because it would not be futile to grant leave to replead, the Court does so here. Accordingly, the Court grants Plaintiff leave to replead facts in support of his conspiracy claim against DEA agents related to any conduct outside of the grand jury proceeding.

[3]    Because federal witnesses are immune for their testimony at a grand jury proceeding, the Supreme Court need not consider whether a plaintiff *could* bring a *Bivens* action concerning witness testimony.

**CONCLUSION**

The Clerk of Court is directed to assign this matter to my docket, mail a copy to Plaintiff, and note service on the docket. Plaintiff's complaint is dismissed under the doctrines of prosecutorial immunity, witness immunity, and for failure to exhaust his FTCA claims, with leave to replead his conspiracy claims against DEA agents. See 28 U.S.C. §§ 1915(e)(2)(B)(i)-(iii).

Plaintiff's request to provide documents (ECF No. 3) and his motion for summary judgment (ECF No. 4) are denied as moot.

Because this action is being dismissed with leave to replead, the Court declines to accept as related any another action Plaintiff has filed. (*See* ECF No. 5.)

The Court certifies under 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, and therefore *in forma pauperis* status is denied for the purpose of an appeal. *See Coppedge v. United States*, 369 U.S. 438, 444-45 (1962).

The Clerk of Court is directed to docket this as a "written opinion" within the meaning of Section 205(a)(5) of the E-Government Act of 2002.

SO ORDERED.

**All Citations**

Slip Copy, 2019 WL 2082549

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Distinguished by Hogan v. County of Lewis, N.Y., N.D.N.Y., March 8, 2013

2010 WL 335581
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
E.D. New York.

Erwin JACKSON, Plaintiff,
v.
COUNTY OF NASSAU, Nassau County
Police Department, and Office of the Nassau
County District Attorney, Defendants.

No. 07-CV-245 (JFB)(AKT).
|
Jan. 22, 2010.

**Attorneys and Law Firms**

Erwin Jackson, pro se.

Ralph J. Reissman and Sara A. Wells of the Nassau County Attorney's Office, Mineola, NY, for defendants.

**MEMORANDUM AND ORDER**

JOSEPH F. BIANCO, District Judge.

**\*1** On January 17, 2007, pursuant to 42 U.S.C. § 1983, *pro se* plaintiff Erwin Jackson ("plaintiff" or "Jackson") brought this action against defendants County of Nassau ("the County"), Nassau County Police Department, and the Office of the Nassau County District Attorney alleging that defendants violated plaintiff's rights under the First, Fourth, and Fourteenth Amendments of the United States Constitution. Specifically, Jackson claims that his constitutional rights were violated during his pretrial proceedings when police officers allegedly withheld exculpatory evidence, made perjurous statements, and falsely verified felony complaints against plaintiff when they had no personalknowledge of the underlying facts. Jackson further contends that the County of Nassau has a policy of committing these constitutional violations. Jackson also alleges that the County of Nassau has a policy of failing to investigate criminal complaints

regarding these types of violations if they are filed by pretrial detainees or criminal defendants. The defendants now move, jointly, for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set forth below, defendants' motion is granted.

I. FACTS

The Court has taken the facts set forth below from the parties' depositions, affidavits, and exhibits, and from the defendants' respective Rule 56.1 statements of facts. [1] Upon consideration of a motion for summary judgment, the Court shall construe the facts in the light most favorable to the non-moving party-here, the plaintiff. *See Capobianco v. City of New York,* 422 F.3d 47, 50 n. 1 (2d Cir.2001). Unless otherwise noted, where a party's 56.1 statement or deposition is cited, that fact is undisputed or the opposing party has pointed to no evidence in the record to contradict it. [2]

[1]     The Court notes that plaintiff failed to file and serve a response to defendant's Local Rule 56.1 Statement of Facts in violation of Local Civil Rule 56.1. Generally, a "plaintiff['s] failure to respond or contest the facts set forth by the defendants in their Rule 56.1 statement as being undisputed constitutes an admission of those facts, and those facts are accepted as being undisputed." *Jessamy v. City of New Rochelle,* 292 F.Supp.2d 498, 504 (S.D.N.Y.2003) (quoting *NAS Elecs., Inc. v. Transtech Elecs. PTE Ltd.,* 262 F.Supp.2d 134, 139 (S.D.N.Y.2003)). However, "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules." *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 73 (2d Cir.2001) (citations omitted); *see also Gilani v. GNOC Corp.,* No. 04 Civ. 2935(ILG), 2006 WL 1120602, at \*2 (E.D.N.Y. Apr. 26, 2006) (exercising court's discretion to overlook the parties' failure to submit statements pursuant to Local Civil Rule 56.1). In plaintiff's opposition papers, he specifically identified those paragraphs of defendants' Rule 56.1 statement with which he agreed that there were no material disputed issues of fact. The Court, in its discretion, thus relies on those paragraphs as equivalent to plaintiff's Rule 56 .1 statement of facts for the purposes of this opinion. In the exercise of its broad discretion and

given plaintiff's *pro se* status, the Court will also only deem admitted those facts in defendant's Rule 56.1 statement that are supported by admissible evidence and not controverted by other admissible evidence in the record. *See Jessamy,* 292 F.Supp.2d at 504-05.

[2]   Because plaintiff is *pro se,* the Court has independently reviewed plaintiff's deposition testimony. Plaintiff's deposition contains no additional evidence other than plaintiff's speculation and conclusory allegations.

### A. The Underlying Prosecution

On November 22, 2005, plaintiff Erwin Jackson was arrested by Nassau County police officers for attempted robbery of the Bank of America located in Baldwin, New York, on November 21, 2005. (Defs.' 56.1 Statement ¶ 4.) Plaintiff was brought to the Bellmore police station, where he was questioned about the November 21, 2005 robbery. (Deposition of Irwin Jackson, Defs.' Ex. E (hereinafter "Pl.'s Dep.") at 32-33.) At the station, Jackson was also questioned about other bank robberies. (*Id.* at 34-35.) Plaintiff was arrested and arraigned on November 23, 2005. He was charged for the November 21 robbery and four additional robberies that had occurred in Nassau County on November 13, 2005, October 1, 2005, September 2, 2005, and July 23, 2005. (*Id.* at 40-41; Defs.' 56.1 Statement ¶ 5.) Plaintiff was indicted by a grand jury on thirteen counts on December 19, 2005. (Pl.'s Dep. at 44-45.) In June 2006, a pretrial suppression hearing was held, at which Police Officer Joseph Hughes testified. (*Id.* at 45-46.) Plaintiff proceeded to trial on the charges and, on February 6, 2007, was found guilty on nine counts of Robbery in the First Degree (New York Penal Law 160.15) and one count of Conspiracy in the Fourth Degree (New York Penal Law 105.10). (*Id.* at 53-54.) On July 30, 2008, Jackson was sentenced to fifteen years for each of the nine counts of Robbery in the First Degree, plus one year and four months for Conspiracy in the Fourth Degree. (Defs.' 56.1 ¶ 8.) Jackson's minimum aggregate sentence was set at twenty-five years, eight months and sixteen days. (*Id.* ¶ 9.)

### B. Officer Hughes

**\*2**  By letter dated September 17, 2006, while a pretrial detainee, Jackson filed three criminal complaints against Police Officer Joseph Hughes with the Nassau County

District Attorney's Criminal Complaint Unit. (*Id.* ¶ 10.) The complaints were based on Officer Hughes's allegedly inconsistent testimony at a pretrial suppression hearing. Jackson alleges that while testifying before the Grand Jury in December 2005, Officer Hughes stated that he observed five black males fleeing a four-door Buick wearing face masks. During a subsequent pretrial hearing on July 10, 2006, plaintiff cross-examined Officer Hughes. At that hearing, Officer Hughes stated that only some of the males he observed were wearing face masks. The testimony at the July 10 pretrial hearing was as follows:

> Q: This individual jumps out of the car. This is the individual that you pursued after?
>
> A: Correct. * * *
>
> Q: Did he have mask on? A: No mask.
>
> Q: No mask. You testified in the grand jury that all five of the occupants of that car that fled had masks on?
>
> A: I was incorrect about that. I stated that before.
>
> Q: That information wasn't true?
>
> A: It was incorrect. * * *
>
> Q: You testified they all had masks on. Now, you're saying, you take the mask off one-
>
> A: I believe in that statement. I was describing all the occupants. I said, they all had masks on. I was incorrect. I should have said, some had masks on.

(*Id.* ¶ 12 (citing Ex. AB at 485-86).)

Jackson also claims Officer Hughes made a "punishable false written statement" and committed the crime of "offering a false instrument for filing" by verifying and signing five felony complaints against plaintiff, although Officer Hughes had no personal knowledge of the information contained in those complaints and relied on information provided by other officers. (*Id.* ¶¶ 13-14.) According to Jackson, during the pretrial hearing and trial of his co-defendant Paul Henry, Officer Hughes testified that it was police procedure for officers to verify and swear to felony complaints even though they lacked knowledge of the underlying facts or crimes alleged therein. (Pl.'s Dep. at 61.) Jackson also alleges that Hughes testified to this at Jackson's own trial on cross-examination. (*Id.* at 61-62.)

On September 21, 2006, Assistant District Attorney ("ADA") Thurer transferred plaintiff's perjury complaint against Officer Hughes to ADA Barbara Kornblau, Chief of the Public Corruption Bureau. (*Id.* ¶ 15.) ADA Kornblau reviewed plaintiff's complaint against Officer Hughes. Because plaintiff's case was still pending and "the issues alleged by plaintiff all pertained to credibility," (Defs.' Ex. K ¶ 6), ADA Kornblau notified Daniel Looney, the ADA prosecuting plaintiff, and plaintiff's attorney, Jeffrey Groder, of plaintiff's claims. The District Attorney's Office later informed Jackson that it also forwarded the case to the Internal Affairs Bureau of the Nassau County Police Department for administrative action at their discretion. (Pl.'s Dep. at 56; Defs.' 56.1 ¶ 16.) After receiving plaintiff's complaint from the District Attorney's Office, the Nassau County Police Department's Internal Affairs Bureau "determined that plaintiff's complaint against Officer Hughes for perjury was unfounded, since plaintiff had been convicted in a jury trial on February 6, 2007." (Defs.' 56.1 ¶ 18.)

C. Detective Comiskey

**\*3** Jackson also filed criminal complaints against Detective Joseph Comiskey with the Nassau County District Court. (Pl.'s Dep. at 58-59.) According to Jackson, Detective Comiskey committed "official misconduct" and perjury for allegedly failing to provide plaintiff with "exculpatory material" in July 2006 at a pretrial hearing, and for advising the court that he had turned over all of his notes when, according to Jackson, he had not done so. (Defs.' 56.1 ¶ 19.) ADA Steven L. Schwartz, Chief of the Nassau County District Attorney's District Court Bureau, investigated these two complaints against Detective Comiskey, and found the claims in them unfounded. (*Id.* ¶ 20.) Plaintiff was subsequently informed that the District Attorney's Office declined to prosecute these complaints. (*Id.*) These complaints were also reviewed by ADA Kornblau, who determined that Detective Comiskey's actions were not a crime. (*Id.* ¶ 22.) Subsequently, as she had done with the complaint against Officer Hughes, she forwarded the complaints to the Nassau County Police Department Internal Affairs Bureau. (*Id.* ¶ 22.) ADA Kornblau also sent a letter to Jeffrey Groder, plaintiff's trial counsel, informing him of plaintiff's allegations, since they pertained to an incident in which Groder was involved. (*Id.*)

D. The Instant Complaint

Jackson alleges eleven causes of action against the County of Nassau and two of its administrative arms, the Nassau County District Attorney's Office and the Nassau County Police Department, arguing that these entities had unconstitutional policies, practices, and customs that infringed his constitutional rights. Jackson asserts three claims specifically against the County of Nassau. First, he alleges that the County had a policy of failing to discipline its employees for any alleged perjury or cover-ups with respect to evidence. (Compl. at 5; Pl.'s Dep. at 93.) Jackson's second cause of action claims that the County has a policy, practice, procedure and custom of failing to take steps to terminate the unconstitutional practices of "its legal subordinates," defendants Nassau County Police Department and the Nassau County District Attorney's Office. (Compl. at 5; Pl.'s Dep. at 93-94.) Jackson's third cause of action alleges that the County has failed to properly train and supervise its employees with regard to "the proper constitutional and statutory requirements in the exercise of their authority." (Compl. at 5; Pl.'s Dep. at 94.)

Jackson asserts four claims against the Nassau County Police Department. The fourth cause of action in Jackson's complaint alleges that the Nassau County Police Department has a policy that authorizes subordinates to falsely verify and file criminal felony complaints without "knowledge of or knowledge based upon belief" of the underlying facts. (Compl. at 5; Pl.'s Dep. at 95.) The fifth cause of action alleges that the Nassau County Police Department failed to properly train and supervise its employees in the processing of arrestees. (Compl. at 5-6.) Specifically, Jackson contends that, due to inadequate training, employees of the Nassau County Police Department do not realize "that they are not authorized to swear or fill out a felony complaint that they have absolutely no knowledge of." (Pl.'s Dep. at 96.) The sixth cause of action in Jackson's complaint claims that the Nassau County Police Department has an illegal practice or custom that condones and sanctions its employees who commit perjury, which is demonstrated by the fact that plaintiff, a pretrial criminal defendant, attempted to file criminal charges against the defendants' subordinates, but the defendants took no corrective actions. (*Id.* at 96-97; Compl. at 6.) Jackson's seventh cause of action alleges that the Nassau County Police Department, as a policy maker, has a defective and illegal policy whereby it does not correct or punish wrongdoings,

such as those alleged in causes of action numbers four, five, and six. (Compl. at 6; Pl.'s Dep. at 97-98.)

**\*4** Jackson asserts his four final claims against the Nassau County District Attorney's Office. Jackson's eighth cause of action alleges that the Nassau County District Attorney's Office has a history and practice of ignoring criminal defendants' and arrestees' complaints, ignoring evidence of police misconduct, and shielding police officers and other assistant district attorneys from prosecution. (Compl. at 6.) Jackson's ninth cause of action alleges that the Nassau County District Attorney's Office does not give "any credence to pretrial criminal defendants who seek to file and give any credence to pretrial criminal defendants that seek to commence criminal actions in the court against public officials." (*Id.* at 130.) Specifically, plaintiff contends that the Nassau County District Attorney's Office declines to investigate, arrest, and/or prosecute public officials when illegal conduct is alleged by pretrial or criminal defendants. (Compl. at 6-7.) Jackson's tenth cause of action alleges that the Nassau County District Attorney's Office has failed to punish the illegal practices and wrongdoings of their employees and the Nassau County Police Department. (Compl. at 7.) Jackson's eleventh and final cause of action contends that the Nassau County District Attorney's Office has a policy and procedure whereby the district court clerk does not submit or file any claims or complaints against a public official made by criminal defendants. (Compl. at 7.)

## II. PROCEDURAL HISTORY

Jackson filed the complaint in this action on January 17, 2007. The Court granted plaintiff leave to proceed *in forma pauperis* on January 31, 2007. Defendants filed an answer to the complaint on May 23, 2007. On March 14, 2008, plaintiff filed a motion to amend the complaint. This Court denied that motion on February 13, 2009. On May 15, 2009, defendants submitted their motion for summary judgment and provided *pro se* plaintiff with the notice required by Local Civil Rule 56.2. Defendant submitted supplemental papers to their motion on June 5, 2009. Plaintiff submitted opposition papers on May 28, 2009. [3] Defendants filed their reply to plaintiff's opposition on June 5, 2009. Plaintiff also submitted a motion for sanctions against defendants on June 10, 2009. Defendants submitted their opposition to the motion for sanctions on June 11, 2009. This matter is fully submitted.

[3] Due to delay, it appears that plaintiff's response was not filed with the Court until June 11, 2009.

## III. STANDARD OF REVIEW

The standards for summary judgment are well settled. Pursuant to Federal Rule of Civil Procedure 56(c), a court may not grant a motion for summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Globecon Group, LLC v. Hartford Fire Ins. Co.,* 434 F.3d 165, 170 (2d Cir.2006). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones,* 396 F.3d 53, 69 (2d Cir.2005). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 122 (2d Cir.2004); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

**\*5** Once the moving party has met its burden, the opposing party " 'must do more than simply show that there is some metaphysical doubt as to the material facts.... [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial.*' " *Caldarola v. Calabrese,* 298 F.3d 156, 160 (2d Cir.2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986) (emphasis in original). As the Supreme Court stated in *Anderson,* "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249-50 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Id.* at 247-48 (emphasis in original). Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth " 'concrete particulars' " showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d 69, 77 (2d Cir.1984) (quoting *SEC v. Research Automation Corp.,* 585 F.2d 31, 33 (2d Cir.1978)). Accordingly, it is insufficient for a party opposing summary

2010 WL 335581

judgment " 'merely to assert a conclusion without supplying supporting arguments or facts.' " *BellSouth Telecomms., Inc. v. W.R. Grace & Co.,* 77 F.3d 603, 615 (2d Cir.1996) (quoting *Research Automation Corp.,* 585 F.2d at 33).

Where the plaintiff is proceeding *pro se,* the Court must "construe [the complaint] broadly, and interpret [it] to raise the strongest arguments that [it] suggest[s]." *Weixel v. Bd. of Educ. of the City of N.Y.,* 287 F.3d 138, 145-46 (2d Cir.2002) (alterations in original) (quoting *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000)). Though a *pro se* litigant's pleadings and other submissions are afforded wide latitude, a *pro se* party's conclusory assertions, completely unsupported by evidence, are not sufficient to defeat a motion for summary judgment. *Shah v. Kuwait Airways Corp.,* --- F.Supp.2d ----, No. 08 Civ. 7371(GEL), 2009 WL 2877604, at *2 (S.D.N.Y. Sept. 9, 2009) ("Even a *pro se* party, however, 'may not rely simply on conclusory allegations or speculation to avoid summary judgment, but instead must offer evidence to show that its version of the events is not wholly fanciful.' " (quoting *Auguste v. N.Y. Presbyterian Med. Ctr.,* 593 F.Supp.2d 659, 663 (S.D.N.Y.2009))).

## IV. DISCUSSION

### A. Proper Defendants

Plaintiff alleges specific causes of action against the Nassau County Police Department and Nassau County District Attorney's Office as defendants. However, "under New York law, departments that are merely administrative arms of a municipality do not have a legal identity separate and apart from the municipality and, therefore, cannot sue or be sued." *See Davis v. Lynbrook Police Dep't,* 224 F.Supp.2d 463, 477 (E.D.N.Y.2002) (dismissing claim against Lynbrook Police Department); *see also Hall v. City of White Plains,* 185 F.Supp.2d 293, 303 (S.D.N.Y.2002) ("Because plaintiff has named the City of White Plains as a defendant, any claims against the [White Plains Department of Public Safety] are redundant. WPDPS does not have its own legal identity, and therefore the claims against it are dismissed."); *Polite v. Town of Clarkstown,* 60 F.Supp.2d 214, 216 (S.D.N.Y.1999) ("[M]unicipal departments in this State-such as the Clarkstown Police Department-are not amenable to suit, and no claims can lie directly against them."); *Wilson v. City of New York,* 800 F.Supp. 1098, 1101 (E.D.N.Y.1992) ("The court also dismisses the claims against the New York City Police Department, which cannot be sued

independently because it is an agency of the City of New York." (citations omitted)). Plaintiff's allegations against the Police Department are more properly raised in claims against Nassau County, which plaintiff has also brought in his first, second, and third causes of action. Accordingly, the Nassau County Police Department is dismissed as a defendant.

**\*6** For the same reason, plaintiff cannot bring claims against the Nassau County District Attorney's Office. *See Conte v. County of Nassau,* No. 06-CV-4746 (JFB)(ETB), 2008 WL 905879, at *1 n. 2 (E.D .N.Y. Mar. 31, 2008) (dismissing Section 1983 claims against the Nassau County District Attorneys Office because the entity is an " 'administrative arm[ ]' of the same municipal entity-the County ... and thus lack[s] the capacity to be sued"). Plaintiff's allegations against the District Attorneys Office are more properly brought as claims against Nassau County. Plaintiff has brought substantially the same claims against the District Attorney's Office as he has brought against the County of Nassau. Accordingly, the Nassau Count District Attorney's Office is dismissed as a defendant in this case. [4] Because the plaintiff is proceeding *pro se,* the Court, in its discretion, does not dismiss plaintiff's fourth through eleventh causes of action in their entirety, but rather construes those claims, which are largely duplicative of causes of action one through three, as against the County of Nassau.

[4] The Court further notes that it has previously denied plaintiff's attempt to amend his complaint to state claims against Lawrence Mulvey, the Commissioner of the Nassau County Police Department, and Kathleen Rice, the Nassau County District Attorney. *See Jackson v. County of Nassau,* No. 07-CV-0245 (JFB)(AKT), 2009 WL 393640 (E.D.N.Y. Feb. 13, 2009).

### B. Section 1983 Liability

As stated *supra,* Jackson has brought his claims pursuant to Section 1983. Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan,* 443 U.S. 137, 145 n. 3 (1979). [5] For claims under Section 1983, a plaintiff must prove that "(1) the challenged conduct was attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of

the United States." *Snider v. Dylag,* 188 F.3d 51, 53 (2d Cir.1999) (citation omitted). Here, the parties do not dispute that defendants were acting under color of state law. The question presented, therefore, is whether defendants' conduct deprived Jackson of the rights he asserts.

[5]      Specifically, Section 1983 provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law....

42 U.S.C. § 1983.

Although *pro se* plaintiff alleges eleven separate causes of action against the County of Nassau and its administrative arms, the claims alleged by plaintiff in his complaint are as follows: (1) the County of Nassau has a policy or practice of permitting its employees (or employees of its administrative arms) to commit perjury and a policy or practice of failing to discipline its employees who do commit perjury; (2) the County of Nassau has a policy or practice of permitting its police officers to falsely verify criminal complaints; and (3) the County of Nassau has a policy of not investigating, responding to, or prosecuting complaints or cross-criminal complaints of pretrial detainees and criminal defendants that allege crimes and misconduct against police officers and assistant district attorneys. (Plaintiff's Opposition (hereinafter "Opp.") at 14.)

Defendants argue that they are entitled to summary judgment on the grounds that Jackson has failed to provide any evidence that would raise a genuine issue of fact as to municipal liability for any of these claims. As set forth below, the Court agrees. First, plaintiff has failed to provide any evidence that there was an underlying constitutional violation with respect to his arrest and conviction, which would be a necessary element of any municipal liability claim. In fact, under well-settled Supreme Court and Second Circuit precedent, plaintiff's valid conviction precludes him from litigating any of his claims in the instant case because success on such claims (that is, demonstrating his constitutional rights were violated in connection with the investigation and prosecution of his case) would necessarily implicate the unconstitutionality of his conviction. Second, plaintiff has

provided absolutely no evidence of an unconstitutional policy or custom of the County of Nassau and, thus, his municipal liability claims against the County cannot survive summary judgment.

### (1) Plaintiff Cannot Demonstrate Violation of His Constitutional Rights

**\*7** To bring a successful Section 1983 claim, plaintiff must first demonstrate that he was injured as a result of a constitutional violation. In the instant case, plaintiff cannot do so. First, Supreme Court precedent prevents a prisoner, like Jackson, from bringing a Section 1983 claim where success on the claim necessarily would implicate the unconstitutionality of the prisoner's conviction or sentence. Second, even assuming this rule did not apply, plaintiff has presented no evidence of any constitutional violations relating to his conviction.

### a. *Heck v. Humphrey*

As a threshold matter, although not explicitly raised by defendants, plaintiff's claims fail as a matter of law, by virtue of his conviction. Specifically, the Supreme Court's decision in *Heck v. Humphrey,* 512 U.S. 477 (1994), entitles defendants to a decision in their favor as a matter of law with respect to these claims.

### i. The *Heck* Rule

In *Heck v. Humphrey,* the Supreme Court "confronted the question of whether, given the overlap between § 1983 and the federal habeas corpus statute, a prisoner seeking civil damages may proceed with a § 1983 claim where success on the claim necessarily would implicate the unconstitutionality of the prisoner's conviction or sentence." *Amaker v. Weiner,* 179 F.3d 48, 51 (2d Cir.1999) (citing *Heck,* 512 U.S. at 480-90). The Supreme Court in that case explained:

> We hold that, in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a

§ 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254. A claim for damages bearing that relationship to a conviction or sentence that has *not* been so invalidated is not cognizable under § 1983. Thus, when a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated.

512 U.S. at 486-87 (footnote omitted) (emphasis in original); *see also Wilkinson v. Dotson,* 544 U.S. 74, 81 (2005) ("Heck specifies that a prisoner cannot use § 1983 to obtain damages where success *would* necessarily imply the unlawfulness of a (not previously invalidated) conviction or sentence." (emphasis in original)).

Thus, pursuant to *Heck,* courts routinely dismiss claims brought under Section 1983 when such claims bear on the validity of an underlying conviction or sentence. *See, e.g., Guerrero v. Gates,* 442 F.3d 697, 703-04 (9th Cir.2006) (holding that Heck bars plaintiff's § 1983 claims of wrongful arrest, malicious prosecution, and conspiracy); *Amaker,* 179 F.3d at 51-52 (holding that *Heck* applies to Section 1983 conspiracy); *Perez v. Cuomo,* No. 09 Civ. 1109(SLT), 2009 WL 1046137, at *7 (E.D.N.Y. Apr. 17, 2009) ("A § 1983 claim for the violation of the due process right to a fair trial is, in essence, a claim for damages attributable to an unconstitutional conviction.... Since plaintiff's conviction remains valid, plaintiff's claim for violation of his right to a fair trial is not cognizable under § 1983, and must be dismissed as to all defendants[.]") (internal quotation marks and citations omitted); *Younger v. City of N.Y.,* 480 F.Supp.2d 723, 730 (S.D.N.Y.2007) (holding that plaintiff's claims for false arrest/imprisonment and malicious prosecution were barred by his plea of guilty pursuant to *Heck); cf. Jovanovic*

*v. City of N.Y.,* No. 04 Civ. 8437, 2006 WL 2411541, at * 12 (S.D.N.Y. Aug. 17, 2006) (applying *Heck* to a Section 1983 claim for denial of the right to a fair trial in the context of a statute of limitations issue).

### ii. Application

**\*8** Here, as stated *supra,* Jackson was convicted after a trial in state court of nine counts of Robbery in the First Degree and one count of Conspiracy in the Fourth Degree on July 30, 2008. It is apparent that Jackson is still incarcerated for this conviction and, to date, has been unsuccessful in challenging his conviction or has not even attempted to do so. Under these circumstances, the Supreme Court's holding in *Heck* precludes plaintiff from bringing claims in this Court under Section 1983 for municipal liability, because a plaintiff bringing such claims must demonstrate a constitutional violation in connection with his conviction, and a successful result in this case on any one of plaintiff's claims would bear on the validity of that underlying conviction.

Indeed, *Heck'*s application to the instant matter is straightforward. Plaintiff's complaint claims that he was "subsequently indicted based upon officer Hughes['s] 'inaccurate' testimony." (Compl.¶ 9.) Plaintiff also contends that during his pretrial hearings there was extensive "late disclosure of [exculpatory] material." (*Id.* ¶ 11.) Although it is true that not all claims brought under Section 1983 necessarily implicate the validity of the underlying conviction, in this case, plaintiff's assertions of perjury, withheld evidence, and falsely sworn documents during his trial by police officers do necessarily implicate the validity of his conviction and are thus barred by the *Heck* rule. [6] *See, e.g., McCloud v. Jackson,* 4 F. App'x 7, 10 (2d Cir.2001) ("[Plaintiff] could not assert [municipal liability] claims under § 1983 against the county defendants for holding him in jail because any claim for money damages which, as here, necessarily imputes the invalidity of a conviction, is barred under *Heck v. Humphrey,* 512 U.S. 477, 484, 486-87 (1994), until such time as the conviction is vacated or otherwise invalidated."); *Channer v. Mitchell,* 43 F.3d 786, 787-88 (2d Cir.1994) (per curiam) (affirming *Heck*-based dismissal of claim that police officers committed perjury and coerced witnesses to identify plaintiff wrongfully); *Williams v. Schario,* 93 F.3d 527, 529 (8th Cir.1996) ("[A] judgment in Williams's favor on his damages claim that defendants engaged in malicious prosecution and presented perjured testimony would 'necessarily imply the invalidity of his conviction or sentence' " (quoting *Heck,*

512 U.S. at 487)); *Smithart v. Towery,* 79 F.3d 951, 952-53 (9th Cir.1996) (per curiam) (affirming *Heck*-based dismissal of § 1983 claim of conspiracy to "bring unfounded criminal charges" against plaintiff); *Jasper v. Fourth Court of Appeals,* No. 08 Civ. 7472(LAP), 2009 WL 1383529, at *1 (S.D.N.Y. May 18, 2009) ("The Court liberally construes this complaint as asserting that plaintiff was denied his constitutional right to a fair trial. [However, s]ince plaintiff's conviction remains valid, plaintiff's fair trial claim is not cognizable under § 1983, and it must be dismissed as to all defendants[.]"); *Perez,* 2009 WL 1046137, at *7 ("A § 1983 claim for the violation of the due process right to a fair trial is, in essence, a claim for damages attributable to an unconstitutional conviction.... Since plaintiff's conviction remains valid, plaintiff's claim for violation of his right to a fair trial is not cognizable under § 1983, and must be dismissed as to all defendants[ .]") (internal quotation marks and citations omitted); *Fernandez v.. Holzbach,* No. 3:04 Civ. 1664(RNC), 2007 WL 1467182, at *1 (D.Conn. May 15, 2007) (holding that plaintiff's allegations that his convictions were based on perjury and fabricated evidence pursuant to a conspiracy to violate his federal rights "necessarily impl[ied] that he was wrongly convicted" and could not be litigated "until he show[ed] that the convictions have been invalidated"); *Duamutef v. Morris,* 956 F.Supp. 1112, 1115-16 (S.D.N.Y.1997) (dismissing § 1983 claims for, *inter alia,* malicious prosecution, false arrest, and perjury during trial due to a failure to state a claim under *Heck* because of the valid underlying criminal conviction). Thus, in order to bring a cognizable Section 1983 claim in this Court for the harms alleged, plaintiff must first establish the invalidity of his state court conviction.

6      With respect to plaintiff's claim that the County of Nassau has a policy of declining to investigate criminal complaints filed by pretrial detainees and criminal defendants, as discussed *infra,* plaintiff has failed to present any evidence that his claim was not investigated, whereas the County has presented substantial evidence demonstrating that plaintiff's claim was, in fact, investigated. Moreover, the prosecution of plaintiff's criminal complaints against Officer Hughes and Detective Comiskey would have implicated the validity of his underlying conviction, in contravention of the *Heck* rule. Accordingly, *Heck* can be construed to preclude all of plaintiff's Section 1983 claims.

**\*9** The fact that plaintiff is seeking to assert municipal liability claims against the County of Nassau, rather than against individual defendants, does not vitiate the application

of the *Heck* rule to plaintiff's claims. To prevail against the County of Nassau in his Section 1983 action under any of these theories, a plaintiff must plead and prove: (1) there was an official municipal policy or custom; and (2) that policy or custom caused him to be subjected to a denial of a constitutional right. *See Monell v. Dep't Soc. Servs.,* 436 U.S. 658, 690-91 (1978). There must be a "direct causal link" between the alleged municipal action and the deprivation of the plaintiff's constitutional rights. *City of Canton, Ohio v. Harris,* 489 U.S. 378, 385 (1989); *Vippolis v. Vill. of Haverstraw,* 768 F.2d 40, 44 (2d Cir.1985); *see also Lynch v. Suffolk County Police Dep't,* No. 07-3684-cv, 2009 WL 3287565, at *2 (2d Cir. Oct. 14, 2009) ("In order to prevail on a claim against a municipality under *Monell,* a plaintiff must allege, among other things, that a 'municipal policy of some nature caused a constitutional tort.' " (citations omitted)). In the instant case, because the Court finds as a matter of law on summary judgment that *Heck v. Humphrey* prevents a finding that a constitutional violation was committed against plaintiff by any of the defendants, *see supra,* no *Monell* claim can lie against the County of Nassau pursuant to § 1983.[7] *See, e.g., Lynch,* 2009 WL 3287565, at *2 ("Insofar as plaintiff alleges that a municipal policy caused prosecutorial misconduct in the trial that led to his felony convictions, plaintiff's claim seeks to 'recover damages for [an] allegedly unconstitutional conviction or imprisonment' and is barred by *Heck,* 51 U.S. at 486." (alteration in original)); *Segal v. City of N.Y.,* 459 F.3d 207, 219 (2d Cir.2006) ("Because the district court properly found no underlying constitutional violation, its decision not to address the municipal defendants' liability under *Monell* was entirely correct."); *accord Vippolis,* 768 F.2d at 44 ("A plaintiff who seeks to hold a municipality liable in damages under section 1983 must prove that the municipality was, in the language of the statute, the 'person who ... subjected, or cause[d][him] to be subjected,' to the deprivation of his constitutional rights." (citing 42 U.S.C. § 1983)); *see also Ewolski v. City of Brunswick,* 287 F.3d 492, 516 (6th Cir.2002) ("Having concluded that the Appellant has not shown a genuine issue of material fact as to any of the asserted constitutional claims, we therefore conclude that the district court correctly dismissed the Appellant's municipal liability claims.").

7      In any event, summary judgment would also be warranted in favor of the County of Nassau because, as discussed *infra,* plaintiff has failed to proffer any evidence of a policy, custom, or

failure to train, that led to any alleged constitutional violation.

In sum, even accepting plaintiff's allegations as true and drawing all reasonable inferences in plaintiff's favor, the Court finds that plaintiff cannot successfully bring a claim because the *Heck* rule, as a matter of law, prevents plaintiff from demonstrating a violation of his constitutional rights, which is a necessary predicate to any municipal liability claim pursuant to Section 1983.

### b. No Evidence of Violation of Plaintiff's Constitutional Rights

**\*10** Moreover, even assuming that the validity of plaintiff's underlying conviction was not implicated by his claim that the County of Nassau had a policy of ignoring criminal complaints filed by pretrial detainees and criminal defendants, he has presented no evidence to support his contention that the County did not investigate his claims. Thus, because there is no evidence from which a rational jury could find a violation of his constitutional rights, there is no predicate for his municipal liability claim.

The only forms of evidence offered by plaintiff on this issue are his bald assertions and the fact that the County did not prosecute Officer Hughes or Detective Comiskey for their alleged misconduct in relation to plaintiff's trial. Plaintiff's exhibits consist merely of copies of the letters and complaints that he filed with Nassau County entities. Plaintiff presents no evidence to contradict the evidence put forth by defendants, which demonstrates that plaintiff's complaints were investigated. In two affidavits submitted by ADA Kornblau, former Bureau Chief of the District Attorney's Public Corruption Bureau, she asserts that she personally investigated plaintiff's complaints against the officers. (*See* Defs.' Exs. K, X.) According to ADA Kornblau's affidavit, upon investigating Jackson's complaints, "[it] was clear from the minutes that [Jackson's] criminal attorney raised the issue of the failure to turn over *Rosario* material to the trial court, which is the proper venue for such an allegation." (Defs.' Ex K ¶ 4.) Subsequently, ADA Kornblau determined that the remainder of plaintiff's claims were unfounded, and declined to prosecute the matter. (*See id.* ¶ 4 ("Subsequent to reviewing Jackson's complaint and after determining that the [complaint] did not allege conduct which constituted a crime, I referred the matter to the Internal Affairs Bureau of the Nassau County Police Department ...."); *id.* ¶ 6 ("In view of the fact that the trial of this case

was still pending, and the issues alleged by [Jackson] all pertained to credibility, I notified Daniel Looney, the Assistant District Attorney assigned to Jackson's prosecution, as well as defense counsel, Jeffrey Groder, of Jackson's claims. I also forwarded Jackson's complaint to the Internal Affairs Bureau of the Nassau County Police Department for whatever administrative action they deemed necessary.").) In a separate affidavit, ADA Steven L. Schwartz, Bureau Chief of the District Court Trial Bureau in the Nassau County District Attorney's Office, states that he personally investigated plaintiff's proposed accusatory instruments and found them to be unfounded; accordingly, they were not prosecuted. (Defs.' Ex. Q ¶ 9.) [8]

[8]   The Court further notes that in the absence of any evidence that the Nassau County District Attorney's Office failed to investigate Jackson's complaints, the decision not to prosecute those complaints is protected by prosecutorial immunity. *See, e.g., Fields v. Soloff,* 920 F.2d 1114, 1119 (2d Cir.1990) ("[U]nless a prosecutor proceeds in the clear absence of all jurisdiction, absolute immunity exists for those prosecutorial activities intimately associated with the judicial phase of the criminal process.... This protection extends to the decision to prosecute as well as the decision not to prosecute." (internal quotations and citations omitted)).

Here, as in *Staley v. Grady,* 371 F.Supp.2d 411 (S.D.N.Y.2005), "[s]imply because defendants disagreed with plaintiff as to the merits of the proposed [complaint] and chose not to prosecute the same, does not give rise to an equal protection violation." *Id.* at 417. Here, too, the Nassau County District Attorney's Office received Jackson's criminal complaints, reviewed and investigated them, and declined to prosecute them based upon the conclusion that the complaints were without merit. (*See* Defs.' Exs. K, Q.)

**\*11** In short, due to plaintiff's inability to set forth any evidence from which a rational jury could find a deprivation of his constitutional rights, plaintiff's *Monell* claims against the County of Nassau cannot survive summary judgment.

### (2) Plaintiff Has Set Forth No Evidence to Support a *Monell* Claim

Even assuming *arguendo* that plaintiff had put forth evidence to create a genuine issue of fact on whether his constitutional rights were violated, his municipal liability claims still cannot survive summary judgment because there is no evidence of a policy, practice or custom to support a finding by a rational jury of municipal liability under *Monell.*

### i. Applicable Standard

Municipalities cannot be held vicariously liable for the actions of an employee under § 1983. *Monell,* 463 U.S. at 691 ("[A] municipality cannot be held liable solely because it employs a tortfeasor-or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory."). Thus, "[a] municipality will not be held liable under Section 1983 unless the plaintiff can demonstrate that the allegedly unconstitutional action of an individual law enforcement official was taken pursuant to a policy or custom 'officially adopted and promulgated by that [municipality's] officers.' " *Abreu v. City of N.Y.,* No. 04-CV-1721 (JBW), 2006 U.S. Dist. LEXIS 6505, at *11 (E.D.N.Y. Feb. 22, 2006) (quoting *Monell,* 436 U.S. at 690) (alteration in original). " '[M]unicipal liability under § 1983 attaches where-and only where-a deliberate choice to follow a course of action is made from among various alternatives' by city policymakers ." *City of Canton,* 489 U.S. at 389 (quoting *Pembaur v. Cincinnati,* 475 U.S. 469, 483-84 (1986)). Thus, an individual's misconduct will not result in *respondeat superior* liability for his supervisors absent specific allegations that he acted pursuant to an official policy or custom. *Ricciuti v. N.Y.C. Transit A uth .,* 941 F.2d 119, 123 (2d Cir.1991). However, "[a] court may draw the inference of the existence of a policy or custom 'when a plaintiff presents evidence that a municipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction.' " *Caidor v. M & T Bank,* No. 05-CV-297 (FSJ), 2006 U.S. Dist. LEXIS 22980, at *35-36 (N.D.N.Y. Mar. 27, 2006) (quoting *Grifin-Nolan v. Providence Wash. Ins. Co.,* No. 04-CV-1453 (FJS), 2005 U.S. Dist. LEXIS 12902, at *10 (N.D.N.Y. June 20, 2005) (quotation omitted)). But, " 'the mere assertion ... that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference.' " *Zahra v. Town of Southold,* 48 F.3d 674, 685 (2d Cir.1995) (quoting *Dwares v. City of N.Y.,* 985 F.2d 94, 100 (2d Cir.1993)).

### ii. Application

Even if plaintiff could prove that his constitutional rights were violated, whether at trial or by the subsequent failure to prosecute his criminal complaint for the actions by municipal actors at his trial, this is not sufficient to demonstrate a policy or custom by the County of Nassau. "[A] single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy." *Ricciuti,* 941 F.2d at 123; *see also Oklahoma City v. Tuttle,* 471 U.S. 808, 823-24 (1985) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell,* unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker."); *McAllister v. N.Y.C. Police Dep't,* 49 F.Supp.2d 688, 706 (S.D.N.Y.1999) (same); *Palmer v. City of Yonkers,* 22 F.Supp.2d 283, 290 (S.D.N.Y.1998) ("[T]he court will not infer the existence of a municipal policy from a single incident."). As discussed *supra,* " 'the mere assertion ... that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference.' " *Zahra,* 48 F.3d at 685 (quoting *Dwares,* 985 F.2d at 100). [9]

[9]       Plaintiff contends that the persons who violated his constitutional rights were policymakers. (Opp. at 14 ("All of plaintiff's claims were made against the 'policy makers' and not against employees below the policy making level.").) First, as discussed *supra,* plaintiff's claims regarding alleged perjury, withholding of evidence, or falsely verified complaints relating to his trial are barred by *Heck.* In addition, however, plaintiff presents no evidence in support of this argument. Moreover, for purposes of plaintiff's causes of action regarding the failure to investigate his criminal complaints against those persons, plaintiff would need to allege that the persons who allegedly failed to investigate his accusations were policymakers. Plaintiff does not do so. Instead, he acknowledges that the policy maker is District Attorney Kathleen Rice, and the individuals who submitted the defendants' supporting affidavits-those who investigated plaintiff's allegations-are subordinates to the policy maker. (Opp. at 15.)

For the reasons contained in our earlier opinion, this Court declines to add District Attorney Rice as a defendant in this action. *See Jackson, 2009 WL 393640, at \*3-5.* In light of Jackson's repeated argument that the actions of the Nassau County District Attorney's Office's and Nassau County Police Department's actions were part of a policy, procedure, or custom, the Court interprets his complaint and opposition papers to argue municipal liability based only on a theory of municipal policy, procedure, or custom, and not on a theory of unconstitutional action by a policymaker.

**\*12** Plaintiff's complaint, statements at his deposition, and opposition papers to defendants' motion for summary judgment contain vague allegations regarding the existence of a policy or procedure by the County of Nassau of refusing to investigate criminal complaints of pretrial detainees and criminal defendants. (*E.g.,* Opp. at 5-6 ("Plaintiff also stated that he never received any response or letters of acknowledgment from either office though he wrote numerous letters inquiring about the status of his complaints and criminal charges."); Opp. at 6 ("The complaints were never investigated and plaintiff never received any response."); Opp. at 7 ("During the deposition plaintiff continuously testified to the fact that no one ever investigated nor responded to his complaints and grievances.").) These conclusory allegations as to the existence of a policy or custom are insufficient to withstand summary judgment. *See Bishop v. Toys "R" Us-NY, LLC, No. 04 Civ. 9403(PKC), 2009 WL 440434, at \*4 (S.D.N.Y. Feb. 19, 2009)* ("[P]roceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." (quoting *Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir.1995)*). Indeed, mere "conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." *Id .* (citing *Matsushita, 475 U.S. 574, 587 (1986)*); Order, *McCrary v. County of Nassau,* No. 06 CV 4982(SJF)(ARL) (E.D.N.Y. Sept. 22, 2008) ("Magistrate Judge Lindsay properly found that [p]laintiff had proffered no evidence to support his assertion that a custom, policy and/or practice, which precludes the consideration of criminal charges brought by an accused against police officers and assistant district attorneys, existed" when plaintiff merely asserted that a police officer was "aware of alleged police misconduct regarding Plaintiff's apprehension, [the] affidavits in support of County

Defendants' summary judgment motion were not sufficiently detailed, and that there was no record of any investigation having been conducted by [County Defendants] in regards to the [complaints]"). Plaintiff has presented no actual evidence of a policy or custom whereby the County would decline to review the criminal complaints of pretrial detainees or criminal defendants.

The County of Nassau, however, has put forward extensive evidence regarding the policies that it has in place to review criminal complaints filed by all citizens. In two separate affidavits, ADA Kornblau affirms that the County does investigate criminal complaints against police officers and ADAs-including those made by pretrial and criminal defendants: "[M]any of the [District Attorney's Public Corruptions Bureau's] cases are referred from members of the public, including direct complaints of police misconduct that the Bureau receives from defendants and/or their attorneys." (Defs.' Ex. X. ¶ 5.) Similarly, "[t]o facilitate the investigation into complaints by incarcerated individuals including pretrial detainees, the Public Corruption Bureau maintains a hotline in the Nassau County Correctional Center for the purpose of allowing inmates to file complaints directly with the Public Corruption Bureau, without having to have their complaints reviewed first by any other entity, agency, or person." (*Id.*) Moreover, ADA Kornblau's affidavit states that "[e]ach criminal complaint is afforded individual attention and investigation ... [and if] after investigation, it is determined that a complaint is supported by credible evidence, the Nassau County District Attorney's Public Corruption Bureau will recommend prosecution, after which those cases will be prosecuted in criminal court." (*Id.* ¶¶ 6-7).

**\*13** The County of Nassau has also submitted evidence that the system utilized by the Nassau County District Attorney's Office for examining criminal complaints filed by private citizens does not differentiate between complaints based on the individual who files the complaint. ADA Kornblau explains that:

> Complaints are retrieved from within the computerized complaint system in one of three ways: (1) a complainant's name; (2) a defendant's name; or, (3) a complaint number. Therefore, there is no way to retrieve criminal complaints made specifically by pretrial detainees from within the computer complaint

system since complaints are placed
into the system without complainant
classification (e.g., civilian, pretrial
detainee, police officer, etc.).

(*Id.* ¶ 8; *see also* Defs.' 56.1 ¶ 47; Defs.' Ex. W ¶ 11.) In
plaintiff's opposition papers, he stated that he did not dispute
these facts. (Opp. at 12.)

The County of Nassau also submitted an affidavit from
ADA Warren Thurer, the Bureau Chief of the Nassau
County Criminal Complaint Unit. According to ADA
Thurer, "[s]pecifically with respect to allegations of an
assistant district attorney's or police officer's criminal
conduct, such allegations will be individually investigated
and if appropriate, will be forwarded to the Public
Corruption Bureau of the Nassau County District Attorney's
Office." (Defs.' Ex. W ¶ 10; *see also* Defs.' Ex. Q ¶ 10 ("There
is no policy, practice, or custom within the Nassau County
District Attorney's Office that precludes the consideration,
investigation, and/or acceptance of criminal cross-complaints
brought by an accused against police officers and/or assistant
district attorneys based upon the status of the complainant as
a pretrial detainee").) An affidavit provided by ADA Steven
L. Schwartz, Bureau Chief of the District Court Trial Bureau
in the Nassau County District Attorney's Office, states that:

All proposed accusatory instruments
are given individual attention and
investigation. There is no distinction
made for the status of the complainant
and pretrial detainees are not treated
any differently than other individuals
proposing accusatory instruments to
be filed. Each proposed accusatory
instrument is investigated for possible
criminalityand, if appropriate, any
case may be forwarded and assigned
to one of the investigative bureaus
within the District Attorney's Office,
or prosecuted within the District
Attorney's District Court Bureau. If the
allegations in a proposed accusatory
instrument are determined to be
unfounded, I send a letter to the
Associate Court Clerk stating that the
District Attorney's Office has declined

to prosecute the matter.... Specifically,
with respect to allegations of
an assistant district attorney's or
police officer's criminal conduct,
such allegations are individually
investigated and if appropriate, are
forwarded to the Nassau County
District Attorney's Office Public
Corruption Bureau.

**\*14** (Defs.' Ex. Q ¶¶ 7-8.) Plaintiff has presented no evidence
to contradict the information contained in these affidavits or
to suggest otherwise.

Nor has plaintiff presented evidence of a policy or custom
of committing perjury, withholding evidence, or falsely
verifying criminal complaints. Plaintiff has merely asserted
that "he can testify based upon personal knowledge to the
undisputed facts and that he has credible witnesses and
documental evidence to support said factual claims." (Opp. at
11.) Plaintiff has not alleged with specificity other instances
of perjury, withheld evidence, or falsified complaints, nor
has he presented any other evidence of police officers'
commission of perjury, withholding of evidence, or filing of
falsely sworn complaints. The County of Nassau, by contrast,
has put forward evidence regarding its arrest processing
procedures and arrest records. (*See* Defs.' Ex. Z.) Nowhere
in the County's arrest policies is false verification of criminal
complaints, withholding of evidence, or perjury authorized.
Furthermore, the "collective knowledge doctrine" or "fellow
officer rule" permits arresting officers to rely upon other
law enforcement officers' knowledge to justify probable
cause to arrest. *See Savino v. City of New York,* 331 F.3d
63, 74 (2d Cir.2003) ( [F]or the purpose of determining
whether an arresting officer had probable cause to arrest,
'where law enforcement authorities are cooperating in an
investigation, ... the knowledge of one is presumed shared by
all.' "); *Stokes v. City of New York,* No 05-CV-0007 (JFB)
(MDG), 2007 U.S. Dist. LEXIS 32787, at \*17 (E.D.N.Y.
May 3, 2007) ("[U]nder the collective knowledge doctrine,
defendant Buskey is permitted to rely on knowledge obtained
by any other officers during the investigation"); *Phelps v. City
of New York,* No. 04 CIV. 8570(DLC), 2006 U.S. Dist. LEXIS
42926, at \*9-10 (S.D.N.Y. June 29, 2006) ("The rationale
behind the [collective knowledge] doctrine is that in light of
the complexity of modern police work, the arresting officer
cannot always be aware of every aspect of an investigation;
sometimes his authority to arrest a suspect is based on

facts known only to his superiors or associates. Although the doctrine is typically used to establish probable cause for the purpose of admitting evidence at trial, it is equally applicable here. As the Supreme Court has recognized, police officers called upon to aid other officers in making an arrest are entitled to assume that the officers requesting aid have acted properly." (internal quotations and citations omitted)). Accordingly, it is not improper for an officer to verify a criminal complaint based upon facts learned from another officer and plaintiff has put forth no evidence of a policy, practice, or custom of Nassau County police officers falsifying information in criminal complaints or committing perjury.

Moreover, the County of Nassau has put forward an affidavit from a former Nassau County ADA, who investigated and prosecuted a complaint against a Nassau County Police Officer in an unrelated matter that alleged that the officer had committed perjury by falsely testifying before the grand jury. (Defs.' Ex. Y ¶¶ 2-5.) That police officer was prosecuted and convicted of perjury in the third degree. (*Id.* ¶ 8.) In the face of this undisputed evidence of the County prosecuting perjury when it is uncovered, plaintiff has not identified any specific instances of police officers' commission of perjury that were not prosecuted.

**\*15** In sum, the undisputed facts demonstrate the following: (1) plaintiff's conviction prevents him from disputing any alleged constitutional violations relating to his trial; (2) defendants did investigate plaintiff's criminal complaints regarding Officer Hughes's and Detective Comiskey's alleged behavior; (3) defendants do have in place policies and procedures whereby criminal complaints filed by private citizens are investigated-even if those citizens are pretrial detainees or criminal defendants; and (4) the County of Nassau does not have a policy or procedure of permitting its employees to commit perjury, to falsely verify criminal complaints, or to withhold exculpatory evidence at trial. In short, plaintiff has failed to provide any factual support for his conclusory allegations that the defendants have engaged in unconstitutional policies or procedures. Accordingly, defendant's motion for summary judgment is granted.

### C. Motion for Sanctions

The Court has also reviewed plaintiff's motion for sanctions and, for the reasons stated throughout this opinion, finds plaintiff's claims to be without merit. Accordingly, plaintiff's motion for sanctions is also denied. *See S.E. C. v. Shainberg, 316 F. App'x 1, 2 (2d Cir.2008).*

### V. CONCLUSION

For the foregoing reasons, the Court grants defendants' motion for summary judgment in its entirety. Because the Court grants defendants' motion for summary judgment in its entirety, it also denies plaintiff's motion for sanctions against defendant.

The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this order would not be taken in good faith, and, therefore, *in forma pauperis* status is denied for the purpose of any appeal. *See Coppedge v. United States,* 369 U.S. 438, 444-45 (1962).

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 335581

2009 WL 2868231
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Quentin LA GRANDE, Plaintiff,

v.

TOWN OF BETHLEHEM POLICE
DEPARTMENT, et al., Defendants.

No. 1:08–CV–0738 (LEK/DRH).
|
Sept. 1, 2009.

**Attorneys and Law Firms**

Quentin La Grande, Albany, NY, pro se.

Nannette R. Kelleher, Bailey, Kelleher Law Firm, Albany, NY, for Defendants.

*DECISION AND ORDER*

LAWRENCE E. KAHN, District Judge.

**\*1** Plaintiff *pro se* Quentin La Grande ("Plaintiff" or "La Grande") commenced the instant action against Defendants Robert Helligrass [1], Stephen Kraz [2] and the Town of Bethlehem Police Department (collectively, "Defendants") pursuant to 42 U.S.C. § 1983. Complaint (Dkt. No. 1). Presently before this Court is Defendants' Motion to dismiss (Dkt. No. 13) and Plaintiff's Motion for summary judgment (Dkt. No. 12). For the following reasons, Defendants' Motion to dismiss is granted and Plaintiff's Motion for summary judgment is denied.

[1]  Incorrectly named in the Complaint as "R.J. Helliergrass." *See generally* Complaint (Dkt. No. 1).

[2]  Incorrectly named in the Complaint as "William Craz." *See generally* Complaint.

**I. BACKGROUND**
According to Plaintiff, "[o]n April 1, 2008 I was threaten by Patrol Officer William Craz. Patrol Officer called me a 'Nigger,' and also threaten to cause bodily harm to me. On April 2, 2008 I met with Seargent R.J. Helliergrass and was

interogated, and racial harrassed. On or about April 5, 10, 15, May 6, 8, 10, 15, and June 6, 2008, I have been followed by the Bethlehem Police Department." Compl. at 2. Plaintiff's jurisdictional statement asserts that the Complaint is being brought pursuant to 42 U.S.C. § 1983. *Id.* at 1.

In lieu of filing an answer, on March 11, 2009, Defendants filed the Motion to dismiss presently before the Court. Mot. to Dismiss (Dkt. No. 13). Plaintiff also filed a Motion for summary judgment on February 24, 2009, which is now before the Court. Mot. for Sum. Judg. (Dkt. No. 12).

**II. DISCUSSION**

**A. Defendants' Motion to Dismiss**

**a. Standard of Review**
In order to withstand a motion to dismiss, "a [pleading] must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* ––– U.S. ––––, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). A party must plead with such factual detail so as to sufficiently " 'nudge [ ][its] claims ... across the line from conceivable to plausible.' " *Iqbal,* 129 S.Ct. at 1950–51 (quoting *Twombly,* 550 U.S. at 570). While stating a claim does not require the recitation of detailed factual allegations, it does, however, require facts sufficient to state a claim to relief that is *prima facie* plausible. *Iqbal,* 129 S.Ct. at 1949 (citing *Twombly,* 550 U.S. at 555). The Court must accept the allegations in the well-pleaded complaint as true, *Albright v. Oliver,* 510 U.S. 266, 268, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994), and draw all inferences in favor of the non-moving party. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1973); *Global Network Commc'ns, Inc. v. City of New York,* 458 F.3d 150, 154 (2d Cir.2006); *King v. Am. Airlines, Inc.,* 284 F.3d 352, 356 (2d Cir.2002).

In assessing the legal sufficiency of the Complaint, the Court is mindful that La Grande is a *pro se* litigant and his submissions are subject to "less stringent standards than formal pleadings drafted by lawyers." *Hughes v. Rowe,* 449 U.S. 5, 9, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980) (quoting *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)). The Court must "read the pleadings of a *pro se* plaintiff liberally and interpret them 'to raise the strongest arguments they suggest.' " *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999); *see Hemphill v. New York,* 380 F.3d

680, 687 (2d Cir.2004) (" "It is well-established that 'when a plaintiff proceeds *pro se* the court is obligated to construe his pleadings liberally, particularly when they allege civil rights violations' ") (quoting *McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir.2004)). However, a plaintiff's *pro se* status "does not exempt [him] from compliance with relevant rules of procedural and substantive law." *Traguth v. Zuck,* 710 F.2d 90, 92 (2d Cir.1983).

### b. Analysis

**\*2** Defendants move to dismiss Plaintiff's Complaint in its entirety pursuant to Rules 12(b)(6) of the Federal Rules of Civil Procedure.[3] Mot. to Dismiss (Dkt. No. 13) at 1. Defendants specifically argue that all causes of action against the Town of Bethlehem Police Department must be dismissed as it is not a legal entity subject to suit under 42 U.S.C. § 1983 and further that Plaintiff's entire Complaint should be dismissed for failing to state a cause of action. *Id.* at 4.

[3]   Defendants argue, alternatively, that Plaintiff's Complaint should be dismissed pursuant to 28 U.S.C. § 1915(e) and for failing to adhere to Rule 8(a) of the Federal Rules of Civil Procedure. The Court need not address these arguments as it is dismissing Plaintiff's Complaint in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6).

### i. Town of Bethlehem Police Department

The Town of Bethlehem moves to dismiss Plaintiff's Complaint on the ground that it is not susceptible to suit under 42 U.S.C. § 1983. While a municipality may be susceptible to suit under 42 U.S.C. § 1983, a municipal police department is not. *See Walker v. Waterbury Police Dep't.,* 08–cv–959 (JG)(AKT), 2009 U.S. Dist. LEXIS 7933, at \*5, 2009 WL 261527 (E.D.N.Y. Feb. 4, 2009). "Under New York law, departments which are merely administrative arms of a municipality do not have a legal identity separate and apart from the municipality and cannot sue or be sued." *Id.* (citing *Hall v. City of White Plains,* 185 F.Supp.2d 293, 303 (S.D.N.Y.2002)). Accordingly, claims asserted under 42 U.S.C. § 1983 will be dismissed against a municipality's police department. *See Walker,* 2009 U.S. Dist. LEXIS 7933, at \*5, 2009 WL 261527 (internal citation omitted); *see also Baker v. Willett,* 42 F.Supp.2d 192, 198 (N.D.N.Y.1999).

Here, Plaintiff has sued the Town of Bethlehem Police Department along with two individual officers of the

department. *See generally* Compl. Plaintiff's Complaint asserts that it is brought pursuant to 42 U.S.C. § 1983 and does not provide any other basis for the claims. *Id.* at 1. Since the Bethlehem Police Department cannot be sued pursuant to 42 U.S.C. § 1983, Plaintiff's Complaint is dismissed as against the Town of Bethlehem Police Department.

Even assuming *arguendo* that Plaintiff's claims against the Town of Bethlehem Police Department can be construed as a claim against the Town of Bethlehem, Plaintiff's Complaint would still be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).

In order to state a cause of action for municipal liability under 42 U.S.C. § 1983, "a plaintiff must allege that the municipality has adopted a custom or policy which is the moving force behind the [alleged constitutional violation]." *Zappala v. Albicelli,* 980 F.Supp. 635, 649 (N.D.N.Y.1997). A municipality cannot be held liable on the basis of *respondeat superior* and "a single incident alleged in a complaint, especially if it involved only actors below the policymaking level, generally will not suffice to raise an inference of the existence of a custom or policy." *Campanaro v. City of Rome,* 999 F.Supp. 277, 281 (N.D.N.Y.1998); *see also Dwares v. City of New York,* 985 F.2d 94, 100 (2d Cir.1993).

Plaintiff's Complaint is devoid of any allegations that the Town of Bethlehem had a policy or custom of violating constitutional rights, nor does plaintiff allege or even allude that the Town was deliberately indifferent to his constitutional rights. The complete failure to plead such warrants dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure, as the Complaint fails to state a cause of action for which relief can be granted under 42 U.S.C. § 1983. *See Campanaro,* 999 F.Supp. at 281; *Dwares,* 985 F.2d at 100.

### ii. Defendants Kraz and Helligrass

**\*3** La Grande's Complaint alleges that between April and June 2008, he was "racially harassed," "threatened" and "interrogated" by Defendants Kraz and Helligrass, two officers of the Bethlehem Police Department. Compl. at 2. Specifically, La Grande alleges that on multiple occasions the officers addressed him with a racial epithet and followed him through town. *Id.* It is well settled in this Circuit that "42 U.S.C. § 1983 is not designed to rectify harassment or verbal abuse." *Murray v. Pataki,* No. 9:03–cv–1263, 2007 U.S. Dist. LEXIS 26959, at \*22, 2007 WL 956941 (N.D.N.Y. Mar. 29, 2007) (Kahn, J.) (quoting *Gill v. Hoadley,* 261 F.Supp.2d 113, 129 (N.D.N.Y.2003)) (collecting cases).

"[V]erbal harassment or profanity alone, unaccompanied by an injury no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983." *Murray,* 2007 U.S. Dist. LEXIS, at * 22 (quoting *Moncrieffe v. Witbeck,* 2000 U.S. Dist. LEXIS, at *3, 2000 WL 949457 (N.D.N.Y. June 29, 2000)); *see also Zeno v. Cropper,* 650 F.Supp. 138, 141 (S.D.N.Y.1986) ("vile and abusive language ... no matter how abhorrent or reprehensible cannot form the basis for a § 1983 claim) (internal citation and quotation omitted). Further, "threats do not amount to violations of constitutional rights." *Murray,* 2007 U.S. Dist. LEXIS, at *23 (quoting *Malsh v. Austin,* 901 F.Supp. 757, 763 (S.D.N.Y.1995)).

In this case, Plaintiff's claim for verbal harassment in the form of racial slurs and threats is not actionable under § 1983 and, therefore, fails to state a claim entitled to relief. Compl. at 2.

**B. Plaintiff's Motion for Summary Judgment**

Even assuming *arguendo* that this Court did not grant Defendants' Motion to dismiss, Plaintiff's Motion for summary judgment would still be denied. Under the Local Rules, *"all* motions ... require a memorandum of law, supporting affidavit, and proof of service on all the parties." N.D.N.Y. L.R. 7.1(a) (emphasis added). "All memoranda of law shall contain a table of contents and, wherever possible, parallel citations." *Id.* at 7 .1(a)(1). Further "[a]ny motion for summary judgment shall contain a Statement of Material Facts ... *Failure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion." Id.* at 7 .1(a)(3) (emphasis in original).

Here, not only did the Plaintiff fail to submit a memoranda of law in support of his Motion for summary judgment and an affidavit but he also failed to submit a Statement of Material Facts. In fact, in his Motion for summary judgment filed on February 24, 2009, Plaintiff explicitly stated, "I will provide this Court with a 'Law Memorandum' in support of my motion; such will contain applicable law, and case law. I will submit this to the Court on or before March 6, 2009." Mot. for Sum. Judg. at 1. To date, this Court has not received said memorandum of law. While this Court recognizes Plaintiff's *pro se* status, he has failed to comply with *all* of the Local Rules. *See Traguth v. Zuck,* 710 F.2d 90, 92 (2d Cir.1983) (a plaintiff's *pro se* status "does not exempt [him] from compliance with relevant rules of procedural and substantive law"). Accordingly, Plaintiff's Motion for summary judgment

is denied for failing to comply with the relevant rules of procedure. *See, e.g.,* N.D.N.Y. L.R. 7.1(a), 7.1(a)(3).

**C. Amended Complaint**

**\*4** Plaintiff also moves to amend his Complaint. Response (Dkt. No. 27). While *pro se* litigants are generally afforded wide latitude and an opportunity to amend, a District Court need not permit an amendment to a Complaint where it would be futile. *See Forman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962) (holding that although leave to amend should be freely given where justice so requires, a district court need not grant leave if amendment would be futile); *Acito v. Imcera Group, Inc.,* 47 F.3d 47, 55 (2d Cir.1995).

Here, Plaintiff's Complaint does not state any viable causes of action under 42 U.S.C. § 1983. Further, Plaintiffs Complaint does not state which, if any, of his constitutional rights were violated by Defendants nor does it plead any facts to establish municipal liability. Plaintiff's Complaint also does not plead any facts supporting his allegations that he was "racially harassed," "threatened" or "interrogated." Since, as the Court discussed above, none of the complained of actions provides the basis for a cognizable cause of action, leave to cure these defects would be futile. These deficiencies may have been excusable, albeit not cureable, had this Court not previously informed Plaintiff of the requirements for pleading a cause of action under 42 U.S.C. § 1983 against a municipality. *See La Grande v. Albany Police Dep't,* 1:07–CV–757 (Dkt. No. 4). [4] Given that leave to amend would be futile, this Court denies Plaintiff's request.

[4]    Notably, Plaintiff has also filed numerous Complaints in the Northern District, many of which include assertions of civil rights violations and racial discrimination or harassment, wherein Plaintiff has been granted leave to amend his complaints. Plaintiff has filed eleven suits in the Northern District since 2000, including the instant matter. In fact, on May 12, 2008, Chief United States District Judge Norman A. Mordue entered an order enjoining Plaintiff from filing any further actions or pleadings in this district without the prior permission of the Chief Judge. Dkt. No. 6. This Order was entered based on a record of vexatious and frivolous pleadings previously filed by La Grande.

**III. CONCLUSION**

Based on the foregoing, it is hereby

**ORDERED,** that Defendants' Motion to dismiss (Dkt. No. 13) is **GRANTED in its entirety;** and it is further

**ORDERED,** that Plaintiff's request to amend his Complaint (Dkt. No. 27) is **DENIED;** and it is further

**ORDERED,** that Plaintiff's Motion for summary judgment (Dkt. No. 12) is **DENIED in its entirety;** and it is further

**ORDERED,** that the Clerk serve a copy of this Decision and Order on all parties.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 2868231

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 4052286
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Sylvia JENKINS, Plaintiff,
v.
Mr. LIADKA, Syracuse Police Officer; Mr. Sands,
Syracuse Police Officer; John Doe, Syracuse Police
Officer; and Syracuse Police Dep't, Defendants.

No. 5:10–CV–1223 (GTS/DEP).
|
Sept. 13, 2012.

**Attorneys and Law Firms**

Sylvia Jenkins, Syracuse, NY, pro se.

Hon. Mary Anne Dougherty, Corporation Counsel for
City of Syracuse, Catherine Ena Carnrike, Esq., Assistant
Corporation Counsel, of Counsel, Syracuse, NY, for
Defendants.

### *MEMORANDUM–DECISION and ORDER*

GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in this *pro se* civil rights
action filed by Sylvia Jenkins ("Plaintiff") against Mr. Liadka,
Mr. Sands, John Doe, and Syracuse Police Department
("Defendants"), is Defendants' motion to dismiss Plaintiff's
Complaint for insufficient service of process pursuant to
Fed.R.Civ.P. 12(b)(5) and/or for failure to state a claim
pursuant to Fed.R.Civ.P. 12(b)(6). (Dkt. No. 13.) For the
reasons set forth below, Defendants' motion is granted in part
and denied in part.

## I. RELEVANT BACKGROUND

### A. Plaintiff's Complaint
Generally, construed with the utmost of special liberality,
Plaintiff's Complaint asserts three claims against Defendants
arising from an investigatory stop in September 2010, in
Syracuse, New York: (1) a claim that three Syracuse Police
Officers unreasonably searched her in violation of the Fourth
Amendment; (2) a claim that they unlawfully seized, and
failed to return, her personal property in violation of the

Fourth, Fifth, and/or Fourteenth Amendments; and (3) a claim
that they subjected her to excessive force in violation of
the Fourth Amendment. (*See generally* Dkt. No. 1 [Plf.'s
Compl].)

Generally, in support of these claims, Plaintiff alleges as
follows: (1) on the evening of September 9, 2010, she was
stopped on Butternut Street in the City of Syracuse by
two officers, who questioned her regarding a call they had
received; (2) when she told the two police officers that she
did not know what they were talking about and "attempted
to go on about [her] business," the officers became "uptight,
rude, [and] abnormal in their conversations [and] behavior,"
and threatened her; (3) the officers then proceeded to conduct
a search of "all [of Plaintiff and her] personal property,"
and, in the process of doing so, twisted her arm and forced
her onto the front of their police vehicle; (4) a third police
officer arrived, and she was assaulted by all three officers
(hereinafter "Defendants"), who hit her on the back and threw
her onto the police vehicle; (5) following the deprivation on
September 9, 2010, Defendants denied her a post-deprivation
remedy through a combination of threats, intimidation and/
or nonresponsiveness; and (6) Defendants took these actions
against her intentionally because they did not personally like
her, given her previous interactions with the Syracuse Police
Department. (*Id.*)

Plaintiff further alleges that, as a result of this incident,
she suffered various injuries and losses, including (1) a
"tremendous setback in already trying to recover in an [sic]
grave overall manner of my life [and] lifestyle involving
officials internally [and] externally," (2) head and back pain,
and mental suffering, (3) loss of personal property, and, (4)
loss of employment. (*Id.*) As relief, Plaintiff requests an award
of twelve thousand dollars ($12,000) in damages. (*Id.* at ¶ 6.)

Familiarity with the remaining factual allegations supporting
Plaintiff's three claims is assumed in this Decision and Order,
which is intended primarily for review by the parties. (*See
generally* Dkt. No. 1.)

### B. Defendants' Motion
**\*2** On May 6, 2011, Defendants filed a motion to dismiss.
(Dkt. No. 13, Attach 2.) Generally, in support of their motion,
Defendants assert the following two arguments: (1) because
the Complaint was not served within the time allowed by
Fed.R.Civ.P. 4 or Local Rule 4.1 of the Local Rules of Practice
for this Court, the Court lacks jurisdiction over Defendants in
accordance with Fed.R.Civ.P. 4; and (2) the Complaint fails

to state a claim upon which relief can be granted, because (a) the Complaint fails to identify what constitutional rights Plaintiff is attempting to vindicate, (b) even if the Complaint has sufficiently identified a constitutional violation, the Complaint fails to allege facts plausibly suggesting the personal involvement of the individual Defendants in any such constitutional violation, (c) the City of Syracuse Police Department does not have the legal capacity to be sued, (d) even if Plaintiff's Complaint can be liberally construed as attempting to assert a claim against the City of Syracuse, the Complaint fails to allege facts plausibly suggesting that the individual Defendants' actions the result of a city policy or custom sufficient to confer municipal liability upon the City, (e) the Fifth Amendment does not govern a plaintiff's deprivation-of-property claim against state actors, (f) the Complaint fails to allege facts plausibly suggesting that force was used or that if force was used it was excessive for purposes of a Fourth Amendment claim, and (g) based on Plaintiff's factual allegations, Defendants Liadka and Sands are protected from liability as a matter of law by the doctrine of qualified immunity. (*See generally* Dkt. No. 13, Attach. 2.)

On June 2, 2011, Plaintiff filed a response to Defendants' motion. Generally, Plaintiff's response, which is handwritten and three pages in length, states that she "definitely oppose[s] [Defendants'] request" for the dismissal of her Complaint. (*See generally* Dkt. No. 17.) However, Plaintiff's response does not address the legal arguments asserted by Defendants for the dismissal of Plaintiff's Complaint. (*Compare* Dkt. No. 17 *with* Dkt. No. 13, Attach. 2.) Although Plaintiff's response was submitted two days after the expiration of the responsedeadline, the Court has accepted it, out of an extension of special solicitude to her as a *pro se* civil rights litigant.

In addition, Plaintiff has filed three letters to the Court on the following dates: July 6, 2011, August 22, 2011, and January 13, 2012. (Dkt. No. 18–20.) Generally, these letters contain assertions that Plaintiff believes that the police are treating her negatively, and responding unsatisfactorily to her telephone calls. (*Id.*) To the extent that these three letters are intended to constitute papers in opposition to Defendants' motion, the Court will not consider them, because (1) they are not responsive to the motion, and/or (2) they were not submitted in a timely manner. Moreover, to the extent that these three letters are intended to constitute a request for relief, the Court will not consider them, because do not state the relief sought, state with particularity the grounds for seeking the order, and attach a memorandum of law and affidavit, as required by Fed.R.Civ.P. 7(b) and Local Rule 7.1 of the Local Rules of Practice for this Court.

## II. RELEVANT LEGAL STANDARDS

### A. Legal Standard Governing Motions to Dismiss for Insufficient Service of Process

**\*3** Rule 4(m) of the Federal Rules of Civil Procedure provides, in pertinent part, as follows:

> If a defendant is not served within 120 days after the complaint is filed, the court-on motion or its own after notice to the plaintiff-must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period.

Fed.R.Civ.P. 4(m).

The Local Rules of Practice for this Court shorten the service requirements under Fed.R.Civ.P. 4. Specifically, Local Rule 4.1(b) requires "service of process upon all defendants within sixty (60) days of the filing of the complaint. This expedited service is necessary to ensure adequate time for pretrial discovery and motion practice. In no event shall service of process be completed after the time specified in Fed.R.Civ.P. 4." N.D.N.Y. L.R. 4.1(b).

### B. Legal Standard Governing Motions to Dismiss for Failure to State a Claim

It has long been understood that a defendant may base a motion to dismiss for failure to state a claim upon which relief can be granted on either or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed.R.Civ.P. 8(a)(2); or (2) a challenge to the legal cognizability of the claim. *Jackson v. Onondaga Cnty.,* 549 F.Supp.2d 204, 211, nn. 15–16 (N.D.N.Y.2008) (McAvoy, J., adopting Report–Recommendation on *de novo* review).

Because such motions are often based on the first ground, a few words on that ground are appropriate. Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a pleading

contain "a *short and plain* statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) [emphasis added]. In the Court's view, this tension between permitting a "short and plain statement" and requiring that the statement "show[ ]" an entitlement to relief is often at the heart of misunderstandings that occur regarding the pleading standard established by Fed.R.Civ.P. 8(a)(2).

On the one hand, the Supreme Court has long characterized the "short and plain" pleading standard under Fed.R.Civ.P. 8(a)(2) as "simplified" and "liberal." *Jackson,* 549 F.Supp.2d at 212, n. 20 (citing Supreme Court case). On the other hand, the Supreme Court has held that, by requiring the above-described "showing," the pleading standard under Fed.R.Civ.P. 8(a)(2) requires that the pleading contain a statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." *Jackson,* 549 F.Supp.2d at 212, n. 17 (citing Supreme Court cases) (emphasis added).

The Supreme Court has explained that such *fair notice* has the important purpose of "enabl[ing] the adverse party to answer and prepare for trial" and "facilitat[ing] a proper decision on the merits" by the court. *Jackson,* 549 F.Supp.2d at 212, n. 18 (citing Supreme Court cases); *Rusyniak v. Gensini,* 629 F.Supp.2d 203, 213 & n. 32 (N.D.N.Y.2009) (Suddaby, J.) (citing Second Circuit cases). For this reason, as one commentator has correctly observed, the "liberal" notice pleading standard "has its limits." 2 *Moore's Federal Practice* § 12.34[1][b] at 12–61 (3d ed.2003). For example, numerous Supreme Court and Second Circuit decisions exist holding that a pleading has failed to meet the "liberal" notice pleading standard. *Rusyniak,* 629 F. Supp .2d at 213, n. 22 (citing Supreme Court and Second Circuit cases); *see also Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949–52, 173 L.Ed.2d 868 (2009).

**\*4** Most notably, in *Bell Atlantic Corp. v. Twombly,* the Supreme Court reversed an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). In doing so, the Court "retire[d]" the famous statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly,* 127 S.Ct. at 1968–69. Rather than turning on the *conceivability* of an actionable claim,

the Court clarified, the "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 1965–74. The Court explained that, while this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." *Id* . at 1965. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.*[1]

[1]  It should be emphasized that Fed.R.Civ.P. 8's plausibility standard, explained in *Twombly,* was in no way retracted or diminished by the Supreme Court's decision (two weeks later) in *Erickson v. Pardus,* in which (when reviewing a *pro se* pleading) the Court stated, "Specific facts are not necessary" to successfully state a claim under Fed.R.Civ.P. 8(a)(2). *Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) [emphasis added]. That statement was merely an abbreviation of the often-repeated point of law-first offered in *Conley* and repeated in *Twombly*-that a pleading need not "set out *in detail* the facts upon which [the claim is based]" in order to successfully state a claim. *Twombly,* 127 S.Ct. 1965, n. 3 (citing *Conley,* 355 U.S. at 47) [emphasis added]. That statement did not mean that all pleadings may achieve the requirement of "fair notice" without ever alleging any facts whatsoever. Clearly, there must still be enough fact set out (however set out, whether in detail or in a generalized fashion) to raise a right to relief above the speculative level to a plausible level. *See Rusyniak,* 629 F.Supp.2d at 214 & n. 35 (explaining holding in *Erickson* ).

As for the nature of what is "plausible," the Supreme Court explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). "[D]etermining whether a complaint states a plausible claim for relief ... [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not show[n]-that the pleader is entitled to relief." *Iqbal,* 129 S.Ct. at 1950 [internal quotation marks and

2012 WL 4052286

citations omitted]. However, while the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully," *id.,* it "does not impose a probability requirement." *Twombly,* 550 U.S. at 556.

Because of this requirement of factual allegations plausibly suggesting an entitlement to relief, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by merely conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949. Similarly, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. *Iqbal,* 129 S.Ct. at 1949 (internal citations and alterations omitted). Rule 8 "demands more than an adorned, the-defendant-unlawfully-harmed-me accusation." *Id.*

This pleading standard applies even to *pro se* litigants. While the special leniency afforded to *pro se* civil rights litigants somewhat loosens the procedural rules governing the form of pleadings (as the Second Circuit has observed), it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Fed.R.Civ.P. 8, 10 and 12.[2] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Fed.R.Civ.P. 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow.[3] Stated more simply, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended." *Jackson,* 549 F.Supp.2d at 214, n. 28.

[2]      See *Vega v. Artus,* 610 F.Supp.2d 185, 196 & nn. 8–9 (N.D.N . Y.2009) (Suddaby, J.) (citing Second Circuit cases); *Rusyniak,* 629 F.Supp.2d at 214 & n. 34 (citing Second Circuit cases).

[3]      See *Vega,* 610 F.Supp.2d at 196, n. 10 (citing Supreme Court and Second Circuit cases); *Rusyniak,* 629 F.Supp.2d at 214 & n. 34 (citing Second Circuit cases).

**\*5** Finally, a few words are appropriate regarding what documents are considered on a motion to dismiss for failure to state a claim upon which relief can be granted, pursuant to Fed.R.Civ.P. 12(b)(6). The court may consider the following documents without triggering the summary judgment standard: "(1) documents attached as an exhibit to the complaint or answer, (2) documents incorporated by reference into the complaint (and provided by the parties),

(3) documents that, although not incorporated by reference, are "integral" to the complaint, or (4) any matter of which the court can take judicial notice for the factual background of the case." *Planck v. Schenectady Cnty.,* 12–CV–0336, 2012 WL 1977972, at \*5 (N.D.N.Y. June 1, 2012) (Suddaby, J.). Moreover, "a pro se plaintiff's papers in response to a defendant's motion to dismiss for failure to state a claim may be considered as effectively amending the allegations of [her] complaint-to the extent those papers are consistent with the allegations in the complaint." *Planck,* 2012 WL 1977972, at \*5.

### C. Legal Standard Governing Unopposed Motions

In this District, when a non-movant fails to oppose a legal argument asserted by a movant in support of a motion, the movant's burden with regard to that argument has been lightened such that, in order to succeed on that argument, the movant need only show that the argument possesses facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D.N.Y. L.R. 7.1(b) (3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein...."); *Rusyniak v. Gensini,* 07–CV–0279, 2009 WL 3672105, at \*1, n. 1 (N.D.N.Y.Oct.30, 2009) (Suddaby, J.) (collecting cases); *Este–Green v. Astrue,* 09–CV–0722, 2009 WL 2473509, at \*2 & n. 3 (N.D.N.Y. Aug.7, 2009) (Suddaby, J.) (collecting cases).

### D. Legal Standards Governing Plaintiff's Claims

Because the Court has, in its Decision and Order of March 7, 2011, addressed the relevant points of law contained in the legal standards governing Plaintiff's claims in this action, the Court will not again recite, in their entirety, those legal standards in this Decision and Order, 9 which is intended primarily for review by the parties. (*See generally* Dkt. No. 5 [Decision and Order].)

### E. Legal Standards Governing Defendants' Defenses

#### 1. Defense of Lack of Separate Identity

"Under New York law, departments that are merely administrative arms of a municipality do not have a legal identity separate and apart from the municipality, and therefore, cannot sue or be sued." *Davis v. Lynbrook Police Dept.,* 224 F.Supp.2d 463, 477 (E.D.N.Y.2002). "Pursuant to Fed.R.Civ.P. 17, New York governs the capacity of

a police department to sue or be sued. In New York, police departments like the defendant, which are merely administrative arms of a municipal corporation, do not have a legal identity separate and apart from the town." *Loria v. Irondequoit* 775 F.Supp. 599, 606 (W.D.N.Y.1990). While a municipality can sue or be sued, the police department, which does not exist separate from that municipality, can not. *Baker v. Willett,* 42 F.Supp.2d 192, 198 (N.D.N.Y.1999).

### 2. Defense of Limited Municipal Liability

**\*6** It is well established that "[a] municipality may not be held liable in a Section 1983 action for the conduct of a lower-echelon employee solely on the basis of *respondeat superior.*" [4] "Rather, to establish municipal liability under § 1983 for unconstitutional acts by a municipality's employees, a plaintiff must show that the violation of [his or] her constitutional rights resulted from a municipal custom or policy." [5] "Thus, to hold a [municipality] liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to ... prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." [6]

[4] *Powell v. Bucci,* 04–CV–1192, 2005 WL 3244193, at *5 (N.D.N.Y. Nov.30, 2005) (McAvoy, J.); *see also Monell v. Dept. of Soc. Servs.,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) ("[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents."); *Batista v. Rodriguez,* 702 F.2d 393, 397 (2d Cir.1983) ("[A] [municipality] may not be held for the actions of its employees or agents under a theory of *respondeat superior."* ).

[5] *Powell,* 2005 WL 3244193, at *5; *Monell,* 436 U.S. at 690–691 ("[L]ocal governments ... may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels."); *Batista,* 702 F.2d at 397 ("[M]unicipalities may be sued directly under § 1983 for constitutional deprivations inflicted upon private individuals pursuant to a governmental custom, policy, ordinance, regulation, or decision."); *Smith v. City of New York,* 290 F.Supp.2d 317, 321 (S.D.N.Y.2003) ("In order to establish the liability of [municipal] defendants in an action under §

1983 for unconstitutional acts by [its] employees, a plaintiff must show that the violation of [his or] her constitutional rights resulted from a municipal custom or policy.").

[6] *Batista,* 702 F.2d at 397, *accord, Zahra v. Town of Southold,* 48 F.3d 674, 685 (2d Cir.1995), *McKeon v. Daley,* 101 F.Supp.2d 79, 92 (N.D.N.Y.2000) (Hurd, J.), *Merriman v. Town of Colonie, NY,* 934 F.Supp. 501, 508 (N.D.N.Y.1996) (Homer, M.J.); *Douglas v. Cnty. of Tompkins,* 90–CV–0841, 1995 WL 105993, at *12 (N.D.N.Y. March 2, 1995) (McCurn, J.), *Keyes v. Cnty. of Albany,* 594 F.Supp. 1147, 1156 (N.D.N.Y.1984) (Miner, J.).

With regard to the first element (the existence of a policy or custom), a "[p]laintiff may establish the 'policy, custom or practice' requirement by demonstrating: (1) a formal policy officially endorsed by the municipality ...; (2) actions taken by government officials responsible for establishing municipal policies related to the particular deprivation in question ...; (3) a practice so consistent and widespread that it constitutes a 'custom or usage' sufficient to impute constructive knowledge to the practice of policymaking officials ...; or (4) a failure by policymakers to train or supervise subordinates to such an extent that it amounts to 'deliberate indifference' to the rights of those who come in contact with the municipal employees...." [7] With regard to the second element (causation), a plaintiff must show "a direct causal link" or "an affirmative link" between the municipal policy or custom and the alleged constitutional deprivation (i.e., that the policy or custom was the "moving force" behind the deprivation). [8]

[7] *Dorsett–Felicelli, Inc.,* 371 F.Supp.2d 183, 194 (N.D.N.Y.2005) (Kahn, J.) (citing three Supreme Court cases for these four ways), *accord, Dunbar v. Cnty. of Saratoga,* 358 F.Supp.2d 115, 133–134 (N.D.N.Y.2005) (Munson, J.); *see also Clayton v. City of Kingston,* 44 F.Supp.2d 177, 183 (N.D.N.Y.1999) (McAvoy, J.) (transposing order of second and third ways, and citing five more Supreme Court cases).

[8] *See City of Canton, Ohio v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) ("[O]ur first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional

deprivation."); *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 823, n. 8, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985) ("The fact that municipal 'policy' might lead to 'police misconduct' is hardly sufficient to satisfy *Monell'* s requirement that the particular policy be the 'moving force' behind a constitutional violation. There must at least be an affirmative link between [for example] the training inadequacies alleged, and the particular constitutional violation at issue."); *Monell,* 436 U.S. at 694 ("[I]t is when execution of a government's policy or custom ... inflicts the injury that the government as an entity is responsible under § 1983. Since this case unquestionably involves official policy as the moving force of the constitutional violation [at issue] ... we must reverse the judgment below."); *Vippolis v. Village of Haverstraw,* 768 F.2d 40, 44 (2d Cir.1985) ("A plaintiff who seeks to hold a municipality liable in damages under section 1983 must prove that ... an official policy or custom [was] the cause of the deprivation of constitutional rights.... [T]he plaintiff must establish a causal connection-an affirmative link-between the policy and the deprivation of his constitutional rights.") [internal quotation marks and citation omitted]; *Batista v. Rodriguez,* 702 F.2d 393, 397 (2d Cir.1983) ("Absent a showing of a causal link between an official policy or custom and the plaintiff's injury, *Monell* prohibits a finding of liability against the City."); *Powell,* 2005 WL 3244193, at *5 ("Ultimately, the plaintiff must demonstrate a direct causal link between a municipal policy or custom, and the alleged constitutional deprivation.") [internal quotation marks and citation omitted].

### 3. Defense of Qualified Immunity

"Once qualified immunity is pleaded, plaintiff's complaint will be dismissed unless defendant's alleged conduct, when committed, violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Williams v. Smith,* 781 F.2d 319, 322 (2d Cir.1986) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 815 [1982] ). As a result, a qualified immunity inquiry in a civil rights case generally involves two issues: (1) "whether the facts, viewed in the light most favorable to the plaintiff establish a constitutional violation"; and (2) "whether it would be clear to a reasonable [official] that his conduct was unlawful in the situation confronted." *Sira v. Morton,* 380 F.3d 57, 68–69 (2d

Cir.2004) [citations omitted], *accord, Higazy v. Templeton,* 505 F.3d 161, 169, n. 8 (2d Cir.2007) [citations omitted].

In determining the second issue (i.e., whether it would be clear to a reasonable official that his conduct was unlawful in the situation confronted), courts in this circuit consider three factors:

> (1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

**\*7** *Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991) [citations omitted], *cert. denied,* 503 U.S. 962, 112 S.Ct. 1565, 118 L.Ed.2d 211 (1992).[9] "As the third part of the test provides, even where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Higazy v. Templeton,* 505 F.3d 161, 169–70 (2d Cir.2007) [citations omitted].[10] This "objective reasonableness" part of the test is met if "officers of reasonable competence could disagree on [the legality of defendant's actions]." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).[11] As the Supreme Court has explained,

[9] *See also Pena v. DePrisco,* 432 F.3d 98, 115 (2d Cir.2005); *Clue v. Johnson,* 179 F.3d 57, 61 (2d Cir.1999); *McEvoy v. Spencer,* 124 F.3d 92, 97 (2d Cir.1997); *Shechter v. Comptroller of City of New York,* 79 F.3d 265, 271 (2d Cir.1996); *Rodriguez v. Phillips,* 66 F.3d 470, 476 (2d Cir.1995); *Prue v. City of Syracuse,* 26 F.3d 14, 17–18 (2d Cir.1994); *Calhoun v. New York State Division of Parole,* 999 F.2d 647, 654 (2d Cir.1993).

[10] *See also Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)

("[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective reasonableness of the action.' ") [citation omitted]; *Davis v. Scherer,* 468 U.S. 183, 190, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984) ("Even defendants who violate [clearly established] constitutional rights enjoy a qualified immunity that protects them from liability for damages unless it is further demonstrated that their conduct was unreasonable under the applicable standard."); *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993) (qualified immunity protects defendants "even where the rights were clearly established, if it was objectively reasonable for defendants to believe that their acts did not violate those rights").

11 *See also Malsh v. Correctional Officer Austin,* 901 F.Supp. 757, 764 (S.D.N.Y.1995) [citing cases]; *Ramirez v. Holmes,* 921 F.Supp. 204, 211 (S.D.N.Y.1996).

[T]he qualified immunity defense ... provides ample protection to all but the plainly incompetent or those who knowingly violate the law.... Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized.

*Malley,* 475 U.S. at 341.[12]

12 *See also Hunter v. Bryant,* 502 U.S. 224, 299, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) ("The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law.") [internal quotation marks and citation omitted].

## III. ANALYSIS

### A. Whether Plaintiff's Complaint Should Be Dismissed for Failure to Serve Process in Timely Manner

After carefully considering the matter, the Court must answer this question in the negative. By Defendants' own calculations, Plaintiff's Complaint was served on April 18, 2011–a mere 42 days after the Court granted Plaintiff's motion to proceed *in forma pauperis,* approved the filing of her

Complaint, and directed the Clerk of the Court to issue summonses and forward them with the Complaint to the United States Marshal's Service, for service on Defendants. (Dkt. No. 5 [Decision and Order filed March 7, 2011].) Indeed, Defendants acknowledge that Plaintiff completed the Civil Summonses and USM285 form, and returned them to the Clerk's Office (so that the Clerk's Office could forward them to the U.S. Marshal's Service for service of Plaintiff's Complaint) less than eight days after receiving them from the Clerk's Office. (Dkt. No. 13, Attach. 1, at ¶¶ 6–7; Dkt. No. 13, Attach. 2, at 9 [attaching page "8" of Defs.' Memo. of Law]; *see also* Dkt. Nos. 6, 8.) After that point in time, service was largely if not entirely outside of Plaintiff's control.

Under the circumstances, the Court finds that good cause exists to extend the deadline for service by 42 days. The Court notes that a contrary conclusion (e.g., a conclusion that Plaintiff had to serve her Complaint by December 13, 2010 pursuant to Local Rule 4.1, or even February 11, 2011 pursuant to Fed.R.Civ.P. 4) would render meaningless the Court's directive to the Clerk of the Court, on March 5, 2011, to take sufficient action to enable the United States Marshal's Service to effect service for Plaintiff.

### B. Whether Plaintiff's Complaint Should Be Dismissed for Failure to State a Claim Upon Which Relief Can Be Granted

### 1. Whether Plaintiff's Complaint Should Be Dismissed for Failing to Sufficiently Identify What Constitutional Rights She Is Attempting to Vindicate

**\*8** After carefully considering the matter, the Court must answer this question also in the negative. In construing the pleadings of a *pro se* civil rights litigant in this Circuit, a district court's imagination should be limited only by the plaintiff's factual allegations, not by the legal claims set out in his or her pleadings. *See Phillips v. Girdich,* 408 F.3d 124, 130 (2d Cir.2005) ("We leave it for the district court to determine what other claims, if any, Phillips has raised. In so doing, the court's imagination should be limited only by Phillips' factual allegations, not by the legal claims set out in his pleadings.").

Here, based on Plaintiff's (albeit scant and confused) factual allegations, the Court can imagine that she is attempting to assert the following three claims: (1) a claim of an unreasonable search under the Fourth Amendment; (2) a claim of an unlawful seizure of, and failure to return, her personal property under the Fourth, Fifth and/or Fourteenth

Amendments; and (3) a claim of excessive force under the Fourth Amendment.

### 2. Whether Plaintiff's Claims Against the Individual Defendants Should Be Dismissed for Failing to Allege Facts Plausibly Suggesting Their Personal Involvement in the Constitutional Violations Alleged

After carefully considering the matter, the Court answers this question in the affirmative for the reasons stated by Defendants in their memorandum of law. (Dkt. No. 13, Attach. 2, at 13 [attaching page "12" of Defs.' Memo. of Law].) The Court would add only the following three brief points.

First, at the very least, Defendants have met the lightened burden that was created by Plaintiff's failure to respond to this argument for dismissal. *See, supra,* Part III.C. of this Decision and Order. [13] Second, in any event, the Court would reach the same conclusion even if it were to subject Defendants' argument to the more rigorous scrutiny appropriate for a contested argument. Third, and finally, even when construed with the utmost of special liberality, the Complaint does not identify the precise location of the incident, which officers were responsible for violating her rights, how she suffered the head injury she alleges, what property was taken from her, and how Defendants frustrated her efforts to recover that property. *See Vogeler v. Colbath,* 04–CV–6071, 2005 U.S. Dist. LEXIS 44658, at *29, 2005 WL 2482549 (S.D.N.Y. Oct. 6, 2005) ("Plaintiffs must also allege ... the personal involvement of the Defendant in the actions underlying their claim."). [14]

[13]     Under the circumstances, the Court finds that Plaintiff had sufficient notice of the consequences of failing to respond to the arguments asserted in Defendants' motion. For example, on October 14, 2010, Plaintiff was given a courtesy copy of the District's *Pro Se* Handbook and a courtesy copy of the Local Rules of Practice for the Northern District of New York. (Dkt. No. 4.) In addition, on May 6, 2011, Defendants advised Plaintiff of her need to respond to their arguments. (Dkt. No. 15.) Also, Plaintiff had extensive experience as a *pro se* civil rights litigant in this District, before responding to the motion in question. *See, infra,* Part III.D. of this Decision and Order.

[14]     Indeed, the Court notes that one of the officers that Plaintiff lists in her Complaint has not been identified. In a prior decision by the Court, Plaintiff was ordered to take reasonable steps to ascertain the identity of the unnamed officer, immediately notify the Court, amend her complaint to include the identity of the third Defendant, and also to have that officer served. (Dkt. No. 5, at 14.) Because Plaintiff has not done so, her alleged physical injuries remain attributable to an unidentified person.

For all of these alternative reasons, Plaintiff's claims against the individual Defendants are dismissed.

### 3. Whether the Syracuse Police Department Should Be Dismissed as a Defendant

After carefully considering the matter, the Court answers this question in the affirmative for the reasons stated by Defendants in their memorandum of law. (Dkt. No. 13, Attach 2, at 13.) The Court would add only the following three brief points.

**\*9** First, at the very least, Defendants have met the lightened burden that was created by Plaintiff's failure to respond to this argument for dismissal. Second, in any event, the Court would reach the same conclusion even if it were to subject Defendants' argument to the more rigorous scrutiny appropriate for a contested argument. Third, and finally, "as Plaintiff has been told several times, under New York State law, departments, like the Onondaga County Sheriff's Department, that are merely administrative arms of a municipality, do not have a legal identity separate from the municipality and may not sue or be sued." *Jenkins v. Onondaga Cnty. Sheriff's Dep't,* 12–CV–0855, Report–Recommendation, at 5 (N.D.N.Y. filed June 28, 2012) (Baxter, J.) (citing *Hayes v. Cnty. of Sullivan,* 07–CV–0667, 2012 WL 1129373, at *24 [S.D.N.Y. March 30, 2012] ). Because the Syracuse Police Department is merely an administrative arm of the City of Syracuse, it is not a proper defendant in this case. The real party in interest is the City of Syracuse itself.

For all of these alternative reasons, the Syracuse Police Department dismissed as a Defendant.

### 4. Whether, Even if the City of Syracuse Were Substituted for the Police Department, Plaintiff's Claims Against the City Should Be Dismissed for Failing to Allege Facts Plausibly Suggesting Municipal Liability

After carefully considering the matter, the Court answers this question in the affirmative for the reasons stated by Defendants in their memorandum of law. (Dkt. No. 13, Attach. 2, at 14–15 [attaching pages "13" and "14" of Defs.' Memo. of Law].) The Court would add only the following three brief points.

First, at the very least, Defendants have met the lightened burden that was created by Plaintiff's failure to respond to this argument for dismissal. Second, in any event, the Court would reach same conclusion even if it were to subject Defendants' argument to the more rigorous scrutiny appropriate for a contested argument. Third, even when it is construed with the utmost of special liberality, Plaintiff's Complaint has not alleged facts plausibly suggesting a widespread policy or custom promulgated by the municipal policy maker necessary to hold the City liable for her injuries. As indicated above in Part II.E.2. of this Decision and Order, Plaintiff must allege facts plausibly suggesting that the municipality "has adopted a 'custom' or 'policy' which is the 'moving force' behind [the violation]." *Zappala v. Albicelli,* 980 F.Supp. 635, 639 (N.D.N.Y.1997) (Scullin, J.) (citing, *inter alia, Monell v. Dept. of Soc. Servs. of City of New York,* 436 U.S. 658, 689 [1978] ). However, Plaintiff has not alleged *any* official policy or custom adopted by the City of Syracuse or its Police Department, [15] let alone one responsible for the alleged injuries she received. Because *Monell* prohibits the finding of liability against a City when there is no causal connection between a municipal policy and a resulting injury, Syracuse City Police Department cannot be responsible for Plaintiff's alleged injuries. *Monell,* 436 U.S. at 692. As a result, the City of Syracuse cannot be maintained as a Defendant in this action, and Plaintiff's Section 1983 claims against it are dismissed.

[15]    In addition to not alleging facts plausibly suggesting the existence of a department-wide policy or custom, Plaintiff has not alleged facts plausibly suggesting that Officers Liadka, Sands, and the unnamed officer created or promulgated that policy, or even that they were final policymakers. "A municipal official that exercises discretion, whether it be in a constitutional or unconstitutional manner, in an area of which that official is not the final policymaker, cannot, by itself, establish municipal liability." *Clayton v. City of Kingston,* 44 F.Supp.2d 177, 184 (N.D.N.Y.1999) (McAvoy, C.J.).

**\*10** For all of these reasons, Plaintiff's claims against the City of Syracuse Police Department and/or the City of Syracuse are dismissed on this alternative ground.

### 5. Whether, in the Alternative, Plaintiff's Deprivation–of–Property Claim Should Be Dismissed to the Extent It Is Grounded on the Fifth Amendment

After carefully considering the matter, the Court answers this question in the affirmative for the reasons stated by Defendants in their memorandum of law. (Dkt. No. 13, Attach. 2, at 16–17 [attaching pages "15" and "16" of Defs.' Memo. of Law].) The Court would add only the following four brief points.

First, at the very least, Defendants have met the lightened burden that was created by Plaintiff's failure to respond to this argument for dismissal. Second, in any event, the Court would reach the same conclusion even if it were to subject Defendants' argument to the more rigorous scrutiny appropriate for a contested argument. Third, a takings claim is not ripe where a state remedy is potentially available. *Vandor Inc. v. Militello,* 301 F.3d 37, 39 (2d. Cir.2002). As the Supreme Court has explained,

> An unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available. For intentional, as for negligent deprivations of property by state employees, the state's action is not complete until and unless it provides or refuses to provide a suitable postdeprivation remedy.

*Hudson v. Palmer,* 468 U.S. 517, 533, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). Police are not required to provide the owner with notice for state-law remedies, which are "established by published, generally available state statutes and case law." *City of W. Covina v. Perkins,* 525 U.S. 234, 240–241, 119 S.Ct. 678, 142 L.Ed.2d 636 (1999). "Once the property owner is informed that his property has been seized,

he can turn to these public sources to learn about the remedial procedures that are available to him. The City need not take other steps to inform him of his options." *City of W. Covina, 525 U.S. at 241.* Here, Plaintiff has not alleged facts plausibly suggesting that she attempted to recover her property in the proper manner (or even what property was taken). Fourth, and finally, Plaintiff does not allege facts suggesting that her property was taken for public use in an unconstitutional manner that would require her to be paid just compensation. Instead, Plaintiff alleges that, after she attempted to escape from her investigation and was restrained by officers, she was searched and had property taken from her.

For all of these alternative reasons, Plaintiff's deprivation-of-property claim is dismissed to the extent that it is grounded on the Fifth Amendment.

### 6. Whether, in the Alternative, Plaintiff's Excessive Force Claim Should Be Dismissed for Failing to Allege Facts Plausibly Suggesting Either that Force Was Used or that Any Such Force Was Excessive

**\*11** After carefully considering the matter, the Court answers this question in the affirmative for the reasons stated by Defendants in their memorandum of law. (Dkt. No. 13, Attach. 2, at 17–18 [attaching pages "16" and "17" of Defs.' Memo. of Law].) The Court would add only the following three brief points.

First, at the very least, Defendants have met the lightened burden that was created by Plaintiff's failure to respond to this argument for dismissal. Second, in any event, the Court would reach same conclusion even if it were to subject Defendants' argument to the more rigorous scrutiny appropriate for a contested argument. Third, as stated in the Court's Decision and Order of March 7, 2011, in evaluating a Fourth Amendment excessive-force claim, "courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." (Dkt. No. 5, at 13.) [16] Here, Plaintiff alleges the following facts, which could be construed as plausibly suggesting that, at the time the incident occurred, she had given Defendants probable cause to use the force at issue against her: (1) Defendants were dispatched to that location regarding a problem; (2) Defendants specifically chose to question Plaintiff about the incident; (3) Plaintiff was attempting to get away from Defendant when they were attempting to question her; (4) she acted in such a way as to cause Defendants to become "worked up"; (5) it became

necessary for a third unnamed officer to step in and assist Defendants Sands and Liadka in controlling Plaintiff. (Dkt. No. 1, at ¶ 4 & Attachment.) Simply stated, it is plausible, based on Plaintiff's factual allegations, that the amount of force used by the officers to pull her hands behind her back and detain her was necessary to keep her from getting away and "going about [her] business." (*Id.* at ¶ 4.) It is important to note that Plaintiff does not allege facts plausibly suggesting any physical injury other than vague "head & back pains." (*Id.* at ¶ 5.) [17]

[16] More specifically, the standard governing constitutional excessive-force claims against government officials in "the course of making an arrest, investigatory stop, or other seizure" of a person is the Fourth Amendment's objective reasonableness standard. *Graham v. Connor,* 490 U.S. 386, 388, 391, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Pursuant to this standard, three elements must be objectively examined to determine whether excessive force was used for Fourth Amendment violations: "(1) the need for the application of force; (2) the relationship between that need and the amount of force that was used; and (3) the extent of the injury inflicted." *Graham,* 490 U.S. at 390, 397. It is essential to look at surrounding circumstances in each case, and analyze "whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. The "extent of intrusion on the suspect's rights" must be balanced against the "importance of governmental interests." *Tennessee v. Garner,* 471 U.S. 1, 8, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985).

[17] More specifically, Plaintiff's Complaint does not allege facts plausibly suggesting that her injuries were significant, how long the pain lasted, or that medical treatment was necessary (or even sought) following the incident. *See Smith v. City of New York,* 04–CV–3286, 2010 U.S. Dist. LEXIS 88774, at *27, 2010 WL 3397683 (S.D.N.Y. Aug. 27, 2010) ("Courts in this Circuit have consistently held that an injury is de minimis when it is temporary and/or minor in severity.") (collecting cases).

For all of these reasons, Plaintiff's excessive force claim is dismissed on this alternative ground.

**7. Whether, in the Alternative, Plaintiff's Claims Against the Individual Defendants Should Be Dismissed Because, Based on the Factual Allegations of the Complaint, Defendants Are Protected from Liability as a Matter of Law by the Doctrine of Qualified Immunity**

After carefully considering the matter, the Court answers this question in the affirmative for the reasons stated by Defendants in their memorandum of law. (Dkt. No. 13, Attach. 2, at 19–20 [attaching pages "18" and "19" of Defs.' Memo. of Law].) The Court would add only the following three brief points.

First, at the very least, Defendants have met the lightened burden that was created by Plaintiff's failure to respond to this argument for dismissal. Second, in any event, the Court would the reach same conclusion even if it were to subject Defendants' argument to the more rigorous scrutiny appropriate for a contested argument. Third, as indicated above in Part I.E.3. of this Decision and Order, "[u]nder federal law, a police officer is entitled to qualified immunity where (1) his conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or (2) it was objectively reasonable for him to believe that his actions were lawful at the time of the challenged act." *Jenkins v. City of New York,* 478 F.3d 76, 87 (2d Cir.2007) (internal quotations and other citations omitted). Here, based on Plaintiff's own factual allegations, it is plausible that police officers of reasonable competence could disagree as to whether Defendants' actions were unlawful (e.g., given their need to question her, and her attempt to flee the scene).

**\*12** For all of these reasons, Plaintiff's claims against the individual Defendants are dismissed on this alternative ground.

**C. Whether the Court Should Give Plaintiff an Opportunity to File an Amended Complaint Before Dismissing This Action**

Generally, when a district court dismisses a *pro se* action, the plaintiff will be allowed to amend his action. *See Gomez v. USAA Fed. Savings Bank,* 171 F.3d 794, 796 (2d Cir.1999). However, an opportunity to amend is not required where the defects in the plaintiff's claims are substantive rather than merely formal, such that any amendment would be futile. As the Second Circuit has explained, "[w]here it appears that

granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993) (citations omitted), *accord, Brown v. Peters,* 95–CV–1641, 1997 WL 599355, at \*1 (N.D.N.Y. Sept.22, 1997) (Pooler, J.) ("[T]he court need not grant leave to amend where it appears that amendment would prove to be unproductive or futile.") (citation omitted); *see also Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962) (denial not abuse of discretion where amendment would be futile); *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) ("The problem with Cuoco's causes of action is substantive; better pleading will not cure it. Repleading would thus be futile. Such a futile request to replead should be denied.") (citation omitted); *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (citation omitted); *Health–Chem Corp. v. Baker,* 915 F.2d 805, 810 (2d Cir.1990) ("[W]here ... there is no merit in the proposed amendments, leave to amend should be denied").

This rule applies even to *pro se* plaintiffs. *See, e.g., Cuoco,* 222 F.3d at 103; *Brown,* 1997 WL 599355, at \*1. As explained above in Part II.B. of this Decision and Order, while the special leniency afforded to *pro se* civil rights litigants somewhat loosens the procedural rules governing the form of pleadings (as the Second Circuit has observed), it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Fed.R.Civ.P. 8, 10 and 12; rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Fed.R.Civ.P. 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow.

Here, the Court has some difficulty finding that the referenced defect in Plaintiff's Complaint is merely formal. Nor is the Court confident that granting Plaintiff an opportunity to amend her Complaint will be productive. The Court notes that the errors made by Plaintiff in this action were previously made by her, and not corrected, on many occasions. Plaintiff has been ordered numerous times to file amended complaints at risk of dismissal of her case. [18] Of the seven times an amended complaint was required, Plaintiff submitted an amended complaint only three times. [19] Two of these were one page documents which did not state a claim upon which relief could be granted and were rejected by the Court, and the other did not correct the deficiencies of the original complaint. [20] Plaintiff did not comply with the Court's order

to amend her complaint at all on four occasions.[21] In one case, Plaintiff was given an additional thirty day period to file her amended complaint after she failed to do so within the first 30 day period granted to her. *Jenkins v. Emergency Dep't Upstate Univ. Hosp.,* 06–CV–0060 (N.D.N.Y. filed Jan. 17, 2006). Similarly, in a separate case, Plaintiff did not follow up on her original claim because she failed to appear for three hearings the Court rescheduled despite warnings of her need to comply with the Court Orders. *Jenkins v. Onondaga Sheriffs' Dep't,* 05–CV–1457 (N.D.N.Y. filed Nov. 21, 2005). All seven of these cases resulted in dismissal, most for failure to prosecute, failure to comply with Court Orders, or failure to state a claim. Five of Plaintiff's cases were not given leave to amend because granting such leniency would have been futile.[22]

[18]   *Jenkins v. Comm'r of Soc. Sec. Admin.,* 06–CV–0059 (N.D.N.Y. filed Jan 17, 2006); *Jenkins v. Emergency Dep't Upstate Univ. Hosp.,* 06–CV–0060 (N.D.N.Y. filed Jan. 17, 2006); *Jenkins v. Dep't Corr. Servs.,* 06–CV–0621 (N.D.N.Y. filed May 19, 2006); *Jenkins v. Onondaga Sheriff's Dep't.,* 06–CV–1092 (N.D.N.Y. filed Sept. 12, 2006); *Jenkins v. Sheriff's Dep't.,* 07–CV–0939 (N.D.N.Y. filed Sept. 11, 2007); *Jenkins v. Murphy,* 08–CV–0921 (N.D.N.Y. filed Aug. 8, 2008); *Jenkins v. Onondaga Cnty. Sheriff's Dep't.,* 12–CV–0855 (N.D.N.Y. filed May 23, 2012).

[19]   *Jenkins v. Dep't Corr. Servs.,* 06–CV–0621 (N.D.N.Y. filed May 19, 2006); *Jenkins v. Comm'r of Soc. Sec. Admin.,* 06–CV–0059 (N.D.N.Y. filed Jan 17, 2006); *Jenkins v. Sheriff's Dep't.,* 07–CV–0939 (N.D.N.Y. filed Sept. 11, 2007).

[20]   *Id.*

[21]   *Jenkins v. Emergency Dep't Upstate Univ. Hosp.,* 06–CV–0060 (N.D.N.Y. filed Jan. 17, 2006); *Jenkins v. Onondaga Sheriff's Dep't.,* 06–CV–1092 (N.D.N.Y. filed Sept. 12, 2006); *Jenkins v. Murphy,* 08–CV–0921 (N.D.N.Y. filed Aug. 8, 2008); *Jenkins v. Onondaga Cnty. Sheriff's Dep't.,* 12–CV–0855 (N.D.N.Y. filed May 23, 2012)

[22]   *Jenkins v. Emergency Dep't Upstate Univ. Hosp.,* 06–CV–0060 (N.D.N.Y. filed Jan. 17, 2006); *Jenkins v. Mohawk Corr. Facility,* 06–CV–1167 (N.D.N.Y. filed Sept. 29, 2006); *Jenkins v. Sheriff's*

*Dep't,* 07–CV–0939 (N.D.N.Y. filed Sept. 11, 2007); *Jenkins v. USA,* 09–CV0603 (N.D.N.Y. filed May 11, 2009); *Jenkins v. Rice,* 11–CV–1037 (N.D.N.Y. filed Aug. 31, 2011).

**\*13** However, the Court is mindful of the special solicitude that should be afforded to *pro se* civil rights litigants. For these reasons, before the Court dismisses Plaintiff's action, the Court will afford her an opportunity to file an Amended Complaint correcting the above-described pleading defects within thirty (30) days from the date of the filing of this Decision and Order.

If Plaintiff submits an Amended Complaint, she is encouraged to describe the acts of misconduct alleged therein and identify each individual who participated in the misconduct. Moreover, Plaintiff is advised that her Amended Complaint must be a complete pleading that will replace and supersede her original Complaint in its entirety. Finally, Plaintiff is cautioned that, if she fails to file, in a timely fashion, an Amended Complaint that successfully states a claim upon which relief can be granted, her action will be dismissed with prejudice without further Order of the Court.

### D. Whether This Case Should Be Forwarded to the Chief Judge with a Recommendation that an Anti–Filing Injunction Order Be Issued Against Plaintiff

A review of Plaintiff's litigation history on Federal Judiciary's Public Access to Court Electronic Records ("PACER") Service reveals that, before filing the current action on October 13, 2010, she filed thirteen *pro se* civil actions in this District alone-twelve of which have been dismissed and the thirteen of which is being considered for dismissal.[23] A review of Plaintiff's litigation history has caused the undersigned to believe that (1) Plaintiff lacks a good-faith expectation in prevailing in her lawsuits, (2) she is vexatious and indeed incorrigible when proceeding pro se, (3) she has caused needless expense to other parties and placed an unnecessary burden on the Court and its personnel, and (4) no lesser sanctions (e.g., such as dismissal or chastisement) would be adequate to protect the Court and other parties.

[23]   *Jenkins v. Onondaga Sheriffs' Dep't,* 05–CV–1457 (N.D.N.Y. filed Nov. 21, 2005); *Jenkins v. Dep't Corr. Servs.,* 06–CV–0621 (N.D.N.Y. filed May 19, 2006); *Jenkins Comm'r of Soc. Sec. Admin.,* 06–CV–0059 (N.D.N.Y. filed Jan. 17, 2006); *Jenkins v. Emergency Dep't Upstate Univ. Hosp.,* 06–CV–0060 (N.D.N.Y. filed Jan. 17, 2006); *Jenkins v. City*

*of Syracuse,* 06–CV–1005 (N.D.N.Y. filed Aug. 21, 2006); *Jenkins v. Onondaga Sheriff's Dep't,* 06–CV1092 (N.D.N.Y. filed Sept. 12, 2006); *Jenkins v. Mohawk Corr. Facility,* 06–CV–1167 (N.D.N.Y. filed Sept. 29, 2006); *Jenkins v. City of Syracuse,* 07–CV–0930 (N.D.N.Y. filed Sept. 7, 2007); *Jenkins v. Sheriff's Dep't,* 07–CV–0939 (N.D.N.Y. filed Sept. 11, 2007); *Jenkins v. Murphy,* 08–CV–0921 (N.D.N.Y. filed Aug. 8, 2008); *Jenkins v. USA,* 09–CV–0603 (N.D.N.Y. filed May 11, 2009); *Jenkins v. Rice,* 11–CV–1037 (N.D.N.Y. filed Aug. 31, 2011); *Jenkins v. Onondaga Cnty. Sheriff's Dept.,* 12–CV–0855 (N.D.N.Y filed May 23, 2012).

For example, eight of Plaintiff's actions have resulted in a dismissal for failure to state a claim or frivolousness, another has resulted in the pending recommendation of a dismissal on that ground, three others have resulted in a dismissal for lack of subject-matter jurisdiction, and another has resulted in a dismissal for failure to prosecute. [24]

[24]   *Jenkins v. Onondaga Sheriffs' Dep't,* 05–CV–1457, Decision and Order (N.D.N.Y. filed Apr. 25, 2006) (Scullin, J.); *Jenkins Comm'r of Soc. Sec. Admin.,* 06–CV–0059, Decision and Order (N.D.N.Y. filed March 29, 2007) (Hurd, J.); *Jenkins v. Emergency Dep't Upstate Univ. Hosp.,* 06–CV–0060, Memorandum–Decision and Order (N.D.N.Y. filed April 14, 2006) (Scullin, J.); *Jenkins v. Dep't Corr. Servs.,* 06–CV–0621, Decision and Order (N.D.N.Y. filed July 5, 2006) (Kahn, J.); *Jenkins v. City of Syracuse,* 06–CV–1005, Order (N.D.N.Y. filed Oct. 5, 2006) (Mordue, C.J.); *Jenkins v. Onondaga Sheriff's Dep't,* 06–CV–1092, Decision and Order, (N.D.N.Y. filed Oct. 6, 2006) (McAvoy, J.); *Jenkins v. Mohawk Corr. Facility,* 06–CV–1167, Decision and Order (N.D.N.Y. filed Oct. 12, 2006) (Mordue, C.J.); *Jenkins v. City of Syracuse,* 07–CV–0930, Decision and Order (N.D.N.Y. filed Oct. 7, 2007) (Mordue, C.J.); *Jenkins v. Sheriff's Dep't,* 07–CV–0939, Decision and Order (N.D.N.Y. filed Nov. 21, 2007) (Hurd, J.); *Jenkins v. Murphy,* 08–CV–0921, Order (N.D.N.Y. filed Oct. 14, 2008) (McCurn, J.); *Jenkins v. USA,* 09–CV–0603, Decision and Order (N.D.N.Y. filed May 28, 2009) (McAvoy, J.); *Jenkins v. Rice,* 11–CV–1037, Decision and Order (N.D.N.Y. filed Oct. 11, 2011) (Kahn, J.); *Jenkins*

*v. Onondaga Cnty. Sheriff's Dept.,* 12–CV–0855, Report–Recommendation (N.D.N.Y filed June 28, 2012) (Baxter, M.J.).

Moreover, Plaintiff has sued the Onondaga County Sheriff's Department four times. [25] As a result, she has been repeatedly instructed on the legal standard for suing a municipality. For example, on October 6, 2006, she was specifically informed of the need to establish a custom or policy which is the moving force behind a resulting injury. *Jenkins v. Onondaga Cnty. Sheriff's Dep't.,* 06–CV–1092, Decision and Order, at 4 (N.D.N.Y. filed Oct. 6, 2006) (McAvoy, J.). However, despite receiving that specific information, she has *repeatedly* continued to file improper claims against the Onondaga County Sheriff's Department. [26]

[25]   *Jenkins v. Onondaga Sheriffs' Dep't,* 05–CV–1457 (N.D.N.Y. filed Nov. 21, 2005); *Jenkins v. Onondaga Sheriff's Dep't,* 06–CV–1092 (N.D.N.Y. filed Sept. 12, 2006); *Jenkins v. Sheriff's Dep't,* 07–CV–0939 (N.D.N.Y. filed Sept. 11, 2007); *Jenkins v. Onondaga Cnty. Sheriff's Dept.,* 12–CV–0855 (N.D.N.Y filed May 23, 2012).

[26]   *Jenkins v. Sheriff's Dep't,* 07–CV–0939, Decision and Order at 3 (N.D.N.Y. filed Oct. 2, 2007) (Hurd, J.); *Jenkins v. Sheriff's Dep't,* 07–CV–0939, Decision and Order at 2 (N.D.N.Y. filed Nov. 21, 2007) (Hurd, J.); *Jenkins v. Onondaga Cnty. Sheriff's Dept.,* 12–CV0855, Decision and Order, at 4–5 (N.D.N.Y filed May 24, 2012) (Baxter, M.J.); *Jenkins v. Onondaga Cnty. Sheriff's Dept.,* 12–CV–0855, Report–Recommendation, at 5–6 (N.D.N.Y filed June 28, 2012) (Baxter, M.J.); *see also, supra,* Part III.B.4. of this Decision and Order.

Finally, Plaintiff has repeatedly had to be ordered to comply with the Local Rules, and reminded that all factual allegations should be contained in the complaint itself, that paragraphs ought to be numbered, and that the individuals she alleges violated her rights must be identified. *See, e.g., Jenkins v. Dep't Corr. Servs.,* 06–CV–0621, Decision and Order (N.D.N.Y. filed July 5, 2006) (Kahn, J.); *Jenkins v. Onondaga Sheriff's Dep't,* 06–CV–1092, Order (N.D.N.Y. filed Oct. 6, 2006) (McAvoy, J.).

**\*14** Under such circumstances, a federal district court may impose reasonable filing restrictions on a *pro se* litigant in that particular court, pursuant to 28 U.S.C. § 1651(a) and its inherent authority to control and manage its own docket

Jenkins v. Lladka, Not Reported in F.Supp.2d (2012)
Case 3:19-cv-00868-TJM-TWD   Document 16   Filed 07/20/20   Page 69 of 130

2012 WL 4052286

so as to prevent abuse in its proceedings. For example, a federal district court may, after providing an appropriate opportunity to be heard, prohibit a vexatious litigant from filing, in that particular court, any action *pro se* (that is, without counsel), without prior leave of that court. *See Hong Mai Sa v. Doe,* 406 F.3d 155, 158 (2d Cir.2005) ("If a litigant has a history of filing vexatious, harassing or duplicative lawsuits, courts may impose sanctions, including restrictions on future access to the judicial system.") [internal quotations and citations omitted]; *In re Sassower,* 20 F.3d 42, 44 (2d Cir.1994) (where a *pro se* plaintiff has demonstrated a "clear pattern of abusing the litigation process by filing vexatious and frivolous complaints," a "leave to file" requirement may be instituted by the court as an appropriate sanction); *Moates v. Barkley,* 147 F.3d 207, 208 (2d Cir.1998) ( "[T]he district court may not impose a filing injunction on a litigant *sua sponte* without providing the litigant with notice and an opportunity to be heard."); *Azubuko v. Unknown Boston Police Officers,* 08–CV–0330, 2008 WL 1767067, at * 1 (N.D.N.Y. Apr.16, 2008) (McCurn, J.).

For all of these reasons, this case is forwarded to Chief United States District Judge Gary L. Sharpe with a recommendation that an Anti–Filing Injunction Order be issued against Plaintiff.

**ACCORDINGLY,** it is

**ORDERED** that Defendants' motion to dismiss (Dkt. No. 13) is *GRANTED* **in part** and *DENIED* **in part;** and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is conditionally ***DISMISSED;*** and it is further

**ORDERED** that Plaintiff is permitted to file an Amended Complaint within **THIRTY (30) DAYS** of the filing date of this Order; and it is further

**ORDERED** that, *if Plaintiff fails to timely file an Amended Complaint, the Clerk shall enter judgment dismissing this action without further Order of this Court;* and it is further

**ORDERED** that, upon filing of the Amended Complaint, this file in this matter be returned to the Court for further review; and it is further

**ORDERED** that the Clerk of the Court is directed to forward this case to Chief United States District Judge Gary L. Sharpe with the recommendation of the undersigned that an AntiFiling Injunction Order be issued against Plaintiff.

*The Court hereby certifies, for purposes of* 28 U.S.C. § 1915(a) (3), *that any appeal taken from the Court's final judgment in this action would not be taken in good faith.*

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 4052286

---

2007 WL 607341
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Paul CIPRIANI, Plaintiff,

v.

Harry C. BUFFARDI, Sheriff; Schenectady
County Jail; Cheryl Clark, M.D.;
Kevin J. O'Connor, Defendants.

No. 9:06-CV-0889(LEK/DRH).
|
Feb. 20, 2007.

**Attorneys and Law Firms**

Paul Cipriani, Plaintiff, pro se.

***DECISION and ORDER***

LAWRENCE E. KAHN, U.S. District Judge.

 **\*1** Presently before the Court is an amended complaint filed by Plaintiff Paul Cipriani ("Plaintiff"). Amended Compl. (Dkt. No. 10). This amended complaint was submitted in compliance with the Memorandum-Decision and Order issued by this Court on November 27, 2006 ("November Order"). Mem.-Decision and Order (Dkt. No. 7).

In its November Order, the Court advised plaintiff that he must set forth facts demonstrating that Defendants were personally involved in a violation of Plaintiff's rights. *Id.* at 4. Plaintiff was also advised that in order to establish the liability of a municipality, he must allege a custom or policy which is the moving force behind the violation. *Id.*

In his amended complaint, Plaintiff names thirteen defendants and asserts numerous claims against them arising from his confinement at Schenectady County Jail. Amended Compl. (Dkt. No. 10).

The Court notes that plaintiff has not named "Schenectady County Jail," "Cheryl Clark," or "Kevin J. O'Connor" in his amended Complaint. Therefore, "Schenectady County Jail," "Cheryl Clark," and "Kevin J. O'Connor" are hereby dismissed as defendants in this action.

The Court also notes that Plaintiff's amended Complaint mentions "Mr. Booth" and "Mr. Purdy" only in the caption, and fails to allege any act or omission by these individuals. Dismissal is appropriate where a defendant is listed in the caption, but the body of the complaint fails to indicate what the defendant did to the plaintiff. *Gonzalez v. City of New York,* No. 97 CIV. 2246(MGC), 1998 WL 382055, at \*2 (S.D.N.Y. July 9, 1998) (citing *Crown v. Wagenstein,* No. 96 CIV. 3895(MGC), 1998 WL 118169, at \*1 (S.D.N.Y.Mar.16, 1998) (mere inclusion of warden's name in complaint insufficient to allege personal involvement) and *Taylor v. City of New York,* 953 F.Supp. 95, 99 (S.D.N.Y.1997)). Because plaintiff has failed to allege any personal involvement on the part of defendants "Mr. Booth" and "Mr. Purdy", they are hereby dismissed as defendants in this action.

In his amended Complaint, Plaintiff alleges that the remaining Defendants committed various violations of his constitutional rights, including inadequate medical care, breach of doctor-patient confidentiality, excessive force, denial of due process in a disciplinary proceeding, and interference with the grievance process. Amended Compl. (Dkt. No. 10).

Based on the foregoing, Plaintiff's amended complaint as against the remaining Defendants is accepted for filing.

Plaintiff is advised, however, that the U.S. Marshals cannot effect service on a "John Doe" defendant. In the event that plaintiff wishes to pursue this claim against the "John Doe" defendants named in the amended Complaint, he must take reasonable steps to ascertain their identities. Plaintiff may then file a Motion to amend his complaint and seek leave of the Court to add such individuals, by name, as defendants to this lawsuit. Plaintiff is further advised that if these individuals are not timely served, the action will be against them will be dismissed.

 **\*2** WHEREFORE, it is hereby

**ORDERED,** that "Mr. Booth," "Mr. Purdy," "Schenectady County Jail," "Cheryl Clark," and "Kevin J. O'Connor" are **DISMISSED** as defendants in this action, and it is further

**ORDERED,** that the Clerk revise the docket to add "Schenectady County," "Mr. Burns," "Mr. Jones," "Mr. Adams," "Ms. Jones," "Ms. Hull," "John Doe # 1," "John Doe # 7," "John Doe # 10," and "Loraine Walker" as defendants in this action, and it is further

**ORDERED,** that the Clerk issue summonses naming the remaining defendants and forward them, along with copies of the amended Complaint (Dkt. No. 10), to the United States Marshal for service upon the defendants, together with a copy of this Order. [1] The Clerk shall also forward a copy of the summons and amended Complaint by mail to the County Attorney for Schenectady County, together with a copy of this Order, and it is further

[1] Plaintiff was granted leave to proceed with this action *in forma pauperis.* Mem.-Decision and Order (Dkt. No. 7).

**ORDERED,** that a formal response to Plaintiff's amended Complaint be filed by Defendants or their counsel as provided for in Rule 12 of *the Federal Rules of Civil Procedure* subsequent to service of process on Defendants, and it is further

**ORDERED,** that Plaintiff take reasonable steps to ascertain the identities of any other individual(s) that purportedly violated Plaintiff's civil and/or constitutional rights and, if appropriate, file a Motion to amend his complaint and add such individuals, by name, as defendants to this lawsuit, and it is further

**ORDERED,** that all pleadings, motions and other documents relating to this action must bear the case number assigned to this action and be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261-7367. *Any paper sent by a party to the Court or the Clerk must be accompanied by a certificate showing that a true and correct copy of it was mailed to all opposing parties or their counsel. Any document received by the Clerk or the Court which does not include a proper certificate of service will be returned, without processing.* Plaintiff must comply with requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions, which must be returnable before the assigned Magistrate Judge with proper allowance for notice as required by the Rules. *Plaintiff is also required to promptly notify the Clerk's Office and all parties or their counsel of any change in his address; his failure to do so will result in the dismissal of this action.* All motions will be decided on submitted papers without oral argument unless otherwise ordered by the Court; and it is further

**ORDERED,** that the Clerk serve a copy of this Order on plaintiff by regular mail.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 607341

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

Perez v. Ponte, Not Reported in Fed. Supp. (2017)

Case 3:19-cv-00868-TJM-TWD   Document 16   Filed 07/20/20   Page 72 of 130

2017 WL 1050109

2017 WL 1050109
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Jesswill PEREZ, Plaintiff,
v.
Joseph PONTE, et al., Defendants.

16-CV-645 (JFB)(AKT)
|
Signed 03/15/2017

**Attorneys and Law Firms**

Jesswill Perez, Fishkill, NY, pro se.

Colin M. Ceriello, Office of the Corporation Counsel New York City Law Department, New York, NY, Pablo A. Fernandez, Nassau County Attorney's Office, Mineola, NY, for Defendants.

ORDER

Joseph F. Bianco, United States District Judge

**\*1** Before the Court is a Report and Recommendation ("R&R," ECF No. 40) from Magistrate Judge Tomlinson recommending that the Court grant defendants Michael Sposato's and Joseph Ponte's ("defendants") motions to dismiss (ECF Nos. 16, 20). The R&R instructed that any objections to the R&R be submitted within fourteen (14) days of service of the R&R. (See R&R, dated February 14, 2017, at 68.) Defendants served the R&R on plaintiff on February 21, 2017 (see ECF No. 43), and the date for filing any objections has accordingly since expired. Plaintiff has not filed any objections to the R&R. For the reasons set forth below, the Court adopts the thorough and well-reasoned R&R in its entirety, grants defendants' motion to dismiss plaintiff's claims, grants plaintiff's motion to amend his complaint, in part, and denies the motion to amend, in part. Specifically, plaintiff may amend his Complaint to: (1) substitute only Chief Turhan Gumusdere and Officers John Doe #1 and John Doe #2 as Defendants; and (2) assert claims of constitutional deprivations of his Fourteenth Amendment Due Process rights based upon his transfer from Riker's to Rockland as well as his failure-to-protect claim. Plaintiff shall file the amended complaint by April 24, 2017. Failure to file

an amended complaint by that date may result in dismissal of the case with prejudice for failure to prosecute.

Where there are no objections, the Court may adopt the report and recommendation without de novo review. See Thomas v. Arn, 474 U.S. 140, 150 (1985) ("It does not appear that Congress intended to require district court review of a magistrate's factual or legal conclusions, under a de novo or any other standard, when neither party objects to those findings."); see also Mario v. P & C Food Mkts., Inc., 313 F.3d 758, 766 (2d Cir. 2002) ("Where parties receive clear notice of the consequences, failure timely to object to a magistrate's report and recommendation operates as a waiver of further judicial review of the magistrate's decision."); cf. 28 U.S.C. § 636(b)(1)(c) and Fed. R. Civ. P. 72(b)(3) (requiring de novo review after objections). However, because the failure to file timely objections is not jurisdictional, a district judge may still excuse the failure to object in a timely manner and exercise its discretion to decide the case on the merits to, for example, prevent plain error. See Cephas v. Nash, 328 F.3d 98,107 (2d Cir. 2003) ("[B]ecause the waiver rule is non jurisdictional, we 'may excuse the default in the interests of justice.' " (quoting Thomas, 474 U.S. at 155)).

Although plaintiff has waived any objections to the R&R and thus de novo review is not required, the Court has conducted a de novo review of the R&R in an abundance of caution. Having conducted a review of the full record and the applicable law, and having reviewed the R&R de novo, the Court adopts the findings and recommendations contained in the well-reasoned and thorough R&R in their entirety. Accordingly, IT IS HEREBY ORDERED that defendants' motion to dismiss plaintiff's claims is granted. IT IS FURTHER ORDERED that plaintiff's motion to amend is granted, in part, and denied, in part, in accordance with Judge Tomlinson's R&R. In particular, plaintiff may amend his Complaint to: (1) substitute only Chief Turhan Gumusdere and Officers John Doe #1 and John Doe #2 as Defendants; and (2) assert claims of constitutional deprivations of his Fourteenth Amendment Due Process rights based upon his transfer from Riker's to Rockland as well as his failure-to-protect claim. Plaintiff shall file the amended complaint by April 24, 2017. Failure to file an amended complaint by that date may result in dismissal of the case with prejudice for failure to prosecute.

**\*2** SO ORDERED.

Perez v. Ponte, Not Reported in Fed. Supp. (2017)

Case 3:19-cv-00868-TJM-TWD  Document 16  Filed 07/20/20  Page 73 of 130

2017 WL 1050109

**All Citations**

Not Reported in Fed. Supp., 2017 WL 1050109

---

 © 2020 Thomson Reuters. No claim to original U.S. Government Works.

 © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 3857995
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Nakia CHANEY, Plaintiff,

v.

CITY OF ALBANY, Albany Police Department,
Steven Krokoff, Scott Gavigan (Badge #1826),
Richard Gorleski (Badge #2232), Daniel Kuhn
(Badge #1952), Kevin Meehan (Badge #2407),
John Doe (Badge #889), Brian Kisling, Matthew
Staley, Daniel James, Jason Wilson, Seeber,
Schenectady County, Schenectady County Jail,
Anthony Sinatra (Badge #270), Joseph Glasser
(Badge #065), Kris Van Hoesen (Badge #291), Ernie
Reaulo (Badge #24), Unknown John Does From
Schenectady Sheriff, Unknown John Does From
Schenectady County Jail, and Alan Bell, Defendants.

6:16-CV-1185 (NAM/TWD)
|
Signed 08/16/2019

### Attorneys and Law Firms

Nakia Chaney, Schenectady, New York 13206, Plaintiff Pro
Se.

The Rehfuss Law Firm, P.C., Stephen J. Rehfuss, Esq.,
Abigail W. Rehfuss, Esq., 40 British American Blvd.,
Latham, New York 12110, Attorneys for Defendants City of
Albany, Krokoff, Gavigan, Gorleski, Kuhn, Meehan, Kisling,
Wilson, Seeber, Staley, James.

Burke, Scolamiero, Mortati & Hurd LLP, Judith B. Aumand,
Esq., 7 Washington Square, Albany, New York 12212,
Attorney for Defendant Alan Bell.

Goldberg Segalla, LLP, James F. Faucher, II, Esq., Jonathan
M. Bernstein, Esq., 8 Southwoods Blvd., Suite 300, Albany,
New York 12211, Attorneys for Defendants Schenectady
County, Reaulo, Sinatra, Vanhoesen, Glasser.

### MEMORANDUM-DECISION AND ORDER

Hon. Norman A. Mordue, Senior District Court Judge:

### I. INTRODUCTION

**\*1** Plaintiff *pro se* Nakia Chaney ("Plaintiff") brings this
action under 42 U.S.C. § 1983 alleging various claims
arising out of encounters with the Defendant law enforcement
officers. (Dkt. No. 1). Currently before the Court are
Defendants' motions for summary judgment, (Dkt. Nos. 165,
167, 168), which Plaintiff has opposed, (Dkt. No. 176, 177,
178). For the reasons that follow, Defendants' motions are
granted in part and denied in part.

### II. BACKGROUND

#### A. Procedural History

Plaintiff commenced this action on September 30, 2016,
asserting at least nine claims for alleged violations
of his constitutional rights by known and unknown
individuals. (Dkt. No. 1). Specifically, Plaintiff first
alleges that Defendants Schenectady County, Schenectady
County Sheriff's Department, Schenectady County Jail, and
Officers Sinatra, Glasser, Van Hoesen, Reaulo, and other
unknown John Does (collectively, the "Schenectady County
Defendants") conducted "unlawful [ ] visual body cavity
searches" on Plaintiff's person prior to his admission to
Schenectady County Jail in 2013 and 2014. (*Id.*, p. 22). [1]
Plaintiff also alleges that on December 28, 2013, Defendant
Glasser used "excessive force [by] unlawfully tasering
plaintiff while [in] handcuffs...." (*Id.*, p. 23). Defendant
further claims that the Schenectady County Defendants
unlawfully denied him medical care immediately following
the December 28th incident. (*Id.*, p. 7).

[1]  All citations to documents in the record reference
the page numbers identified on the CM/ECF page
stamp.

Plaintiff claims that the Albany Police Department ("APD"),
Police Chief Steven Krokoff, and Officers Gavigan, Gorleski,
Kuhn, Meehan, Kisling, Staley, James, Wilson and Seeber
(collectively the "Albany Defendants") conducted "unlawful
[ ] visual body cavity searches" on Plaintiff's person at the
Albany police station. (Dkt. No. 1, p. 22). Plaintiff further
alleges that the Albany Defendants violated his constitutional
rights in August 2014 and October 2014 for separate incidents
involving alleged "unlawful gun point stop[s], arrest or
frisk, forcible touching [ ], sexual assault, excessive force,
and abuse of legal process." (*Id.*). Plaintiff claims that the
Albany Defendants violated his right to privacy through

their unlawful touching of his "private parts" during several alleged strip searches. (*Id.*, p. 23).

Finally, Plaintiff alleges that Defendant Alan Bell of the Niskayuna Police Department, along with Defendant Gavigan, conducted "unlawful [GPS] tracking of [Plaintiff's] every move for over 9 months without a warrant...." (Dkt. No. 1, pp. 10, 23). Specifically, Plaintiff claims that Defendant Bell "requested [that] [D]efendant Scott Gavigan use the unlawful GPS tracking device," and "controlled the GPS device in the Town of Niskayuna [while] Defendant Scott Gavigan covered the GPS device for the Albany Police without a warrant [ ] or probable cause." (*Id.*, p. 10).

In November 2017, the Court granted the Albany County Defendants' motion for judgment on the pleadings, dismissing them from this action. (Dkt. No. 110, pp. 7–8). In that same order, the Court denied Defendant Alan Bell's motion to dismiss. (*Id.*, pp. 11–14). On December 15, 2017, the Court granted Plaintiff's motion to substitute Joseph Glasser for Defendant Schenectady County Sheriff Badge #SCP 065; and granted Plaintiff's motion to substitute APD Officers Daniel Kuhn, Brian J. Kisling, Jason A. Wilson, Seeber, Matthew Staley, and Daniel James for "Defendant John Does Albany Police." (*See* Dkt. No. 111).

### B. Record Before the Court [2]

[2]    The discovery deadline expired on November 30, 2018. Defendants deposed Plaintiff on July 31, 2018. (*See* Dkt. No. 165-28). Plaintiff did not depose any of the Defendants.

\*2  While the Court "is not required to consider what the parties fail to point out," in deference to Plaintiff's *pro se* status and out of an abundance of caution, the Court has nevertheless conducted "an assiduous review of the record" to determine whether there is evidence that might support any of Plaintiff's claims. *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001). The Court has construed the following undisputed facts in the light most favorable to the Plaintiff.

### 1. December 28, 2013 Arrest

On December 28, 2013, Plaintiff was a passenger in a vehicle driven by Lorenzo McGill. (Dkt. No. 165-28, p. 114). McGill led police on a high-speed chase after he was observed

driving without headlights. (*Id. see also* Dkt. No. 165-29, ¶ 4). The chase ended at 767 Westmoreland Drive in the Town of Niskayuna, where Plaintiff lived at the time. (Dkt. No. 165-28, pp. 117, 123). There, Plaintiff was involved in a brief struggle with Schenectady County Sheriff's Deputy Glasser, who used a taser to subdue Plaintiff. (Dkt. No. 165-29, ¶ 4). Plaintiff appeared in court and was released on bail that same night. (Dkt. No. 165-28, p. 125). Plaintiff did not receive medical treatment for any injuries while in police custody, nor did he seek medical treatment following his release. (*Id.*, pp. 127–28). Plaintiff was later charged with obstructing governmental administration and resisting arrest; he pled guilty to disorderly conduct in full satisfaction of those charges. (Dkt. No. 165-28, p. 116; Dkt. No. 165-29, ¶ 9; *see also* Dkt. No. 165-36, pp. 3–4; Dkt. No. 165-37, p. 2).

### 2. August 14, 2014 Arrest

On August 14, 2014, Plaintiff was a passenger in a vehicle driven by his friend, Jonathan Smith. (Dkt. No. 165-28, p. 25). APD officers stopped the vehicle after Smith failed to use a turn signal. (Dkt. No. 167-2, p. 4). The police report states that APD officers then observed Smith throw three glassine envelopes, each containing a quantity of heroin, out of the vehicle. (*Id.*). Smith was arrested and charged with criminal possession of a controlled substance and criminal possession of a hypodermic instrument. (*Id.*). Plaintiff was not charged with any crime, and he was released from the scene. (Dkt. No. 165-28, p. 45).

### 3. October 13, 2014 Arrest

On October 13, 2014, APD Officer Gavigan received information from a confidential informant that Plaintiff and the informant would be transporting heroin to the Albany area from New Jersey. (Dkt. No. 167-2, p. 93). When Plaintiff and the informant exited the highway in Albany, APD officers stopped the vehicle and ordered Plaintiff to show his hands and exit the vehicle. (*Id.*, pp. 93–94). The Arrest Report indicates that APD recovered 198 glassine envelopes from the left pocket of Plaintiff's coat located in the trunk of the vehicle. (*Id.*, p. 6). Each envelope contained a quantity of heroin, with an aggregate weight of 4 grams. (*Id.*). Plaintiff was later charged and convicted of Criminal Possession of a Controlled Substance in the Third Degree in violation of Penal Law § 220.16(1). (Dkt. No. 167-2, p. 7).

### 4. Visual Body Cavity Searches

In 2014, Plaintiff was convicted of drug crimes in Niskayuna Town Court based on activities unrelated to this action. (Dkt. No. 165-28, p. 46). Plaintiff was sentenced to serve 30 consecutive four-day weekends in Schenectady County Jail. (*Id.*). While serving that sentence, Plaintiff was required to submit to a "visual body cavity search" before each admission to the Schenectady County Jail. (Dkt. No. 165-28, pp. 15–16). Plaintiff was admitted to the Schenectady County Jail and searched according to the County's admission policy on at least six occasions in August and September 2014. (Dkt. No. 165-38, ¶ 4).

### III. STANDARD OF REVIEW

**\*3** Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions, taken together, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*).

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250, 106 S.Ct. 2505; *see also Celotex*, 477 U.S. at 323–24, 106 S.Ct. 2548; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). Further, "[w]hen no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and the grant of summary judgment is proper." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223–24 (2d Cir. 1994) (citing *Dister v. Continental Grp., Inc.*, 859 F.2d 1108, 1114 (2d Cir. 1988)). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas*

*Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). "Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case." *Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003). To that end, "sworn statements are more than mere conclusory allegations subject to disregard [ ]; they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion." *Id.* at 289 (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983)).

Further, where a plaintiff proceeds *pro se*, the Court must read his submissions liberally and interpret them "to raise the strongest arguments that they suggest." *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)). Nevertheless, a *pro se* party's " 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Jordan v. New York*, 773 F. Supp. 2d 255, 268 (N.D.N.Y. 2010) (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

### IV. DISCUSSION

Plaintiff asserts a number of claims against each of the Defendants. The Court has construed Plaintiff's Complaint liberally, and will address each of the Defendants' arguments for summary judgment in turn.

#### A. Claims Against the Schenectady County Defendants

##### 1. Excessive Force on December 28, 2013 [3]

[3]

To the extent they are alleged, the Court dismisses Plaintiff's claims against "Unknown John Does from Schenectady County Sherriff" arising from the encounter between Plaintiff and Officer Glasser on December 28, 2013. The Court has reviewed the record and finds that there is no evidence to support a claim that excessive force or other unlawful conduct was committed by any unidentified officer(s) on that date.

**\*4** Plaintiff alleges that on December 28, 2013, Officer Glasser of the Schenectady County Sherriff's Department used "excessive force [by] unlawfully tasering plaintiff while [in] handcuffs." (Dkt. No. 1, p. 23). The Schenectady

Defendants counter that the force deployed by Officer Glasser was proper under the circumstances, and they argue that "Plaintiff is estopped from claiming that he was a passive recipient of police violence." (Dkt. No. 165-43, pp. 6–11).

"The Fourth Amendment prohibits the use of unreasonable and therefore excessive force by a police officer in the course of effecting an arrest." *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010). To succeed on an excessive force claim, "a plaintiff must ultimately demonstrate that the defendant's use of force was objectively unreasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Hulett v. City of Syracuse*, 253 F. Supp. 3d 462, 491 (N.D.N.Y. 2017); *see also Maxwell v. City of New York*, 380 F.3d 106, 108 (2d Cir. 2004). The "objective reasonableness" inquiry is "case and fact specific and requires balancing the nature and quality of the intrusion on the plaintiff's Fourth Amendment interests against the countervailing governmental interests at stake." *Tracy*, 623 F.3d at 96 (citing *Amnesty America v. Town of West Hartford*, 361 F.3d 113, 123 (2d Cir. 2004)).

In evaluating an excessive force claim, courts consider: "(1) the nature and severity of the crime leading to the arrest, (2) whether the suspect poses an immediate threat to the safety of the officer or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Id.* (citing *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). "[A] court must evaluate the record from the perspective of a reasonable officer on scene, rather than with the 20/20 vision of hindsight." *Hulett*, 253 F. Supp. 3d at 491 (citing *Tracy*, 623 F.3d at 96; *Jones v. Parmley*, 465 F.3d 46, 61 (2d Cir. 2006)). "[G]ranting summary judgment against a plaintiff on an excessive force claim is not appropriate unless no reasonable fact finder could conclude that the officers' conduct was objectively unreasonable." *Amnesty Am.*, 361 F.3d at 123.

Here, the parties have offered vastly different versions of the events that occurred after the police chase on December 28th. Plaintiff claims that he "did not run [from police] and had no reason to run," and adds that he was "snatched out of the vehicle by several officers at gun point [sic] flanked by several officers and immediately handcuffed and tasered." (Dkt. No. 176, p. 2). These allegations are consistent with the Complaint, and align with his recollection of events during his deposition testimony. (Dkt. No. 1, p. 7; *see also* Dkt. No. 165-28, pp. 117–28). According to Plaintiff, he was

hit by the taser in the leg near his hamstring, causing bleeding and leaving a scar. (Dkt. No. 165-28, pp. 120–21).

Officer Glasser recalls the encounter quite differently, asserting that when the chase ended at 767 Westmoreland Drive:

> Plaintiff Nakia Chaney jumped out of the passenger side door and ran to the front door of the house trying to get the door open. I took plaintiff to the ground where he resisted and refused to place his hands behind his back. I gave Plaintiff direct orders to put his hands behind his back, which he ignored. I used my taser to drive stun plaintiff in the back. This caused plaintiff's hands to move from the front of his body to the back. Once that occurred, I was able to handcuff plaintiff.
>
> **\*5** At the time of arrest, I did not know why plaintiff had tried to run away. I also did not know if plaintiff was armed and why plaintiff was resisting so hard to keep his hands in front of him. For my safety and the safety of the other officers involved, Plaintiff needed to be handcuffed so that he could not access a weapon or flee the scene....
>
> Since the taser did not cause any injury to plaintiff, he was not given medical treatment. No taser darts were used. I employed the taser using a drive stun. A drive stun is when the taser is held against someone's body without firing the projectiles, and is used to employ electricity to gain compliance.

(Dkt. No. 165-29, ¶¶ 4–5, 8). Officer Glasser's recollection appears to be consistent with his Arrest Report and Taser Use Report from the night of the incident. (*See* Dkt. No. 165-33, p. 2; Dkt. No. 165-30, p. 2).

Aside from these accounts, the parties offer no additional evidence to support their opposing versions of events. At a minimum, there are material issues of fact as to whether Plaintiff ran and resisted arrest, where the taser struck him, and whether it did so before or after he was in handcuffs, all of which affect the reasonableness of the use of force. Weighing the competing evidence and the parties' credibility is a task reserved for the trier of fact. Accordingly, the disputed issues of material fact preclude resolution as a matter of law, and the Schenectady County Defendants' motion for summary judgment on this claim must be denied.[4]

4    The Court rejects the Schenectady County Defendants' argument that judicial and collateral

estoppel bar Plaintiff's excessive force claim because Plaintiff pled guilty to disorderly conduct. (*See* Dkt. No. 165-43, pp. 16–19). Here, a favorable adjudication of Plaintiff's excessive force claim would not "necessarily imply the invalidity" of Plaintiff's guilty plea because disorderly conduct involves materially different elements than obstructing governmental administration and resisting arrest—the original charges against him. *See Shapard v. Attea*, 710 F. App'x 15, 17–19 (2d Cir. 2017) (reversing the district court's finding that Section 1983 claims were barred where the excessive force claims were not incompatible with the plaintiff's prior guilty plea to second degree assault against an officer).

### 2. Denial of Medical Attention

Plaintiff also appears to claim that he was unlawfully denied medical attention by the Schenectady County Defendants following his arrest on December 28, 2013. (Dkt. No. 1, p. 7). Plaintiff alleges that he required medical treatment because "he became extremely hot, nervous, heart racing [sic], shocked scared weird feeling but was denied initial medical treatment to document complaints." (Dkt. No. 176, p. 2).

A claim for deliberate indifference to a pre-trial detainee's serious medical needs is analyzed under the Fourteenth Amendment, and requires a two-part showing: (1) that Plaintiff had a serious medical need for treatment; and (2) that the Schenectady County Defendants acted with deliberate indifference to such needs. *See Gabriel v. County of Herkimer*, 889 F. Supp. 2d 374, 392 (N.D.N.Y. 2012) (citing *Caiozzo v. Koreman*, 581 F.3d 63, 71–72 (2d Cir. 2009)). The first element requires "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Bruno v. City of Schenectady*, 727 F. App'x 717, 720 (2d Cir. 2018) (citing *Johnson v. Wright*, 412 F.3d 398, 403 (2d Cir. 2005)). The second element is met when "the official 'acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety.'" *Id.* (quoting *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017)).

**\*6** Here, Plaintiff offers no evidence of a serious medical condition capable of producing extreme pain, degeneration,

or death. (*See generally* Dkt. No. 1; Dkt. No. 176). Plaintiff's claim that he was "extremely hot," "nervous," and "shocked" falls far short of the necessary showing. *See Bradley v. Village of Greenwood Lake*, 376 F. Supp. 2d 528, 535 (S.D.N.Y. 2005) (dismissing excessive force claim against an arresting officer who kicked the plaintiff in the stomach causing temporary nausea and an abdominal scratch); *Esmont v. City of New York*, 371 F. Supp. 2d 202, 213–15 (E.D.N.Y. 2005) (dismissing an excessive force claim where the arresting officer caused the plaintiff to bump her head as she was placed in patrol car, resulting in a headache; left her in hot patrol car for ten minutes, resulting in profuse sweating; and applied handcuffs too tightly, resulting in bruising, swelling and unsubstantiated claims of nerve damage); *Roundtree v. City of New York*, 778 F. Supp. 614, 622 (E.D.N.Y. 1991) (dismissing an excessive force claim where the arresting officer pushed the plaintiff into a patrol car causing alleged pain and suffering).

Further, Plaintiff admits that he did not seek medical attention for his alleged medical needs following his release, and he does not claim any lasting physical injuries from the December 28th encounter. (*See* Dkt. No. 165-28, p. 128). Indeed, courts have found that a plaintiff's failure to seek medical attention after being released from custody undermines any claim of serious pain or that urgent care was needed. *See, e.g., Carey v. Maloney*, 480 F. Supp. 2d 548, 557–58 (D. Conn. 2007) (dismissing a plaintiff's claim for denial of medical treatment where the plaintiff never requested medical attention from the police, and did not seek medical attention until nearly twenty-four hours after his release from custody); *see also Rivera v. Goord*, 253 F. Supp. 2d 735, 756 (S.D.N.Y. 2003) ("Evidence that a plaintiff has refused medical care has been found to effectively rebut claims of deliberate indifference to serious medical needs."). After careful review of the record, the Court concludes that there are no facts from which a jury could find that Plaintiff had a serious medical need on December 28, 2013.

Moreover, even if Plaintiff could show a serious medical need, he has not presented any evidence that the Defendant officers ignored or rejected a specific request by Plaintiff for medical attention. Indeed, there is no evidence that the Schenectady County Defendants were even aware of Plaintiff's alleged serious medical condition. Thus, the record offers no facts whatsoever to show deliberate indifference by the Defendant officers.

Accordingly, because no reasonable jury could return a verdict in Plaintiff's favor for denial of medical attention, the Schenectady County Defendants' motion for summary judgment is granted on this claim.

### 3. Unlawful Visual Body Cavity Searches

Next, Plaintiff alleges that he was subjected to unlawful visual body cavity searches performed by the Schenectady County Defendants prior to each admission for his weekend stays at the Schenectady County Jail. (Dkt. No. 1, p. 22). Plaintiff adds that the "schenectady county jail admission policy in which [Plaintiff] was forced to undress and spread apart his rectal and lift up his penis was without justification as there was no reason to believe that weapons or contraband was being concealed on or in the body and therefore violated [Plaintiff's] constitutional rights." (*Id.*, pp. 19–20). Plaintiff claims that Defendants Van Hoesen, Reaulo, and Sinatra performed an "unlawful admission visual body cavity search" on Plaintiff on several occasions in August, September, and October of 2014. (*Id.*). Plaintiff also alleges that unidentified John Does of the Schenectady County Sheriff's Department performed unlawful visual body cavity searches in December 2013, and May and August of 2014. (*Id.*). Defendants acknowledge that Plaintiff was admitted to the Schenectady County Jail on six separate occasions in August and September 2014. (Dkt. No. 165-38, ¶ 4).

**\*7** It is well-established that "[t]he general practice of strip searching a detainee during housing searches and on the way to and from court appearances is not unconstitutional, even if the detainee is accused only of a misdemeanor." *Thompson v. City of New York*, No. 16-CV-824, 2017 WL 1929552, at \*2, 2017 U.S. Dist. LEXIS 70423 (S.D.N.Y. May 9, 2017) (citing cases). The Supreme Court has recognized that "correctional officials must be permitted to devise reasonable search policies to detect and deter the possession of contraband in their facilities." *Florence v. Bd. of Chosen Freeholders of County of Burlington*, 566 U.S. 318, 328, 132 S.Ct. 1510, 182 L.Ed.2d 566 (2012). In *Florence*, the Supreme Court held that a county jail did not violate prisoners' rights when it permitted visual inspection body cavity searches, without reasonable suspicion, prior to the prisoners' introduction to a general population unit. *Id.* at 339, 132 S.Ct. 1510. As in *Florence*, Plaintiff's allegations of unlawful searches relate specifically to "visual body cavity searches" conducted upon his admission to the Schenectady County Jail. (*See, e.g.*, Dkt. No. 1, p. 7).

In support of summary judgment, the Schenectady County Defendants argue that Plaintiff's claims have been expressly rejected by the Supreme Court, and that his allegations "fail[ ] to show that the alleged admission visual strip searches violated a clearly established law in the Second Circuit." (Dkt. No. 180-4, pp. 11–12). According to Captain Gregory Cufari of the Schenectady County Sheriff's Office, "[e]ach time the plaintiff entered the jail he was a security risk because he was coming off the street and going into the jail's general population. By coming into the jail from the street, plaintiff had the ability [ ] to bring into the jail such items as weapons, drugs or other contraband." (*Id.*). In response, Plaintiff argues that "there was no reason to conduct a cavity search after plaintiff cleared all boss chairs and handwands without detection," and he contends that "[a]ny cavity searches was only to humiliate as there was no reasonable suspicion as plaintiff cleared security and unrelated to legitimate penological interests." (Dkt. No. 176, p. 4).

On this claim, the Court's previous ruling dismissing Plaintiff's claim against the Albany County Defendants applies with equal force. (*See* Dkt. No. 110, pp. 7–8). Plaintiff alleges that the searches he underwent at the Schenectady County Jail were unconstitutional because the Schenectady County Defendants did not have reasonable suspicion of concealed contraband—precisely the same claim rejected by the Supreme Court in *Florence*. Again here, Plaintiff's argument fails "because *Florence* permits correction officers to strip search detainees without particularized suspicion ... and recognizes that strip searches are specifically 'designed to uncover contraband that can go undetected by a patdown, metal detector, and other less invasive searches.' " *Thompson*, 2017 WL 1929552, at \*2, 2017 U.S. Dist. LEXIS 70423 (quoting *Florence*, 566 U.S. at 334, 132 S.Ct. 1510). That includes searches involving visual inspection of body cavities. *Florence*, 566 U.S. at 340–41, 132 S.Ct. 1510. Moreover, there is no evidence that the searches "did not serve a legitimate penological purpose," or that they were "instead designed to intimidate, harass, or embarrass [Plaintiff]." *See Smith v. City of New York*, No. 14-CV-5934, 2015 WL 3929621, at \*2, 2015 U.S. Dist. LEXIS 81337 (S.D.N.Y. June 17, 2015).

Accordingly, Plaintiff's claims of unlawful searches fail as a matter of law, and the Schenectady County Defendants' motion for summary judgment on these claims is granted. Plaintiff's claims against the Schenectady County Jail and

Officers Van Hoesen, Reaulo, Sinatra, and other "Unknown John Does from Schenectady County Jail" are dismissed with prejudice.

### 4. *Monell* Claim

Next, Plaintiff alleges that "[t]he wrongful conduct alleged herein in regards to the admission visual body cavity searches has been conducted generally upon all members of the plaintiff class in that the strip searches were conducted pursuant to a long-established plan, policy, or procedure of the [Schenectady County Sheriff.]" (Dkt. No. 1, p. 20). This could be construed as a municipal liability claim against Schenectady County pursuant to *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694–95, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). In general, municipalities are responsible only for "their own illegal acts," *Pembaur v. Cincinnati*, 475 U.S. 469, 479, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986), and are not vicariously liable for civil rights violations perpetrated by their employees. *Monell*, 436 U.S. at 691, 98 S.Ct. 2018. In order to sustain a claim for municipal liability under Section 1983, a plaintiff must show that he suffered a constitutional violation in the first place, and that the violation resulted from an identified municipal policy or custom. *Monell*, 436 U.S. at 694–95, 98 S.Ct. 2018. The same is true for claims against other government entities such as the County of Schenectady. *See Sheriff's Silver Star Ass'n of Oswego County, Inc. v. County of Oswego*, 56 F. Supp. 2d 263, 266 (N.D.N.Y. 1999).

**\*8** As noted by the Schenectady County Defendants, Plaintiff's *Monell* claim is limited to the alleged policy and practice of conducting visual body cavity searches upon admission to the Schenectady County Jail. Because the Court has already determined that the County's pre-admission search practices for the jail did not violate the Constitution, Plaintiff's *Monell* claim fails for the same reason. *See Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006) (municipal liability under *Monell* may only lie where there is an underlying constitutional violation). Accordingly, the Schenectady County Defendants' motion for summary judgment on Plaintiff's *Monell* claim is granted.

### B. Claim Against Defendant Bell

Plaintiff alleges that Defendant Alan Bell, a sergeant with the Niskayuna Police Department, "requested [that] Defendant Scott Gavigan use the unlawful GPS tracking device," and

"controlled the GPS device in the Town of Niskayuna ... without a warrant [ ] or probable cause." (Dkt. No. 1, pp. 10, 23). Plaintiff claims that "[t]he unlawful GPS tracking on plaintiff [sic] vehicle or cellphone was done without a warrant," resulting in a "massive invasion of [his] privacy." (*Id.*, p. 20). Plaintiff admits that these allegations are solely based on logs from the Albany-area license plate reader ("LPR") system, which identify dates, times, and locations when Plaintiff's vehicle was observed on public roads. (Dkt. No. 165-28, p. 141). Plaintiff testified that he is aware that Albany has cameras stationed throughout the city, and that these cameras are used to "record everything that goes by them," including license plates on passing vehicles. (*Id.*, pp. 133–34). Plaintiff also acknowledged that he does not believe that any LPR technology was placed directly on his vehicle. (*Id.*, pp. 135–37). Nonetheless, he argues that the use of numerous cameras throughout the city operated like a tracking device for law enforcement "because it continuously tracks and it works the same way as the GPS works." (*Id.*).

Defendant Bell argues that summary judgment is appropriate "because there is no evidence that Defendant Bell placed or directed to be placed a GPS device on Plaintiff's vehicle(s) and/or cellphone." (*See* Dkt. No. 168-32, pp. 6–9). Defendant Bell contends that Plaintiff's allegations about unlawful GPS tracking stem from a misunderstanding of the LPR technology. (*See id.*). According to Defendant Bell, "it is without question that [LPRs] are lawful, constitutional technology and may be used by law enforcement as a valuable tool." (*Id.*, p. 7).

Indeed, courts have consistently upheld the use of LPR and similar technologies by law enforcement agencies. *See, e.g.*, *United States v. Miranda–Sotolongo*, 827 F.3d 663, 668 (7th Cir. 2016) ("Because the police conducted a check of a database containing only non-private information and did so using only registration information that could be seen by any member of the public, the police did not conduct a Fourth Amendment search."); *United States v. Diaz–Castaneda*, 494 F.3d 1146, 1152 (9th Cir. 2007) (stating that "when police officers see a license plate in plain view, and then use that plate to access additional non-private information about the car and its owner, they do not conduct a Fourth Amendment search"); *United States v. Ellison*, 462 F.3d 557, 563 (6th Cir. 2006) ("Thus, so long as the officer had a right to be in a position to observe the defendant's license plate, any such observation and corresponding use of the information on the plate does not violate the Fourth Amendment"). In *People v. Bushey*, the New York Court of Appeals addressed a similar challenge to

police-use of license plate information collected through LPR technology. *See generally* 29 N.Y.3d 158, 75 N.E.3d 1165 (2017). There, the Court of Appeals explained that:

> **\*9** Because the purpose of a license plate is to readily facilitate the identification of the registered owner of the vehicle for the administration of public safety, a person has no reasonable expectation of privacy in the information acquired by the State for this purpose and contained in a law enforcement or DMV database. Indeed, the information is typically provided voluntarily by a driver to a government agency in exchange for the privilege of a valid license and registration. Considering that police officers are authorized by law to inspect and check for violations of licensing and registration requirements (*see* Vehicle and Traffic Law §§ 390, 401), drivers cannot claim any objectively reasonable expectation of privacy with respect to the DMV information being obtained by law enforcement. An officer's observation of that which is publicly displayed and the use of the information relative thereto contained in the DMV database does not violate defendant's Fourth Amendment rights, nor any provision of our New York State Constitution. As defendant did not have any reasonable expectation of privacy in either his license plate or the information lawfully obtained and accessible through the DMV database, there was no search or seizure cognizable under federal or state constitutional law.

*Id.* at 163–64.

Here, Defendant Bell has explained how the Albany Crime Analysis Center ("ACAC"), a division of the Albany Police Department, tracks license plate information throughout the Albany area. (*See* Dkt. No. 168-31, ¶ 5). Relevantly, Defendant Bell states that:

> Plaintiff has relied on print outs from the [ACAC] to claim that I placed or caused to be placed a GPS device on his vehicle(s) and/or cell phone. I did not. Instead, I requested information from the ACAC pertaining to license plates known to be associated with the plaintiff. It just so happens that the license plate information I entered into the system was captured by some of the license plate readers in Albany and the print out demonstrates when and where the license plates passed any of the various cameras.

(*Id.*, ¶ 6). Defendant Bell further explains the LPR log forms cited by Plaintiff as follows:

> One heading of the print out states "GPS". In this context, it is not a GPS in the way plaintiff alleges where a device is placed onto a vehicle or cell phone and then sends out information as to the vehicle's whereabouts at any point in time. Instead, in the context of the license plate readers, "GPS" refers to the location of the license plate reader itself. Based on this, I am able to tell whether the license plate associated with the plaintiff was captured as it drove by a stationary camera or a camera affixed to a police vehicle. If a vehicle associated with Mr. Chaney did not drive by a license plate reader, I would not know his whereabouts. Had there actually been a GPS placed on the vehicle, I would be able to know his whereabouts at all times. Because I only accessed the database and did not use a GPS, I would not know where Mr. Chaney

was at any given time, only the occasions when he passed a camera.

(*Id.*, ¶ 7).

In sum, the record shows that APD used fixed cameras throughout the city that indiscriminately recorded 24-hours a day, without any particular focus on specific individuals, a fact acknowledged by Plaintiff. (*See* Dkt. No. 165-28, pp. 135–36). And Plaintiff has presented no evidence that Defendant Bell used any technology other than LPR to track the location of Plaintiff's vehicles or his cell phone. Thus, for the reasons outlined by the Court of Appeals in *Bushey*, Defendant Bell's use of the LPR technology did not violate Plaintiff's Fourth Amendment rights because he had no reasonable expectation of privacy in his license plate information while traveling on public roads.

Accordingly, Defendant Bell's motion for summary judgment is granted.

### C. Claims Against the City of Albany Defendants[5]

[5]   The Court notes that the Albany Defendants have not moved for summary judgment on Plaintiff's unlawful tracking claims against APD and Officer Gavigan. (*Compare* Dkt. No. 1, *with* Dkt. No. 167).

#### 1. Excessive Force Claim

Plaintiff claims that he was subjected to excessive force during encounters with APD officers on August 14, 2014 and October 13, 2014. (Dkt. No. 1, pp. 7–8, 22–23). Specifically, Plaintiff claims that an unknown officer (Defendant John Doe Badge #889) "used excessive force by tackling [ ] plaintiff to the ground and handcuffing plaintiff as he tried to enter the store on central ave on the night of August 14, 2014." (*Id.*, p. 7). Plaintiff also claims that he was subjected to excessive force on October 13, 2014 when APD Officers Gavigan, Gorleski, Kuhn, and Meehan "roadblocked plaintiffs [sic] vehicle at gun point and strong armed plaintiff facedown in the middle of interstate I-90." (*Id.*, p. 8). During his deposition, Plaintiff stated that he was "snatched out of the vehicle at gunpoint, ... rustled, handcuff[ed], and arrested." (Dkt. No. 165-28, pp. 55–56). Plaintiff claims that the APD Officers had no reason to use force against him.

**\*10**  The Albany Defendants argue that Plaintiff's excessive force claim is subject to summary judgment because "[Plaintiff] fails to articulate any specific physical injuries," and "never sought or received medical treatment as a result of either incident." (Dkt. No. 167-1, pp. 10–11). In response, Plaintiff argues that officers used "extreme and excessive force" on both occasions, but he fails to identify any resulting injuries. (Dkt. No. 177, p. 3).

As discussed above, excessive force claims brought under Section 1983 are evaluated under the Fourth Amendment's "objective reasonableness" standard. *See Terranova v. New York*, 676 F.3d 305, 308 (2d Cir. 2012). "[A] plaintiff must present sufficient evidence to establish that the alleged use of force is 'objectively sufficiently serious or harmful enough' to be actionable." *Washpon v. Parr*, 561 F. Supp. 2d 394, 406 (S.D.N.Y. 2008) (quoting *United States v. Walsh*, 194 F.3d 37, 47 (2d Cir. 1999)). "[T]he Second Circuit and district courts in the Circuit recognize the concept of *de minimis* injury and, when the injury resulting from alleged excessive force falls into that category, the excessive force claim is dismissed." *Jackson v. City of New York*, 939 F. Supp. 2d 219, 231 (E.D.N.Y. 2013); *see also Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993). Furthermore, a " '[d]e minimis injury can serve as conclusive evidence that *de minimis* force was used.' " *Washpon*, 561 F. Supp. 2d at 407 (quoting *Carr v. Deeds*, 453 F.3d 593, 606 (4th Cir. 2006)). However, "the absence of any significant injury to [Plaintiff] does not end the [excessive force] inquiry, for our standards of decency are violated even in the absence of such injury if the defendant's use of force was malicious or sadistic." *Wright v. Goord*, 554 F.3d 255, 270 (2d Cir. 2009).

Here, Plaintiff does not allege *any* specific injuries resulting from the claimed excessive force by APD officers on August 14 or October 13 in 2014. (*See generally* Dkt. No. 1; Dkt. No. 171). Plaintiff merely asserts that, on August 14th, he was "surrounded by all the officers who basically just took me down," and that "[t]hey came over with guns drawn, threw me down to the floor, rushing me down, and handcuffing me." (Dkt. No. 165-28, pp. 29–30). After being pushed to the ground, Plaintiff states that the APD officers "searched around me, took my phone and stuff out of my pocket, searched my pocket and my, you know, genital area around me at first. And then after that they went and told me to sat [sic] down on the curb, like helped me sit down because I was handcuffed." (*Id.*, p. 32). As for October 13th, Plaintiff recalls that he "got tooken [sic] out of the car, snatched to the ground,

handcuffed, and -- rustled me out of the car and took me down to the precinct." (*See id.*, pp. 55–56).

For both arrests, it is undisputed that APD officers had probable cause to believe that drug crimes had been committed and did not know whether Plaintiff and his associates were armed. (*See* Dkt. No. 167-2, pp. 4–9, 93–94). Crediting Plaintiff's allegations, the officers made these arrests by taking Plaintiff down to the ground and placing him in handcuffs. There is no evidence whatsoever that Plaintiff suffered any injury resulting from their actions, much less a significant one. Nor could malicious or sadistic intent be inferred based on their actions. On these facts, no jury could find that the force used against Plaintiff was unreasonable. Therefore, Plaintiff's excessive force against the APD Defendants must be dismissed. *See Bermudez v. Waugh*, No. 11-CV-947, 2013 WL 654401, at *5, 2013 U.S. Dist. LEXIS 23422 (N.D.N.Y. Feb. 21, 2013) (finding that tackling of inmate that caused minor bruising constituted *de minimis* force) (collecting cases); *Bradley v. Village of Greenwood Lake*, 376 F. Supp. 2d 528, 535 (S.D.N.Y. 2005) (dismissing excessive force claim against arresting officer who kicked the plaintiff in the stomach causing temporary nausea and an abdominal scratch); *Esmont v. City of New York*, 371 F. Supp. 2d 202, 213–15 (E.D.N.Y. 2005) (dismissing excessive force claim where arresting officer caused the plaintiff to bump her head as she was placed in patrol car, resulting in a headache; left her in hot patrol car for ten minutes, resulting in profuse sweating; and applied handcuffs too tightly, resulting in bruising, swelling and unsubstantiated claims of nerve damage).

### 2. October 13, 2014 Arrest Report

 **\*11**  Plaintiff next claims that Defendant Gavigan "falsified the arrest report/accusatory instrument on October 13, 2014 by alleging the red jacket found in the trunk belonged to this plaintiff as opposed to the driver who owned the vehicle." (Dkt. No. 1, p. 9). As a result, Plaintiff claims that his due process rights were violated because the "perjured arrest report/accusatory instrument" did not meet the "requirements of CPL 100.40 and CPL 100.15" since Gavigan "failed to provide any facts to support his conclusory statements[.]" (*Id.*).

In response, the Albany Defendants argue that Plaintiff's drug conviction related to the October 13th incident precludes him from asserting that Detective Gavigan falsified the related

arrest report. (Dkt. No. 167-1, pp. 7–8). This argument relies on the Supreme Court's decision in *Heck v. Humphrey*, which held that:

> [I]n order to recover damages for [an] allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus. A claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is not cognizable under § 1983. Thus, when a state prisoner seeks damages in a Section 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated.

512 U.S. 477, 486–87, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994).

Here, Plaintiff offers no evidence that his conviction for Criminal Possession of a Controlled Substance in the Third Degree (*see* Dkt. No. 167-2, p. 7) has been reversed or invalidated. Furthermore, the undisputed facts demonstrate that Plaintiff's conviction stems entirely from the evidence obtained by APD officers on October 13th, which included 198 glassine envelopes of heroin recovered from Plaintiff's left coat pocket. (*See id.*, p. 6). Thus, the success of Plaintiff's claim challenging the arrest report would necessarily imply the invalidity of his conviction.

For these reasons, the Court finds that Plaintiff's claim challenging the validity of the October 13th arrest report is

barred by *Heck* and must be dismissed. *See Warren v. Fischl*, 674 F. App'x 71, 73 (2d Cir. 2017), *cert. denied*, —— U.S. ——, 138 S. Ct. 123, 199 L.Ed.2d 75 (2017) (finding that the appellant's claims alleging that defendants "conspired to fabricate evidence and testimony against him and introduced such fabricated evidence and perjury at trial," if proved, "would demonstrate the invalidity of his conviction," and were therefore barred by *Heck*); *Monroe v. Gould*, 372 F. Supp. 3d 197, 202–03 (S.D.N.Y. 2019) (granting summary judgment on a plaintiff's Section 1983 claim challenging the validity of the police search of a vehicle where the plaintiff's success would have implied the invalidity of his prior conviction).

### 3. Unlawful Strip and Visual Body Cavity Searches

Plaintiff also claims that APD officers subjected him to a number of unlawful strip and visual body cavity searches. (Dkt. No. 1, pp. 23–24). Specifically, Plaintiff alleges that while he was handcuffed on August 14, 2014, "[Defendant John Doe Badge #889], Detective Scott Gavigan and members of his unit arrived on scene and performed there [sic] own search of plaintiff private area [sic]." (*Id.*, p. 8). According to Plaintiff, several APD officers, including Defendant Gavigan, took him to a parking lot and searched his pockets, waistband, shoes, socks, and then removed his belt. (Dkt. No. 165-28, pp. 33–35). Plaintiff states that "my genitals and all that was lift up, [officers] searched inside my pants ... up under my arms, my shoes and socks was tooken [sic] off and then the back was also searched." (*Id.*, pp. 35–36). When asked specifically whether the officers touched his genitals, Plaintiff testified: "Yes. Yes. Yes. Outside and at the precinct also, when I got down to the station house." (*Id.*, p. 36).

 **\*12**  Plaintiff also alleges that APD officers conducted a similar unlawful search when he was arrested on October 13, 2014, wherein Defendant Officers Gavigan and Kuhn performed a public search of Plaintiff's "private areas." (Dkt. No. 1, pp. 8–9, 22–23). And Plaintiff claims that APD Officers Gorleski, Kuhn and Meehan performed another unlawful visual body cavity search when Plaintiff arrived at the Albany police station. (*See id.*, pp. 8–9, 22). Plaintiff claims that, on both occasions, the APD officers lacked probable cause to "forcibly search" his underwear in public. (*Id.*, pp. 8–9). Consistent with these allegations, Plaintiff testified that the police strip-searched him in public and again at the police station. (Dkt. No. 165-28, pp. 57, 66). According

to Plaintiff, APD officers, including Defendant Gavigan, physically touched his genitals during both searches. (*Id.*, pp. 66–67).

The Albany Defendants admit that a visual body cavity search was conducted in a private room at the police station on October 13th, but they insist that no strip-searches were ever conducted in public. [6] (Dkt. No. 167-1, p. 9). Further, the Albany Defendants argue that Plaintiff's claims about public strip-searches are "simply unbelievable and unsupported by evidence," and that "the facts and totality of the circumstances rendered the strip [at the police station] necessary and constitutional." (*Id.*, pp. 9–10).

[6]   Regarding the October 13th encounter, Defendant Gavigan states that police performed a "pat down" search on Plaintiff's person. (Dkt. No. 167-2, ¶ 9).

The Fourth Amendment protects individuals from unreasonable searches by the government. *See* U.S. Const. amend. IV. A search of a person is presumptively unreasonable if conducted without a warrant, but warrantless searches may be justified if they fall under an exception to the warrant requirement. *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). For example, strip-searches at detention facilities are generally valid under the Fourth Amendment, as discussed above. Under the circumstances here, Plaintiff's allegations about searches at the police station also fall in this category. Notably, the record shows that Plaintiff was arrested with a large amount of narcotics in glassine envelopes and has a criminal history involving narcotics. (*See* Dkt. No. 167-2, p. 6). Therefore, the police also had reasonable suspicion that Plaintiff could be carrying and concealing drugs on his person, which justified the search. Further, Plaintiff admits that the search at the station was performed in a private room, limiting the intrusion on his privacy. (*See* Dkt. No. 165-28, p. 64).

Accordingly, Plaintiff's allegations about searches at the police station do not permit a rational finding that his Fourth Amendment rights were violated. *See Elk v. Townson*, 839 F. Supp. 1047, 1052 (S.D.N.Y. 1993) (holding that the defendant's presence in a vehicle in which drugs were found gave the sheriff's office "reasonable grounds" to conduct a strip-search at the precinct); *Easton v. City of New York*, No. 05-CV-1873, 2009 WL 1767725, at *3–4, 2009 U.S. Dist. LEXIS 53519 (E.D.N.Y. June 23, 2009) (holding that reasonable suspicion existed for visual body cavity search where the plaintiff was arrested while in possession of

Chaney v. City of Albany, Slip Copy (2019)
Case 3:19-cv-00868-TJM-TWD    Document 16    Filed 07/20/20    Page 85 of 130
2019 WL 3857995

marijuana and cash, allowing the rational inference that he was engaged in the sale and distribution of marijuana); *see also United States v. Doutre*, No. 08-CR-10215, 2009 WL 1211048, at *5, 2009 U.S. Dist. LEXIS 37758 (D. Mass. May 5, 2009) (holding that police had reasonable suspicion to conduct a strip-search of the defendant at the station where the defendant was arrested for a drug trafficking crime and police had received information from an informant that defendant possessed cocaine earlier that evening).

However, as to the alleged public strip-searches, the parties' contrasting accounts preclude summary judgment because there is an issue of fact as to whether Plaintiff was subjected to a public strip-search/visual body cavity inspection. A public search as alleged would rise to the level of a Fourth Amendment violation. In sum, the Albany Defendants' motion for summary judgment on Plaintiff's Fourth Amendment claims is granted as to the strip and/or visual body cavity searches conducted upon intake at the Albany police station, but denied as to Plaintiff's claims that APD officers touched his genitals during public strip-searches on August 14th and October 13th of 2014. [7]

[7]    The Court rejects the Albany Defendants' argument that Officers Kisling, Wilson, Seeber, and James were not personally involved in any of the alleged conduct. (*See* Dkt. No. 167-1, p. 6). Plaintiff has consistently recalled that numerous officers were involved in the alleged unlawful searches on August 14th. Plaintiff specifically alleges that after his apprehension on August 14th, "Defendant Scott Gavigan and members of his unit arrived on the scene and performed [their] own search of [Plaintiff's] private areas." (Dkt. No. 1, p. 8). During Plaintiff's deposition, he recalled that he was escorted by four officers to a parking lot where the alleged search was conducted. (Dkt. No. 165-28, p. 35). In opposition to the Albany Defendants' motion, Plaintiff argues that "these officers [sic] names didn't fall from the sky there [sic] names are a result of there [sic] participation in the unlawful public cavities [sic] searches...." (Dkt. No. 177, p. 1). Viewing the alleged facts in a light most favorable to the Plaintiff, the Court finds that a reasonable jury could find that Officers Kisling, Wilson, Seeber, and James were involved in the alleged conduct.

**4. Deprivation of Property**

**\*13**  Next, Plaintiff alleges that Defendant Gavigan unlawfully "seized" $5,832.00 from him on an unspecified date. (Dkt. No. 1, p. 12). Plaintiff asserts that he has "yet to receive a voucher or notification of forfeiture proceedings," and that "[n]othing was ever mentioned in court and I hereby request [the] return of my money confiscated. Plaintiff asserts a claim of conversion [ ]." (*Id.*).

The Albany Defendants deny that that Detective Gavigan ever seized any money from Plaintiff, and argue that "even assuming this allegation is true, the availability of an Article 78 procedure is sufficient to satisfy Plaintiff's right to due process such that Plaintiff fails to state a cognizable [Section 1983] due process claim." (Dkt. No. 167-1, p. 14). In response, Plaintiff argues that the "court has jurisdiction over plaintiff [sic] property claim irrespective of plaintiff not filings [sic] and article 78 and waisting [sic] time." (Dkt. No. 177, p. 3).

In general, "there is no constitutional violation (and no available Section 1983 action) when there is an adequate state postdeprivation procedure to remedy a random, arbitrary deprivation of property or liberty." *Hellenic Am. Neighborhood Action Comm. v. City of New York*, 101 F.3d 877, 881–82 (2d Cir. 1996) (citations omitted). As noted by the Albany Defendants, the Second Circuit has held that "an Article 78 proceeding constitutes an adequate postdeprivation procedure under the Due Process Clause...." *Id.* (citing *Marino v. Ameruso*, 837 F.2d 45, 47 (2d Cir. 1988)). Moreover, this Court has held that Article 78 proceedings provide an adequate remedy for those who seek to challenge any action or inaction by an administrative agency or officers of state or local government. *See Hourihan v. Lafferty*, 58 F. Supp. 2d 10, 14–15 (N.D.N.Y. 1999) (citing N.Y. C.P.L.R. § 7801).

Here, Plaintiff has offered no evidence that he ever sought the return of the money that was allegedly seized by Detective Gavigan, either directly from APD or through an Article 78 proceeding. Plaintiff's remedy for this claim was to seek relief under Article 78 rather than file suit in federal court. Accordingly, Plaintiff's claim to recover the value of the seized property is dismissed as a matter of law.

Case 3:19-cv-00868-TJM-TWD   Document 16   Filed 07/20/20   Page 86 of 130

### 5. *Monell* Claim

Lastly, Plaintiff asserts a municipal liability claim against the City of Albany under several theories, including: (1) failure to train, supervise, or discipline its employees; (2) creation and use of "a blanket policy that allowed ... officers to commit perjury within arrest reports;" (3) "fail[ure] to implement a policy that screen [sic] all arrest reports/accusatory instruments for facial and jurisdictional defects prior to infringing upon a plaintiff [sic] due process liberty rights;" (4) creation of "a blanket policy that allowed all officers to arrest a plaintiff in the absence of probable cause;" (5) "deliberate indifference to Plaintiff's false arrest by enforcing a blanket policy created by the prosecutor and the police chief to allow the Albany police to conduct stop-frisks, unlawful cavity searches, and file false reports without conducting a thorough investigation;" and (6) "the admission visual body cavity searches ... conducted pursuant to a long-established plan, policy, or procedure of the ... albany police department." (Dkt. No. 1, pp. 9–10, 15–17, 20–21).

In support of summary judgment, the Albany Defendants argue that "the only proof Plaintiff has offered in an attempt to substantiate these conclusory, boilerplate allegations are his own isolated allegations of misconduct which form the basis of this litigation." (Dkt. No. 167-1, p. 12). In response, Plaintiff argues that "[t]he defendants were put on notice for years about the same identical issues raised herein and failed to discipline or institute a policy to detect perjury, filings of perjured false police report, unlawful cavity searches etc. wherefore these issues are not isolated and clearly establishes a monell claim." (Dkt. No. 177, p. 3).

**\*14** Under *Monell*, a city may only be held liable under Section 1983 where a plaintiff demonstrates that the constitutional violation complained of was caused by a municipal "policy or custom." 436 U.S. at 694–95, 98 S.Ct. 2018; *see also Patterson v. County of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004) (citing *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 733–36, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989)). A municipal policy or custom may be established by any of the following: (1) a formal policy, officially promulgated by the municipality, *id.* at 690, 98 S.Ct. 2018; (2) an action taken by the official responsible for establishing policy with respect to a particular issue, *Pembaur*, 475 U.S. at 483–84, 106 S.Ct. 1292; (3) unlawful practices by subordinate officials so permanent and widespread as to practically have the force of law, *City of St. Louis v. Praprotnik*, 485 U.S.

112, 127–30, 108 S.Ct. 915, 99 L.Ed.2d 107 (1985) (plurality opinion); or (4) a failure to train or supervise that amounts to "deliberate indifference" to the rights of those with whom the municipality's employees interact. *City of Canton v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

Here, Plaintiff has not demonstrated any underlying constitutional violation to support his *Monell* claim, with the possible exception of the alleged public searches. Moreover, he has not produced any evidence of a municipal policy or custom by the City of Albany that caused the alleged constitutional violations. Plaintiff simply asserts, without offering supporting evidence, that his experiences with APD officers were part of a larger pattern of systemic misconduct. (*See* Dkt. No. 1, pp. 9–10, 15–17, 20–21). At most, Plaintiff has only alleged a few isolated instances of misconduct. [8] Without more, he cannot sustain a *Monell* claim because it is well-settled that "a single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy." *DeCarlo v. Fry*, 141 F.3d 56, 61 (2d Cir. 1998); *see also Southerland v. Garcia*, 483 F. App'x 606, 609 (2d Cir. 2012) (holding that summary judgment was proper where the "[p]laintiffs [ ] failed to allege, let alone present any evidence of, an official custom or policy such as is necessary to establishing liability under *Monell*"); *Giaccio v. City of New York*, 308 F. App'x 470, 472 (2d Cir. 2009) (affirming the district court's dismissal of a *Monell* claim where isolated evidence of constitutional violations "[fell] far short of establishing a practice that is so 'persistent and widespread' to justify the imposition of municipal liability"). Accordingly, Plaintiff's conclusory allegations of wider misconduct by the Albany police are insufficient to show a policy or practice by the City, and Plaintiff's *Monell* claim must be dismissed. [9]

[8]    The Court notes that Plaintiff's opposition papers include several articles from Albany-area newspapers identifying at least one other case in which APD and Defendant Gavigan were accused of civil rights violations. (*See, e.g.*, Dkt. No. 177-1, pp. 15–16, 41–42). Although there appears to be some tangential similarities between the claims in those cases and Plaintiff's claims here, there is nothing to suggest anything more than isolated incidents of alleged wrongdoing on behalf of specific officers.

[9]    Plaintiff claims that Albany Police Chief Steven Krokoff violated his constitutional rights because

Chief Krokoff, *inter alia*, failed "to prevent unlawful stops, frisks without probable cause or [to prevent] the filing of perjurous [sic] police reports that lead to unwarranted malicious prosecution or deprivation of plaintiff [sic] due process liberty rights." (*See* Dkt. No. 1, pp. 9–11). However, Plaintiff has failed to offer any evidence supporting these allegations, and therefore, Plaintiff's claims against Chief Krokoff must be dismissed.

## V. CROSS-CLAIMS

**\*15**  The Schenectady County Defendants and Defendant Bell also move to dismiss all cross-claims against them. (*See* Dkt. No. 165-43, pp. 32–33; Dkt. No. 168-32, p. 9). Although "[n]either the Supreme Court nor the Second Circuit has ruled on the question of whether there is a right to contribution between joint tortfeasors under 42 U.S.C. § 1983, New York district courts have consistently held that federal law does not provide a basis for contribution under Section 1983." *See Thomas v. City of Troy*, 293 F. Supp. 3d 282, 301–02 (N.D.N.Y. 2018) ("even if this action went to trial and City Defendants were found liable, they would be liable for their own actions and not for the actions of County Defendants"); *see also De Ratafia v. County of Columbia*, No. 13-CV-0174, 2013 WL 5423871, at \*18, 2013 U.S. Dist. LEXIS 138169 (N.D.N.Y. Sept. 26, 2013) (holding that "federal law does not provide a basis for contribution for liability under Section 1983"); *Castro v. County of Nassau*, 739 F. Supp. 2d 153, 184 (E.D.N.Y. 2010) ("To the extent the County seeks indemnification and contribution on plaintiff's § 1983 claims, they cannot do so as a matter of law. No right to contribution exists under § 1983. Nor is there a federal right of indemnification under the statute."). The Court sees no reason to diverge from this well-established precedent here. Accordingly, Defendants' cross-claims for contribution and indemnity are dismissed.

## VI. CONCLUSION

For the foregoing reasons, it is

**ORDERED** that the Schenectady County Defendants' Motion for Summary Judgment (Dkt. No. 165), is **GRANTED** as to Plaintiff's claims for: (1) unlawful visual body cavity searches; (2) denial of necessary medical attention; and (3) municipal liability under *Monell;* but is **DENIED** as to Plaintiff's excessive force claim arising from the encounter on December 28, 2014; and it is further

**ORDERED** that Defendant Bell's Motion for Summary Judgment (Dkt. No. 168), is **GRANTED**; and it is further

**ORDERED** that the Albany Defendants' Motion for Summary Judgment (Dkt. No. 167), is **GRANTED** as to Plaintiff's claims for: (1) unlawful searches at the police station on October 13, 2014; (2) excessive force on August 13, 2014 and October 13, 2014; (3) unlawfully "seized" money; and (4) municipal liability under *Monell*; but is **DENIED** as to Plaintiff's claims for unlawful public strip-searches on August 13, 2014 and October 14, 2014; and it is further

**ORDERED** that all cross-claims, to the extent they are asserted by and against the Defendants, are **DISMISSED** with prejudice; and it is further

**ORDERED** that, in accordance with this Memorandum-Decision and Order, Defendants Sinatra, Van Hoesen, Reaulo, Bell, Schenectady County Jail, Unknown John Does from the Schenectady County Jail, Unknown John Does from the Schenectady County Sherriff, and Albany Police Chief Steven Krokoff are hereby **DISMISSED** from this action with prejudice; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum-Decision and Order to the parties in accordance with the Local Rules of the Northern District of New York.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2019 WL 3857995

---

**End of Document** © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:19-cv-00868-TJM-TWD Document 16 Filed 07/20/20 Page 88 of 130

Thompson v. City of New York, Not Reported in Fed. Supp. (2017)

2017 WL 1929552

2017 WL 1929552
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Andre THOMPSON, Plaintiff,

v.

CITY OF NEW YORK, and
John Does 1-3, Defendants.

16 Civ. 824 (PKC)
|
Signed 05/09/2017

**Attorneys and Law Firms**

Andre Thompson, New York, NY, pro se.

Kate Fay McMahon, New York City Law Department, New
York, NY, for Defendants.

<u>MEMORANDUM AND ORDER</u>

P. Kevin Castel, United States District Judge

*1 Plaintiff Andre Thompson, who is unrepresented, asserts
pursuant to 42 U.S.C. § 1983 that his constitutional rights
were violated when the defendants strip searched him
upon entering and leaving New York City Department of
Correction ("DOC") facilities and during searches of his
housing areas. Plaintiff alleges that because he was a pretrial
detainee facing only misdemeanor charges, these actions
violated his Fourth Amendment rights as applicable to the
defendants by reason of the Fourteenth Amendment.

This action was filed on February 2, 2016. (Dkt. 2.) In
an Order dated March 18, 2016, then Chief Judge Loretta
Preska wrote that "[p]laintiff's allegations that he is a
pretrial detainee facing misdemeanor charges and is strip
searched when going to and from court, without more, are
insufficient to state a claim." (Dkt. 5) (citing Florence v.
Board of Chosen Freeholders of Cty. of Burlington, 566
U.S. 318 (2012)). However, Chief Judge Preska granted
plaintiff leave to amend his complaint because there were
still some situations in which it may not be reasonable to
strip search pretrial detainees. (See id.) (citing Florence,
566 U.S. at 339 (declining to reach the issue of searches
involving intentional humiliation or abuse), In re Nassau
Cty. Strip Search Cases, 639 Fed.Appx. 746, 750-51 (2d

Cir. 2016) ("categorically strip-searching the following two
classes of detainees may not pass constitutional muster:
(1) detainees charged with misdemeanors and segregated
alone from the general population; and (2) detainees charged
with misdemeanors and segregated with other detainees
charged with misdemeanors from the general population."),
and Turkmen v. Hasty, 789 F.3d 218, 260 (2d Cir. 2015)
(policy requiring strip searches "was not reasonably related
to legitimate penological interests" when there was "no
possibility that [inmates] could have obtained contraband")).

Plaintiff filed an Amended Complaint on April 7, 2016. (Dkt.
6.) In an Order dated July 13, 2016, this Court set a briefing
schedule for the defendant's proposed motion to dismiss,
requiring any opposition from the plaintiff by October 10,
2016. (Dkt. 14.) On September 8, 2016, defendant City
of New York moved to dismiss the Amended Complaint
pursuant to Rule 12(b)(6), Fed. R. Civ. P. (Dkt. 15.) It is now
more than seven months since the defendant filed its motion
to dismiss, and more than six months since the deadline for
the plaintiff's response has passed. (Dkt. 14.) The plaintiff has
not submitted opposition papers, and has not written the Court
to request an extension. As a result, the motion is unopposed.

When considering a Rule 12(b)(6) motion, the Court draws
all reasonable inferences in the plaintiff's favor and accepts
as true the facts alleged in the complaint. In re Elevator
Antitrust Litig., 502 F.3d 47, 50 (2d Cir. 2007). To survive
a motion to dismiss, a complaint must "contain sufficient
factual matter ... to 'state a claim to relief that is plausible
on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)
(quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570
(2007)). Plausibility exists "when the plaintiff pleads factual
content that allows the court to draw the reasonable inference
that the defendant is liable for the misconduct alleged."
Id. Nevertheless, " 'a pro se complaint, however inartfully
pleaded, must be held to less stringent standards than formal
pleadings drafted by lawyers.' " Erickson v. Pardus, 551 U.S.
89, 94 (2007) (quoting Estelle v. Gamble, 429 U.S. 97, 106
(1976)). Courts continue to afford special solicitude for pro se
complaints after Iqbal and Twombly. See Harris v. Mills, 572
F.3d 66, 72 (2d Cir. 2009). A plaintiff's failure to respond to
a motion to dismiss does not automatically warrant dismissal
of the complaint. McCall v. Pataki, 232 F.3d 321, 323 (2d Cir.
2000).

*2 In his Amended Complaint, plaintiff alleges that
while he was held in three different DOC facilities—the
Manhattan Detention Center ("MDC"), the George Motchan

Thompson v. City of New York, Not Reported in Fed. Supp. (2017)

2017 WL 1929552

Case 3:19-cv-00868-TJM-TWD   Document 16   Filed 07/20/20   Page 89 of 130

Detention Center ("GMDC"), and the Anna M. Kross Center ("AMKC")—he was strip searched multiple times in housing areas and in the intake areas when he was on his way to and from court. (Amended Complaint, Dkt. 6.) Plaintiff claims these searches occurred between September 9, 2015 and March 29, 2016. (Id.) According to plaintiff, the DOC officers had no "cause" to strip search him before he was taken to court because he was already required to clear multiple metal detectors and his clothing and property were scanned and hand searched by correction officers. (Id.) Similarly, he claims that there was no "cause" for officers to take him and 5-7 other inmates to the bathroom to be strip searched during housing area searches because correction officers already use drug sniffing dogs, metal detectors, and x-ray machines to search the person and property of the inmates during these searches. (Id.) Accordingly, plaintiff concludes that the only purpose of these strip searches was to "demoralize, dehumanize, and violate [his Fourth] Amendment rights." (Id.)

Plaintiff alleges that he filed grievances at AMKC and GMDC regarding these strip searches. (Id.) According to the Amended Complaint, there was "no result" in his AMKC grievance and in response to his GMDC grievance he was "deemed a security risk." (Id.) Plaintiff does not appear to have appealed the DOC decision, if any, on either of his grievances. (Id.) (showing no response to the question "What steps, if any, did you take to appeal that decision?"). However, in his original complaint, he wrote that he was "never part of the appeals process because [he] was never spoken to anyone about [his] grievance." (Dkt. 2.)

The Amended Complaint fails to cure the deficiencies identified by Chief Judge Preska and is dismissed for substantially the same reasons noted in Chief Judge Preska's Order of March 18, 2016. The general practice of strip searching a detainee during housing searches and on the way to and from court appearances is not unconstitutional, even if the detainee is accused only of a misdemeanor. See Florence, 566 U.S. at 324, 339 (holding that suspicionless strip search of detainee arrested for a minor offense prior to his admission into the general jail population did not violate Fourth Amendment); Smith v. City of N.Y., No.

14 Civ. 5934 (JCF), 2015 WL 3929621, at *2-3 (S.D.N.Y. June 17, 2015) ("[T]he policy of strip searching inmates after contact visits or upon departing for court appearances does not, in itself, violate the Constitution."); Myers v. City of N.Y., No. 11 Civ. 8525 (PAE), 2012 WL 3776707, at *9 (S.D.N.Y. Aug. 29, 2012) (suspicionless strip searches of non-felony pretrial detainee at intake and upon leaving facility for court appearances were constitutional); Israel v. City of N.Y., No. 11 Civ. 7726 (JMF), 2012 WL 4762082, at *3 (S.D.N.Y. Oct. 5, 2012) (strip searches before and after court visits and incident to random cell searches were reasonably related to legitimate security interests and did not violate Fourth Amendment). The types of searches described by the plaintiff serve the legitimate penological purpose of preventing contraband from coming into and out of prisons and jails. See Smith, 2015 WL 3929621, at *2; Israel, 2012 WL 4762082, at *3 (strip search during search of inmate's cell reasonable because it ensures inmate is not concealing contraband on his person).

Plaintiff's argument that there was no "cause" to strip search him is unavailing because Florence permits correction officers to strip search detainees without particularized suspicion, see Florence, 566 U.S. at 339; Jean-Laurent v. Wilkerson, 438 F. Supp. 2d 318, 323 (S.D.N.Y. 2006), aff'd, 461 Fed.Appx. 18 (2d Cir. 2012) ("Generally, strip searches have been upheld as a reasonable security measure within a correctional facility even in the absence of probable cause as long as they are related to a legitimate penological goal."), and recognizes that strip searches are specifically "designed to uncover contraband that can go undetected by a patdown, metal detector, and other less invasive searches." Florence, 566 U.S. at 334.

**\*3** For the foregoing reasons, the defendant's motion to dismiss (Dkt. 15) is GRANTED.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 1929552

---

2020 WL 3406445
Only the Westlaw citation is currently available.
United States Court of Appeals, Second Circuit.

UNITED STATES of America, Appellee,

v.

Joseph W. PEEPLES, III, Defendant-Appellant,

18-2309-cr
|
August Term 2019
|
No. 18-2309-cr
|
Argued: March 31, 2020
|
Decided: June 22, 2020

**Synopsis**
**Background:** In prosecution for bank robbery, entering a
bank with intent to commit larceny, and bank larceny, the
United States District Court for the Western District of
New York, Frank P. Geraci, Chief Judge, 2018 WL 495636,
adopted the report and recommendation of Jonathan W.
Feldman, United States Magistrate Judge, 2017 WL 9517692,
and denied defendant's motion to suppress and motion to
dismiss, and defendant was convicted of the charged offenses.
Defendant appealed.

**Holdings:** The Court of Appeals, Cabranes, Circuit Judge,
held that:

[1] as a matter of apparent first impression, suppression of
prejudicial, post-arrest evidence, rather than dismissal of the
criminal case, is the proper remedy when an arrestee's initial
appearance did not occur in the proper judicial district without
unnecessary delay;

[2] criminal complaint was valid despite magistrate judge's
failure to sign the jurat on last page of affidavit submitted by
FBI agent; and

[3] any error was harmless as to allegedly unduly suggestive
in-court identification procedure.

Affirmed.

**Procedural Posture(s):** Appellate Review; Pre-Trial Hearing
Motion; Trial or Guilt Phase Motion or Objection.

West Headnotes (20)

[1] **Criminal Law**  **Construction in favor of
government, state, or prosecution**

Where a defendant has been found guilty of the
crime charged, the factfinder's role as weigher
of the evidence is preserved on appeal through a
legal conclusion that upon judicial review all of
the evidence is to be considered in the light most
favorable to the prosecution.

[2] **Criminal Law** **Review De Novo**

Questions of law arising from a district court's
judgment in a criminal case are reviewed de
novo.

[3] **Criminal Law** **Reception and
Admissibility of Evidence**

Evidentiary rulings are reviewed for abuse of
discretion.

[4] **Criminal Law** **Discretion of Lower Court**

A district court has abused its discretion if it
based its ruling on an erroneous view of the
law or on a clearly erroneous assessment of
the evidence, or if it rendered a decision that
cannot be located within the range of permissible
decisions.

[5] **Criminal Law** **Questions of Fact and
Findings**

Findings of fact are reviewed for clear error.

[6] **Criminal Law** **Reception and
Admissibility of Evidence**

The Court of Appeals will reverse an evidentiary
ruling only in instances of manifest error.

**[7]**    **Criminal Law**    Evidence in general

Even where the Court of Appeals concludes that an evidentiary ruling was manifestly erroneous, it will nonetheless affirm if the error was harmless, that is, if the Court of Appeals can conclude that the error did not affect substantial rights.

**[8]**    **Criminal Law**    Evidence in general

In determining whether an erroneous admission of evidence was harmless, the Court of Appeals considers: (1) the overall strength of the prosecutor's case; (2) the prosecutor's conduct with respect to the improperly admitted evidence; (3) the importance of the wrongly admitted evidence; and (4) whether such evidence was cumulative of other properly admitted evidence.

**[9]**    **Criminal Law**    Delay in Arraignment or Initial Appearance

The remedy for a violation of the requirement that law enforcement present an arrestee to a magistrate judge or a state or local judicial officer for an initial appearance, without unnecessary delay, is the suppression of any prejudicial post-arrest statements, including an arrestee's confession, rather than dismissal of a criminal case. Fed. R. Crim. P. 5(a)(1)(A).

**[10]**    **Criminal Law**    Purpose of Exclusionary Rule

The evidentiary sanction of exclusion of evidence reflects the broad principle that prejudicial evidence obtained as a result of governmental misconduct may be excluded to safeguard defendants' rights through the deterrence of similar future misconduct by the Government.

**[11]**    **Criminal Law**    Delay in Arraignment or Initial Appearance

Suppression of prejudicial, post-arrest evidence, rather than dismissal of the criminal case, is the proper remedy when an arrestee's initial appearance did not occur in the proper judicial district without unnecessary delay. Fed. R. Crim. P. 5(a)(1)(A), (c)(2).

**[12]**    **Criminal Law**    Delay in Arraignment or Initial Appearance

One of the main concerns, if not the principal one, animating the procedural requirements for an arrestee's prompt initial appearance in the judicial district in which the arrest occurred or an adjacent district, is that a defendant be presented to a judicial officer for his or her arraignment as soon as practicable in order to prevent the Government from using the delay to obtain incriminating evidence or elicit a confession. Fed. R. Crim. P. 5(a)(1)(A), (c)(2).

**[13]**    **Criminal Law**    Affidavit or complaint; probable cause

**Searches and Seizures**    Legality of information

The mere inclusion of tainted evidence in a search warrant affidavit does not, by itself, taint the warrant or the evidence seized pursuant to the warrant. U.S. Const. Amend. 4.

**[14]**    **Searches and Seizures**    Scope of inquiry or review, in general

Where tainted evidence was included in a search warrant affidavit, a reviewing court should excise the tainted evidence and determine whether the remaining, untainted evidence would provide a neutral magistrate with probable cause to issue a warrant. U.S. Const. Amend. 4.

**[15]**    **Searches and Seizures**    Particular concrete applications

**Searches and Seizures** 👉 Legality of information

Despite government's violation of rule requiring an arrestee's prompt initial appearance to occur in judicial district in which the arrest occurred or an adjacent district, use of defendant's post-arrest statements in affidavits in support of application for warrant to search defendant's hotel room, for money taken in a bank robbery, did not render the warrant invalid, where ample untainted evidence in the affidavits supported the magistrate judge's probable cause findings; after bank robbery, law enforcement officials were able to trace defendant's steps with commendable precision by relying on testimony of witnesses, extensive video surveillance, and physical evidence that defendant left behind. U.S. Const. Amend. 4; Fed. R. Crim. P. 5(a)(1)(A), (c)(2).

[16]  **Criminal Law** 👉 Verification, signature, and jurat

Failure of magistrate judge to sign the jurat on last page of affidavit submitted by FBI agent, with magistrate judge signing only the jurat on face of criminal complaint, to which the affidavit was attached, did not require dismissal of criminal complaint, where the complaint expressly referenced the affidavit; by signing complaint, magistrate judge confirmed that FBI agent, in magistrate judge's presence, had sworn to the truth of assertions made in affidavit. Fed. R. Crim. P. 3.

[17]  **Searches and Seizures** 👉 Scope of inquiry or review, in general

Search warrants are upheld, despite technical errors, when the possibility of actual error is eliminated by other information. U.S. Const. Amend. 4.

[18]  **Constitutional Law** 👉 Identification Evidence and Procedures

Due process requires identification testimony to be excluded if it is so unreliable as to

create a very substantial likelihood or irreparable misidentification. U.S. Const. Amend. 5.

[19]  **Criminal Law** 👉 Arrest and identification, evidence relating to

Any error was harmless beyond a reasonable doubt, as to two bank employees' allegedly unduly suggestive in-court identification of defendant, whose appearance had changed significantly since the bank robbery, which identification occurred after district court denied defendant's request to be seated elsewhere in courtroom, i.e., away from defense table, during employees' testimony, where evidence against defendant was overwhelming; in-court identification was minor part of government's case, which included unbroken chain of video surveillance, physical evidence, and other eyewitnesses who identified defendant without difficulty. U.S. Const. Amend. 5.

[20]  **Criminal Law** 👉 Presumptions and burden of proof

A defendant who brings a motion to suppress evidence seized during a search bears the burden of establishing that his rights under the Fourth Amendment were violated. U.S. Const. Amend. 4.

On Appeal from the United States District Court for the Western District of New York (Frank P. Geraci, Jr., *Chief Judge*)

**Attorneys and Law Firms**

KATHERINE A. GREGORY , Assistant United States Attorney, for James P. Kennedy, Jr., United States Attorney, Western District of New York, Buffalo, NY, for Appellee.

Jillian S. Harrington , Monroe Township, NJ, for Defendant-Appellant.

Before: Walker, Cabranes, and Sack , Circuit Judges.

**Opinion**

[José A. Cabranes](#) , Circuit Judge:

**[1]**   **\*1**  On January 5, 2017, at approximately 8:20
a.m., Joseph W. Peeples, III ("Peeples") robbed a bank in
Rochester, New York and immediately fled the scene.[1]
Carrying over $100,000 in large stacks of cash, Peeples
needed to escape. His ultimate destination? Unclear, but
perhaps Mexico (at least, according to one passing statement
by Peeples). His escape plan? Also unclear. Perhaps trying
to figure one out on the run, Peeples made several stops.
He took a cab and checked in to a hotel in Rochester using
his own name. Later that morning, he boarded a Greyhound
bus headed for New York City. But he never made it there.
Instead, he got off the bus in Binghamton and tried to buy a
car. Unable to do so, he found a hotel, booked a room, and
asked an employee where he could find a shopping mall and
a strip club.

[1]
> For purposes of this appeal, where Peeples "has
> been found guilty of the crime charged, the
> factfinder's role as weigher of the evidence is
> preserved through a legal conclusion that upon
> judicial review *all of the evidence* is to be
> considered in the light most favorable to the
> prosecution." *Lewis v. Jeffers*, 497 U.S. 764, 782,
> 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990) (quoting
> *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct.
> 2781, 61 L.Ed.2d 560 (1979) (footnote omitted)).
> Here, Peeples does not challenge the sufficiency
> of the evidence at trial to support his criminal
> conviction.

The escape route by way of Binghamton did not turn out to
be a successful one for Peeples. Before boarding the bus in
Rochester, Peeples accidentally had left behind an unbroken
trail of evidence—the sunglasses, sweatshirt, and shirt that
he wore during the robbery, and approximately $53,400 in
cash. With the assistance of eyewitnesses, extensive video
surveillance, and physical evidence, law enforcement agents
were able to trace Peeples' steps with notable precision.
Eleven hours later, and approximately 140 miles away from
the Rochester bank, Peeples, then a guest in the Grand Royale
Hotel in Binghamton, was arrested.

Peeples now appeals from a judgment of the United States
District Court for the Western District of New York (Frank
P. Geraci, Jr., *Chief Judge*) convicting him, following a

jury trial, of bank robbery, entering a bank with the intent
to commit larceny, and bank larceny. On appeal, Peeples
contends that his judgment of conviction should be vacated
for two principal reasons.

*First*, Peeples argues that the District Court erred in declining
to dismiss the criminal charges against him because: (i) he
was transferred outside of the district of arrest to the district
where the crime took place without first appearing before
a magistrate judge, in asserted violation of [Federal Rule of
Criminal Procedure 5(c)(2)](#);[2] and (ii) the magistrate judge
failed to sign the affidavit attached to the complaint in alleged
violation of [Federal Rule of Criminal Procedure 3](#),[3] even
though he signed the face of the complaint.

[2]
> Rule (c)(2) provides in relevant part:
> > If the defendant was arrested in a district other
> > than where the offense was allegedly committed,
> > the initial appearance must be:
> > > (A) in the district of arrest; or
> > > (B) in an adjacent district if:
> > > (i) the appearance can occur more
> > > promptly there; or
> > > (ii) the offense was allegedly committed there
> > > and the initial appearance will occur on the
> > > day of the arrest.

[3]
> [Rule 3](#) provides: "The complaint is a written
> statement of the essential facts constituting the
> offense charged. Except as provided in Rule 4.1, it
> must be made under oath before a magistrate judge
> or, if none is reasonably available, before a state or
> local judicial officer."

  **\*2**  *Second*, Peeples argues that the District Court erred
in admitting: (i) the bank employees' testimony identifying
Peeples for the first time at trial in alleged violation of his
due process rights; and (ii) physical evidence seized from the
Binghamton hotel room in alleged violation of his right to be
free from unreasonable searches and seizures.

The two main questions presented in this case are: (1) whether
dismissal of a criminal complaint is the appropriate remedy
for a violation of [Federal Rule of Criminal Procedure 5(c)](#);
and (2) whether a magistrate judge's failure to sign the *jurat*
on the last page of the affidavit attached to the criminal
complaint renders the complaint invalid under [Federal Rule
of Criminal Procedure 3](#), even where the magistrate judge did
sign the complaint itself.[4]

4
"A jurat is in reality a certificate of the officer who administered the oath that the affiant had subscribed and sworn to the same before him." *United States v. McDermott*, 140 U.S. 151, 153, 11 S.Ct. 746, 35 L.Ed. 391 (1891); *see also Dawson v. Phillips*, Case No. 03-cv-8632 (RJS) (THK), 2008 WL 818539, at *1 n.3 (S.D.N.Y. Mar. 25, 2008) ("A 'jurat' is a 'certification added to an affidavit ... stating when and before what authority the affidavit ... was made'; a 'certificate' is a 'document in which a fact is formally attested.' ") (quoting *Black's Law Dictionary* (8th ed. 2004)).

We conclude that, in the circumstances presented, the dismissal of criminal charges is not the appropriate remedy for a violation of Rule 5(c) and that the magistrate judge's failure to sign the affidavit attached to the criminal complaint did not render the complaint invalid. We also conclude that Peeples' remaining evidentiary challenges do not warrant vacatur of his conviction. Accordingly, the August 1, 2018 judgment the District Court is **AFFIRMED**.

## BACKGROUND

When Peeples entered a Chase Bank in Rochester on January 5, 2017, he was wearing a black knit cap, gold rimmed sunglasses, a black pullover sweatshirt, black jeans, and black boots. There were two bank employees present: Jeannine Furioso and Patricia Bentley. Pretending to have trouble with his bank account, Peeples approached Furioso and handed her a black bag and a note with robbery instructions. The note said: "listen, you need to cooperate, I want large bills, otherwise everybody will die today." 5

5
Trial Transcript at 123.

Upon receipt of the threatening note, Furioso nervously walked over to Bentley in the teller line and handed her the bag so that Bentley could retrieve the money. Peeples objected. He "want[ed] the money out of the vault," not "out of [teller] drawer." 6 He also exclaimed, "I'm not playing around, I've done this before, hurry up." 7 Peeples, who appeared to have something in the front of his pullover sweatshirt, had given the impression to Furioso and Bentley that he was carrying a "gun," a "bomb," or some kind of "weapon." 8

6
*Id.* at 127, 175.

7
*Id.* at 176.

8
*Id.* at 133, 191.

Furioso and Bentley entered their combinations to open the vault. Once inside the vault, Peeples began to put stacks of cash in his black bag. He then exited the bank as he had entered: through the front door, but now with more than $100,000 in his bag. Furioso immediately notified security and called the police.

As confirmed by surveillance video and the eyewitness testimony of a parking garage attendant, a man wearing all black and carrying a black bag, identified at trial as Peeples, was seen minutes after the robbery running down the bank's stairs and towards the cab stand at the nearby Hyatt Hotel. There, around 8:30 a.m., Peeples got into a J & J taxicab. According to the cab driver, they arrived at a Greyhound bus station around 8:47 a.m. The driver gave Peeples a business card and, as Peeples rushed out of the cab, he left behind in the back seat his sunglasses, the black sweatshirt, and $9,900 in the sweatshirt's pockets, all of which was recovered by the Rochester police. As shown on video, Peeples entered the bus station and headed to the men's bathroom. Minutes later, he came out of the bathroom wearing different clothing and placed something in the garbage can outside the bathroom. It was not mere trash though, but rather, a black shirt and $43,500 in cash, also recovered by Rochester police.

**\*3** Video surveillance showed Peeples leaving the station and getting into another taxi. According to the testimony of Gurmit Ram, the driver of the second taxi, Peeples headed to a Quality Inn Hotel. The hotel's general manager, in testimony at trial, confirmed Peeples' brief visit to the Quality Inn. According to the manager, an individual who identified himself as "Joseph W. Peeples, III" and was carrying large amounts of cash checked in to the hotel that morning. Peeples left the hotel and returned to the bus station about an hour later in Ram's cab. According to video surveillance, around 10:15 a.m., Peeples entered the bus station and purchased a bus ticket to New York City. At approximately 10:45 a.m., Peeples boarded the bus; but he did not arrive at his apparent destination. Instead, according to the bus driver, between 2:10 and 2:20 p.m., Peeples got off the bus in Binghamton.

In Binghamton, Peeples got into another taxi. According to the driver, Youssif Saleh, Peeples asked to be driven to various places. First, he went to a liquor store. Then, wanting to buy

a car in cash, Peeples went to a car dealership. Realizing that he needed insurance to buy the car, Peeples headed to a State Farm location. But that did not work for Peeples either. Unable to buy insurance or a car, Peeples opted to look for a hotel.

The first two hotels Peeples tried refused to book him a room without a credit card. Then, Saleh drove Peeples to the Grand Royale Hotel, where Peeples was finally able to book a room (Room 310) for $600 in cash. Saleh gave Peeples his business card and left. Once settled in, Peeples asked a hotel employee where he could find a shopping mall and a strip club.

At 9:00 p.m., having traced Peeples' movements by reviewing video surveillance material and speaking with several eyewitnesses, Special Agent John Bokal of the Federal Bureau of Investigation ("FBI") arrived at the Grand Royale Hotel. Joined by a hotel employee, Special Agent Bokal headed to Room 310 to look for Peeples. On their way to the room, they ran into Peeples, who was sitting on the stairs, and Special Agent Bokal immediately placed Peeples under arrest. In response, Peeples asked the employee, "[W]ho ratted me out, was it you?" [9] He also exclaimed, "you know they're after me," "you were supposed to let me get to Mexico," "you know what I did," and "don't go in my room without a warrant." [10]

[9]   *Id.* at 567.

[10]   *Id.*

Peeples was taken away and detained in the Binghamton Police Department—in the Northern District of New York —where he was questioned by Special Agent Bokal. At the police station, after waiving his *Miranda* rights, Peeples confessed to: (1) having robbed the Chase bank in Rochester; (2) accidentally leaving the money in the back seat of the J & J Taxi and in the garbage can at the Greyhound bus station in Rochester; and (3) hiding the remaining stacks of cash inside Room 310. In the meantime, police officers were posted outside of Room 310 to secure the area pending a search warrant.

The next day, on January 6, 2017, a magistrate judge in the Northern District of New York approved the search warrant application. Police officers executed the warrant in Room 310 and found, among other things, $48,700 in cash; business cards from the J & J Taxi driver, from Ram, and from Saleh; a bag; a room key to a Quality Inn Hotel; a Greyhound bus

ticket from Rochester to New York City for a January 5, 2017, 10:55 a.m. bus; and a benefits card and a Chase card in Peeples' name.

That same day, January 6, Peeples was transported back to Rochester, where he was brought, at about 3:50 p.m., before a magistrate judge in the Western District of New York for his initial appearance. Notwithstanding the magistrate judge's repeated admonitions about the advantages of being represented by counsel during his criminal prosecution, and the disadvantages of not being represented by an attorney, Peeples elected to proceed *pro se*. In fact, Peeples represented himself throughout the criminal proceedings, including trial, while maintaining a court-appointed counsel on standby. After a 90-minute deliberation, the jury found Peeples guilty on all three counts.

**\*4**  On July 27, 2018, the District Court sentenced Peeples to 240 months' imprisonment on Count 1 (Bank Robbery) and Count 2 (Entering a Bank With Intent to Commit Larceny), to run concurrently with 120 months' imprisonment on Count 3 (Bank Larceny), to be followed by 3 years of supervised release. This appeal followed.

# DISCUSSION

**[2]    [3]    [4]    [5]**  On appeal, Peeples argues that his judgment of conviction should be vacated because the District Court erred in failing to dismiss the criminal complaint against him and in failing to exclude certain evidence introduced at trial. In considering his challenge on appeal, we review *de novo* any questions of law arising from the District Court's judgment, [11] any evidentiary ruling for "abuse of discretion," [12] and any findings of fact for "clear error." [13]

[11]   *See  All. for  Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev.,* 911 F.3d 104, 109 (2d Cir. 2018).

[12]   *See   United States v. Miller,* 626 F.3d 682, 687–88 (2d Cir. 2010). "A district court has 'abused its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence,'   *Cooter  &  Gell v.  Hartmarx Corp.,*  496  U.S.  384,  405,  110  S.Ct.  2447,  110 L.Ed.2d 359 ... (1990),* or rendered a decision that 'cannot be located within the range of permissible decisions,'  *Zervos v. Verizon N.Y., Inc.,*  252  F.3d

163, 169 (2d Cir. 2001)." *In re Sims*, 534 F.3d 117, 132 (2d Cir. 2008) (alteration omitted).

13    *United States v. Cramer*, 777 F.3d 597, 601 (2d Cir. 2015) ("A finding of fact is clearly erroneous only if, after reviewing all of the evidence, this Court is left 'with the definite and firm conviction that a mistake has been committed.' ") (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)).

[6]    [7]    [8]   Furthermore, we will reverse an evidentiary ruling only in instances of "manifest error." [14]  And "even where we conclude that an evidentiary ruling was 'manifestly erroneous,' we will nonetheless affirm if the error was 'harmless'—that is, if we can conclude that the error did 'not affect substantial rights.' " [15]  In determining whether an erroneous admission was harmless, we consider: "(1) the overall strength of the prosecutor's case; (2) the prosecutor's conduct with respect to the improperly admitted evidence; (3) the importance of the wrongly admitted testimony; and (4) whether such evidence was cumulative of other properly admitted evidence." [16]

14    *Miller*, 626 F.3d at 688–89 (collecting cases and explaining that "we find 'manifest error' only where we are 'persuaded that the trial judge ruled in an arbitrary and irrational fashion.' " (quoting *United States v. Dhinsa*, 243 F.3d 635, 649 (2d Cir. 2001)).

15    *Id.* at 688 (quoting Fed. R. Crim. P. 52(a); *SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC*, 467 F.3d 107, 119 (2d Cir. 2006)).

16    *United States v. Gomez*, 617 F.3d 88, 95 (2d Cir. 2010) (quotation marks and citation omitted).

For the reasons stated below, we reject Peeples' challenges on appeal and thus affirm the District Court's judgment of conviction.

## I. The Remedy for an Alleged Violation of Federal Rule of Criminal Procedure 5(c)(2)

Peeples argues that the District Court should have dismissed the criminal charges against him because he was transferred outside of the district of his arrest (N.D.N.Y.) to the district where the crimes took place (W.D.N.Y.), without first appearing before a magistrate judge in the Northern District,

in asserted violation of Rule 5(c)(2) of the Federal Rules of Criminal Procedure. We disagree.

**\*5**  Rule 5 of the Federal Rules of Criminal Procedure governs the procedures relating to a defendant's initial appearance. [17]  More specifically, Rule 5(c)(2) provides:

If the defendant was arrested in a district other than where the offense was allegedly committed, the initial appearance must be:

(A) in the district of arrest; or

(B) in an adjacent district if:

(i) the appearance can occur more promptly there; or

(ii) the offense was allegedly committed there and the initial appearance will occur on the day of arrest.

Relatedly, Rule 5(a)(1)(A) provides that "[a] person making an arrest within the United States must take the defendant without unnecessary delay before a magistrate judge, or before a state or local judicial officer as Rule 5(c) provides, unless a statute provides otherwise."

17    Fed. R. Crim. P. 5 (entitled, "Initial Appearance").

There is no question that Peeples was arrested in a district other than the district where the bank robbery was committed. Therefore, under Rules 5(a)(1)(A) and 5(c)(2), the Government needed to take Peeples, without unnecessary

delay, before a magistrate judge in: (1) the Northern District; (2) an adjacent district (such as the Western District), *if* Peeples' appearance could occur more promptly in that adjacent district than in the Northern District; or (3) the Western District, *if* the initial appearance would have taken place on the same day of the charged robbery (January 5). [18]

[18]    *See* Fed. R. Crim. P. 5(c)(2).

As noted above, Peeples was taken to the Western District for his initial appearance on January 6 at about 3:50 p.m. To satisfy Rule 5(c)(2), the Government was required to show that an initial appearance in the Northern District could not have occurred sooner, thereby justifying Peeples' transfer to the Western District. The Government did not attempt to make this showing. Nor does it now contest Peeples' assertion that his transfer to the Western District for an initial appearance was a technical violation of Rule 5(c)(2). Instead, the Government notes that it agreed not to introduce at trial Peeples' post-arrest statements, including his confession to Special Agent Bokal at the Binghamton Police Department.

Peeples argues that the Government's decision is not enough; the District Court was required, in his view, to dismiss the charges against him, because, he asserts, dismissal of the charges is the only proper remedy for a violation of Rule 5(c)(2). Alternatively, Peeples argues that the search warrant issued by the magistrate judge in the Northern District and the criminal complaint filed against him in the Western District were invalid because the affidavits in support of both documents relied in part upon Peeples' post-arrest statements. We address and reject each argument in turn.

### A.

Peeples' principal argument that dismissal of a criminal case is the only proper remedy for a violation of Rule 5(c)(2) lacks merit. As a threshold matter, the dismissal of criminal charges has no basis in the text of Rule 5(c)(2). And perhaps more critically, that proposed remedy cannot be reconciled with the precedents of the Supreme Court and our own Court in the closely related context of Rule 5(a)(1)(A)'s limitation on post-arrest, pre-arraignment investigations. Those precedents are instructive and apply with equal force to the present circumstances; they consistently refer to the application of evidentiary sanctions (*e.g.*, the exclusion of evidence), not dismissal of criminal charges, as the appropriate remedy for a violation of the rule.

### 1.

[9]    **\*6**  "Rule 5(a)(1)(A) requires law enforcement to present arrestees [to a magistrate judge] 'without unnecessary delay.' " [19]  But even before the enactment of Rule 5(a), "[t]he common law obliged an arresting officer to bring his prisoner before a magistrate as soon as he reasonably could." [20]  The longstanding remedy for a violation of "this prompt-presentment requirement" is the suppression of any prejudicial post-arrest statements, including "a defendant's confession." [21]

[19]    *United States v. Gonzalez*, 764 F.3d 159, 167 (2d Cir. 2014) (quoting Fed. R. Crim. P. 5(a)(1)(A)).

[20]    *Corley v. United States*, 556 U.S. 303, 306, 129 S.Ct. 1558, 173 L.Ed.2d 443 (2009).

[21]    *United States v. Redlightning* 624 F.3d 1090, 1106 (9th Cir. 2010) (internal quotation marks omitted).

For more than seven decades, the Supreme Court has made it clear that the failure to present a defendant promptly before a judicial officer may render a defendant's post-arrest confession inadmissible. [22]  Put another way, the "evidentiary rule of exclusion [ ] formulated by the Supreme Court" has long been the "judicial technique utilized for the enforcement of [the prompt-presentment requirement in] Rule 5(a)." [23]  To that end, we have stated that "we will *exclude* confessions obtained following an unnecessary or unreasonable delay in presentment," [24]  and that such exclusions may be necessary to deter any "continuing practice of unnecessarily delaying arraignments." [25]

[22]    *See, e.g.*, *Corley*, 556 U.S. at 322, 129 S.Ct. 1558 ; *United States v. Alvarez-Sanchez*, 511 U.S. 350, 114 S.Ct. 1599, 128 L.Ed.2d 319 (1994); *Mallory v. United States*, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957); *Upshaw v. United States*, 335 U.S. 410, 69 S.Ct. 170, 93 L.Ed. 100 (1948); *McNabb v. United States*, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943).

[23]    *United States v. Klapholz*, 230 F.2d 494, 496 (2d Cir. 1956).

24   *Gonzalez*, 764 F.3d at 167 (citing *Corley*, 556 U.S. at 322, 129 S.Ct. 1558 ) (emphasis added).

25   *United States v. Fullwood*, 86 F.3d 27, 32 (2d Cir. 1996) (citing *United States v. Colon*, 835 F.2d 27, 31 (2d Cir. 1987)).

Although the history of the prompt-presentment requirement codified in Rule 5(a) reflects an evolving understanding of what constitutes a violation of that requirement, [26] that same history confirms that the remedy for such a violation is the exclusion of evidence, not dismissal of a criminal case. [27] And, as some of our sister Circuits have held, "the appropriate remedy for a violation of Rule 5(a)(1)(A) is not dismissal of an indictment, but suppression of evidence illegally obtained as a result of the violation." [28]

26   *See, e.g.,* *Corley*, 556 U.S. at 306–11, 322, 129 S.Ct. 1558 ; 2 Wayne R. LaFave, Jerold H. Israel, Nancy J. King, and Orin S. Kerr, *Criminal Procedure* § 6.3(b) (4th ed. 2009) (as supplemented) (describing the reactions to the Supreme Court's *McNabb - Mallory* rule over the years); 1 Charles Alan Wright & Arthur Miller, *Federal Practice & Procedure* § 72 (4th ed. 2008) (as supplemented) ("Timing of the Initial Appearance").

27   *See* *Corley*, 556 U.S. at 322, 129 S.Ct. 1558 (relying on, among other things, the Advisory Committee's Notes on Federal Rule of Evidence 402 which explains that "the effective enforcement of ... Rule 5(a) ... is held to require the exclusion of statements elicited during detention in violation thereof" (internal quotation marks and citations omitted)); *see also* *Gonzalez*, 764 F.3d at 167–68 (analyzing the prompt-presentment requirement in terms of whether the elicited confession should be excluded); *Fullwood*, 86 F.3d at 32 (same); *Colon*, 835 F.2d at 31 (same); *United States v. Perez*, 733 F.2d 1026, 1031–32 (2d Cir. 1984) (same); *United States v. Rubio*, 709 F.2d 146, 153–54 (2d Cir. 1983) (same).

28   *United States v. Cooke*, 853 F.3d 464, 471 (8th Cir. 2017); *see, e.g.*, *United States v. Dyer*, 325 F.3d 464, 470 n.2 (3d Cir. 2003) (same); *Bayless v. United States*, 381 F.2d 67, 70–71 (9th Cir. 1967) (same); *see also* *United States v. Bibb*, 194 F.

App'x 619, 623 (11th Cir. 2006) (non-precedential summary order pursuant to Fed. R. App. P. 32.1 and 11th Cir. R. 36-2, 36-3) (same).

Various district courts also have reached the same conclusion. *See, e.g.,* *United States v. Savchenko*, 201 F.R.D. 503, 509 (S.D. Cal. 2001) ("Rule 5 ... is not a general remedial statute, but rather a rule designed to deal with a particular problem by applying an evidentiary sanction. ... In this case, even if the delay in transport of the defendants from the high seas to the district court were found unnecessary or unreasonable, those facts alone would not justify dismissal since that is not a sanction available under Rule 5."); *United States v. Perez-Torribio*, 987 F. Supp. 245, 247 (S.D.N.Y. 1997) ("Unnecessary delay violations of Rule 5(a) warrant suppression of evidence," not dismissal of the indictment); *United States v. DiGregorio*, 795 F. Supp. 630, 634 (S.D.N.Y. 1992) (same).

### 2.

**[10]**   **[11]**   **\*7** The remedy of exclusion of evidence is not unique to Rule 5(a), as it is not specific to its text or circumstances. The evidentiary sanction of exclusion reflects the broader principle that prejudicial evidence obtained as a result of governmental misconduct may be excluded to safeguard defendants' rights through the deterrence of similar future misconduct by the Government. [29] That principle applies with equal force to violations of Rule 5(c)(2)'s own prompt-presentment requirement. We see no reasonable basis to adopt a different remedy here with respect to Rule 5(c)(2), nor does Peeples provide a reasoned justification to do so.

29   *See* *Rubio*, 709 F.2d at 153 (concluding that, in the absence of wrongdoing by the Government, the district court correctly denied the defendant's motion to suppress his post-arrest statements under Rule 5(a)); *cf.* *Herring v. United States*, 555 U.S. 135, 139–40, 129 S.Ct. 695, 172 L.Ed.2d 496 (2009) (explaining that, in the context of the Fourth Amendment, the Supreme Court's "decisions establish an exclusionary rule that ... is designed to safeguard Fourth Amendment rights generally through its deterrent effect" (internal quotation marks and citations omitted)).

By its own terms, Rule 5(c)(2) governs the place of a defendant's initial appearance, as well as the circumstances permitting the defendant's transfer to another district. As described above, the rule requires the defendant's initial appearance to take place in the district of the defendant's arrest. [30] Alternatively, the initial appearance could take place in a district adjacent to the district of arrest if one or another circumstance is met: (1) the appearance can occur more promptly in the adjacent district than in the district of arrest; or (2) the alleged crime took place in the adjacent district and the initial appearance will occur on the same day of the arrest. [31]

[30]    See Fed. R. Crim. P. 5(c)(2)(A).

[31]    See Fed. R. Crim. P. 5(c)(2)(B).

**[12]**    As revealed by the text of Rule 5(c)(2), one of the main concerns, if not the principal one, animating its procedural requirements is precisely the same concern that animates the requirement in Rule 5(a)(1)(A): that a defendant be presented to a judicial officer for his or her arraignment as soon as practicable in order to prevent the Government from using the delay to obtain incriminating evidence or elicit a confession. [32] It follows that the exclusion of prejudicial, post-arrest evidence obtained in violation of Rule 5(c)(2) may be an appropriate and fully satisfactory remedy for certain violations of that rule, as it is for violations of Rule 5(a)(1)(A). [33]

[32]    Cf. United States v. Marrero, 450 F.2d 373, 376 (2d Cir. 1971) ("It is not the lapse of time but the use of the time ... to employ the condemned psychologically coercive or third degree practices [of interrogators] which is proscribed."); see also Rubio, 709 F.2d at 153–54 (explaining that a "lapse of hours between arrest and arraignment, standing alone, does not require the exclusion of a statement made during the period" because there must be some ensuing "prejudice" to the defendant as a result of the Government's wrongdoing); United States v. Middleton, 344 F.2d 78, 82 (2d Cir. 1965) ("The objective of Rule 5(a) is to check resort to psychologically coercive or 'third degree' practices and not simply to insure that the accused is arraigned at the earliest possible time." (internal citation omitted)).

[33]    We do not address here, much less consider, whether an egregious delay in arraignment may violate some other right, such as the constitutional guarantee to due process, which may in turn provide the basis for a more drastic remedy in a criminal proceeding, including dismissal. Cf. Savchenko, 201 F.R.D. at 509 ("Where government delay or outrageous conduct leads to a request for a dismissal, a basis beyond Rule 5 must be used if defendant truly hopes to succeed. The Due Process Clause of the U.S. Constitution and the Acts of Congress stated herein are well designed to address those circumstances."); United States v. Egan, 501 F. Supp. 1252, 1263 (S.D.N.Y. 1980) (analyzing the violation of the prompt-presentment requirement in terms of the suppression of post-arrest statements, but also concluding that the "dismissal of the indictment" was not warranted because the arraignment delay did "not rise to the level of outrageous conduct which shocks the conscience").

### 3.

**\*8**    Here, the Government did not rely on Peeples' post-arrest statements as part of its evidence at trial. Therefore, with respect to the trial proceedings, Peeples cannot show that his transfer to the Western District in violation of Rule 5(c)(2) caused him *any* prejudice. "There having been no evidence [used at trial] which could have been excluded, on motion, on these grounds," the District Court correctly concluded that there was no further remedy available to Peeples and thus his motion "to dismiss the [complaint] ... was correctly denied." [34]

[34]    Bayless, 381 F.2d at 71; see Appellant's App'x at 127 (Decision of the District Court denying Peeples' motion because "the only evidence obtained between Peeples'[ ] arrest and his initial appearance were the statements he made to law enforcement" and since "the Government does not intend to use Peeples'[ ] statements in its case ... there is no remedy available to Peeples").

### B.

To our knowledge, Peeples' post-arrest statements to Special Agent Bokal were only used in the application for the search warrant executed at the Grand Royale Hotel and in the criminal complaint filed against Peeples. But, in the

circumstances presented, that reliance did not render the warrant or the complaint invalid, nor did it require the dismissal of the ensuing criminal charges against Peeples.

As a threshold matter, we note that Peeples has not pointed to *any* evidence in the record justifying the exclusion of the post-arrest statements from the affidavits in support of the search warrant and the criminal complaint. Nothing in the record of this case supports an inference, let alone demonstrates, that the Government violated Rule 5(c)(2) in order to obtain a post-arrest, pre-arraignment confession from Peeples.[35] Without evidence of wrongdoing, there is "nothing to deter" and "exclusion simply cannot pay its way."[36]

[35]    *Cf.   Rubio,* 709 F.2d at 153 (affirming the denial of the defendant's motion to suppress because, among other things, "there was no purposeful postponement of arraignment, and no lengthy, hostile, or coercive interrogation which caused the [defendant] prejudice"); *see also  ante* note 32.

[36]    *United States v. Raymonda,* 780 F.3d 105, 118 (2d Cir. 2015) (internal quotation marks and citation omitted).

**[13]    [14]** In any event, although unlawfully obtained evidence should not be included in an affidavit,[37] it is well established that "[t]he mere inclusion of tainted evidence in an affidavit does not, by itself, taint the warrant or the evidence seized pursuant to the warrant."[38] In those circumstances, "[a] reviewing court should excise the tainted evidence and determine whether the remaining, untainted evidence would provide a neutral magistrate with probable cause to issue a warrant" or file a criminal complaint.[39]

[37]    *See  Wong Sun v. United States,* 371 U.S. 471, 484–85, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

[38]    *United States v. Trzaska,* 111 F.3d 1019, 1026 (2d Cir. 1997) (citation omitted).

[39]    *Id.* (citation omitted).

**[15]** Even if we were to excise Peeples' post-arrest statements from the affidavits in support of the application for the search warrant and in support of the criminal complaint, there is ample untainted evidence in the affidavits supporting the magistrate judge's probable cause findings. Law enforcement officials were able to trace Peeples' steps

from Rochester to Binghamton with commendable precision by relying on the testimony of witnesses, extensive video surveillance, and physical evidence that Peeples left behind in Rochester.

Specifically, the affidavits pointed to, among other things, the testimony of the bank employees, video surveillance from the Hyatt Hotel in Rochester, the testimony of the two taxi drivers in Rochester, the money and items left in the back seat of the J & J taxi, video surveillance from the Greyhound bus station in Rochester, the money and shirt discarded in the garbage can of the bus station, video surveillance from the Quality Inn Hotel in Rochester, testimony of the Quality Inn's manager, video surveillance from the Binghamton bus station, testimony of the taxi driver in Binghamton, testimony of the employees of the Grand Royale Hotel in Binghamton, and items seized from Peeples during his arrest.[40]

[40]    *See* Government's App'x at 4–8 (Special Agent Bokal's affidavit in support of the application for a search warrant of Room 310); *see also* Appellant's App'x at 17–21 (Special Agent Fleitman's affidavit in support of the criminal complaint).

**\*9** Peeples' confession and post-arrest statements merely corroborated what abundant "extrinsic evidence independently secured through skillful investigation"[41] already revealed: there was probable cause to believe that Peeples robbed the Chase bank in Rochester and was hiding the stolen money in his hotel room in Binghamton.

[41]    *Escobedo v. Illinois,* 378 U.S. 478, 489, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964).

Accordingly, Peeples failed to demonstrate that the Government's violation of Rule 5(c)(2) had any prejudicial effect whatsoever on the criminal case against him.

### II. The Magistrate Judge's Signature of the Criminal Complaint Under Federal Rule of Criminal Procedure 3

**[16]** Peeples correctly notes that Magistrate Judge Jonathan Feldman of the Western District did not sign the *jurat* on the last page of the affidavit submitted by Special Agent Seth Fleitman of the FBI. Judge Feldman did sign, however, the *jurat* on the face of the criminal complaint against Peeples, to which the affidavit was attached. Peeples argues that the magistrate judge's failure to sign the affidavit rendered the complaint invalid under Rule 3 of the Federal Rules of

Criminal Procedure and that, as result, the District Court erred in declining to dismiss the complaint. In the circumstances presented here, we see no error in the District Court's decision to not dismiss the complaint.

Rule 3 provides in relevant part that a criminal complaint is "a written statement of the essential facts constituting the offense[s] charged," which "must be made under oath before a magistrate judge or, if none is reasonably available, before a state or local judicial officer." By failing to sign the *jurat* on the last page of the affidavit, Peeples argues, the magistrate judge failed to attest that the assertions made in the affidavit were made under oath. The argument carries little weight in light of the facts presented here.

As a threshold matter, the text of Rule 3 merely requires that the complaint be made under oath before the magistrate judge. It may well be that the magistrate judge's signature in the affidavit in support of the criminal complaint constitutes the best evidence that Rule 3's requirement was met. It does not follow, however, that anything else falls short of satisfying Rule 3.

By its own terms, Rule 3 refers to the criminal complaint itself, and not to any affidavit presented in support of the complaint. Here, both Judge Feldman and Special Agent Fleitman signed the criminal complaint, which expressly references the affidavit (or "sheet") by Special Agent Fleitman that is attached to the complaint. [42] By signing the complaint, Judge Feldman confirmed that Special Agent Fleitman swore to the truth of the assertions made in the affidavit in Judge Feldman's own presence. [43] Rule 3 does not require more.

[42]    *See* Appellant's App'x 16 (Criminal Complaint).

[43]    *See id.* (stating that the complaint was "[s]worn to before [the magistrate judge] and signed in [his] presence").

Even if we were to assume, for the sake of argument only, that Judge Feldman erred in failing to sign Special Agent Fleitman's affidavit, that error did not render the complaint invalid. To reach this conclusion, we draw guidance from sources in two closely related contexts.

*First*, as revealed in one compendium of practice in the various American jurisdictions, under the law of many states, it is the case that "[g]enerally, the omission of a jurat is not

fatal to the validity of an affidavit so long as it appears either from the instrument itself or from outside evidence that the affidavit was, in fact, duly sworn to before an authorized officer." [44] Moreover, "in the absence of a jurat, the fact may be proved by outside evidence from a source other than the document itself" and "in the face of an incomplete or defective jurat, many states allow extrinsic evidence to prove that the affidavit was properly sworn." [45]

[44]    2A C.J.S. *Affidavits* § 28 (2020) (footnotes omitted and collecting cases).

[45]    *Id.* (footnotes omitted and collecting cases).

**\*10**  *Second*, we also have stated that "minor errors in an affidavit are not cause for invalidating the [document] that it supports." [46] In examining warrant applications and their underlying affidavits, for example, the Supreme Court has admonished "magistrates and courts" to "test[ ] and interpret[ ]" them "in a commonsense and realistic fashion," rather than in "a hypertechnical ... manner." [47]

[46]    *United States v. Waker*, 534 F.3d 168, 171 (2d Cir. 2008).

[47]    *United States v. Ventresca*, 380 U.S. 102, 108–09, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965).

**[17]** These two contexts—namely, the predominant understanding across our country of the validity of affidavits and the Supreme Court's teaching on the interpretation of warrant applications—guide our analysis of the present situation. Just as we uphold warrants "despite 'technical errors,' ... when the possibility of actual error is eliminated by other information," [48] here, any possible error or confusion has been eliminated by Judge Feldman's signature of the complaint and his confirmation that Special Fleitman swore to the truth of the assertions made in the affidavit in Judge Feldman's presence.

[48]    *Velardi v. Walsh*, 40 F.3d 569, 576 (2d Cir. 1994).

In sum, in the circumstances presented here, the District Court did not err in declining to dismiss the criminal complaint against Peeples.

### III. Peeples' Evidentiary Challenges

Peeples argues that his conviction should be vacated because the District Court erred in admitting: (1) identification

testimony at trial in violation of his due process rights; and (2) evidence seized from Room 310 in violation of his Fourth Amendment rights. We disagree.


### A.

Peeples first argues that his in-court identification by Furioso and Bentley, the Chase bank employees who were the victims of Peeples' robbery, was unduly suggestive and should have been excluded. To Peeples, the evidentiary ruling was so manifestly erroneous that a vacatur of his conviction is imperative. The argument lacks merit.

 [18]  Due process requires identification testimony to be excluded if it is so unreliable as to create "a very substantial likelihood or irreparable misidentification." [49]  In the context of in-court identifications, we have admonished district courts to ensure that any in-court identification procedure employed does not amount to a "show-up." [50]

[49]    *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968).

[50]    *United States v. Archibald*, 734 F.2d 938, 941, modified , 756 F.2d 223 (2d Cir. 1984).

Here, the Government and Peeples agree that Peeples' appearance had changed significantly between the time of the robbery and the trial. Concerned with the possibility of undue suggestibility of an in-court identification, Peeples, who was proceeding *pro se*, asked the District Court if he could be seated elsewhere in the courtroom during the testimony of Furioso and Bentley. The request was arguably a reasonable one given the absence of an identification of Peeples prior to trial, the fact that Peeples' appearance had changed, and the fact that a defendant's traditional seating in a courtroom is inherently suggestive. [51]  Nonetheless, the District Court, without explanation, denied the request for this special in-court procedure.

[51]    See  *id.*  (explaining that the traditional seating of a defendant in the courtroom is "obviously suggestive" and that "[a]ny witness, especially one who has watched trials on television, can determine which of the individuals in the courtroom is the defendant, which is the defense lawyer, and which is the prosecutor").

*11    The Government argues that Peeples was required to move for a line-up order prior to trial. A line-up order would have "assure[d] that the identification witness will first view the suspect with others of like description rather than in the courtroom sitting alone at the defense table." [52]  According to the Government, only if that request for a line-up order had been "denied or the decision reserved would special in-court procedures possibly have been warranted." [53]  Because Peeples did not move for such an order, the Government contends, Peeples "should not now be heard to complain about the alleged [suggestibility] of in-court identifications." [54]

[52]    *United States v. Brown*, 699 F.2d 585, 594 (2d Cir. 1983).

[53]    Government's Br. at 26 (citing  *Archibald*, 756 F.2d at 223).

[54]    *Id.*

 [19]  We agree with the Government that there is no evidence in the record "that the in-court identifications were irreparably tainted by [suggestibility]." [55]  Indeed, Furioso and Bentley notably testified that they were confident in their in-court identification of Peeples, [56]  and Furioso even identified Peeples as the robber by his voice. [57]  In any event, we need not decide whether the District Court erred in admitting the identification testimony of Furioso and Bentley after denying Peeples' request for a special in-court identification procedure, as there can be no question that, even if we were to find an error in the District Court's evidentiary ruling, that error would have been harmless beyond any reasonable doubt.

[55]    *Id.*

[56]    *See* Trial Transcript at 143 (testimony by Furioso that she was "100% [sure] they caught the right guy" and that she was "looking right at him"); *id*. at 184–85 (testimony by Bentley that Peeple's "image is drilled into [her] head for the rest of [her] life probably").

[57]    *Id.* at 130–31.

We reach this conclusion in light of, among other things, the strength of the Government's case and the overwhelming evidence against Peeples. [58]  Indeed, the identification by Furioso and Bentley was a minor part of the Government's

case against Peeples, which included an unbroken chain of video surveillance, physical evidence, and other eyewitnesses who also identified Peeples without difficulty. And, finally, there is no evidence of prosecutorial misconduct leading to the admission of the challenged identification testimony.

58       *See ante* at 692 & note 16; *see also United States v. Stewart*, 907 F.3d 677, 689 (2d Cir. 2018) ("We have repeatedly held that the strength of the government's case is the most critical factor in assessing whether error was harmless." (quotation marks omitted)).

## B.

Peeples also argues that the evidence recovered from Room 310 should have been suppressed because allegedly there was a warrantless entry and an exploratory search of the room prior to the execution of the search warrant. This last argument is not supported by the record and warrants little discussion.

On July 12, 2017, the magistrate judge conducted an evidentiary hearing in which the FBI agent who arrested Peeples, Special Agent Bokal, testified. At no point during the evidentiary hearing did Peeples ask Special Agent Bokal whether someone entered Room 310 prior to the execution of the search warrant. After the suppression hearing, the Government submitted a letter that included a crime scene entry log that identified those police officers were posted outside Room 310 between Peeples' arrest and the execution of the search warrant.

Furthermore, at trial, the hotel manager testified that he opened Room 310's door and left because he had no authority to be there. There is no evidence in the record, however, that someone entered and searched the room prior to the execution of the warrant. To the contrary, Special Agent Bokal testified at trial that, shortly after Peeples' arrest, law enforcement agents secured the room from the outside pending the arrival of a search warrant. That testimony was confirmed by other law enforcement officers, who also testified that no one entered the room before the search warrant was executed.

**[20]    *12** Peeples bears the burden of establishing that his rights under the Fourth Amendment were violated and that any unlawfully-obtained evidence should have been excluded from trial.[59] Yet, Peeples, who already had been

taken away and was not present at the time when the hotel manager opened the room, failed to provide any evidence in support of his speculative belief that there was a warrantless entry and search of Room 310. In the absence of supporting evidence or a showing that any factual finding was clearly erroneous, Peeples has failed to support his claim that his Fourth Amendment rights were violated.

59       *Rakas v. Illinois*, 439 U.S. 128, 130 n.1, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978) ("The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure."); *see also Simmons*, 390 U.S. at 389, 88 S.Ct. 967 ("[T]o effectuate the Fourth Amendment's guarantee of freedom from unreasonable searches and seizures, this Court long ago conferred upon defendants in federal prosecutions the right, *upon motion and proof*, to have excluded from trial evidence which had been secured by means of an unlawful search and seizure." (emphasis added)).

We have no trouble concluding that the District Court did not err in denying Peeples' motion to suppress and admitting the physical evidence seized from Room 310.

## CONCLUSION

To summarize, we conclude that:

(1) The appropriate remedy for a violation of Rule 5(c)(2) of the Federal Rules of Criminal Procedure is not dismissal of an indictment, but suppression of any post-arrest evidence illegally obtained as a result of the violation of the rule's requirement.

(2) Peeples failed to show that his transfer to the Western District of New York for an initial appearance

in violation of Rule 5(c)(2) caused him any prejudice.

 

a. With respect to the trial proceedings, because the Government did not rely on Peeples' post-arrest statements in its case before the jury, there was no evidence that could have been excluded and thus the motion to dismiss the criminal charges was correctly denied.

 

b. With respect to the affidavit in support of the application for the search warrant and the affidavit in support of the criminal complaint, Peeples failed to demonstrate that the circumstances presented here warranted the exclusion of the post-arrest statements. And, in any event, even if we were to excise those statements from the affidavits, the District Court correctly denied the motion to dismiss because the search warrant and the criminal complaint remained valid in light of the ample untainted evidence in the affidavits supporting the magistrate judge's probable cause findings.

 

(3) The District Court did not err in denying Peeples' motion to dismiss the criminal complaint because, even though the magistrate judge failed to sign the *jurat* on the last page of the affidavit in support of the criminal complaint, the magistrate judge signed the *jurat*

on the complaint itself, to which the affidavit was attached. The magistrate judge's signature in the complaint attested to the fact that the complainant's assertions were sworn before the magistrate judge and signed in his presence, thereby complying with the requirement of Rule 3 of the Federal Rules of Criminal Procedure.

 

(4) Peeples failed to present evidence showing that the in-court identification by the Chase bank employees was irreparably tainted by suggestibility in violation of his due process rights. We need not conclude that the District Court erred in admitting the identification testimony while denying Peeples' request for a special in-court identification procedure because any such error would have been harmless beyond a reasonable doubt and thus would not warrant a vacatur of Peeples' conviction.

 

**\*13** (5) Peeples failed to support his speculative belief that there was a warrantless entry and exploratory search of Room 310 prior to the execution of the search warrant and thus the District Court did not err in admitting the physical evidence seized from the hotel room pursuant to the search warrant.

 

For the foregoing reasons, the District Court's August 1, 2018 judgment is **AFFIRMED**.

2020 WL 3406445

**All Citations**

--- F.3d ----, 2020 WL 3406445

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 4076007
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Calieb BARNES, Plaintiff,

v.

CITY OF NEW YORK, et al., Defendants.

No. 13−CV−7283 (GBD)(JLC).
|
Signed July 2, 2015.

### REPORT AND RECOMMENDATION

JAMES L. COTT, United States Magistrate Judge.

**\*1  To The Honorable George B. Daniels, United States District Judge:**

*Pro se* plaintiff Calieb Barnes, currently incarcerated at the United States Penitentiary Allenwood in White Deer, Pennsylvania, has brought this action under 42 U.S.C. § 1983 against the City of New York, the New York Police Department ("NYPD") 47 th Precinct, NYPD Detective Clarence Fredericks, and NYPD Detective Nemesio Rodriguez [1] (collectively referred to as "Defendants"), alleging the violation of his rights under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution as well as other related claims arising from the towing and impoundment (the "seizure") and subsequent search of his automobile. Defendants have moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, arguing that Barnes lacks standing to challenge the seizure and subsequent search of the automobile and, in any event, his claims are without merit because: (1) the automobile was lawfully towed; (2) the subsequent search was conducted pursuant to a valid warrant; (3) all claims challenging his criminal conviction are barred; (4) Barnes has failed to state a claim for municipal liability; (5) Detective Fredericks is entitled to qualified immunity; and (6) any state-law tort claims should be dismissed for failure to satisfy conditions precedent and as time-barred. For the reasons set forth below, I recommend that Defendants' motion be granted.

---

[1]  As discussed in section II.B.7 of this Report and Recommendation, Detective Rodriguez is not a party to this action because he was never properly

served under Rule 4(m) of the Federal Rules of Civil Procedure.

### I. *BACKGROUND*

**A. Facts**
The following facts are taken from the Local Rule 56.1 statements, and other documentary evidence submitted by the parties. Unless otherwise noted, these facts are either not in dispute or are construed in the light most favorable to Barnes as the non-moving party.

#### 1. Barnes' Criminal Case
In November 2010, Barnes was the subject of a multi-agency investigation by both federal and local law enforcement for his operation of a criminal enterprise involving narcotics and firearms trafficking dating back to approximately 2000. *See* Defendants' Rule 56.1 Statement dated Sept. 25, 2014 ("Defs. Rule 56.1") ¶¶ 1, 5 (Dkt. No. 32). [2] As a result of this investigation, Barnes was arrested on February 18, 2011, and on March 1, 2011, he was indicted by a federal grand jury on multiple felony counts. Defs. Rule 56.1 ¶¶ 16–17; Pl. Rule 56.1 ¶ 2; Declaration of Special Assistant Corporation Counsel Randolph Hall dated Sept. 25, 2014 ("Hall Decl."), Ex. E (Indictment, *United States v. Barnes,* No. 11−CR−184 (DLC) (S.D.N.Y. March 1, 2011)) (Dkt. No. 31). [3] Following a jury trial before the Honorable Denise L. Cote of this Court, Barnes was convicted of ten substantive and conspiratorial counts, including drug trafficking, firearms trafficking, Hobbs Act robbery, the murder of Raymond McNeil on May 15, 2010, and the use of a firearm in furtherance of certain of the aforementioned crimes. Defs. Rule 56.1 ¶ 18. He was thereafter sentenced to 100 years' imprisonment. *United States v. Barnes,* 560 F. App'x 36, 39 (2d Cir.2014) (summary order). Barnes appealed and the Second Circuit subsequently affirmed his conviction on March 21, 2014. *Id.* at 43.

---

[2]  Barnes does not challenge his involvement in this criminal enterprise but he disputes that it began in 2000, arguing that his incarceration during that year would have made his participation impossible at that time. *See* Plaintiffs Rule 56.1 Statement dated Nov. 20, 2014 ("PI. Rule 56.1") ¶¶ 1, 4 (Dkt. No. 36).

[3]
Following the completion of the briefing on the pending motion, Barnes moved to compel the production of the superseding indictment in his criminal case "for confirmation to [him]self and the Court of all of the charges" in light of the fact that Defendants only submitted the original indictment as an exhibit in their motion papers. (Dkt. No. 48). As this superseding indictment is accessible on the public docket of the criminal case (Dkt. No. 25 in *United States v. Barnes,* 11–CR–184 (DLC)), it is already available to the Court. Moreover, it is not relevant to the decision on the pending motion. Therefore, there is no need for its production at this time. Accordingly, by separate order dated July 2, 2015, the Court will deny this motion.

### 2. The Towing and Impoundment of Barnes' Car on November 15, 2010

**\*2** On November 15, 2010, NYPD Detective Rodriguez observed a black BMW with no license plates parked in front of Barnes' residence in the vicinity of Holland Avenue between 211 th and 212 th streets in the Bronx. Defs. Rule 56.1 ¶ 6; Final Amended Complaint ("FAC") dated March 18, 2014, 5, 7 (Dkt. No. 13). NYPD officers subsequently confirmed that the car was a 1998 black BMW model 528, bearing vehicle identification number WBADD632XWBW43603. Defs. Rule 56.1 ¶ 7; Hall Decl., Ex. I (N.Y.PD Property Clerk's Motor Vehicle Invoice). The car was registered to Chaquera Daly, Barnes' former girlfriend, and was assigned license plate number FBY6254. Defs. Rule 56.1 ¶¶ 8–9; Hall Decl., Ex. D (New York Department of Motor Vehicles ("DMV") Abstract of Registration Record). According to DMV records, Daly resided in the Bronx, but at a different address than Barnes. Hall Decl., Ex. D. Earlier that day, Daly had removed the license plates from the car and voluntarily surrendered them to the DMV because Barnes had incurred several parking tickets. Hall Decl., Ex. D; Pl. Rule 56.1 ¶ 8; FAC ¶¶ 5, 7.

After officers surrounded the vehicle, Barnes emerged from his residence and inquired whether there was something wrong with the car. Defs.' Letter dated Jan. 16, 2015, Ex. 1 (Trial Transcript, *United States v. Barnes,* No. 11–CR–184) ("Tr."), at 473 (Dkt. No. 46). [4] Detective Rodriguez responded that the car could not be parked on a public street without license plates. *Id.* Barnes explained that the car was his, although it was registered to his girlfriend, and that she had removed the license plates. *Id.* Barnes produced his driver's license and a copy of the vehicle's registration. *Id.*

at 473–74. He said that he intended to sell the car. *Id.* at 474. After Rodriguez informed him that police likely would have to tow the car, Barnes offered to arrange for its removal himself. *Id.* Based on determinations made during an earlier conversation with Detective Fredericks, whom Rodriguez called when he first ascertained that the car might be the one Barnes drove, Rodriguez informed Barnes that police would tow the vehicle to the 47 th Precinct in the Bronx, which they did. *Id.* at 472–73, 474–75; *see also* Defs. Rule 56.1 ¶ 11. The car then remained in a secured garage at the 47 th Precinct overnight. Tr. at 476.

[4]
On January 16, 2015, at the Court's request, Defendants supplemented the record with the complete testimony of Detectives Rodriguez and Fredericks from Barnes' criminal trial, in order for the Court to fully consider certain of Barnes' allegations that relied on this testimony. (Dkt. No. 46).

### 3. Issuance of a Warrant and Search of Barnes' Car on November 16, 2010

The next day, on November 16, 2010, Detective Fredericks swore out an application for a search warrant before the Honorable Frank Maas of this Court. Declaration of Plaintiff Calieb Barnes in Opposition to Defendants' Motion for Summary Judgment dated Nov. 20, 2014 ("Barnes Decl."), Ex. B (Detective Clarence Fredericks' Application for a Search Warrant and Supporting Affidavit dated Nov. 16, 2010, No. 10–MAG–2530) ("Search Warrant Aff."); Reply Declaration of Special Assistant Corporation Counsel Randolph Hall dated Dec. 23, 2014 ("Hall Reply Decl."), Ex. J (Complaint Follow–Up Informational filed by Detective Fredericks on Nov. 29, 2010 ("Nov. 29, 2010 Police Report")). Judge Maas subsequently signed the warrant authorizing the search of the seized BMW. Defs. Rule 56.1 ¶¶ 12–13. Thereafter, Fredericks arranged to have the car transported from the 47 th Precinct to a crime scene facility at the 105 th Precinct in Queens, where the car was photographed, dusted for fingerprints, and swabbed for DNA evidence. Hall Reply Decl., Ex. J (Nov. 29, 2010 Police Report); Tr. at 476–77, 742. Later that day at around 10 or 11 o'clock at night, Detective Rodriguez met Detective Fredericks at the 105 th Precinct and they searched the vehicle, recovering several items, including numerous papers bearing Barnes' name, some of which were introduced as exhibits at Barnes' trial. Hall Reply Decl., Ex. J (Nov. 29, 2010 Police Report); Tr. at 477, 742–46. [5]

5    Oddly, Defendants assert that none of the physical items recovered from the search was introduced as evidence at Barnes' criminal trial, though they cite only to a transcript of the initial court conference in this case conducted by telephone on September 9, 2014, during which Barnes stated that "there was no evidence seized from the vehicle linking me to a crime." *See* Defs. Rule 56.1 ¶ 15 (citing Hall Decl., Ex. G (Transcript of Initial Conference recorded on Sept. 9, 2014), at 6:19–21). The trial transcript, however, demonstrates that several of the items recovered from Barnes' car were introduced through Fredericks' testimony. *See, e.g.,* Tr. at 742–46.

**B. Procedural History**

 *3 Barnes, proceeding *pro se,* initiated this action on October 11, 2013 against Detectives Fredericks and Rodriguez and the NYPD 47 th Precinct. (Dkt. No. 2). Barnes was granted leave to proceed *in forma pauperis* on November 15, 2013. (Dkt. No. 5). By order dated December 9, 2013, the Court dismissed the claims against the NYPD 47 th Precinct but permitted Barnes to amend his complaint to name the City of New York as a defendant to the extent Barnes was seeking to impose municipal liability under Section 1983. (Dkt. No. 7). Barnes amended his complaint on February 3, 2014, removing the NYPD 47 th Precinct as a party (Dkt. No. 12), and subsequently filed a final amended complaint dated March 18, 2014, adding the City of New York as a defendant. (Dkt. No. 13). By order dated April 7, 2014, the Court accepted Barnes' final amended complaint for filing (although he had not sought leave to amend a second time) and directed that U.S. Marshals Service 285 forms be sent to Barnes in order to assist him with effecting service on Defendants. (Dkt. No. 14). The Court emphasized that, regardless of what method of service Barnes chose to use, he must effect service within 120 days of the issuance of the summons, and that it was his responsibility to inquire of the Marshals Service as to whether service has been made and, if necessary, to request an extension of time for service. *Id.*

Barnes notified the Court by letter dated April 9, 2014, that, in lieu of using the Marshals Service, he was authorizing another individual to serve Defendants through a process service company. (Dkt. No. 15). On April 25, 2014, Barnes' agent served both Fredericks and Rodriguez at their place of business, and filed affidavits of service with the Court. (Dkt. Nos. 16 & 17). The City of New York was served on June 2, 2014. (Dkt. No. 19). Defendants Fredericks and the City of New York answered Barnes' final amended complaint on July 18, 2014. (Dkt. No. 23). Their answer noted that Rodriguez was never properly served, having retired from the NYPD more than two years prior to Barnes' attempt to serve him at his former place of business, and, accordingly, he was not a party to the lawsuit. *Id.* n. 1. Barnes never reattempted service on Rodriguez.

On September 30, 2014, Fredericks and the City of New York moved for summary judgment. *See* Notice of Motion for Summary Judgment (Dkt. No. 29); Memorandum of Law in Support of Defendants' Motion for Summary Judgment ("Defs.Mem.") (Dkt. No. 30); Hall Decl. (Dkt. No. 31); Defs. Rule 56.1 (Dkt. No. 32). Barnes submitted opposition papers dated November 20, 2014, which included Plaintiffs Rule 56.1 Statement, Barnes' Declaration, and a Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Pl.Mem."). (Dkt. No. 36). [6] Defendants replied on December 24, 2014. *See* Reply Memorandum of Law in Support of Defendants' Motion for Summary Judgment ("Defs.Reply") (Dkt. No. 41); Defendants' Counter Rule 56.1 Statement dated Dec. 23, 2014 ("Defs. Counter Rule 56.1") (Dkt. No. 42); Hall Reply Decl. (Dkt. No. 43).

6    Barnes styled his papers as a cross-motion "for a report and recommendation denying summary judgment to Defendants" (*see* Dkt. No. 36 at 1), which the Court construes as his opposition to Defendants' motion.

**II. *DISCUSSION***

**A. Standard of Review**

 *4 Summary judgment is appropriate where the moving party "shows that there is no genuine dispute as to any material fact" and that he "is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see also Gonzalez v. City of Sc hen ectady,* 728 F.3d 149, 154 (2d Cir.2013). A fact is material if it "might affect the outcome of the suit under the governing law" of the claims involved. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine dispute as to a material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Ramos v. Baldor Specialty Foods, Inc.,* 687 F.3d 554, 558 (2d Cir.2012) (citation omitted). A party cannot rely on "conclusory allegations or unsubstantiated speculation" at the summary judgment stage of the case. *Jeffreys v. City of New York,* 426 F.3d

549, 554 (2d Cir.2005) (citation omitted). Rather, parties must cite to "particular parts of materials in the record," including depositions, documents, affidavits, declarations, and admissions in support of its assertions, or show that the adverse party "cannot produce admissible evidence" to support its own asserted facts. Fed.R.Civ.P. 56(c)(1)(B).

The moving party bears the initial burden of establishing that there are no genuine disputes as to any material facts. Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Generally, the burden then shifts to the non-moving party to " 'go beyond the pleadings' and 'designate specific facts showing that there is a genuine issue for trial.' " *Holcomb v. Iona Coll.,* 521 F.3d 130, 137 (2d Cir.2008) (quoting *Celotex,* 477 U.S. at 324).

"The function of the district court in considering the motion for summary judgment is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Kaytor v. Electric Boat Corp.,* 609 F.3d 537, 545 (2d Cir.2010) (citation omitted). At this stage, the Court does not engage in trial-like "[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence." *McClellan v. Smith,* 439 F.3d 137, 144 (2d Cir.2006) (citation omitted). Instead, in considering the record, the Court must "resolve all ambiguities and draw all reasonable inferences against the movant." *Beyer v. County of Nassau,* 524 F.3d 160, 163 (2d Cir.2008) (citation omitted). If the court subsequently determines that, even "with all permissible inferences and credibility questions resolved in favor" of the non-moving party, "there can be but one reasonable conclusion as to the verdict"-that is, for the moving party-summary judgment is appropriate. *Kaytor,* 609 F.3d at 546 (quoting *Liberty Lobby,* 477 U.S. at 250). However, "[i]f there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party, summary judgment must be denied." *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH,* 446 F.3d 313, 315 (2d Cir.2006) (internal quotation marks and citation omitted).

**\*5** Finally, the Court is mindful that "the submissions of a *pro se* litigant must be construed liberally and interpreted to raise the strongest arguments that they suggest." *Sykes v. Bank of Am.,* 723 F.3d 399, 403 (2d Cir.2013) (quoting *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 474 (2d Cir.2006)). "Specifically, 'the pro se litigant should be given special latitude in responding to a summary judgment motion.' " *Farzan v. Wells Fargo Bank, N.A.,*

No. 12–CV–1217 (RJS)(JLC), 2013 WL 6231615, at \*12 (S.D.N.Y. Dec. 2, 2013) (quoting *Warren v. Goord,* 579 F.Supp.2d 488, 493 (S.D.N.Y.2008), *aff'd,* 368 F. App'x 161 (2d Cir.2010)). Nevertheless, the *pro se* litigant is not relieved from the usual standards of summary judgment motions, including, for instance, Rule 56's requirement that affidavits and declarations "be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." *Id.* (quoting Fed.R.Civ.P. 56(c)(4)) (additional citations omitted). " '[U]nsupported allegations do not create a material issue of fact' for the benefit of the *pro se* litigant any more than they do for the represented party." *Id.* (quoting *Weinstock v. Columbia Univ.,* 224 F.3d 33, 41 (2d Cir.2000)); *see also* Fed.R.Civ.P. 56(e)(3).

## B. Analysis

### 1. Fredericks Is Entitled to Summary Judgment as to Barnes' Fourth Amendment Seizure Claim Because He Has Qualified Immunity

#### a. Barnes Has Standing to Pursue his Fourth Amendment Claims

As a threshold matter, the Court must determine whether Barnes has standing to raise a Fourth Amendment challenge to either the seizure or subsequent search of the automobile. Defendants argue that Barnes lacks standing because he did not legally own the vehicle, as its title and registration was held by Daly, Barnes' former girlfriend. *See* Defs. Mem. at 10–12; Defs. Reply at 8–9. For the reasons that follow, the Court disagrees.

In general, a party may establish that he had a right protected by the Fourth Amendment by showing: "(a) that he had an expectation of privacy that society is prepared to recognize as reasonable, and (b) that he had conducted himself and dealt with the property in a way that indicated a subjective expectation of privacy." *United States v. Perea,* 986 F.2d 633, 639 (2d Cir.1993) (citations omitted). "One need not be the owner of the property for his privacy interest to be one that the Fourth Amendment protects, so long as he has the right to exclude others from dealing with the property." *Id.* at 639–40; *see Rakas v. Illinois,* 439 U.S. 128, 143, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978) ("[The] capacity to claim the protection *of* the Fourth Amendment depends not upon a property right in the invaded place but upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place.") (citations omitted).

**\*6** Fourth Amendment protection extends to persons who have permission from the owner of a vehicle to use it and the right to exclude others from its use. *See, e.g., United States v. Ochs,* 595 F.2d 1247, 1253 (2d Cir.1979) (defendant who had permission from owner to use car, possessed key to car, and had complete dominion and control over car had standing to challenge vehicle search); *United States v. Papraniku,* No. 11–CR–345 (SLT), 2013 WL 1335804, at \*3 (E.D.N.Y. Mar.29, 2013) (defendant who had permission to use car owned by sister and authority to exclude others from it had reasonable expectation of privacy in luggage stored in trunk); *United States v. Little,* 945 F.Supp. 79, 83 (S.D.N.Y.1996) (defendant who had permission of lessee to use rental car had standing to challenge its search) *aff'd,* 133 F.3d 908 (2d Cir.1998); *United States v. Rubio–Rivera,* 917 F.2d 1271, 1275 (10th Cir.1990) ("Where the defendant offers sufficient evidence indicating that he has permission of the owner to use the vehicle, the defendant plainly has a reasonable expectation of privacy in the vehicle and standing to challenge the search of the vehicle.") (collecting cases).

Here, Defendants concede that Barnes had access to and use of the vehicle. Defs. Mem. at 11. On more than one occasion, NYPD officers saw Barnes driving the car or observed it parked in front of his residence on Holland Avenue between 211 th and 212 th Street, as it was on November 15, 2010 when the officers seized it. *See* Tr. at 472–73, 739–40. Barnes alleges that the owner of the car, his then-girlfriend, removed the license plates that day because he had accrued parking tickets, suggesting his frequent use of the car. FAC ¶¶ 5, 7. [7] A search of the car uncovered a number of Barnes' personal papers and effects, including a customer receipt for an interim driver's license issued to Barnes and an envelope bearing his name and address, which is also consistent with frequent access to the vehicle and implied permission from the owner to store his personal belongings in it. *See* Tr. at 744–45.

[7]     Defendants argue that even if Barnes had Daly's permission to use the vehicle, she effectively withdrew her consent to Barnes' use when she surrendered the license plates to the DMV, Defs. Mem. at 11–12, an inferential conclusion that Barnes disputes. *See* Pl. Mem. at 7–8.

In addition, on November 15, 2010, Barnes represented to Detective Rodriguez that it was his car although it was registered in his girlfriend's name, and that he intended to sell it. Tr. at 473–74. In fact, the legal title to the car was

found in Barnes' home during a subsequent search. Tr. at 781. Before police towed the car, Barnes offered to arrange for its removal himself, which they declined. Tr. at 474–75. These facts strongly suggest that Barnes "not only had permission to use" the car but, "[e]xcept with respect to the owner," Barnes "had complete dominion and control" over the car "and could exclude others from it," sufficient to establish a possessory interest in the car protected by the Fourth Amendment. *Ochs,* 595 F.2d at 1253 (internal quotation marks omitted). Accordingly, the Court will reach the merits of Barnes' Fourth Amendment claims.

**b. Material Disputes of Fact Preclude the Court from Finding that the Warrantless Seizure of the Car Was Reasonable as a Matter of Law**

**\*7** The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "The touchstone of the Fourth Amendment is reasonableness, and the reasonableness of a search [or seizure] is determined 'by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.' " *United States v. Knights,* 534 U.S. 112, 118–19, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001) (quoting *Wyoming v. Houghton,* 526 U.S. 295, 300, 119 S.Ct. 1297, 143 L.Ed.2d 408 (1999)).

The impoundment of vehicles "[i]n the interests of public safety and as part of what the [Supreme] Court has called 'community caretaking functions,' " is a recognized exception to the warrant requirement. *South Dakota v. Opperman,* 428 U.S. 364, 368, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976) (quoting *Cady v. Dombrowski,* 413 U.S. 433, 441, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973)). When vehicles impede traffic or threaten public safety, "[t]he authority of police to seize and remove [them] from the streets ... is beyond challenge." *Id.* at 369. Because the decision to impound a car in such circumstances is related to public safety and not to probable cause, police discretion must be "exercised according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity." *United States v. Messina,* No. 08–CR–529 (LMM), 2009 WL 455306, at \*3 (S.D.N.Y. Feb.24, 2009) (quoting *Colorado v. Bertine,* 479 U.S. 367, 375, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987)); *accord Dombrowski,* 413 U.S. at 441 (describing community caretaking functions as "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute").

Case 3:19-cv-00868-TJM-TWD   Document 16   Filed 07/20/20   Page 111 of 130

Statutes or regulations authorizing impoundment under various circumstances may provide standard criteria to guide officers' discretion. *See Bertine,* 479 U.S. at 375–76; *United States v. Best,* 415 F.Supp.2d 50, 56 (D.Conn.2006); *see also People v. Williams,* 145 Cal.App.4th 756, 762, 52 Cal.Rptr.3d 162 (2006) (stating, however, that "statutory authorization does not, in and of itself, determine the constitutional reasonableness of the seizure"). Defendants' argument as to the lawfulness of the seizure rests entirely on the relationship between two provisions of New York municipal traffic laws: New York Vehicle and Traffic Law Sections 402(l) (a) and 1204. *See* Defs. Mem. at 5–8. Defendants contend that because the car was parked on a public road without license plates in violation of Section 402(l)(a),[8] Section 1204 authorizes the police to remove it. Section 1204(a) provides that "[w]henever any police officer ... finds a vehicle standing upon a highway *in violation of any of the foregoing provisions of this article* such officer is hereby authorized to move such vehicle, or require the driver or other person in charge of the vehicle to move the same to a position off the ... highway." N.Y. Veh. & Traf. Law § 1204 (emphasis added). Section 402(l)(a), however, is not contained within the same article as Section 1204, nor even within the same title of the New York Vehicle and Traffic Law.[9] As such, Section 1204 provides no statutory authority for Defendants' actions.

[8]    Section 402(1)(a) provides that "[n]o person shall operate, drive or park a motor vehicle" on a public road without "a distinctive number assigned to it" and "a set of number plates" issued by the State of New York.

[9]    Section 1204 is found within Article 32 titled "Stopping, Standing, and Parking." None of the provisions in Article 32 refers to the requirement of displaying conforming license plates found in Section 402(l)(a), which is in Article 14 (Registration of Motor Vehicles).

**\*8**  Although Defendants did not make this argument, the Court notes that Section 1224 of the New York Vehicle and Traffic Law, regarding abandoned vehicles, vests the police with authority to remove a vehicle without license plates, if the vehicle otherwise meets the definition of abandonment in Section 1224. Indeed, one of Barnes' principal allegations is that the officers impermissibly relied on the fact that his vehicle was abandoned when they removed it from the street, and he disputes the fact that it was abandoned. FAC ¶¶ 5, 7,

12; Pl. Rule 56.1 ¶ 8; Pl. Mem. at 8–9, 11–12. Therefore, the Court will consider whether the towing and impoundment of the vehicle was authorized under Section 1224.

Under Section 1224(1), "[a] motor vehicle shall be deemed to be ... abandoned ... if left unattended: (a) with no number plates affixed thereto, for more than six hours on any highway or other public place." N.Y. Veh. & Traf. Law § 1224. On the present record, the Court cannot determine whether the car was without license plates for longer than six hours. Daly surrendered the license plates to the Department of Motor Vehicles on the very same day, November 15, 2010, that officers towed the car to the 47 th Precinct, and none of the documentary evidence submitted by the parties establishes the period of time between these two events. Accordingly, the Court cannot conclude that the car was abandoned at the time it was towed. *See, e.g., Brownstein v. Walsh,* No. 08–CV–4878 (SJF)(ARL), 2010 WL 1930232, at \*5 (E.D.N.Y. May 5, 2010) (denying judgment on the pleadings as to Fourth Amendment seizure claim where record unclear as to whether vehicle was parked on street for requisite amount of time to be deemed abandoned); *Alloul v. City of New York,* No. 09–CV–7726 (JSR)(FM), 2010 WL 5297215, at \*6 (S.D.N.Y. Dec. 21, 2010) (plaintiff retained property interest in car for purposes of 14 th Amendment due process claim where record was unclear as to whether car had been abandoned as defined by Section 1224).

Although a police officer is not required to adopt the least intrusive course of action in deciding whether to impound a car, the action taken must nonetheless be reasonable in light of the justification for the impoundment exception to the warrant requirement. *See Bertine,* 479 U.S. at 374; *Williams,* 145 Cal.App.4th at 761–62, 52 Cal.Rptr.3d 162. Courts have found warrantless impoundment of vehicles to be reasonable, for example, when the driver has been arrested and no one else is able to take control of the vehicle. *See, e.g., Messina,* 2009 WL 455306, at \*3 (finding officers' decision to impound parked car of arrestee reasonable in order to safeguard his property from harm); *United States v. Mundy,* 806 F.Supp. 373, 376 (E.D.N.Y.1992) (same, stating that "police are ... authorized to seize an automobile not in control of its driver as part of a 'community caretaking function' ") (citation omitted). *But see People v. Francis,* 12 Misc.3d 781, 785, 819 N.Y.S.2d 393 (Sup.Ct.2006) (no valid reason for impoundment under community-caretaking doctrine where passenger of car could have removed it from street after driver arrested); *People v. Miles,* 3 Misc.3d 566, 570, 774 N.Y.S.2d 647 (City Ct.2003) (same).

**\*9** There is evidence that Barnes was available and willing to arrange for the removal of the car before officers towed it to the 47th Precinct. *See* Tr. at 473–74. Defendants do not assert, nor is there any indication in the record, that the car was parked in a spot where it was not legally permitted to be, that it was impeding traffic, or that it was threatening public safety in any way. In the alternative, Defendants argue that impoundment was reasonable because, "by his own admission, [Barnes] knew that the vehicle was suspected in the commission of the murder of Raymond McNeil." Defs. Mem. at 7–8. But this argument is unavailing in the communitycaretaking context where impoundment must be justified "on the basis of something other than suspicion of evidence of criminal activity." *Bertine,* 479 U.S. at 375.

Thus, material disputes of fact preclude the Court from concluding at this stage of the proceedings that the warrantless seizure was reasonable as a matter of law. Nonetheless, as discussed below, the Court finds that Detective Fredericks is entitled to qualified immunity regarding the seizure of Barnes' car.

### c. Detective Fredericks Is Entitled to Qualified Immunity as to the Seizure of Barnes' Car

"Qualified immunity protects public officials from liability for civil damages when one of two conditions is satisfied: (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Garcia v. Does,* 779 F.3d 84, 92 (2d Cir.2015) (quoting *Russo v. City of Bridgeport,* 479 F.3d 196, 211 (2d Cir.2007)) (internal quotation marks omitted). Law is "clearly established" if "[t]he contours of [a] right [are] sufficiently clear" that every "reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd,* ––– U.S. ––––, ––––, 131 S.Ct. 2074, 2083, 179 L.Ed.2d 1149 (2011) (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). In determining whether the right allegedly violated was clearly established, the court must first define the right "at the appropriate level of specificity." *Saucier v. Katz,* 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (citation omitted). Then, courts in this Circuit "generally look to Supreme Court and Second Circuit precedent existing at the time of the alleged violation." *Garcia,* 779 F.3d at 92 (internal quotation marks and citation omitted); *see Zalaski v. City of Hartford,* 723 F.3d 382, 389 (2d Cir.2013) ("[T]he inquiry is not how courts or lawyers might have understood the state of the law" but

rather "whether it would be clear to a *reasonable officer* that his conduct was unlawful in the situation he confronted.") (quoting *Saucier,* 533 U.S. at 202) (internal quotation marks omitted).

"[E]ven if a right is clearly established in certain respects, qualified immunity will still shield an officer from liability if 'officers of reasonable competence could disagree' on the legality of the action at issue in its particular factual context." *Zalaski,* 723 F.3d at 389 (quoting *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Messerschmidt v. Millender,* ––– U.S. ––––, ––––, 132 S.Ct. 1235, 1244, 182 L.Ed.2d 47 (2012) (quoting *al-Kidd,* 131 S.Ct. at 2085) (internal quotation marks omitted); *see Pearson v. Callahan,* 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (qualified immunity applies to mistakes of law, fact, or mistakes based on mixed questions of law and fact).

**\*10** The Court therefore must determine first whether the constitutional right at issue was clearly established at the time of the alleged violation. The Court finds that in the circumstances presented here it was not. Neither the Supreme Court nor the Second Circuit has definitively addressed the issue as to whether and under what circumstances vehicle impoundments for traffic infractions violate the Fourth Amendment. "[T]he law of this Court does not clearly establish that vehicle impoundments under the police community caretaking function must be made pursuant to standardized procedures. Indeed, there is a split among the circuits on this question, and this Court has not yet addressed it." *United States v. Barrios,* 374 F. App'x 56, 57 (2d Cir.2010) (summary order) (citing cases in other circuits); *cf. Best,* 415 F.Supp.2d at 57 (noting Second Circuit has not addressed issue as to whether impoundment of arrestee's vehicle violated Fourth Amendment and finding decision to impound reasonable under the circumstances).

It is undisputed that the car, parked on a public street without license plates, was in violation of a traffic ordinance. "Deciding to tow a car for a traffic violation is a discretionary act within a police officer's official capacity." *Calderon v. Burton,* 457 F.Supp.2d 480, 484 (S.D.N.Y.2006) (citation omitted). In addition, while it is disputed, the car may also have been abandoned. The Court finds that it would not be clear to a reasonable officer in Detective Fredericks' position

that the decision to tow the car under the circumstances was unlawful.

Moreover, even if the Court were to find the right to be clearly established, Detective Fredericks would still be entitled to qualified immunity because "officers of reasonable competence could disagree on the legality of the action at issue" in this particular factual context. *Zalaski,* 723 F.3d at 389 (internal quotation marks omitted and citations omitted). If, as Defendants argue, Detective Fredericks believed, albeit erroneously, that Section 1204 of the New York Vehicle and Traffic Law authorized officers to remove a car that was in violation of Section 402(1)(a), this mistake of law falls within the zone of "reasonable but mistaken judgments" entitled to protection. Similarly, if Detective Fredericks assumed that the car was parked without license plates for longer than six hours, which would justify its removal under the abandonment provisions in Section 1224, and it turned out that he was factually mistaken, the Supreme Court has "recognized that searches and seizures based on mistakes of fact can be reasonable." *Helen v. N. Carolina,* ––– U.S. ––––, ––––, 135 S.Ct. 530, 536, 190 L.Ed.2d 475 (2014).

In sum, Detective Fredericks is entitled to qualified immunity as to his decision to impound Barnes' car. Because qualified immunity precludes liability, the Court recommends that Fredericks be granted summary judgment as to Barnes' Fourth Amendment seizure claim.

### 2. Barnes' Fourth Amendment Search Claim Is Without Merit

**\*11** Barnes also raises a Fourth Amendment challenge to the search of the car, arguing that Detective Fredericks' affidavit in support of his warrant application contained false statements and erroneous information. The Fourth Amendment provides that search warrants shall not be issued, except "upon probable cause, supported by oath or affirmation." U.S. Const, amend. IV. "A search warrant affidavit is presumed reliable." *United States v. Klump,* 536 F.3d 113, 119 (2d Cir.2008) (citing *Franks u. Delaware,* 438 U.S. 154, 171, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978)). "In certain circumstances, however, a [plaintiff] may challenge the truthfulness of factual statements made in the affidavit, and thereby undermine the validity of the warrant and the resulting search or seizure." *United States v. Awadallah,* 349 F.3d 42, 64 (2d Cir.2003). [10]

10    Typically, such a challenge is made in the context of a suppression motion before trial and the defendant must make a substantial preliminary showing that he is entitled to a factual hearing, pursuant to *Franks,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667, to examine his allegations challenging the warrant affidavit. *See, e.g., United States v. Mandell,* 710 F.Supp.2d 368, 372–77 (S.D.N.Y.2010). Barnes, however, apparently made no such motion in his criminal case.

"A section 1983 plaintiff challenging a warrant on this basis must make the same showing that is required at a suppression hearing under [*Franks,* 438 U.S. at 155–56]: the plaintiff must show that the affiant knowingly and deliberately, or with a reckless disregard of the truth, made false statements or material omissions in his application for a warrant, and that such statements or omissions were necessary to the finding of probable cause." *Velardi v. Walsh,* 40 F.3d 569, 573 (2d Cir.1994). In the case of both intentional and reckless falsehoods, the plaintiff must show that the officer's subjective intent behind the misstatement was to mislead the judicial officer into approving the requested warrant. *See, e.g., United States v. Rajaratnam,* 719 F.3d 139, 153 (2d Cir.2013); *United States v. Lahey,* 967 F.Supp.2d 698, 709 (S.D.N.Y.2013) (citation omitted). As to the materiality of the alleged misrepresentation or omission, a court "look[s] to the hypothetical contents of a 'corrected' application to determine whether a proper warrant application, based on existing facts known to the applicant, would still have been sufficient to support arguable probable cause" as a matter of law. *McColley v. Cnty. of Rensselaer,* 740 F.3d 817, 823 (2d Cir.2014) (internal quotation marks and citation omitted).

The Supreme Court has emphasized that not every statement in a warrant affidavit has to be true "in the sense that every fact recited ... is necessarily correct, for probable cause may be founded upon hearsay and upon information received from informants, as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily." *Franks,* 438 U.S. at 165. Moreover, "probable cause is a fluid concept-turning on the assessment of probabilities in particular factual contexts," and the task of the issuing magistrate is simply to make a practical, commonsense decision as to whether, given the totality of the circumstances set forth in the affidavit, "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates,* 462 U.S. 213, 232, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *see, e.g., United States v. Falso,* 544 F.3d 110, 117 (2d Cir.2008).

**\*12** Here, Barnes contends that Detective Fredericks' affidavit misrepresented that the car had been abandoned "in connection with a murder investigation" when officers discovered it parked in the vicinity of 211 th Street and Holland Avenue. FAC ¶ 7; *see* Pl. Mem. at 7; Search Warrant Aff. ¶ 7.b. Barnes maintains that the officers' reason for impounding the car, namely that it was abandoned, was pretextual, because their sole purpose for seizing the vehicle was to search for evidence in relation to the Raymond McNeil murder investigation. Pl. Mem. at 8–9. Second, Barnes alleges that the testimony of confidential informants linking Barnes to the McNeil murder, on which the affidavit relied, was "perjured." *Id.* at 7. Finally, Barnes contends that the affidavit omitted the fact that Detectives Fredericks and Rodriguez had already searched the car on November 15, 2010, after it was towed to the 47 th Precinct. *Id.* at 7, 10. Without these material misrepresentations and omissions, Barnes argues, there was insufficient probable cause to search the car. *Id.* at 7–10.

Barnes' allegations fail for lack of any proof that Detective Fredericks intentionally misstated or omitted facts in order to mislead Magistrate Judge Maas into approving the warrant application. Furthermore, even if Barnes could overcome this hurdle, the alleged errors were not material to Judge Maas' probable cause finding.

### a. Fredericks' Statement that the Car Was Abandoned

First, as to Fredericks' statement that the car was abandoned, this statement is in essence a deduction from facts that were truthfully and fully described in the affidavit, namely that the license plates, registration sticker, and inspection sticker had all been removed from the vehicle and that he learned the license plates had been voluntarily surrendered to the DMV on November 15, 2010. *See* Search Warrant Aff. ¶ 7.a. The affidavit further disclosed that Barnes had approached the officers in order to claim the vehicle but the officers instead had the vehicle towed to an NYPD facility in the Bronx. *Id.* ¶ 7.b. As discussed above, abandonment of a vehicle requires that a car remain parked on a public road without license plates for longer than six hours, a fact which is in dispute. N.Y. Veh. & Traf. Law § 1224. Nevertheless, probable cause may be founded upon "information within the affiant's own knowledge that sometimes must be garnered hastily," and not every statement in the affidavit need be technically correct. *Franks,* 438 U.S. at 165. Fredericks truthfully reported that he and Detective Rodriguez perceived the car to be abandoned and he provided the factual basis for his opinion. Even if it proved to be incorrect, it does not follow that it was a false statement made knowingly and intentionally, or with reckless disregard for the truth.

Even assuming for argument's sake that this statement was open to challenge, it was still not dispositive because "the remaining portions of the affidavit would support probable cause to issue the warrant." *Awadallah,* 349 F.3d at 65 (quoting *United States v. Canfield,* 212 F.3d 713, 718 (2d Cir.2000)). Multiple sources of information linked the vehicle to the McNeil murder, including the testimony of three confidential informants, an eyewitness to the murder, and an anonymous tip to a crimestopper hotline that the black BMW allegedly driven by the shooter had the same license plate number (FBY6254) as that belonging to the car that officers seized in front of Barnes' residence (which they were able to confirm through corresponding VIN numbers). Search Warrant Aff. ¶¶ 6.c., 6.d, 6.e, 7.c.

### b. Statements Made by Confidential Informants

**\*13** Second, as to Barnes' allegation that the information provided by the confidential informants was false-for which he offers no proof-there is no evidence that Detective Fredericks relayed these statements in his affidavit knowing them to be false. Fredericks explained the circumstances leading him to credit the informants' "veracity, reliability, and basis of knowledge," *United States v. Gagnon,* 373 F.3d 230, 235 (2d Cir.2004) (quoting *Gates,* 462 U.S. at 230) (internal quotation marks omitted), including the personal relationship between the primary confidential informant, Barnes, and his co-defendant in the criminal trial, Gregory Plaskett, as well as independently corroborated telephone records confirming communication between all three immediately before and after the murder of McNeil. Search Warrant Aff. ¶ 6.e. Considering the totality of the circumstances, there was a sufficient basis for Judge Maas to conclude that there was a fair probability that evidence of the McNeil murder would be found in the car.

### c. Alleged Omission of Facts Concerning Warrantless Search of Car

Finally, Barnes contends that Detective Fredericks left out the fact that he and Detective Rodriguez had already conducted a warrantless search of the vehicle on November 15, 2010. While this is potentially a material omission, it lacks any support in the record. [11] As a preliminary matter, if Barnes raised this allegation for the first time in his opposition papers, as Defendants contend, Defs. Reply at 7–8, it would be procedurally barred because "courts will not consider, on a

motion for summary judgment, allegations that were not pled in the complaint and raised for the first time in opposition to a motion for summary judgment." *Mahmud u. Kaufmann,* 607 F.Supp.2d 541, 555 (S.D.N.Y.2009). However, in construing Barnes' pleadings liberally, the Court presumes that this alleged concealment of facts may be among Fredericks' "other false statements" or omissions to which Barnes' final amended complaint refers. *See* FAC ¶¶ 5, 7; *see also, e.g., Rosado v. Herard,* No. 12–CV–8943 (PGG)(FM), 2014 WL 1303513, at 11 (S.D.N.Y. Mar. 25, 2014).

11    Barnes' allegation of a warrantless search raises an independent constitutional violation, irrespective of the validity of the search warrant, because "[a] warrantless search is '*per se* unreasonable under the Fourth Amendment-subject only to a few specifically established and well-delineated exceptions.' " *Perea,* 986 F.2d at 639 (quoting *Mincey v. Arizona,* 437 U.S. 385, 390, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978)) (additional internal quotation marks omitted). The comprehensive evidentiary search testified to by the Detectives at trial and described in the November 29, 2010 police report, which included the collection of fingerprints and DNA evidence, would not have qualified for the routine inventory search exception to the warrant requirement (contrary to Defendants' assertion in their Reply brief, *see* Defs. Reply at 7–8). *See, e.g., United States v. Mendez,* 315 F.3d 132, 137 (2d Cir.2002) (quoting *Florida v. Wells,* 495 U.S. 1, 4, 110 S.Ct. 1632, 109 L.Ed.2d 1 (1990)) ("[I]nventory searches are [not to be] turned into a purposeful and general means of discovering evidence of crime.") (internal quotation marks and citation omitted). However, given the lack of any evidence in support of this allegation, the Court need not address it further.

As support for his contention that a warrantless search occurred on November 15, 2010, Barnes includes excerpts of the testimony of Detectives Rodriguez and Fredericks at his criminal trial. *See* Barnes Decl., Ex. A. The Court subsequently directed defense counsel to submit the Detectives' complete trial testimony so that it could examine Barnes' allegation on a fuller record. (Dkt. No. 45). Having reviewed this testimony, the Court concludes that it fails to raise a genuine dispute of material fact.

Barnes' theory of a warrantless search rests entirely on one statement by Detective Rodriguez during his direct

examination. For the sake of clarity, the statement, along with the relevant preceding testimony, is provided:

Q: And what did you ultimately do with the car?

A. With the assistance of the 47 Precinct, the car was towed back to the Precinct and placed in their garage.

\* \* \*

**\*14**  Q. Did you later meet up with Detective Fredericks?

A. Yes, I did.

Q. And where did you meet up with Detective Fredericks?

A. I met up with Detective Fredericks at the 47 Precinct.

Q. And what did you do next with the car?

A. Well, that date and time we put up some signs that the vehicle was not to be touched by anyone. Just in case anyone walked by the garage or anything, just keep your hands off the car.

\* \* \*

Q. And so what did you do next?

A. At that time, that day the car stayed at the 47 Precinct with the authority of the 47 commander who knew the car was there. Detective Fredericks and I, he proceeded to-I believe he called the crime scene unit to have the car dusted and printed, and any type of evidentiary nature to be recovered from the vehicle.

Q. Was that process done at the 47 or was the car moved someplace else?

A. No, Detective Fredericks had the department tow the car to the 105 Precinct, which is a facility in the back of the 105 that has a garage where crime scene does all their dusting and removal of any evidentiary nature from the car.

\* \* \*

Q. Were you present in Queens at this facility when the BMW was being analyzed?

A. Yes, I was.

Q. Were you there during the entire analysis or did you leave at some point?

A. No, I left at some point. The process takes about six, seven hours. *We got there maybe 10 or 11 o'clock at night, and by about 1 or 2 o'clock in the morning I left, but Detective Fredericks stayed throughout the process.*

Tr. at 475–77 (emphasis added). According to Barnes, Rodriguez's testimony that he and Fredericks arrived at the crime scene facility at "10 or 11 o'clock at night" implies that the search began on the night of November 15, 2010, the day the car was impounded, and not on the night of November 16, 2010, after the Detectives secured a search warrant. Pl. Mem. at 8. However, when evaluated in context with his preceding testimony and other evidence in the record, it is clear that Rodriguez was referring to the night of November 16, 2010. Rodriguez earlier testified that the car remained at the 47 th Precinct in the Bronx overnight on November 15, 2010 ("that day *[ i.e.* November 15, 2010] the car stayed at the 47 Precinct"). Tr. at 476. Earlier in the trial, Detective Fredericks testified, consistently with Rodriguez, that the car remained at the 47 th Precinct on the night it was seized and "the following day" (*i.e* . November 16, 2010), he made arrangements to tow the car to the 105 th Precinct in Queens, where it was searched. Tr. at 742. Moreover, the November 29, 2010 police report also confirms that the search occurred on November 16, 2010, after Fredericks had obtained the search warrant (and the report is in all other respects consistent with the Detectives' testimony at trial). Hall Reply Decl., Ex. J (Nov. 29, 2010 Police Report). Barnes offers no other evidence in support of his theory that a warrantless search occurred on November 15, 2010.

*15 Accordingly, because no reasonable jury could find that the facts alleged undermine the validity of the warrant signed by Judge Maas and the resulting search of the car, the Court recommends that summary judgment be granted as to Barnes' Fourth Amendment search claim.

### 3. Barnes Does Not Have a Cognizable Due Process Claim under the Fourteenth Amendment as to the Seizure of the Car

Barnes alleges that Defendants demonstrated deliberate indifference in subjecting him to such deprivations as the seizure of his car without his consent or a warrant. FAC 6, 13, 14. Construing his papers liberally, Barnes seems to

be alleging that Defendants deprived him of his property without due process of law in violation of the Fourteenth Amendment. *See Alloul,* 2010 WL 5297215, at *4 (construing Fourteenth Amendment due process claim from allegations that City unlawfully towed, impounded, and destroyed his automobile).

"A claim under Section 1983 for deprivation of procedural due process raises two threshold questions: (1) 'whether the plaintiff possessed a liberty or property interest' and, if so, (2) 'what process was due before the plaintiff could be deprived of that interest.' " *Colson v. New York Police Dep't,* No. 13–CV–5394 (JG)(CLP), 2015 WL 64688, at *9 (E.D.N.Y. Jan. 5, 2015) (quoting *Green v. Bauvi,* 46 F.3d 189, 194 (2d Cir.1995)). However, "[d]eprivation of property by a state actor, whether intentional or negligent, does not give rise to a claim under § 1983 so long as the law of that state provides for an adequate post-deprivation remedy and the deprivation was the result of a 'random and unauthorized' act." *Nogbou v. Mayrose,* No. 07–CV–3763 (RWS), 2009 WL 3334805, at *5 (S.D.N.Y. Oct.15, 2009) (quoting *Dove v. City of N.Y.,* No. 99–CV3020 (DC), 2000 WL 342682, at *2 (S.D.N.Y. Mar.30, 2000)) *aff'd,* 400 F. App'x 617 (2d Cir.2010); *see, e.g., Davis v. New York,* 311 F. App'x 397, 400 (2d Cir.2009) (summary order) (quoting *Hudson v. Palmer,* 468 U.S. 517, 533, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)); *Cameron v. Wise,* No. 09–CV–967 (PKC)(JLC), 2011 WL 1496341, at *6 (S.D.N.Y. Apr. 20, 2011) (noting that Second Circuit distinguishes between deprivations resulting from actions of lower ranking official and actions taken by "a high ranking official having final authority over the decision-making process," which are not random or unauthorized) *adopted,* 2011 WL 3479295 (S.D.N.Y. Aug.4, 2011). In New York, state-law tort causes of action, including claims for negligence, replevin, and conversion, have been found to provide an adequate post-deprivation remedy. *See, e.g., Colson,* 2015 WL 64688, at *9; *Smith v. City of New York,* No. 03–CV–7576 (NRB), 2005 WL 1026551, at *8 (S.D.N.Y. May 3, 2005); *Dove,* 2000 WL 342682, at *3.

Defendants argue that because Barnes did not possess a legal property interest in the car, he can neither claim a due process violation regarding its impoundment nor could he have legally pursued state law post-deprivation remedies. Defs. Mem. at 13. Constitutionally protected property interests "extend well beyond actual ownership of real estate, chattels, or money," and include legitimate claims of entitlement to a benefit provided by law. *Morales v. New York,* 22 F.Supp.3d 256, 277 (S.D.N.Y.2014) (quoting *Board of Regents of State*

*Colleges v. Roth*, 408 U.S. 564, 571–72, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)). The Court has previously concluded that Barnes had a reasonable expectation of privacy in the car that is protected by the Fourth Amendment. The Court assumes, without deciding, that Barnes' non-ownership interest in the car is a cognizable property interest entitled to due process protection. However, Barnes has not alleged that the deprivation of his property was the result of any "established state procedures," as opposed to a "random and unauthorized" act by lower-ranking officials. Further, Barnes has not demonstrated that he availed himself of any of the post-deprivation remedies available under New York law. Accordingly, Barnes cannot establish that he suffered a due process violation cognizable under Section 1983 for the towing and impoundment of the car.

### 4. Barnes' Malicious Prosecution and Fair Trial Claims Are Barred by *Heck v. Humphrey* and Otherwise Lack Merit

#### a. *Heck* Bar

**\*16** Certain of Barnes' factual allegations, liberally construed, raise claims for malicious prosecution and deprivation of the right to a fair trial, pursuant to the Fourth, Fifth, and Fourteenth Amendments; these claims, however, are barred by the rule announced in *Heck v. Humphrey*, 512 U.S. 477, 486–87, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994) and, in any event, lack merit.[12] Barnes alleges that the commencement of proceedings against him was "malicious," and as a result he was "eventually charged, arrested, convicted, subjected to facing the death penalty and sentenced to life imprisonment." FAC ¶ 8; *see id.* ¶ 13 (alleging deprivation of "[f]reedom from malicious prosecution"). Specifically, Barnes contends that Detectives Rodriguez and Fredericks fabricated evidence and made false statements intended to create the belief that Barnes' car appeared abandoned, thus making its seizure legal, first with the purpose of misleading Judge Maas into signing a search warrant, and later, at trial, where they "deliberately and maliciously testified against [Barnes] ... for the purpose of misleading the jury into believing that [his] car was abandoned for allegedly committing murder." FAC ¶¶ 5, 7, 14.

---

[12]    Barnes has subsequently stated at both a court conference and in his opposition papers that he is not challenging his criminal conviction or sentence by asserting, *inter alia,* claims for

malicious prosecution, fabrication of evidence, and deprivation of a fair trial. *See* Hall Decl., Ex. G, at 5:6–14; Pl. Mem. at 12. However, Barnes' opposition papers describe his arrest and conviction for murder as "false," and he maintains that Defendants seized and searched his car "to frame and eventually charge [ ][him] with a murder," Pl. Mem. at 4, 12, such that the Court deems it appropriate to address these claims, rather than consider them to be abandoned.

In their moving papers, Defendants also construe Barnes' final amended complaint to raise an implied conspiracy claim alleging that Daly was conspiring with Detectives Fredericks and Rodriguez when she removed the license plates from the car on November 15, 2010 and surrendered them to the DMV. FAC ¶¶ 5, 7. As with the preceding claims, Barnes has expressly denied making a conspiracy claim. *See* Hall Decl., Ex. H (Barnes Letter dated Aug. 5, 2014), at 2 ("The Final Complaint never states a conspiracy regarding any claim .."); Pl. Mem. at 12–13 ("Defendants' determination to assert a conspiracy claim is irrational as the [final amended complaint] never mentioned a conspiracy."). In contrast to the aforementioned claims, however, the Court does not construe Barnes' pleadings to raise a conspiracy claim, implied or otherwise, where Barnes alleges only that Daly removed the license plates because Barnes owed parking tickets, *see* FAC ¶¶ 5, 7, not that she acted in furtherance of any agreement or plan with Defendants. Even if a conspiracy claim were alleged, it too would be barred by *Heck.*

In *Heck,* the Supreme Court held:

> [I]n order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's

issuance of a writ of habeas corpus, 28 U.S.C. § 2254. A claim for damages bearing that relationship to a conviction or sentence that has *not* been so invalidated is not cognizable under § 1983.

512 U.S. at 486–87. Where the plaintiffs underlying conviction has not been so invalidated, courts routinely dismiss Section 1983 claims for, *inter alia,* malicious prosecution, conspiracy, and deprivation of the right to a fair trial pursuant to *Heck. See, e.g., Poventud v. City of New York,* 750 F.3d 121, 131 (2d Cir.2014) (recognizing Heck's bar to malicious prosecution claims); *Lynch v. Suffolk Cnty. Police Dep't, Inc.,* 348 F. App'x 672, 674 (2d Cir.2009) (summary order) (malicious prosecution); *Amaker v. Weiner,* 179 F.3d 48, 51–52 (2d Cir.1999) (conspiracy); *Cruz v. Reilly,* No. 08–CV–1245 (JFB)(AKT), 2009 WL 2567990, at *3 (E.D.N.Y. Aug. 18, 2009) (malicious prosecution, conspiracy, and fair trial); *Perez v. Cuomo,* No. 09–CV–1109 (SLT), 2009 WL 1046137, at *7 (E.D.N.Y. Apr.17, 2009) (fair trial).

The Second Circuit affirmed Barnes' conviction on March 21, 2014. *Barnes,* 560 F. App'x at 43. There is nothing in the record to establish that Barnes' conviction has been called into question by the issuance of a writ of habeas corpus, expunged by executive order, or otherwise held to be invalid. Thus, these claims should be dismissed under *Heck.* For the sake of completeness, however, and because disposition of claims on *Heck* grounds typically supports only a dismissal without prejudice (because the suit could theoretically be reinstated if the prisoner's conviction is subsequently invalidated), *Amaker,* 179 F.3d at 52, the Court will briefly address the merits of each claim below.

**b. Malicious Prosecution Claim**

**\*17** Malicious prosecution claims brought under Section 1983 are "substantially the same" as claims for malicious prosecution under state law, and therefore courts look to state law for the elements of the claim. *Jocks v. Tavernier,* 316 F.3d 128, 134 (2d Cir.2003) (citations omitted). "A malicious prosecution claim under New York law requires the plaintiff to prove (1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Id.* at 136 (internal quotation marks

omitted and citation omitted); *accord Sforza v. City of New York,* No. 07–CV–6122 (DLC), 2009 WL 857496, at *16 (S.D.N.Y. Mar.31, 2009). Fatal to Barnes' claim is his inability to demonstrate that the prosecution terminated in his favor, as a conviction is considered conclusive evidence of guilt and cannot be construed as a favorable termination. *See, e, g., Johnson v. City of New York,* 551 F. App'x 14, 14–15 (2d Cir.2014); *DiBlasio v. City of New York,* 102 F.3d 654, 657 (2d Cir.1996). Moreover, Barnes offers no support for his conclusory statement that Defendants lacked probable cause to commence criminal proceedings against him, much less that they were motivated by actual malice. Accordingly, Defendants are entitled to summary judgment as to Barnes' malicious prosecution claim.

**c. Fair Trial Claim**

Although district courts in this Circuit have expressed some confusion as to whether the same allegation that police officers fabricated evidence gives rise to independent causes of action for both malicious prosecution and for denial of the right to a fair trial guaranteed by the Fifth and Fourteenth Amendments, there appears to be emerging consensus that plaintiffs may allege both claims. *See, e.g., Perez v. Duran,* 962 F.Supp.2d 533, 543 (S.D.N.Y.2013); *Hoyos v. City of New York,* 999 F.Supp.2d 375, 392 (E.D.N.Y.2013) ("[A] fair trial claim may be brought alongside a malicious prosecution claim, even where both claims are based on the same allegedly false evidence and the same deprivation of liberty."); *Struthers v. City of New York,* No. 12–CV–242 (JG), 2013 WL 2390721, at *12 n. 18 (E.D.N.Y. May 31, 2013); *Morse v. Spitzer,* No. 07–CV–4793 (CBA)(RML), 2012 WL 3202963, at *4 (E.D.N.Y. Aug. 3, 2012) (noting confusion in aftermath of *Ricciuti v. N.Y.C. Transit Auth.,* 124 F.3d 123 (2d Cir.1997) and *Jocks,* 316 F.3d 128); *Nibbs v. City of New York,* 800 F.Supp.2d 574, 576 (S.D.N.Y.2011) (noting confusion but acknowledging most courts allow both claims to proceed).

"A person suffers a constitutional violation if an (1) investigating official (2) fabricates evidence (3) that is likely to influence a jury's decision, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of liberty as a result." *Jovanovic v. City of New York,* 486 F. App'x 149, 152 (2d Cir.2012) (citing *Jocks,* 316 F.3d at 138 and *Ricciuti,* 124 F.3d at 130). The fifth element is a causation requirement such that the plaintiff must show that the alleged fabrication led to a deprivation of liberty. *Id.; accord Zahrey v. Coffey,* 221 F.3d 342, 349 (2d Cir.2000); *Maldonado v. City of New York,* No. 11–CV–3514 (RA), 2014 WL 787814, at *9 (S.D.N.Y. Feb.26, 2014).

Case 3:19-cv-00868-TJM-TWD   Document 16   Filed 07/20/20   Page 119 of 130
Barnes v. City of New York, Not Reported in F.Supp.3d (2015)

2015 WL 4076007

**\*18** Barnes' allegations that Detectives Fredericks and Rodriguez fabricated evidence to "frame and eventually charge[ ][him] with a murder" and that they falsely testified against him at trial are largely conclusory. First, as to Detective Fredericks' statement in his search warrant affidavit that Barnes' car had been abandoned, this statement neither can be characterized as fabricated in the sense that it relied on false or nonexistent facts, nor did it directly result in any deprivation of liberty, having no direct causal relationship to Barnes' subsequent arrest (for which a separate warrant was issued) or prosecution. *See, e.g., Maldonado,* 2014 WL 787814, at \*9 (fifth element of fair trial claim requires but for and proximate causation) (citing *Zahrey,* 221 F.3d at 352 n. 8 and *Higazy v. Templeton,* 505 F.3d 161, 175 (2d Cir.2007)); *Morse,* 2012 WL 3202963, at \*6 ("[T]he majority of § 1983 cases involving evidence fabrication arise from allegations that a police officer fabricated evidence and forwarded it to prosecutors *in order to provide probable cause* for an arrest or prosecution.") (citation omitted).

Second, as to the Detectives' testimony at trial, Barnes argues that they testified against him in order to mislead the jury into believing that "[his] car was abandoned for allegedly committing murder." FAC ¶ 7. However, it is undisputed that the car was parked on a public street without license plates, and that is all to which Detective Rodriguez testified. *See* Tr. at 472–75. Detective Fredericks did not testify about the vehicle's condition at all. Moreover, even if the jury erroneously believed that the car had been abandoned, Barnes has not contended that this factual determination on a collateral issue in any way affected its verdict.

In sum, Barnes' allegations do not survive a motion for summary judgment. *See, e.g., Hewitt v. City of New York,* 544 F. App'x 24, 26 (2d Cir.2013) (affirming dismissal of Section 1983 claims on summary judgment where plaintiff did not point to any evidence in record supporting reasonable inference that undercover officer lied or deliberately omitted material information in police report); *Hoyos,* 999 F.Supp.2d at 393 ("Hoyos cannot show that any of these alleged fabrications was both material (*i.e.,* likely to influence a jury's decision) and the legally cognizable cause of an injury to Hoyos's liberty interest (*i.e.,* that he "suffer[ed] a deprivation of liberty as a result" of the alleged fabrication of evidence).") (citing *Jovanovic,* 486 F. App'x at 152).

**5. Barnes' Claim Against the City of New York Should Be Dismissed**

Barnes makes broad allegations that the City of New York has failed to adequately train its officers in the law of warrantless searches and seizures and has failed to implement a policy of instructing police officers regarding the impropriety of searches and seizures in the absence of consent or a court-authorized warrant based upon probable cause and supported by oath and affirmation of "trustworthy information." FAC ¶¶ 16–18; *see id.* ¶ 18 ("Persons shall be secure in their property without unreasonable government intrusion"). Barnes contends that the City's "acts, omissions and systemic failures" caused the illegal seizure and subsequent search of his car, which resulted in his "being eventually charged, arrested and sentenced to life imprisonment." *Id.* ¶ 19. These failures, according to Barnes, amount to negligence, *id.* ¶¶ 17, 18, and "deliberate indifference to those rights used in the [F]ourth [A]mendment." *Id.* 14. Barnes' inability to establish any causal link between an official policy or custom and his alleged constitutional injury, however, precludes a reasonable fact-finder from imposing liability against the City. *Monell v. Dep't of Soc. Servs. of City of New York,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

**\*19** As a threshold matter, when a plaintiff cannot demonstrate any underlying constitutional violation, the district court need not address the municipality's liability under *Monell. See, e.g., Bolden v. Cnty. of Sullivan,* 523 F. App'x 832, 834 (2d Cir.2013) (citing *Segal v. City of N.Y.,* 459 F.3d 207, 219 (2d Cir.2006)). Even assuming the viability of the underlying constitutional claim, *Monell* nonetheless holds that isolated instances of unconstitutional conduct by its employees cannot give rise to a municipality's vicarious liability. *See City of Oklahoma City v. Tuttle,* 471 U.S. 808, 831, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985); *accord Connick v. Thompson,* ——U.S. ——, ——, 131 S.Ct. 1350, 1359, 179 L.Ed.2d 417 (2011) (citing cases). Rather, a plaintiff must "allege facts demonstrating: (1) the existence of an officiallyadopted 'policy, custom, or practice' and (2) a direct and deliberate causal connection between that 'policy, custom, or practice' and the violation of plaintiffs federallyprotected rights." *Santos v. New York City,* 847 F.Supp.2d 573, 576 (S.D.N.Y.2012) (citing *Board of Cnty. Comm'rs of Bryan Cnty. v. Brown,* 520 U.S. 397, 403–04, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997)). "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick,* 131 S.Ct. at 1359 (citations omitted).

In limited circumstances, a municipality may be liable under Section 1983 if its failure to train its employees in a relevant respect amounts to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." *Id.* (quoting *City of Canton, Ohio v. Harris,* 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)) (internal quotation marks omitted); *see, e.g., Patterson v. Cnty. of Oneida, N.Y.,* 375 F.3d 206, 226 (2d Cir.2004) (citation omitted). However, deliberate indifference is "a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick,* 131 S.Ct. at 1360 (quoting *Bryan Cnty.,* 520 U.S. at 410); *accord Jones v. Town of E. Haven,* 691 F.3d 72, 81 (2d Cir.2012) (deliberate indifference requires showing that official made conscious choice and was not merely negligent). "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick,* 131 S.Ct. at 1360 (quoting *Bryan Cnty.,* 520 U.S. at 409).

As previously discussed, Barnes has failed to demonstrate any constitutional violation as to the search of his car pursuant to a valid warrant based upon probable cause. Thus, the Court need only consider the City's liability as to the officers' seizure of the car. Even assuming for argument's sake that the seizure violated Barnes' Fourth Amendment rights-which the Court cannot conclude at this stage of the proceedingsBarnes has alleged no more than an isolated instance of unconstitutional conduct by municipal employees below the policy-making level, for which the City may not be held liable. He has not presented any evidence from which to infer an unconstitutional policy, custom, or practice, nor any evidence of a "pattern of similar constitutional violations" by untrained employees for purposes of demonstrating a deficiency in police officer training. Barnes' recitation of legal theories regarding the constitutional requirements for search and seizure and the legal standard for inferring a municipal policy or custom do not amount to *facts* necessary to establish liability. For all these reasons, the City is entitled to summary judgment as to Barnes' *Monell* claims. *See, e.g., Cucuta v. New York City,* 25 F.Supp.3d 400, 419–20 (S.D.N.Y.2014) (granting summary judgment where plaintiff offered no evidence of unconstitutional policy, custom, or practice); *Bowen v. Cnty. of Westchester,* 706 F.Supp.2d 475, 488, 492 (S.D.N.Y.2010) (same).

**6. Barnes' State–Law Tort Claim Should Be Dismissed for Failure to Satisfy Conditions Precedent to Suit and as Time–Barred**

*20 Defendants construe a potential state-law tort claim in the final amended complaint's references to the City's negligence in failing to implement a policy of instructing officers' as to proper and improper search and seizure methods. Therefore, the Court will briefly address this claim, which should be dismissed because Barnes failed to satisfy the conditions precedent to suit and because it is otherwise barred by the statute of limitations.

In a federal court, state notice-of-claim statutes apply to state-law claims. *Hardy v. New York City Health & Hosp. Corp.,* 164 F.3d 789, 793 (2d Cir.1999) (citations omitted). In New York, service of a notice of claim within 90 days after the claim arises is a statutory prerequisite to a tort suit against a municipality or any of its officers, agents or employees. N.Y. Gen. Mun. Law §§ 50–e, 50–i (McKinney 2013). "[B]ecause notice of claim requirements are construed strictly, the '[f]ailure to comply with these requirements ordinarily requires a dismissal for failure to state a cause of action.' " *Alloul,* 2010 WL 5297215, at *7 (quoting *Hardy,* 164 F.3d at 794) (dismissing state-law tort claim for failing to comply with notice-of-claim requirements); *see, e.g., George v. New York City Transit Auth.,* No. 13–CV–7986 (DLC), 2014 WL 3388660, at *2 (S.D.N.Y. July 11, 2014) (same); *Hart v. City of New York,* No. 11–CV–4678 (RA), 2013 WL 6139648, at *11 (S.D.N.Y. Nov.18, 2013) (denying plaintiff leave to amend to add state-law negligence claim for failure to plead satisfaction of conditions precedent to suit). Additionally, the statute of limitations applicable to such tort claims requires that the suit be commenced within one year and 90 days "after the happening of the event upon which the claim is based." N.Y. Gen. Mun. Law §§ 50–e, 50–i.

Barnes has not offered any evidence that he filed a notice of claim within 90 days of the seizure and subsequent search of the car on November 15 and November 16, 2010, respectively. Although Section 50–e(5) permits a plaintiff to apply to a *state court* for leave to serve a late notice of claim, this Court lacks jurisdiction to entertain such an application. *See Alloul,* 2010 WL 5297215, at *8 (citing *Brown v. Metropolitan Transp. Auth.,* 717 F.Supp. 257, 259– 61 (S.D.N.Y.1989)). Moreover, Barnes' potential state-law tort claims are now time-barred. Accordingly, any state-law tort claims in Barnes' complaint cannot be sustained.

**7. Barnes' Claims against Defendant Rodriguez Should Be Dismissed**

Although not representing Detective Rodriguez in this action, Corporation Counsel of the City of New York has requested

that the Court *sua sponte* dismiss Barnes' claims against Detective Rodriguez for failure to effect service in accordance with Rules 4(e) and 4(m) of the Federal Rules of Civil Procedure. Because the Court finds that it lacks jurisdiction over Detective Rodriguez as a result of these service defects and because extending the time for service would be futile where Barnes' claims against Rodriguez would now be time-barred and, in any event, without merit and/or barred by the doctrine of qualified immunity, it recommends dismissal of all claims against Detective Rodriguez with prejudice.

*\*21* Rule 4(m)'s 120–day service period commenced on April 15, 2014, when the Court issued an amended summons as to all three Defendants, *see* Order dated April 7, 2014 (Dkt. No. 14), and ended on August 13, 2014. Although he had been granted permission to use the U.S. Marshals Service, *see id.,* Barnes instead chose to authorize a friend to serve Defendants by means of a process service company. (Dkt. No. 15). Barnes' agent served both Detectives Fredericks and Rodriguez at the NYPD Narcotics Division at 1 Police Plaza, New York, New York on April 25, 2014; however, Rodriguez had retired from the NYPD more than two years prior to that date,[13] a fact not acknowledged in the affidavit of service filed by Barnes' agent. (Dkt. No. 17). Nevertheless, Defendants' July 18, 2014 answer stated that Rodriguez had not been properly served and therefore was not a party to the lawsuit. Answer at 1 n. 1 (Dkt. No. 23). Although on notice of this deficiency in service, Barnes neither reattempted to serve Rodriguez nor did he seek an extension of time to do so, as provided for in the Court's April 7, 2014 order. Nothing in the record indicates that Rodriguez has had actual notice of the lawsuit.

[13]     *See* Defs. Counter Rule 56.1 ¶ 5; Defs. Mem. at 2 n. 1; Defs. Reply at 11.

Rule 4(e)(1) provides that an individual may be served, *inter alia,* by following state law for serving a summons. Under New York law, personal service on an individual may be accomplished by "delivering the summons within the state to the person to be served," or "by delivering the summons within the state to a person of suitable age and discretion at the actual place of business, dwelling place or usual place of abode ..." N.Y. C.P.L.R. § 308(1)-(2). The "actual place of business" is "defendant's business address at the time of service, and not when the cause of action arose." *Jackson v. Cnty. of Nassau,* 339 F.Supp.2d 473, 478 (E.D.N.Y.2004) (citing cases). Therefore service on Rodriguez at 1 Police Plaza, his former place of business, does not satisfy the statutory requirements of C.P.L.R. § 308. *See, e.g., id.* at

479 (granting motion to dismiss claims against defendant improperly served at former place of business); *Baity v. Kralik,* 51 F.Supp.3d 414, 430–32 (S.D.N.Y.2014) (same).

When a defendant challenges the sufficiency of service, the plaintiff bears the burden of proving its adequacy. *See, e.g., Lederman v. Benepe,* No. 12–CV–6028 (PGG), 2014 WL 1318356, at *3 (S.D.N.Y. Mar.28, 2014). In attempted rebuttal, Barnes argues that the affidavit of service indicates that an employee of the NYPD Narcotics Division accepted service on Rodriguez's behalf, contradicting Defendants' position that service was improper. Pl. Mem. at 6. Barnes has provided no evidence, however, that Rodriguez designated this person to receive service of process on his behalf pursuant to N.Y. C.P.L.R. § 318 (providing for the designation of a service agent). Consequently, the affidavit cannot cure the defect in service where no authority existed to accept service for Rodriguez at his former place of business. *See, e.g., Baity,* 51 F.Supp.3d at 430; *Jackson,* 339 F.Supp.2d at 479.

*\*22* In the alternative, Barnes contends that Defendants have waived Rodriguez's defense of insufficient service of process by failing to raise the defense in "a motion filed under the circumstances described in Fed.R.Civ.P. 12(g) (2)." Pl. Mem. at 5. However, Rule 12(g)(2) applies only to circumstances when a party seeks to raise a defense in a subsequent motion that was omitted from a previous one. Here, Defendants' first responsive pleading was their answer, which made clear that counsel was not appearing on Rodriguez's behalf because the Court lacked jurisdiction over him—sufficiently preserving the defense for adjudication on this motion. *Jackson,* 339 F.Supp.2d at 479 (County preserved defendant's jurisdictional defense when "answer ma[de] clear that counsel was not appearing on behalf of this [d]efendant, [and] stated clearly that [defendant] was not properly served"); *Point–Dujour v. U.S. Postal Serv.,* No. 02–CV–6840 (JCF), 2003 WL 1745290, at *2 n. 3 (S.D.N.Y. Mar.31, 2003) (defendants who raised defenses of improper service and lack of jurisdiction in answer properly preserved issue for adjudication on subsequent motion). Barnes attempts to bolster his waiver argument by pointing to a May 19, 2014 letter from Corporation Counsel requesting an extension of time for Rodriguez and Fredericks to respond to the final amended complaint, when that office had not yet undertaken their representation. Pl. Mem. at 6. However, this extension request cannot be considered sufficiently significant participation in the litigation to constitute a waiver of Rodriguez's jurisdictional defense, particularly where Corporation Counsel clearly specified that it was not

representing Rodriguez. *See, e.g., Howard v. Klynveld Peat Marwick Goerdeler,* 977 F.Supp. 654, 658 (S.D.N.Y.1997) *aff'd,* 173 F.3d 844 (2d Cir.1999); *see also* Defs. Reply at 10–11.

[Rule 4(m)](#) requires the Court to dismiss the action without prejudice as to Rodriguez unless Barnes can show good cause for the failure or the Court finds a discretionary extension of time to effect service to be otherwise appropriate. *See* Fed.R.Civ.P. 4(m); *see also, e.g., Zapata v. City of New York,* 502 F.3d 192, 196 (2d Cir.2007). Good cause typically exists only where the failure to timely serve results from circumstances beyond the plaintiff's control. *See, e.g., Abdul–Hakim Bey v. Hylton,* No. 12–CV–5875 (PAE), 2013 WL 6642034, at *7 (S.D.N.Y. Dec.16, 2013). Neglect, inadvertence, or mistaken belief that service was proper are generally not sufficient to demonstrate good cause, *see, e.g., Lederman,* 2014 WL 1318356, at *3, and a "plaintiffs *pro se* status alone does not justify an additional extension." *Toliver v. N.Y.C. Dep't of Corr.,* No. 10–CV–5804 (AKH) (JCF), 2012 WL 5426658, at *6 (S.D.N.Y. Oct. 10, 2012) (internal quotation marks and citation omitted) *adopted, sub nom. Toliver v. N.Y.C. Dep't of Correction,* 2012 WL 5429659 (S.D.N.Y. Nov.7, 2012).

**\*23** Here, Barnes has not demonstrated good cause for his failure to timely serve Rodriguez. Even if he initially believed, erroneously, that service was successful, Defendant's answer put him on notice of the defect in service. At that time, Barnes could have attempted to serve Rodriguez again or sought an extension of time from the Court to do so. "When a *pro se* plaintiff is on notice that the failure to effectuate service would result in a dismissal and is given time to effect service but fails to do so, dismissal of the complaint is appropriate." *Id.* (citing *McDay v. Travis,* No. 05–4269, 2007 WL 4102718, at *2 (2d Cir.2007)).

Even absent good cause, courts have discretion to grant an extension of time, and the Second Circuit has held that it "will not find an abuse of discretion in the procedure used by the district court, so long as there are sufficient indications on the record that the district court weighed the impact that a dismissal or extension would have on the parties." *Zapata,* 502 F.3d at 197 (affirming denial of extension where statute of limitations rendered dismissal effectively with prejudice). Courts typically consider four factors: "(1) whether the applicable statute of limitations would bar [a] refiled action; (2) whether the defendant had actual notice of the claims asserted in the complaint; (3) whether the defendant had

attempted to conceal the defect in service; and (4) whether the defendant would be prejudiced by the granting of plaintiff's request for relief from the provision." *Songhorian v. Lee,* No. 11–CV–36 (CM), 2012 WL 6043283, at *4 (S.D.N.Y. Dec.3, 2012) (internal quotation marks and citation omitted).

The Court should decline to exercise its discretion to grant Barnes an extension. Although Barnes' claims against Rodriguez would now be time-barred, effectively rendering the [Rule 4(m)](#) dismissal with prejudice, [14] nothing in the record indicates that Rodriguez had actual notice of the suit, nor has he appeared or participated in the litigation in any way, such that he would certainly be prejudiced if the Court *sua sponte* granted Barnes a service extension at this late stage in the proceedings. *See Zapata,* 502 F.3d at 198 ("It is obvious, that any defendant would be harmed by a generous extension of the service period beyond the limitations period for the action, especially if the defendant had no actual notice of the existence of the complaint until the service period had expired ..."); *see also, e.g., Torres v. Carry,* 800 F.Supp.2d 577, 585 (S.D.N.Y.2011) (denying *pro se* plaintiff extension of time to serve individual defendants where plaintiff did not demonstrate good cause for his failure to serve and more than five years had passed since date of incident).

14    In New York, the applicable limitations period for Section 1983 actions is three years. *Zapata,* 502 F.3d at 194 n. 3. Therefore, Barnes' Fourth Amendment search and seizure claims against Rodriguez expired in November 2013.

Finally and perhaps most significantly, an extension of time to effect service would be futile where all of Barnes' claims against Rodriguez are either without merit or barred by the doctrine of qualified immunity for the same reasons as those against Fredericks. Just as discretionary leave to amend a complaint should be denied if futile, so too with an extension of time to effectuate service. *See, e.g., Baity,* 51 F.Supp.3d at 432–33 (dismissing claims against improperly served defendant because even if service had been proper, "the record [was] not sufficient to support Plaintiffs § 1983 claim against him").

**\*24** Accordingly, the Court recommends that Barnes' claims against Rodriguez be dismissed with prejudice.

### III. *CONCLUSION*

For the reasons stated herein, I recommend that Defendants' motion for summary judgment be granted in its entirety.


### PROCEDURE FOR FILING OBJECTIONS

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. *See also* Fed.R.Civ.P. 6. Such objections, and any responses to such objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable George B. Daniels and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street, New York, New York, 10007. Any requests for an extension of time for filing objections must be directed to Judge Daniels.

**FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.** *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.,* 596 F.3d 84, 92 (2d Cir.2010); 28 U.S.C. § 636(b) (1); Fed.R.Civ.P. 72. If Barnes does not have access to the cases cited herein that are reported on Westlaw or Lexis, he should request copies from Defendants. *See Lebron v. Sanders,* 557 F.3d 76, 79 (2d Cir.2009).


**All Citations**

Not Reported in F.Supp.3d, 2015 WL 4076007

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:19-cv-00868-TJM-TWD  Document 16  Filed 07/20/20  Page 124 of 130

Micolo v. F.B.I. Special Agents #1-3, Not Reported in Fed. Supp. (2018)

2018 WL 1730351

2018 WL 1730351
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Marcus Anthony MICOLO, Plaintiff,

v.

F.B.I. SPECIAL AGENTS #1-3, and F.B.I.
Senior Supervising Investigator #1, Defendants.

17-CV-5938(JS)(AKT)
|
Signed 04/09/2018

**Attorneys and Law Firms**

For Plaintiff: Marcus Anthony Micolo, pro se, 03-A-3985,
Clinton Correctional Facility, P.O. Box 2001, Dannemora,
NY 12929.

For Defendants: No appearance.

MEMORANDUM & ORDER

Joanna Seybert, U.S.D.J.

**\*1** On October 10, 2017, incarcerated pro se plaintiff Marcus
Anthony Micolo ("Plaintiff") filed a Complaint in this Court
pursuant to Bivens v. Six Unknown Named Agents of Fed.
Bureau of Narcotics, 403 U.S. 388, 91 S. Ct. 1999, 29 L.Ed.
2d 619 (1971), which permits suits against federal employees
for violations of federal constitutional rights. Plaintiff sues
unidentified individuals, all of whom are alleged to be F.B.I.
agents and an FBI investigator (collectively, "Defendants").
Accompanying the Complaint is an application to proceed in
forma pauperis. However, Plaintiff did not file the required
Prisoner Authorization Form ("Form"). Accordingly, by
Notice of Deficiency dated October 17, 2017, Plaintiff was
instructed to complete and return the enclosed Form within
fourteen (14) days in order for his Complaint to proceed. On
October 27, 2017, Plaintiff timely complied with the Notice
of Deficiency and filed the completed Form together with
another application to proceed in forma pauperis. (See Docket
Entries 9-10.)

Upon review of the declarations in support of the applications
to proceed in forma pauperis, the Court finds that Plaintiff is
qualified to commence this action without prepayment of the

filing fee. See 28 U.S.C. § 1915(a)(1). Therefore, Plaintiff's
requests to proceed in forma pauperis are GRANTED.

However, because Plaintiff seeks to challenge his underlying
state court criminal conviction, his claims are barred by Heck
v. Humphrey, 512 U.S. 477, 487, 114 S. Ct. 2364, 2372, 129
L.Ed. 2d 383 (1994). Accordingly, Plaintiff's claims are not
plausible and are thus DISMISSED pursuant to 28 U.S.C. §§
1915(e) (2)(B)(ii), 1915A(b)(1).

BACKGROUND [1]

[1]    All material allegations in the Complaint and
       are presumed to be true for the purpose of this
       Memorandum and Order. Rogers v. City of Troy,
       New York, 148 F.3d 52, 58 (2d Cir. 1998) (in
       reviewing a pro se complaint for sua sponte
       dismissal, a court is required to accept the material
       allegations in the complaint as true).

Plaintiff's Complaint seeks to challenge Plaintiff's 2003 state
court conviction of Robbery in the First Degree and of
Unauthorized Use of a Motor Vehicle in the First Degree.
(Compl. at 1.) Plaintiff alleges that his Complaint is a "Bivens
Action" against the Defendants who are alleged to have
withheld evidence from Plaintiff that Plaintiff claims would
have been favorable to him in the underlying state criminal
case. (Compl. at 1-3.)

According to the Complaint, Plaintiff admits that he "did steal
a car from a shopping center parking lot and subsequently
use[d] the same in the robbery of the Greenpoint Savings
Bank...." (Compl. ¶ 4.) After Plaintiff was indicted, "he
began stating that he did rob the [bank] except that he never
had his hand in his pocket as was claimed by the bank
tellers." (Compl. ¶ 14.) Plaintiff claims that Defendants have
video tape and pictures taken from the video that would prove
his claim that he did not have his hand in his pocket. (Compl.
¶ 17.) Thus, Plaintiff claims that the First Degree Robbery
charge was improperly brought against him and thus, he seeks
to challenge that conviction. Plaintiff also seeks to recover a
damages award in total sum of $10 million to compensate him
for the "[D]efendants actions and/or inactions which resulted
in him being charged, tried, convicted, and sentenced to 25
years for a charge he is not guilty of while [D]efendants knew,
based on the evidence they had, that [P]laintiff was not guilty
of said charge." (Compl. at 4.)

Micolo v. F.B.I. Special Agents #1-3, Not Reported in Fed. Supp. (2018)

2018 WL 1730351

DISCUSSION

I. In Forma Pauperis Applications

**\*2** Upon review of Plaintiff's declaration in support of the applications to proceed in forma pauperis, the Court finds that Plaintiff is qualified to commence this action without prepayment of the filing fees. See 28 U.S.C. § 1915(a)(1). Therefore, Plaintiff's requests to proceed in forma pauperis are GRANTED.

II. Application of 28 U.S.C. § 1915

Section 1915 of Title 28 requires a district court to dismiss an in forma pauperis complaint if the action is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief against a defendant who is immune from such relief. See 28 U.S.C. §§ 1915(e)(2)(B)(i)-(iii), 1915A(b). The Court is required to dismiss the action as soon as it makes such a determination. See id. § 1915A(b).

Courts are obliged to construe the pleadings of a pro se plaintiff liberally. See Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191 (2d Cir. 2008); McEachin v. McGuinnis, 357 F.3d 197, 200 (2d Cir. 2004). However, a complaint must plead sufficient facts to "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974, 167 L.Ed. 2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L.Ed. 2d 868 (2009) (citations omitted). The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully." Id. at 678; accord Wilson v. Merrill Lynch & Co., 671 F.3d 120, 128 (2d Cir. 2011). While " 'detailed factual allegations' " are not required, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' " Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 555).

III. Heck v. Humphrey Bars Plaintiff's Bivens Claims

When a claim for damages calls into question the validity of an underlying conviction, a district court must dismiss the claim, unless the conviction has been invalidated. Heck, 512 U.S. at 487, 114 S. Ct. at 2372. The petitioner in Heck was an inmate with a direct appeal from his conviction pending, who brought a § 1983 action for damages against state officials who, he claimed, acted unconstitutionally in arresting and

prosecuting him. Drawing an analogy to the tort of malicious prosecution, the Supreme Court held that an inmate's § 1983 claim for damages was unavailable because he could not demonstrate that the underlying criminal proceedings had terminated in his favor. Id. at 486-87. The Supreme Court in Heck enumerated four methods of demonstrating that a conviction has been invalidated: (1) the conviction was reversed on a direct appeal; (2) an executive order expunged the conviction; (3) a habeas corpus petition was issued by a federal court; or (4) an authorized state tribunal declared the conviction invalid. Id. at 486-87. Although Heck involved Section 1983 claims, it is well-established that Bivens claims are analogous to Section 1983 claims except that Section 1983 applies to state actors, rather than federal actors. Tavarez v. Reno, 54 F.3d 109, 110 (2d Cir. 1995) ("Because the two actions [Section 1983 and Bivens] share the same 'practicalities of litigation', federal courts have typically incorporated § 1983 law into Bivens actions." (collecting cases) (citation omitted). Further, Heck's bar has long applied to Bivens actions. Tavarez, 54 F.3d at 110 ("Given the similarity between suits under § 1983 and Bivens, we conclude that Heck should apply to Bivens actions as well." (citing Stephenson v. Reno, 28 F.3d 26, 27 (5th Cir. 1994) (per curiam))).

**\*3** Here, as is readily apparent and, affording the pro se Complaint a liberal construction, Plaintiff does not allege that his conviction has been invalidated.[2] Because Plaintiff's success on his Bivens claims in this case would necessarily invalidate the conviction, which is not alleged to have been reversed or vacated, such claims are not cognizable under Heck. Thus, Heck's bar precludes the adjudication of Plaintiff's Bivens claims, and the Complaint is thus DISMISSED pursuant to 28 U.S.C. §§ 1915(e) (2)(B)(ii); 1915A(b)(1). To the extent that Plaintiff is also asserting pendent state law claims for malicious prosecution and/or negligence, the Court declines, in its discretion, to exercise supplemental jurisdiction over those claims given the dismissal of the federal claims. See 28 U.S.C. § 1367(c)(3); United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726, 86 S. Ct. 1130, 1139, 16 L.Ed. 2d 218 (1966); Kolari v. N.Y.-Presbyterian Hosp., 455 F.3d 118, 122 (2d Cir. 2006).

[2]
Indeed, Plaintiff has already filed three unsuccessful petitions for habeas corpus with this Court. See Micolo v. State of N.Y., 07-CV-0449(JS) (denying Section 2254 petition by Memorandum and Order dated August 18, 2010, and denying reconsideration by Order dated

Micolo v. F.B.I. Special Agents #1-3, Not Reported in Fed. Supp. (2018)

Case 3:19-cv-00868-TJM-TWD   Document 16   Filed 07/20/20   Page 126 of 130

2018 WL 1730351

October 8, 2010, appeal to the Second Circuit dismissed by Mandate dated October 17, 2011, and denying motion to vacate the judgment of dismissal by Order dated August 12, 2012); Micolo v. State of N.Y., 12-CV-5509 (JS) (dismissing writ of habeas corpus pursuant to 28 U.S.C. § 2241 by Order dated January 7, 2013, and denying reconsideration by Order dated June 26, 2013); Micolo v. Capra, 12-CV-5795(JS) (transferred to the Second Circuit as a successive 2254 petition by Order dated January 4, 2013 and dismissed by Mandate dated March 26, 2013).

IV. Leave to Amend

Given the Second Circuit's guidance that a pro se complaint should not be dismissed without leave to amend unless amendment would be futile, Cuoco v. Moritsugu, 222 F.3d 99, 112 (2d Cir. 2000), the Court has carefully considered whether leave to amend is warranted here. Because the defects in Plaintiff's claims are substantive and would not be cured if afforded an opportunity to amend, leave to amend the Complaint is DENIED.

CONCLUSION

For the reasons set forth above, Plaintiff's applications to proceed in forma pauperis are GRANTED, however the Complaint is sua sponte DISMISSED for failure to state a claim pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii), 1915A(b)(1).

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Order would not be taken in good faith and therefore in forma pauperis status is DENIED for the purpose of any appeal. See Coppedge v. United States, 369 U.S. 438, 444-45, 82 S. Ct. 917, 8 L.Ed. 2d 21 (1962).

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 1730351

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 5185047
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

David J. CASH, Plaintiff,

v.

BERNSTEIN, MD, Defendant.

No. 09 Civ.1922(BSJ)(HBP).
|
Oct. 26, 2010.

*REPORT AND RECOMMENDATION*[1]

[1]
    At the time the action was originally filed, the Honorable Leonard B. Sand, United States District Judge, granted plaintiff's application for *in forma pauperis* status based on plaintiff's *ex parte* submission (Docket Item 1). Although the present application seeking to revoke plaintiff's *in forma pauperis* status is non-dispositive, I address it by way of a report and recommendation to eliminate any appearance of a conflict between the decision of a district judge and that of a magistrate judge.

PITMAN, United States Magistrate Judge.

**\*1** TO THE HONORABLE BARBARA S. JONES, United States District Judge,

I. *Introduction*

By notice of motion dated March 4, 2010 (Docket Item 11), defendant moves pursuant to 28 U.S.C. § 1915(g) to revoke plaintiff's *in forma pauperis* ("IFP") status on the ground that plaintiff has previously had at least three Section 1983 actions dismissed as frivolous, malicious or failing to state a claim upon which relief could be granted, and has not shown that he is in imminent danger of serious physical injury. Defendant further seeks an order directing that the action be dismissed unless plaintiff pays the full filing fee within thirty (30) days. For the reasons set forth below, I respectfully recommend that defendant's motion be granted.

II. *Facts*

Plaintiff, a sentenced inmate in the custody of the New York State Department of Correctional Services, commenced this action on or about January 12, 2009 by submitting his complaint to the Court's Pro Se office. Plaintiff alleges, in pertinent part, that he has "a non-healing ulcer that is gane green [*sic* ]" and that defendant Bernstein "did not want to treat the ulcer right" (Complaint, dated March 3, 3009 (Docket Item 2) ("Compl."), at 3).

The action was originally commenced against two defendants —Dr. Bernstein and Dr. Finkelstein. The action was dismissed as to Dr. Finkelstein because the complaint contained no allegations whatsoever concerning Dr. Finkelstein (Order dated February 18, 2010 (Docket Item 9)).

On March 4, 2010, the sole remaining defendant—Dr. Bernstein—filed the current motion. Plaintiff failed to submit a response. Accordingly, on August 20, 2010, I issued an Order advising plaintiff that if he wished to oppose the motion, he must submit his opposition by September 15, 2010 and that after that date I would consider the motion fully submitted and ripe for decision (Order dated August 20, 2010 (Docket Item 15)). The only submission plaintiff has made in response to my Order is a multi-part form issued by the New York State Department of Correctional Services entitled "Disbursement or Refund Request."[2] By this form, plaintiff appears to request that the New York State Department of Correctional Services pay the filing fee for this action. The form is marked "Denied."

[2]
    Plaintiff sent this form directly to my chambers, and it has not been docketed by the Clerk of the Court. The form will be docketed at the time this Report and Recommendation is issued.

III. *Analysis*

28 U.S.C. § 1915 permits an indigent litigant to commence an action in a federal court without prepayment of the filing fee that would ordinarily be charged. Although an indigent, incarcerated individual need not prepay the filing fee at the time at the time of filing, he must subsequently pay the fee, to the extent he is able to do so, through periodic withdrawals from his inmate accounts. 28 U.S.C. § 1915(b); *Harris v. City of New York,* 607 F.3d 18, 21 (2d Cir.2010). To prevent abuse of the judicial system by inmates, paragraph (g) of this provision denies incarcerated individuals the right to proceed without prepayment of the filing fee if they have repeatedly filed meritless actions, unless such an individual shows that he or she is in imminent danger of serious

physical injury. *See Ortiz v. McBride,* 380 F.3d 649, 658 (2d Cir.2004) ("[T]he purpose of the PLRA ... was plainly to curtail what Congress perceived to be inmate abuses of the judicial process."); *Nicholas v. Tucker,* 114 F.3d 17, 19 (2d Cir.1997). Specifically, paragraph (g) provides:

> **\*2** In no event shall a prisoner bring a civil action or appeal a judgment in a civil action or proceeding under this section if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury.

28 U.S.C. § 1915(g).

If an inmate plaintiff seeks to avoid prepayment of the filing fee by alleging imminent danger of serious physical injury, there must be a nexus between the serious physical injury asserted and the claims alleged. *Pettus v. Morgenthau,* 554 F.3d 293, 298 (2d Cir.2009).

Section 1915(g) clearly prevents plaintiff from proceeding in this action without prepayment of the filing fee. The memorandum submitted by defendant establishes that plaintiff has had his IFP status revoked on at least four prior occasions as a result of his repeatedly filing meritless actions.

- In 2005, plaintiff commenced an action in the United States District Court for the Northern District of New York seeking to have his infected leg amputated. *Nelson[3] v. Lee,* No. 9:05–CV–1096 (NAM)(DEP), 2007 WL 4333776 (N.D.N.Y. Dec. 5, 2007). In that matter, the Honorable Norman A. Mordue, Chief United States District Judge, accepted and adopted the Report and Recommendation of the Honorable David E. Peebles, United States Magistrate Judge, that plaintiff had brought three or more prior actions that had been dismissed for failure to state a claim and that plaintiff's IFP status should, therefore, be revoked. 2007 WL 4333776 at *1–*2.

3   It appears that plaintiff uses the names David J. Cash and Dennis Nelson interchangeably. In his complaint in this matter, plaintiff states that the Departmental Identification Number, or DIN, assigned to him by the New York State Department of Correctional Services ("DOCS") is 94–B–0694 (Compl. at 7). DOCS inmate account records submitted by plaintiff in connection with his application for IFP status indicate that DIN 94–B–0694 is assigned to Dennis Nelson. In addition, the DOCS form described in footnote two bears the docket number of this action, but is signed in the name of Dennis Nelson and was sent in an envelope identifying the sender as Dennis Nelson. A subsequent action has been filed in this Court in which the plaintiff identifies himself as Dennis Nelson but lists his DIN as 94–B–0694, the same DIN used by plaintiff here. Finally, plaintiff has submitted nothing to controvert the assertion in defendant's papers that David Cash and Dennis Nelson are the same person. In light of all these facts, I conclude that David Cash and Dennis Nelson are both names used by plaintiff.

- In *Nelson v. Nesmith,* No. 9:06–CV–1177 (TJM)(DEP), 2008 WL 3836387 (N.D.N.Y. Aug. 13, 2008), plaintiff again filed an action concerning the medical care he was receiving for his left leg. The Honorable Thomas J. McAvoy, United States District Judge, accepted the Report and Recommendation of Magistrate Judge Peebles, and revoked plaintiff's IFP status and dismissed the action on the ground that plaintiff had previously commenced at least three actions that had been dismissed on the merits. 2008 WL 3836387 at *1, *7.

  - In *Nelson v. Spitzer,* No. 9:07–CV–1241 (TJM) (RFT), 2008 WL 268215 (N.D.N.Y. Jan. 29, 2008), Judge McAvoy again revoked plaintiff's IFP status on the ground that plaintiff had commenced three or more actions that constituted "strikes" under Section 1915(g) and had not shown an imminent threat of serious physical injury. 2008 WL 268215 at *1–*2.

  - Finally, in *Nelson v. Chang,* No. 08–CV–1261 (KAM)(LB), 2009 WL 367576 (E.D.N.Y. Feb. 10, 2009), the Honorable Kiyo A. Matsumoto, United

Case 3:19-cv-00868-TJM-TWD   Document 16   Filed 07/20/20   Page 129 of 130

States District Judge, also found, based on the cases discussed above, that plaintiff had exhausted the three strikes permitted by Section 1915(g) and could not proceed IFP in the absence of a demonstration of an imminent threat of serious physical injury. 2009 WL 367576 at *2–*3.

**\*3** As defendant candidly admits, there is one case in which plaintiff's leg infection was found to support a finding of an imminent threat of serious physical injury sufficient to come within the exception to Section 1915(g). *Nelson v. Scoggy,* No. 9:06–CV–1146 (NAM)(DRH), 2008 WL 4401874 at *2 (N.D.N.Y. Sept. 24, 2008). Nevertheless, summary judgment was subsequently granted for defendants in that case, and the complaint was dismissed. Judge Mordue concluded that there was no genuine issue of fact that plaintiff had received adequate medical care for his leg wound and that the failure of the leg to heal was the result of plaintiff's own acts of self-mutilation and interference with the treatment provided. *Nelson v. Scoggy,* No. 9:06–CV–1146 (NAM)(DRH), 2009 WL 5216955 at *3–*4 (N.D.N.Y. Dec. 30, 2009). [4]

[4]    Although the form complaint utilized by plaintiff expressly asks about prior actions involving the same facts, plaintiff disclosed only the *Scoggy* action and expressly denied the existence of any other actions relating to his imprisonment (Compl. at 6).

In light of the foregoing, there can be no reasonable dispute that plaintiff has exceeded the three "strikes" allowed by Section 1915(g) and that he cannot, therefore, proceed here without prepaying the filing fee unless he demonstrates an imminent threat of serious physical injury. Plaintiff has declined to attempt to make this showing in response to defendant's motion, and the only suggestion in the record of serious physical injury is the bare statement in the complaint that plaintiff "need[s] to go back to a wound speci [a]list before the gane green [*sic* ] kills [him]" (Compl. at 5). "However, unsupported, vague, self-serving, conclusory speculation is not sufficient to show that Plaintiff is, in fact, in imminent danger of serious physical harm." *Merriweather v. Reynolds,* 586 F.Supp.2d 548, 552 (D.S.C.2008), *citing Ciarpaglini v. Saini,* 352 F.3d 328, 330 (7th Cir.2003) *and White v. Colorado,* 157 F.3d 1226, 1231–32 (10th Cir.1998); *see also Martin v. Shelton,* 319 F.3d 1048, 1050 (8th Cir.2003) (imminent danger exception to Section 1915(g) requires "specific fact allegations of ongoing serious physical injury, or of a pattern of misconduct evidencing the likelihood of imminent serious physical injury"). Given the plaintiff's

history, as set forth in the cases described above, I conclude that this vague statement is insufficient to support a finding that plaintiff is in imminent danger of serious physical injury. [5]

[5]    Plaintiff has sent me several letters describing his wound and its symptoms in detail, and I have no doubt that the wound is serious. However, in granting summary judgment dismissing an action last year based on the same allegations, Judge Mordue of the Northern District found that there was no genuine issue of fact that plaintiff's own conduct was responsible for the ineffectiveness of the treatment he was provided:

Furthermore, to the extent that Nelson's medical treatment was delayed, much of the delay was due to his own refusal to cooperate with medical staff and his self-mutilations. Nelson's actions to thwart the medical treatment of his wound cannot be construed as interference or indifference by anyone else.... [T]he medical treatment Nelson received complied with constitutional guarantees as it was appropriate, timely, and delayed only by Nelson's own actions.

*Nelson v. Scoggy, supra,* 2009 WL 5216955 at *4. Given plaintiff's total failure to respond to the pending motion and his failure to even deny that he is actively thwarting treatment of his wound, it would be sheer speculation for me to conclude that he is in imminent danger of a serious injury as a result of defendant's conduct.

## IV. *Conclusion*

Accordingly, for all the foregoing reasons, I find that plaintiff has had three or more prior actions dismissed as being frivolous, malicious or failing to state a claim and that plaintiff's *in forma pauperis* status should, therfore, be revoked. If your Honor accepts this recommendation, I further recommend that the action be dismissed unless plaintiff pays the filing fee in full within thirty (30) days of your Honor's final resolution of this motion.

## V. *OBJECTIONS*

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from receipt of this Report to file written objections. *See also* Fed.R.Civ.P. 6(a). Such objections (and

responses thereto) shall be filed with the Clerk of the Court, with courtesy copies delivered to the Chambers of the Honorable Barbara S. Jones, United States District Judge, 500 Pearl Street, Room 1920, and to the Chambers of the undersigned, 500 Pearl Street, Room 750, New York, New York 10007. Any requests for an extension of time for filing objections must be directed to Judge Jones. FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS **WILL** RESULT IN A WAIVER OF OBJECTIONS AND **WILL** PRECLUDE APPELLATE REVIEW. *Thomas v. Arn,* 474 U.S. 140, 155

(1985); *United States v. Male Juvenile,* 121 F.3d 34, 38 (2d Cir.1997); *IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.1992); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 57–59 (2d Cir.1988); *McCarthy v. Manson,* 714 F.2d 234, 237–38 (2d Cir.1983).

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 5185047

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.